## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OPTIMA STEEL INTERNATIONAL, LLC and TOKYO STEEL MANUFACTURING CO., LTD.  )  )  )  )  Plaintiffs,  )  )  v.  )  )  UNITED STATES  )  )  Defendant.  )  ) | Court No. 21-00327 |

## COMPLAINT

Plaintiffs Optima Steel International, LLC ("Optima") and Tokyo Steel Manufacturing Co., Ltd. ("Tokyo Steel"), by and through its counsel states the following claims against Defendant United States:

## INTRODUCTION

1.   This court appeal challenges the Commerce Department's ("Commerce") antidumping ("AD") assessment instructions (referred to as "liquidation instructions") issued for hot-rolled steel merchandise produced and exported by Plaintiff Tokyo Steel and imported by Plaintiff Optima that was subject to Commerce's AD review for the March 2016 – September 2017 time period.   This court appeal is being initiated as an alternative approach to the existing court appeal challenging United States Customs and Border Protection's ("CBP") denial of Plaintiffs' protest addressing the very same AD liquidation instructions.   *See* Court No. 21-00062

2.   Plaintiffs are adopting this alternative approach because it appears that the United States Government is refusing to acknowledge that CBP's decision to liquidate Plaintiff's import entries at an AD assessment rate that is different from the specific single AD assessment rate

calculated by Commerce for Tokyo Steel's hot-rolled merchandise imported during the review period was unlawful.  It appears that United States Government intends to argue that CBP was entitled to apply the AD assessment rate that it did, given the content and nature of the Commerce's liquidation instructions.  Or stated differently, it appears that CBP intends to argue that CBP did nothing wrong, as it was simply following Commerce's liquidation instructions

3.   Plaintiffs' position is clear.  There is only one lawful AD assessment rate for Plaintiff Optima's import entries of Plaintiff Tokyo Steel hot-rolled steel merchandise made during the March 2016 – September 2017 time period; namely, the single AD assessment rate of 2.06% that Commerce calculated for Tokyo Steel.  As a matter of law, applying any other AD assessment rate to these import entries is wrong.

4.   And so, if CBP is able to argue that it properly followed Commerce's liquidation instructions in applying a different AD assessment rate, then the only permissible conclusion is that nature and content of Commerce's liquidation instructions were wrong and unlawful because they did not properly instruct CBP to apply the correct AD assessment rate.

5.   Or stated differently, under the law, there are only two possible outcomes.  Either Commerce's liquidation instructions correctly stated the AD assessment rate for imports of Tokyo Steel produced hot-rolled steel, but CBP did not properly apply the correct AD assessment rate. Or Commerce's liquidation instructions were wrong in that they failed to convey to CBP the correct AD assessment rate for Plaintiffs' import entries of Tokyo Steel's them.  This court appeal addresses the second scenario in order to ensure that the correct AD assessment occurs for Plaintiff Optima's import entries of hot-rolled steel produced by Tokyo Steel.

## PARTIES TO THE ACTION

6.   Plaintiff Optima is a U.S. Company, headquartered in the Commonwealth of California which imported merchandise produced by Tokyo Steel and subject to the March 2016 – September 2017 administrative review of the AD duty order on certain hot-rolled flat steel products from Japan.

7.   Plaintiff Tokyo Steel is a Japanese steel producer that produced subject merchandise and was selected as a mandatory respondent during the March 2016 – September 2017 administrative review of the AD duty order on certain hot-rolled flat steel products from Japan.

8.   Defendant United States, through the Commerce administers the U.S. AD duty law, including the conduct of annual administrative reviews. CBP, an agency of the United States Department of Homeland Security, is responsible for collecting AD duties calculated by Commerce in the course of Commerce's administrative proceedings. CBP performs ministerial functions only pursuant to instructions issued by Commerce memorializing the outcome of its AD proceedings.

## JURISDICTION

9.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1581(i), which expresses this Court's residual jurisdiction and provides that, where a matter is not covered by 28 U.S.C. §1581(a)-(h), "the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for— . . . (B) tariffs, duties, fees, or other taxes on the importation of merchandise for reasons other than the raising of revenue; . . . (D) administration

and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)–(h) of this section." 28 U.S.C. §1581(i)(1)(B), (D).

10.   Plaintiffs do not challenge the conduct, substance, or result of Commerce's AD review determination ) for the March 2016 – September 2017 time period) concerning certain hot-rolled flat steel products from Japan.  *See Certain Hot-Rolled Steel Flat Products from Japan: Final Results of Antidumping Duty Administrative Review*, 84 Fed. Reg. 31,025 (June 28, 2019).  This complaint is limited to Commerce's assessment instructions flowing from that review that caused CBP's erroneous liquidation of Optima's entries pursuant to those instructions.

11. Pursuant to the Court of Appeals for the Federal Circuit precedent, a challenge to Commerce's liquidation instructions is proper under this Court's residual jurisdiction embodied in 28 U.S.C. §1581(i). *See Shinyei Corp. of Am. v. United States,* 355 F.3d 1297, 1304–05 (Fed. Cir. 2004); *Consolidated Bearings Co. v. United States,* 348 F.3d 997, 999–1003 (Fed. Cir. 2003). None of the other bases for jurisdiction before this Court are applicable to this complaint.

## STANDING

12. Optima is a United States Importer of merchandise produced by Tokyo Steel and subject to the March 2016 – September 2017 review of the AD duty order on certain hot-rolled flat steel products from Japan.  Those imports were not liquidated at the rate calculated during the review.

13. Tokyo Steel is the producer of the hot-rolled steel merchandise that Plaintiff Optima imported.  Tokyo Steel was the Japanese producer for whom Commerce undertook an AD review that led to the liquidation instructions being challenged.

14. Optima protested the erroneous liquidation of its subject entries through CBP's administrative process and was denied relief. That decision is currently being appealed and Optima is filing this complaint to challenge Commerce's administration of the that review as it related to the issuance of its instructions. Optima has been injured by the dissonance between the result calculated by Commerce and the liquidations performed by CBP.

15. Optima also has standing under 28 U.S.C. §2631(i) which states that "{a}ny civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)–(h) of this section, may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5." 5 U.S.C. §702 provides in pertinent part that "{a} person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

16. Optima has and will continue to be adversely affected and aggrieved by the liquidations of its entries at a rate of duty that is inconsistent with the applicable duty rate calculated by Commerce.

17. Tokyo Steel has and will continue to be adversely affected and aggrieved by the improper AD assessment of its U.S. sale shipments.

## TIMELINESS OF ACTION

18. Pursuant to 28 U.S.C. § 2636(i), a civil action brought under 28 U.S.C. §1581(i) must be commenced within two years after the cause of action first accrues.

19. A claim first accrues at the earliest time that a suit could have been brought. *See, e.g.*, *Celta Agencies, Inc. v. United States,* 865 F. Supp. 2d 1348, 1356 (Ct. Int'l Trade 2012), *Barden Corp. v. United States,* 864 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2012). In this case, the earliest time that this suit could have been brought was when the erroneous liquidations occurred. The relevant liquidations occurred in late December 2019.

20. A claim under 28 U.S.C. §1581(i) must be commenced by the concurrent filing of a summons and complaint. USCIT Rule 3(a)(3). This complaint and the accompanying summons were filed on July 9, 2021. Therefore this complaint is timely.

## FACTUAL BACKGROUND

21. On December 7, 2017 Commerce initiated its administrative review for of the AD duty order on certain hot-rolled flat steel products from Japan for the review period March 22, 2016 to September 30, 2017.

22. On January 16, 2018 Commerce issued a decision memorandum that selected Tokyo Steel, and another Japanese steel producer, Nippon Steel & Sumitomo Metal Corporation to be "mandatory respondents" for the March 2016 to September 2017 review.

23. As part of the review, Tokyo Steel submitted its response to section C of Commerce's AD duty questionnaire which required, in pertinent part, that every sale during the period be presented to Commerce in the required database format.

24. This response, in addition to the other materials submitted to Commerce, demonstrated that all of Tokyo Steel's sales during the period were made to a single unaffiliated Japanese trading company and exported by that company. The unaffiliated Japanese trading company did not act as the importer of record for any sale to the United States.

25. On June 21, 2019, Commerce released its Final Results for the March 2016 – September 2017 administrative review of the AD duty order on certain hot-rolled flat steel products from Japan. In those results, Commerce calculated an AD duty assessment rate of 2.06 percent *ad valorem* for merchandise exported by Tokyo Steel during that time period.

26. On July 16, 2019, Commerce released public liquidation instructions in ACCESS with a message date of July 9, 2019.

27. On July 23, 2019, Commerce released a public version of its non-public liquidation instructions in ACCESS.  The confidential version of this message carried a message date of July 19, 2019.

28. Commerce's non-public liquidation instructions set forth a single AD assessment rate for hot-rolled produced by Tokyo Steel.  Such AD assessment was the metric ton equivalent of the 2.06% AD rate set forth in Commerce's AD review final determination.

29. In late December of 2019, CBP liquidated nine entries of certain hot-rolled flat steel products from Japan imported by Optima from Tokyo Steel at the rate at the rate of deposit when the entries were made.

30. The liquidation rate exceeded the proper assessment rate calculated in the course of Commerce's AD administrative review.

31. On February 18, 2020, Optima filed protest number 2704-20-112444 contesting the erroneous liquidation of those entries through CBP's administrative process.

32. Protest number 2704-20-112444 covered the following nine entries: 300-8028669-2, 300-8028744-3, 300-4000499-5, 300-4000826-9, 300-4001057-0, 300-4001605-6, 3004424031-4, 300-4424237-7, and 300-4424487-8.

33. On October 16, 2020, CBP denied the protest.

34. On March 8, 2021, Optima appealed CBP's denial of that protest in Court No. 21-00062.

35. On June 4, 2021, Optima filed an amended complaint. *See* Exhibit 1.[1]

36. On July 2, 2021, the Department of Justice on behalf of the United States filed its answer to Optima's amended complaint. *See* Exhibit 2.

37. In its answer, the United States admits the core facts of Optima's allegation but, nonetheless, requests that the Court dismiss Optima's claim. Exhibit 2 at page 7.

38. Specifically, the United States "{a}dmits that Optima's hot-rolled steel imports in the subject entries consisted of hot-rolled steel produced by Tokyo Steel Manufacturing Co., Ltd. (Tokyo Steel)." Exhibit 2 at para. 2.

39. In addition, the United States admits that the following statement is accurate: "In December 2017, the United States Commerce Department ("USDOC") initiated an <u>AD review of all sales and import entries of hot-rolled steel produced by Tokyo Steel during the March 2016 – September 2017 time period</u>. The USDOC completed its AD review in June 2019. The USDOC's final AD review determination established a new AD cash deposit rate for Tokyo

---

[1] Please note that this document itself contains 14 exhibits which are included herein.

Steel of 2.06% ad valorem." Exhibit 2 at para. 5 (admitting the first three sentences of paragraph 5 of Optima's amended complaint); *see also* Exhibit 1 at para. 5 (containing the admitted factual statement) (emphasis supplied).

40. As a result, the United States has admitted three core facts.  One, Exports of subject merchandise produced by Tokyo Steel and reviewed during the March 2016 – September 2017 administrative review of the AD duty order on certain hot-rolled flat steel products from Japan were eligible for liquidation at a rate of 2.06 percent *ad valorem*. Two, the nine entries that were imported by Optima and formed the basis for Optima's protest were produced by Tokyo Steel. Third, those same entries were included in the sales database that formed the basis for Commerce's calculation of the duty rate of 2.06 percent *ad valorem*.

41. Notwithstanding the admission of these core fact, the United States claims that CBP did not act incorrectly when it liquidated Plaintiff Optima's import entries at an AD rate different from that set forth in Commerce's liquidation instructions.  The United States' Answer, appended here in Exhibit 2, gives the impression that the CBP properly followed Commerce's liquidation instructions.

42. This appeal is, therefore, filed to address the deficiencies in Commerce's liquidation instructions that caused CBP to liquidate Optima's import entries at an unlawful rate.

## STATEMENT OF CLAIMS

43. In the following respects, and for the reasons apparent from the factual information presented to Commerce in the course of the administrative review and to CBP during the course of Optima's protest and subsequent liquidation, the public version of which is appended to this complaint, Optima is challenging Commerce's liquidation instructions to the extent they have caused CBP to act inconsistent with the law.

**Count 1: Commerce's Liquidation Instructions Unlawfully Included an Entity-Specific Rate Identifying the Unaffiliated Japanese Trading Company that Exported the Subject Merchandise Produced by Tokyo Steel Causing CBP to Make an Error in Liquidation**

44. Optima reasserts and incorporates by reference paragraphs 1-43.

45. Under the AD law Commerce is required to calculate the AD duty margin of each import entry and issue instructions to CBP embodying that analysis so that the accurate level of duty can be collected.

46. In the course of the March 2016 to September 2017 review it became clear that Tokyo Steel had only one channel of trade.  Namely, all of the merchandise it produced during the period under review was exported by an unaffiliated Japanese trading company. As a result, Commerce should have ordered CBP to liquidate every entry of subject merchandise produced by Tokyo Steel to be liquidated at the rate of 2.06 percent *ad valorem*.

47. As a result, the issuance of entity-specific instructions was unnecessary to the proper administration of the AD law and in fact caused CBP to liquidate the covered entries at a rate that was inconsistent with the result of Commerce's administrative review.

**Count 2:  Commerce's Liquidation Instructions Used the Incorrect Name for the Unaffiliated Japanese Trading Company Causing CBP to Make an Error in Liquidation**

48. Optima reasserts and incorporates by reference paragraphs 1-47.

49. In identifying the unaffiliated Japanese trading company in its instruction to CBP, Commerce used a nickname for that entity despite evidence submitted in the course of the review presenting the correct corporate name for that entity.

50. As a result of this discrepancy CBP incorrectly performed the liquidation of Optima's import entries.

## PRAYER FOR JUDGMENT AND RELIEF

WHEREFORE, for the foregoing reasons, Optima prays that the Court enter judgment as follows:

(A)   Enter judgement in favor of Optima and Tokyo Steel;

(B)   Direct Commerce to reissue or clarify its instruction to CBP in order to achieve correct liquidations from the result of the March 2016 – September 2017 administrative review of the antidumping duty order on certain hot-rolled flat steel products from Japan; and

(C)   Grant Optima and Tokyo Steel such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James C. Beaty

**Curtis Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-7373

*Counsel for Optima Steel International LLC and Tokyo Steel Manufacturing Co., Ltd.*

July 9, 2021

**EXHIBIT LIST**

| Number | Description |
|---|---|
| 1 | First Amended Complaint, Ct. No. 21-61 |
| 2 | Answer to Amended Complaint, Ct. No. 21-61 |

# EXHIBIT 1

# UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: **The Honorable Chief Judge Mark A. Barnett**

| | | |
|---|---|---|
| Optima Steel International LLC | ) | |
| | ) | |
| Plaintiff | ) | Court No. 21-00062 |
| | ) | |
| v. | ) | Confidential Information |
| | ) | Deleted from Pages 1-3, 5, 6, 8- |
| United States, | ) | 12, 14-16 and 18 |
| | ) | |
| Defendant. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Optima Steel International LLC ("Optima"), by and through its counsel

submit this First Amended Complaint as of right stating the following claims against

Defendant United States:

### INTRODUCTION

1.  Optima is the plaintiff herein and the importer of record for all challenged

import entries.

2.  All—100 percent—of Optima's hot-rolled steel imports consisted of hot-

rolled steel produced by Tokyo Steel Manufacturing Co., Ltd. ("Tokyo Steel"), a

Japanese hot-rolled steel producer.  Optima purchased the Tokyo Steel hot-rolled steel

from [                                                    ], a Japanese trading company.

3.      For all affected import transactions, Optima was the importer of record,

[        ] was the Japanese exporter, and Tokyo Steel was the Japanese hot-rolled steel

producer.

4.      At the time of import entry (during the time period of Mach 2016 –

September 2017), Optima paid an antidumping duty ("AD") cash deposit rate equal to

5.58%, which was the AD cash deposit rate applicable to Tokyo Steel at the time.

5.      In December 2017, the United States Commerce Department ("USDOC")

initiated an AD review of all sales and import entries of hot-rolled steel produced by

Tokyo Steel during the March 2016 – September 2017 time period.  The USDOC

completed its AD review in June 2019.  The USDOC's final AD review determination

established a new AD cash deposit rate for Tokyo Steel of 2.06% *ad valorem*.  The

USDOC's final AD review also set forth a single company-specific AD assessment rate

equal to [                        ], which was the per metric ton equivalent of 2.06% *ad*

*valorem* AD rate.

6.      In July 2019, USDOC notified the United States Customs and Border

Protection ("CBP") of the "importer-specific AD assessment rate" for the AD review of

Tokyo Steel.  Such notification was through non-public customs instructions that

instructed CBP to liquidate "[


]" and

"[

Public Version

]"  The following paragraph assigned the rate of

[                              ] to the "[                                        ]."

7.      It is crystal clear from USDOC's own AD review documentation that the

customer name [                 ] in USDOC's liquidation instructions came from the U.S.

sales database that Tokyo Steel had submitted to USDOC during the AD review.

8.      Notwithstanding that:

 (a)    100 percent of Optima's imports of hot-rolled steel during the March 2016
        – September 2017 time period consisted of hot-rolled steel produced by
        Tokyo Steel;

 (b)    100 percent of Optima's imports of Tokyo Steel produced hot-rolled steel
        during the March 2016-September 2017 time period were exported by
        [       ] to Optima; and

 (c)     USDOC explicitly instructed Customs that "*all*" shipments of certain hot-
        rolled steel produced by Tokyo Steel and sold to [        ] should be
        assessed AD liability of [                    ] (2.06% *ad valorem*) for
        imports of hot-rolled steel produced by Tokyo Steel

CBP incorrectly applied an AD assessment rate of 5.58% *ad valorem* to the Optima's

import entries.

9.      As a matter law and practice, such application of AD assessment rate is

wrong.  The affected entry transactions should have been liquidated at the final company-

specific AD rate of [                       ].

## JURISDICTION AND STANDING

10.    This is a civil action challenging the denial of a protest under 19 U.S.C. §

1514.

11.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(a)

because this action arises from denied protest number 2704-20-112444.

12.    Optima has standing to bring this action pursuant to 28 U.S.C. § 2631

because it was the importer of record for the entries subject to the denied protest and

caused the denied protest to be filed on its behalf.

13.    CBP is an agency of the United States.

14.     The entries that were the subject of protest number 2704-20-112444 and

that are subject to this action are as follows:

> 300-8028669-2, 300-8028744-3, 300-4000499-5, 300-4000826-9, 300-4001057-0,
> 300-4001605-6, 3004424031-4, 300-4424237-7, and 300-4424487-8.

15.    Protest number 2704-20-112444 was timely filed within the meaning of 19

C.F.R. § 174.12(e).

16.    The instant action is timely filed within the meaning of 28 U.S.C. § 2632,

28 U.S.C. § 2636, and 19 C.F.R. § 174.31 based on CBP's October 16, 2020 denial of

Optima's protest.  *See* Protests and Entries from the Port of Long Beach, CA at Attach 1,

p. 1 (May 13, 2021), ECF No. 14-1.

Public Version

17.    All duties, charges, and exactions assessed as a result of the liquidation of the actions challenged herein have been paid.

## STATEMENT OF FACTS

**Import entries by Optima of hot-rolled steel from Japan produced by Tokyo Steel and exported by [         ]**

18.    During the time period March 2016 – September 2017 Optima made 13 entries of hot-rolled steel from Japan that were subject to AD cash deposits.  *See* Exhibit 1 (copies of Optima import entry summaries). Nine of these entries are the subject of this litigation.

19.    All of the hot-rolled steel imported by Optima was sold to [         ] by Tokyo Steel and exported by [         ] to Optima.  *See* Exhibit 1 (providing invoices from [         ] to Optima).

20.    All of the hot-rolled steel imported by Optima (from [         ]) during this time period was produced by Tokyo Steel Manufacturing Co., Ltd. ("Tokyo Steel"), whose manufacturer identification (ID) number is ([                    ].  *See* Exhibit 1 (showing Box 13 of CF 7501's with the indicated manufacturer ID);  *see also* Exhibit 2 (bills of lading and Tokyo Steel mill certificates corresponding to the invoices from [         ]).

21.    Based on the entry documentation submitted to CBP, all of Optima's 13 protested entries including the 9 entries of hot-rolled steel for which the protest was

Public Version

denied and that are the subject to this litigation were shipped from Japan on the following

vessels and in the following quantities:

| | Vessel Name | Sailing Month | Quantity (MT) |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| *TOTAL* | | [ | ] |

*See* Exhibit 1 (providing the entry summary, invoice, packing list, and certificate of

origin for each of the protested entries).

22.    Each entry was comprised of merchandise produced by Tokyo Steel that

was subject to the AD order.  *See id.*; *see also* Exhibit 2 (bills of lading and Tokyo Steel

mill certificates corresponding to the invoices from [            ]).

23.    Because Tokyo Steel did not yet have (at the time the entries subject to the

challenged protest were entered) its own AD cash deposit rate, Optima deposited

estimated duties at the AD cash deposit applicable to "all others" as set forth in the

USDOC's AD cash deposit instructions dated July 9, 2019.  Such AD deposit rate was

10.24% starting from USDOC's preliminary determination until the final determination

in the underlying investigation at which time the rate was revised to 5.58%.  *See* Exhibit

3 (USDOC's cash deposit instruction following the preliminary determination);  *see also*

Exhibit 4 (USDOC's cash deposit instruction following AD order); Exhibit 1 (Optima's

CF 7501s detailing payment of "ADA" (AD cash deposits) commensurate with the

relevant deposit rate).

**USDOC's AD Review of Tokyo Steel and Establishment of Company-specific AD rate for Tokyo Steel**

*Initiation of USDOC AD Review, Issuance of AD Questionnaire To Tokyo Steel and Tokyo Steel AD Questionnaire Responses*

24.      On December 7, 2017 the USDOC initiated its AD review for the AD

order hot-rolled steel from Japan for the review period March 22, 2016 to September 30,

2017.  *See Initiation of Antidumping and Countervailing Duty Administrative* Reviews,

82 Fed. Reg. 57,705 (December 7, 2017).

25.      On January 16, 2018 the USDOC issued a decision memorandum that

selected Tokyo Steel,  and another Japanese steel producer, Nippon Steel & Sumitomo

Metal Corporation to be "mandatory respondents" for the USDOC's POR1 AD review

for hot-rolled steel from Japan.  Accordingly, on January 19, 2018 the USDOC issued its

AD questionnaire to Tokyo Steel.  *See* Exhibit 5 (Affidavit of Amber Jeffcoat at para. 9,

Attachment 3).

26.      the USDOC's AD questionnaire had four primary parts:  Section A

contained multiple questions about corporate organization of the mandatory respondent

and general information about the mandatory respondent's U.S. sales.  Section B

requested a complete listing of all "home market' sales of the subject merchandise

detailing the invoice price to the home market customer, as well as all expenses incurred

in selling and shipping the subject merchandise to home market customers.  Section C

requested a complete listing of all "United States" sales of the subject merchandise

detailing the invoice price to the U.S., as well as all expenses incurred in selling and

shipping the subject merchandise to the U.S. customers.  And Section D requested a

complete listing of the costs of production for every type of hot-rolled product sold to

home market and U.S. customers.  *Id.*

      27.     On February 20, 2018 Tokyo Steel submitted its response to Section A of

the AD questionnaire.  *See* Exhibit 5 (Affidavit of Amber Jeffcoat at para. 11).

      28.     Of particular relevance was Tokyo Steel's response to USDOC's Section A

question 3 which required that Tokyo Steel provide "detailed information about your

channels of distribution {and}, the categories of customers to whom you sell."  *See*

Exhibit 5 (Affidavit of Amber Jeffcoat at Attachment 3 USDOC's AD Questionnaire at

pg. 10 and 11).  Tokyo Steel provided the following information to the USDOC:

> We note that 100 percent of Tokyo Steel's sales of subject hot-rolled steel to the
> United States are manufactured to order. Also, Tokyo Steel does not sell from
> inventory in either the U.S. or home market.  Accordingly, all production of hot-
> rolled steel is shipped to a customer immediately after production.
>
> **U.S. Sales**
>
> Tokyo Steel's U.S. sales during the review period were made through [
>                                                 ]. For all sales
> made to this unaffiliated Japanese trading company, the unaffiliated Japanese
> company [                                                ]
>
> . . .
>
> As indicated above, **with respect to U.S. sales**, there was [
>                ]; namely, U.S. sales made to an unaffiliated Japanese [

Public Version

> ]. And, within this channel of distribution, **Tokyo Steel had [**
> **].**
>
> . . .
>
> Notwithstanding that [      ] percent of all US subject hot-rolled sales and a
> majority of all home market subject hot-rolled sales made by Tokyo Steel were
> sold through trading companies, Tokyo Steel knows the ultimate destination of
> the shipment. The reason is straightforward. Every sale is produced to order and
> therefore Tokyo Steel knows the identity of the actual U.S. and home market
> customer to whom the merchandise is sold.

*See* Exhibit 5 (Affidavit of Amber Jeffcoat at Attachment 4 providing relevant pages of

Tokyo Steel Section A Questionnaire Response).

29.     In addition to narrative answers to the USDOC's questions, Tokyo Steel's

Section A response provided supporting documentation as exhibits.  *See* Exhibit 5

(Affidavit of Amber Jeffcoat at para. 12).  Specifically, Exhibit A-9 provided a complete

"sales trace" for one of Tokyo Steel U.S. sales of hot-rolled steel made to [      ].  *See*

Exhibit 5 (Affidavit of Amber Jeffcoat at Attachment 5 providing Exhibit A-9).

30.     The documentation in Tokyo Steel's Exhibit A-9 makes clear that Tokyo

Steel's U.S. sales of hot-rolled steel were made to "[                    ]"  *Id.*

31.     On March 8, 2018 Tokyo Steel submitted its response to Section C of the

USDOC's AD questionnaire.  Tokyo Steel's Section C Response consisted of three

primary parts.  The most import part was the submission of a computer sales file that

provided a listing of each and every U.S. shipment of the hot-rolled steel under review by

Tokyo Steel made during the review period, March 22, 2016 – September 30, 2017

("POR 1").

32.     Pursuant to the USDOC's instructions, "each and every U.S. shipment of hot-rolled steel" equaled each and every shipment by Tokyo Steel according to the date when Tokyo Steel's shipment left the factory for the port.  Or stated differently, the shipment-by-shipment listing included all those U.S. shipments the left Tokyo Steel's factory during the time period March 22, 2016 – September 30, 2017 (destined for the port to be loaded on a vessel bound for the United States.

33.     Tokyo Steel's Section C response also included a narrative portion that both provided specific answers to the USDOC's questions and detailed the contents of each field in the submitted U.S. sales computer file.  The third part of Tokyo Steel's Section C response included exhibits that provided additional supporting documentation requested by the USDOC.

34.      Of particular relevance was Tokyo Steel's response to question "field number 6.0 Customer Code"

> **FIELD NUMBER 6.0: Customer Code**
>
> FIELD NAME: CUSCODU
>
> DESCRIPTION: Report the name of the customer or the internal accounting code designating the customer, as used in your normal course of business.
>
> NARRATIVE: Provide a list of customer names and codes as an attachment to your narrative response.

**ANSWER**: Tokyo Steel has reported this field as requested. Tokyo Steel had the following U.S. customer(s) during the POR:

> [                                          ]

We have also reported in field CUSCOD3U [             ] customer. See **Exhibit C-5**.

*See* Exhibit 5 (Affidavit of Amber Jeffcoat at Attachment 6 including the relevant pages of Tokyo Steel's Section C Response, including Exhibit C-5).

35.    Tokyo Steel Exhibit C-5 made clear that Tokyo Steel's internal code for [          ] was [             ] and Tokyo Steel's internal code for [          ] U.S. customer Optima, was [            ].

36.    Again, Tokyo Steel's Section C response contained a computer sales listing of every Tokyo Steel U.S. shipment of hot-rolled steel made during POR1.  Such sales listing indicated that there were a total of [       ] U.S. sales transactions.  Each sales transaction contained a number of different fields providing data and information requested by the USDOC.  Among others, such fields of the Tokyo Steel U.S. sales listing included:

| Field name | Field description |
|---|---|
| | Product code |
| | Primary customer |
| | End customer |
| | Order number |
| | Order date |
| | Invoice number |
| | Invoice date |
| | Shipment date |
| | Vessel name |
| | Zip code of destination |
| | Shipment quantity (metric tons) |
| | Shipment quantity (kgs) |

37.    Between July 11, 2018 and August 16, 2018 the USDOC issued supplemental questionnaires to Tokyo Steel seeking clarification, confirmation or

- 11 -

additional information with respect to the data and information that Tokyo Steel had

provide as part of the AD review.

38.     Of particular relevance was the USDOC's Supplemental Section A-C

Questionnaire dated July 11, 2018 in which the USDOC asked the following question:

> 16. You use at least [
>
>         ]. What is the official name of your U.S. customer and all its affiliated
> companies that you deal with? Explain how they are related to each other and your
> interactions with them.

*See* Exhibit 5 (Affidavit of Amber Jeffcoat at para. 19).

39.     On August 1, 2018, Tokyo Steel submitted to the USDOC a certified

response that contained the following answer to the above question: "[          ] {sic}

is a shortened form, or another name for, [                    ]" *Id.; see also* Exhibit 5

(Affidavit of Amber Jeffcoat at Attachment 8 providing relevant pages from Tokyo

Steel's certified questionnaire response).

40.     This clarification response made by Tokyo Steel—in response to a specific

question by the USDOC—made crystal clear that "[            ]" was essentially a

Tokyo Steel internal nickname for [                ]. Or stated differently, Tokyo

Steel's only customer for all of its U.S. shipments was [                ]. *See* Exhibit

5 (Affidavit of Amber Jeffcoat at para. 21).

41.     Every computer file Tokyo Steel we submitted to the USDOC contained a

specific computer file name.  The latest version of Tokyo Steel's U.S. sales database was

called tsussales02.  *See* Exhibit 5 (Affidavit of Amber Jeffcoat at para. 22).

Public Version

*The USDOC's Final AD Review Determination*

42.     On June 21, 2019, the USDOC released its final results for its AD review of Hot-Rolled Steel from Japan for the review period, March 22, 2016 – September 30, 2017.  *See Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016-2017*, 84 Fed. Reg. 31,025 (June 28, 2019) and accompanying Issues and Decision Memorandum.  *See* Exhibit 5 (Affidavit of Amber Jeffcoat at Attachment 9).

43.     The USDOC's AD review final results release consisted of, among other items a calculation package detailing the specific AD margin calculation methodology employed and the databases used for the USDOC's calculation of Tokyo Steel's AD rate for POR1.  *See* Exhibit 5 (Affidavit of Amber Jeffcoat at para. 24, Attachment 10 and 11 providing relevant pages of final calculation package).

44.     The USDOC's final results calculation package makes clear that the USDOC utilized Tokyo Steel's U.S. sales database called tsussales02 to calculate both Tokyo Steel's AD rate <u>and</u> the company-specific assessment AD rate.  *See* Exhibit 5 (Affidavit of Amber Jeffcoat at para. 25, Attachment 12 providing relevant pages of calculation package).

**Confirmation that Sales Transactions to Optima Steel Were Included in USDOC's AD Assessment Rate Calculation for Tokyo Steel Provided to Customs.**

45.     Attachment 7 to the Affidavit of Amber Jeffcoat provides the public summary of those U.S. sales transactions that USDOC relied upon in calculating Tokyo

Steel's new AD cash deposit rate of 2.06% and the company-specific assessment rate of

[                              ].  *See* Exhibit 7.  Specifically, Attachment 4 provides provided

all those U.S. sales transactions for which the CUSCODU was [          ] (indicating

[                         ] was the customer).  *Id.*

46.    A vessel-by-vessel summary of the U.S. sales transactions in Attachment

12 is set forth below.

| | Vessel Name | Sailing Month | Quantity (MT) |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| *TOTAL* | | [ | ] |

*See* Exhibit 5 (Affidavit of Amber Jeffcoat at para. 27).

47.    The total quantity indicated above equals the sum of all of Tokyo Steel's

individual U.S. sales transactions that were included in the USDOC's AD rate calculation

for the 2016-2017 antidumping review.  *See* Exhibit 5 (Affidavit of Amber Jeffcoat at

para. 28).

48.    Such fact is evidenced by the fact that this total quantity ties exactly to the

specific page in the USDOC's antidumping margin calculation "output" for deriving (a)

Tokyo Steel's new AD cash deposit rate of 2.06% **and** (b) the company-specific AD assessment rate of [                              ].  *Id.*

49.    The summary calculation of Tokyo Steel's new AD cash deposit rate is provided in the USDOC's "Final Results Margin Calculation for Tokyo Steel."  *See* Exhibit 5 ( Affidavit of Amber Jeffcoat at Attachment 11).   As can be seen therein, the total quantity of [                              ] was used to calculate Tokyo Steel's new AD rate of 2.06%.

50.    And the summary calculation of the USDOC's "importer specific AD assessment rate" is provided on in the USDOC's "Output" of its AD margin calculation program."  *See* Exhibit 5 ( Affidavit of Amber Jeffcoat at Attachment 11).   As can be seen therein, the total quantity of [                              ] (column B) was used to derive the "per-unit {AD} assessment rate" of [                              ].  *Id.*

51.    The USDOC's importer specific assessment calculation page makes clear that the USDOC calculated only a single—just one—company-specific AD assessment rate for Tokyo Steel's hot-rolled steel AD review. *Id.*  Had the USDOC believed there were multiple entities eligible for a company-specific assessment rate, the USDOC would have calculated multiple company-specific assessment rates. But the USDOC did not do so.  *See* Exhibit 5 (Affidavit of Amber Jeffcoat at para. 31).

52.    On June 19, 2019, the USDOC issued both public and non-public liquidation instructions directing CBP to liquidate subject entries in accord with the final

results.  *See* Exhibit 6 (Public Customs Instructions); Exhibit 7 (Non-Public Customs

Instructions).

53.    Paragraph 1 of the non-public instructions directed CBP to liquidate entries

from "[                                    ]" at a final rate of "[                    ]."

Exhibit 7.  Those instructions also observed that "[

                        ]."  *Id*.

54.    In late December 2019, CBP liquidated the entries that are subject to the

instant action utilizing the cash deposit rate in effect at the time of entry.

55.    On February 18, 2020, Optima caused the protest at issue here to be filed

on its behalf contesting CBP's failure to liquidate the covered entries in accord with the

company-specific rate applicable to subject merchandise produced by Tokyo Steel and

[                  ].  *See* Exhibit 8 (Original Protest).  Optima's protest was filed by Ms.

Heather Jacobson, Esq. of Junker and Nakachi in Seattle, WA.

56.    On April 2, 2020, CBP indicated via its ACE system that Optima's protest

had been denied, in part, stating that "[

                        ]."  *See* Exhibit 9 (Denial of Protest).

57.     On April 29, 2020, Ms. Jacobson sent an email to CBP Supervisory Import Specialist Craig Callies to request additional information concerning the protest denial. (A copy of this email is provided in Exhibit 10).

58.     On May 1, 2020, Ms. Jacobson talked by telephone with Craig Callies. During this conversation, Mr. Callies stated that he was not directly familiar with the basis for denial but believed that the issue needed to be re-reviewed, and that Optima would need to file a Void Denial request so that CBP could reconsider the issue and consult with Commerce as to the meaning of the liquidation instructions.

59.     On May 4, 2020, Ms. Jacobson filed a Void Denial request as discussed with Mr. Callies. *See* Exhibit 11 (Request for Reconsideration).  In support of the Void Denial request, Ms. Jacobson provided additional information demonstrating that the covered entries were eligible for the company-specific rate in paragraph 1 of the non-public instructions.

60.     On May 5, 2020 CBP's ACE system indicated that Optima's Void Denial request had been denied.  Accordingly, that same day, Ms. Jacobson sent a detailed email to Craig Callies (with a cc to the Director and Assistant Directors of the Center) that documented the substance of the May 1st telephone conference and that also objected to the summary denial of void denial request. (A copy of the email is provided in Exhibit 12).

61.     Later that same day (May 5th), the CBP ACE system indicated that Optima's protest was "SUSPENDED."

62.     On October 16, 2020, CBP denied Optima's protest, in part, stating that "[

]". *See* Exhibit 11 (Denial of Reconsideration); *see also* Exhibit 14 (ACE Summary Printout).

## STATEMENT OF CLAIMS

63.     In the following respects, and for other reasons apparent from the factual information presented to CBP and included in the instant complaint CBP's liquidation of the entries at issue here was erroneous and its denial of Optima's protest was in error.

**Count 1:     CBP Erroneously Liquidated Optima's Entries that Were Produced by Tokyo Steel, sold to [          ], and Imported by Optima**

64.     Optima reasserts and incorporates by reference paragraphs 1-63.

65.     The imports covered by this protest were eligible for the company-specific rate identified in paragraph 1 of the USDOC's non-public instruction.

66.     CBP incorrectly liquidated Optima's covered entries at the cash deposit rate applicable at entry and not the company-specific rate identified in paragraph 1 of the non-public instructions for which they were eligible.

**Count 2:     CBP Denied Optima's Protest Despite Evidence Demonstrating its Position was in Error**

67.     Optima reasserts and incorporates by reference paragraphs 1-66.

68.     Optima's protest and request for reconsideration demonstrated to CBP that its basis for liquidating the covered entries at the cash deposit rate at the time of entry was in error.

69.     CBP denied Optima's protest and its request for reconsideration despite evidence demonstrating that its basis for denying the protest was affirmatively wrong.

Public Version

## PRAYER FOR JUDGMENT AND RELIEF

WHEREFORE, for the foregoing reasons, Optima prays that this Court enter judgment as follows:

(A)     Enter judgment in favor of Optima;

(B)     Hold CBP's denial of Optima's protest invalid;

(C)     Direct CBP to re-liquidate the entries covered by this action in accord with the rate identified in the non-public instructions;

(D)     Direct CBP to refund any excess payments made by Optima with the appropriate interest; and

(E)     Grant Optima such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James C. Beaty

**Curtis Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-7373

June 4, 2021                    *Counsel for Optima Steel International LLC*

Public Version

**EXHIBIT LIST**

| Number | Description |
|---|---|
| Exhibit 1 | Entry Summaries |
| Exhibit 2 | Bills of Lading, Invoices, and Associated Mill Test Certificates |
| Exhibit 3 | INV Preliminary Cash Deposit Instructions |
| Exhibit 4 | INV Final Cash Deposit Instructions |
| Exhibit 5 | Affidavit of Amber Jeffcoat |
| Exhibit 6 | POR 1 Public Cash Deposit Instructions |
| Exhibit 7 | POR 1 Non-public Liquidation Instructions |
| Exhibit 8 | Protest |
| Exhibit 9 | CBP Protest Denial |
| Exhibit 10 | Email with CBP |
| Exhibit 11 | Request for Reconsideration |
| Exhibit 12 | Email with CBP |
| Exhibit 13 | Denial of Request for Reconsideration |
| Exhibit 14 | ACE Printout |

**EXHIBIT 1**

**NOT CAPABLE OF SUMMARY**

**EXHIBIT 2**

**NOT CAPABLE OF SUMMARY**

# EXHIBIT 3

3/3/2021          AD/CVD message 6089306 re hot-rolled steel flat products from Japan: preliminary determination or ... (A-588-874) and critic…

Case 1:21-cv-00027-MAB   Document 21   Filed 07/09/21   Page 42 of 386

🔍  A-588-874

☐ search within › **A-588-874** ✖

Sort by Rank        ▾          10 per page          ▾

---

🏷 **6089306**   📅 **Mar 29, 2016**   ✔ **Active**

Effective Date: Dec 23, 2015

Period of Review: Jul 01, 2014 to Jun 30, 2015

Cite as: 81 FR 15222 • Cite date: Mar 22, 2016

Category: Antidumping • Type: Preliminary Determination • Sub type: AFF-Affirmative • Reference messages: 5260301 • Cases: A-588-874

---

1. On 03/22/2016, Commerce published in the Federal Register its affirmative preliminary determination of sales at less than fair value, critical circumstances, and postponement of the final determination in the antidumping duty investigation of certain hot-rolled steel flat products from Japan (81 FR 15222).

2. The products covered by this investigation are described in message 5260301, dated 09/17/2015.

3. This investigation has been assigned investigation number **A-588-874**.

4. Because Commerce determined that critical circumstances exist for imports of certain hot-rolled steel flat products from Japan from the producers and/or exporters listed below, CBP shall suspend liquidation of all appropriate entries of certain hot-rolled steel flat products from Japan that are entered, or withdrawn from warehouse, for consumption on or after 12/23/2015 which is 90 days before the date of publication of the preliminary determination in the Federal Register. Effective 12/23/2015, for entries of certain hot-rolled steel flat products from Japan from the producers and/or exporters listed below, CBP shall require **a** cash deposit equal to the following dumping margins:

Producer and/or Exporter: Nippon Steel & Sumitomo Metal Corporation/Nippon Steel & Sumikin Bussan Corporation
Case number: **A-588-874**-001
Cash deposit rate: 11.29%

Producer and/or Exporter: JFE Steel Corporation/JFE Shoji Trade Corporation
Case number: **A-588-874**-002
Cash deposit rate: 6.79%

5. Commerce found that critical circumstances do not exist for imports of certain hot-rolled steel flat products from Japan from the producers and/or exporters listed below. For imports of certain hot-rolled steel flat products from Japan from the producers and/or exporters listed below CBP shall suspend liquidation of such entries which were entered, or withdrawn from warehouse, for consumption on or after 03/22/2016. Effective 03/22/2016, for entries of certain hot-rolled steel flat products from Japan from the producers and/or exporters listed below, CBP shall require **a** cash deposit equal to the following dumping margins:

**Get the CustomsMobile app!**                                        ✖

All Others

Case Number: **A-588-874**-000

Cash Deposit Rate: 10.24%

6. If any entries of this merchandise are exported by **a** firm other than the producer, then the following instructions apply:

**A**. If the exporter of the subject merchandise does not have its own rate but the producer has its own rate, the cash deposit or bonding rate will be the producer's rate.

B. Where neither the exporter nor the producer has its own rate or the producer is unknown, use the all-others rate of 10.24 percent to establish the cash deposit.

7. If there are any questions by the importing public regarding this message, please contact the Call Center for the Office of AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce at (202) 482-0984. CBP ports should submit their inquiries through authorized CBP channels only. (This message was generated by OVII:CV.)

8. There are no restrictions on the release of this information.

Alexander Amdur

© 2014 CustomsMobile | Disclaimer | Privacy | About

**Get the CustomsMobile app!**　✖

# EXHIBIT 4

Barcode:3514233-01 A-588-874 INV - Investigation -

| | | | |
|---|---|---|---|
| MESSAGE NO: | 6287306 | MESSAGE DATE: | 10/13/2016 |

| | | | |
|---|---|---|---|
| MESSAGE STATUS: | Active | CATEGORY: | Antidumping |
| TYPE: | ORD-Order | PUBLIC ☑ | NON-PUBLIC ☐ |
| SUB-TYPE: | | | |

| | | | |
|---|---|---|---|
| FR CITE: | 81 FR 67962 | FR CITE DATE: | 10/03/2016 |

REFERENCE
MESSAGE #
(s):

CASE #(s):     A-588-874

| | | | |
|---|---|---|---|
| EFFECTIVE DATE: | 09/29/2016 | COURT CASE #: | |

| | | | |
|---|---|---|---|
| PERIOD OF REVIEW: | 07/01/2014 | TO | 06/30/2015 |

| | | | |
|---|---|---|---|
| PERIOD COVERED: | | TO | |

Notice of Lifting of Suspension Date:

Barcode:3514233-01 A-588-874 INV - Investigation -

TO:    { Directors Of Field Operations, Port Directors }

FROM:  { Director AD/CVD & Revenue Policy & Programs }

RE:    Antidumping duty order on certain hot-rolled steel flat products from Japan (A-588-874)

1.  On 10/03/2016, Commerce published in the Federal Register its antidumping duty order on certain hot-rolled steel flat products from Japan (81 FR 67962).

2.  The merchandise covered by this order is certain hot-rolled, flat-rolled steel products, with or without patterns in relief, and whether or not annealed, painted, varnished, or coated with plastics or other non-metallic substances.  The products covered do not include those that are clad, plated, or coated with metal.  The products covered include coils that have a width or other lateral measurement ("width") of 12.7 mm or greater, regardless of thickness, and regardless of form of coil (e.g., in successively superimposed layers, spirally oscillating, etc.).  The products covered also include products not in coils (e.g., in straight lengths) of a thickness of less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness.  The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieve subsequent to the rolling process, i.e., products which have been "worked after rolling" (e.g., products which have been beveled or rounded at the edges).  For purposes of the width and thickness requirements referenced above:

(1) where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the resulting measurement makes the product covered by the existing antidumping {SEE FOOTNOTE 1} or countervailing duty {SEE FOOTNOTE 2} orders on Certain Cut-To-Length Carbon-Quality Steel Plate Products From the Republic of Korea (A-580-836; C-580-837), and

(2) where the width and thickness vary for a specific product (e.g., the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which: (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by

Filed By: Jennifer Tabo, Filed Date: 10/13/16 2:42 pm, Submission Status: Approved

Barcode:3514233-01 A-588-874 INV - Investigation -

weight; and (3) none of the elements listed below exceeds the quantity, by weight, respectively indicated:

• 2.50 percent of manganese, or

• 3.30 percent of silicon, or

• 1.50 percent of copper, or

• 1.50 percent of aluminum, or

• 1.25 percent of chromium, or

• 0.30 percent of cobalt, or

• 0.40 percent of lead, or

• 2.00 percent of nickel, or

• 0.30 percent of tungsten, or

• 0.80 percent of molybdenum, or

• 0.10 percent of niobium, or

• 0.30 percent of vanadium, or

• 0.30 percent of zirconium.

Unless specifically excluded, products are included in these scopes regardless of levels of boron and titanium.

For example, specifically included in these scopes are vacuum degassed, fully stabilized (commonly referred to as interstitial-free (IF)) steels, high strength low alloy (HSLA) steels, the substrate for motor lamination steels, Advanced High Strength Steels (AHSS), and Ultra High Strength Steels (UHSS).  IF steels are recognized as low carbon steels with micro-alloying levels of elements such as titanium and/or niobium added to stabilize carbon and nitrogen elements. HSLA steels are recognized as steels with micro-alloying levels of elements such as chromium, copper, niobium, titanium, vanadium, and molybdenum.  The substrate for motor lamination steels contains micro-alloying levels of elements such as silicon and aluminum.  AHSS and UHSS are considered high tensile strength and high elongation steels, although AHSS and UHSS are covered whether or not they are high tensile strength or high elongation steels.

Subject merchandise includes hot-rolled steel that has been further processed in a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of this order if performed in the country of manufacture of the hot-rolled steel.

All products that meet the written physical description, and in which the chemistry quantities do not

Barcode:3514233-01 A-588-874 INV - Investigation -

exceed any one of the noted element levels listed above, are within the scope of this order unless specifically excluded.  The following products are outside of and/or specifically excluded from the scope of this order:


• Universal mill plates (i.e., hot-rolled, flat-rolled products not in coils that have been rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, of a thickness not less than 4.0 mm, and without patterns in relief);

• Products that have been cold-rolled (cold-reduced) after hot-rolling; {SEE FOOTNOTE 3}

• Ball bearing steels; {SEE FOOTNOTE 4}

• Tool steels; {SEE FOOTNOTE 5} and

• Silico-manganese steels; {SEE FOOTNOTE 6}


The products covered by this order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.10.1500, 7208.10.3000, 7208.10.6000, 7208.25.3000, 7208.25.6000, 7208.26.0030, 7208.26.0060, 7208.27.0030, 7208.27.0060, 7208.36.0030, 7208.36.0060, 7208.37.0030, 7208.37.0060, 7208.38.0015, 7208.38.0030, 7208.38.0090, 7208.39.0015, 7208.39.0030, 7208.39.0090, 7208.40.6030, 7208.40.6060, 7208.53.0000, 7208.54.0000, 7208.90.0000, 7210.70.3000, 7211.14.0030, 7211.14.0090, 7211.19.1500, 7211.19.2000, 7211.19.3000, 7211.19.4500, 7211.19.6000, 7211.19.7530, 7211.19.7560, 7211.19.7590, 7225.11.0000, 7225.19.0000, 7225.30.3050, 7225.30.7000, 7225.40.7000, 7225.99.0090, 7226.11.1000, 7226.11.9030, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.5000, 7226.91.7000, and 7226.91.8000.  The products covered by this order may also enter under the following HTSUS numbers: 7210.90.9000, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7214.99.0060, 7214.99.0075, 7214.99.0090, 7215.90.5000, 7226.99.0180, and 7228.60.6000.


The HTSUS subheadings above are provided for convenience and U.S. Customs purposes only. The written description of the scope of this order is dispositive.


FOOTNOTE 1: Notice of Amendment of Final Determinations of Sales at Less Than Fair Value and Antidumping Duty Orders: Certain Cut-To-Length Carbon-Quality Steel Plate Products From France, India, Indonesia, Italy, Japan and the Republic of Korea, 65 FR 6585 (February 10, 2000).

FOOTNOTE 2: Notice of Amended Final Determinations: Certain Cut-to-Length Carbon-Quality Steel Plate From India and the Republic of Korea; and Notice of Countervailing Duty Orders: Certain Cut-To-Length Carbon-Quality Steel Plate From France, India, Indonesia, Italy, and the Republic of Korea, 65 FR 6587 (February 10, 2000).

Barcode:3514233-01 A-588-874 INV - Investigation -

FOOTNOTE 3: For purposes of this scope exclusion, rolling operations such as a skin pass, levelling, temper rolling or other minor rolling operations after the hot-rolling process for purposes of surface finish, flatness, shape control, or gauge control do not constitute cold-rolling sufficient to meet this exclusion.

FOOTNOTE 4: Ball bearing steels are defined as steels which contain, in addition to iron, each of the following elements by weight in the amount specified: (i) not less than 0.95 nor more than 1.13 percent of carbon; (ii) not less than 0.22 nor more than 0.48 percent of manganese; (iii) none, or not more than 0.03 percent of sulfur; (iv) none, or not more than 0.03 percent of phosphorus; (v) not less than 0.18 nor more than 0.37 percent of silicon; (vi) not less than 1.25 nor more than 1.65 percent of chromium; (vii) none, or not more than 0.28 percent of nickel; (viii) none, or not more than 0.38 percent of copper; and (ix) none, or not more than 0.09 percent of molybdenum.

FOOTNOTE 5: Tool steels are defined as steels which contain the following combinations of elements in the quantity by weight respectively indicated: (i) more than 1.2 percent carbon and more than 10.5 percent chromium; or (ii) not less than 0.3 percent carbon and 1.25 percent or more but less than 10.5 percent chromium; or (iii) not less than 0.85 percent carbon and 1 percent to 1.8 percent, inclusive, manganese; or (iv) 0.9 percent to 1.2 percent, inclusive, chromium and 0.9 percent to 1.4 percent, inclusive, molybdenum; or (v) not less than 0.5 percent carbon and not less than 3.5 percent molybdenum; or (vi) not less than 0.5 percent carbon and not less than 5.5 percent tungsten.

FOOTNOTE 6: Silico-manganese steel is defined as steels containing by weight: (i) not more than 0.7 percent of carbon; (ii) 0.5 percent or more but not more than 1.9 percent of manganese, and (iii) 0.6 percent or more but not more than 2.3 percent of silicon.

3.  For imports of certain hot-rolled steel flat products from Japan, CBP shall suspend liquidation of entries of subject merchandise entered, or withdrawn from warehouse, for consumption on or after 09/29/2016 (date of publication of the International Trade Commission final determination in the Federal Register).  Effective 09/29/2016, CBP shall require a cash deposit equal to the percentages identified below.

Producer and/or Exporter: All-Others
Case Number:  A-588-874-000
Cash Deposit Rate:  5.58 percent

Producer and/or Exporter: Nippon Steel & Sumitomo Metal Corporation/Nippon Steel & Sumikin Bussan Corporation

Barcode:3514233-01 A-588-874 INV - Investigation  -

Case Number:  A-588-874-001

Cash Deposit Rate:  4.99 percent


Producer and/or Exporter: JFE Steel Corporation/JFE Shoji Trade Corporation

Case Number:  A-588-874-002

Cash Deposit Rate: 7.51 percent


4.  If there are any questions by the importing public regarding this message, please contact the Call Center for the Office of AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce at (202) 482-0984.  CBP ports should submit their inquiries through authorized CBP channels only.  (This message was generated by O7:ML)


5.  There are no restrictions on the release of this information.


Alexander Amdur

Company Details

Barcode:3514233-01 A-588-874 INV - Investigation  -

*Party Indicator Value:

I = Importer, M = Manufacturer, E = Exporter, S = Sold To Party

**EXHIBIT 5**

Public Version

# Affidavit of Amber Jeffcoat

1.     I, Amber Jeffcoat, hereby declare and affirm as follows:

2.     My name is Amber Jeffcoat. I am currently employed at the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis") as a Senior International Trade Advisor.

3.     As part of my duties I regularly review the database submissions of the firm's clients in antidumping ("AD") investigations conducted by the U.S. Department of Commerce ("USDOC"), ensuring they comply with USDOC policies and computer software requirements. I also regularly review and analyze the computer programs that the USDOC issues in its preliminary and final determinations in AD cases, checking to confirm that the USDOC follows its stated policies and does not make any clerical or other ministerial errors in its computer programs.

4.     Prior to joining the team of lawyers currently at Curtis, I was employed as an analyst in the Import Administration, part of the USDOC, from 2001 to 2005. During that 4 year period, it was my responsibility to analyze the computer responses of respondents in numerous AD investigations and AD administrative reviews, involving several types of products from several different countries.

5.     All told, I have more than 15 years of experience with USDOC AD reviews and the sales databases and information used by the USDOC to calculate antidumping review rates.

6.     I am providing this affidavit to explain the information and data submitted by Tokyo Steel that the USDOC relied upon to determine the AD rate for Tokyo Steel for the USDOC's AD administrative concerning the AD order, Hot-Rolled Steel from Japan, for the period of review March 22, 2016 to September 30, 2017 (hereinafter referred to as "POR1"). At Curtis, I was the person primarily responsible for assisting Tokyo Steel in preparing the sales data and information required by the USDOC.

7.     The information and data submitted to and relied upon by the USDOC for the POR1 AD review unequivocally demonstrates that **all** of the U.S. sales transactions that the USDOC used to calculate Tokyo Steel's AD rate for POR1 AD review were the exact same U.S. shipments of hot-rolled steel imported by Optima Steel International LLC's ("Optima") during POR1.

**Initiation of USDOC AD Review, Issuance of AD Questionnaire To Tokyo Steel and Tokyo Steel AD Questionnaire Responses**

8.     On December 7, 2017 the USDOC initiated its AD review for the AD order Hot-Rolled Steel from Japan for the review period March 22, 2016 to September 30, 2017. *See* USDOC Initiation Notice provided in **Attachment 1**. *See also* USDOC Preliminary AD Review Determination and Issues and Decision Memorandum for Hot-Rolled Steel from Japan for 2016-2017 AD Review, provided in **Attachment 2** (hereinafter "USDOC Preliminary AD Review Decision.")

9.     On January 16, 2018 the USDOC issued a decision memorandum that selected Tokyo Steel Manufacturing Co., Ltd. ("Tokyo Steel"),  and another Japanese steel producer, Nippon Steel & Sumitomo Metal Corporation to be "mandatory respondents" for the USDOC POR1 AD review for hot-rolled steel.  *See* USDOC Preliminary AD Review Decision at p. 2).  Accordingly, on January 19, 2018 the USDOC issued its AD questionnaire to Tokyo Steel.  A copy of the USDOC questionnaire issued to Tokyo Steel is provided in **Attachment 3** (hereinafter "USDOC AD Questionnaire").

10.     The USDOC's AD Questionnaire had four primary parts:  Section A contained multiple questions about corporate organization of the mandatory respondent and general information about the mandatory respondent's U.S. sales.  Section B requested a complete listing of all "home market' sales of the subject merchandise detailing the invoice price to the home market customer, as well as all expenses incurred in selling and shipping the subject merchandise to home market customers.  Section C requested a complete listing of all "United States" sales of the subject merchandise detailing the invoice price to the U.S., as well as all expenses incurred in selling and shipping the subject merchandise to the U.S. customers.  And Section D requested a complete listing of the costs of production for every type of hot-rolled product sold to home market and U.S. customers.  *See* **Attachment 3**.

11.     On February 20, 2018 Tokyo Steel submitted to the USDOC its certified response to Section A of the AD questionnaire.  *See* **Attachment 4** (providing relevant pages of Tokyo Steel's Section A response).  Of particular relevance was Tokyo Steel's response to USDOC's Section A question 3 which required that Tokyo Steel provide "detailed information about your channels of distribution {and}, the categories of customers to whom you sell.  *See* **Attachment 4** at pg 10 and 11.  Tokyo Steel provided the following information to the USDOC:

> We note that 100 percent of Tokyo Steel's sales of subject hot-rolled steel to the United States are manufactured to order. Also, Tokyo Steel does not sell from inventory in either the U.S. or home market.  Accordingly, all production of hot-rolled steel is shipped to a customer immediately after production.
>
> **U.S. Sales**
>
> Tokyo Steel's U.S. sales during the review period were made through [
>                                             ]. For all sales made to this unaffiliated Japanese trading company, the unaffiliated Japanese company [
>         ]
>
> . . .
>
> As indicated above, **with respect to U.S. sales**, there was [
>                         ]; namely, U.S. sales made to an unaffiliated Japanese
> [                    ]. And, within this channel of distribution, **Tokyo Steel had**
> [                              ]
>
> . . .

Notwithstanding that [     ] percent of all US subject hot-rolled sales and a majority of all home market subject hot-rolled sales made by Tokyo Steel were sold through trading companies, Tokyo Steel knows the ultimate destination of the shipment. The reason is straightforward. Every sale is produced to order and therefore Tokyo Steel knows the identity of  the actual U.S. and home market customer to whom the merchandise is sold.

**Attachment 4** (providing relevant pages of Tokyo Steel's Section A response) (emphasis in original) (emphasis supplied).

12.     In addition to narrative answers to the USDOC questions, Tokyo Steel's Section A response provided supporting documentation as exhibits.  Specifically, Exhibit A-9 provided a complete "sales trace" for one of Tokyo Steel's U.S. sales of hot-rolled steel made to [        ].  (A copy of Exhibit A-9 is provided in **Attachment 5**).  The documentation in Exhibit A-9 makes clear that Tokyo Steel's U.S. sales of hot-rolled steel were made to "[                    ] and imported by [
            ]"

13.     On  March 8, 2018 Tokyo Steel submitted to the USDOC its certified response to Section C of the USDOC's AD questionnaire.  Tokyo Steel's Section C Response consisted of three primary parts.  The most important part was the submission of a computer sales file that provided a listing of each and every U.S. shipment of the hot-rolled steel under review by Tokyo Steel made during the review period, March 22, 2016 – September 30, 2017.

14.     Pursuant to the Commerce Department's instructions, "each and every U.S. shipment of hot-rolled steel" equaled each and every shipment by Tokyo Steel according to the date when Tokyo Steel's shipment left the port (which is located at the factory).  Or stated differently, the shipment-by-shipment listing included all those U.S. shipments the left Tokyo Steel's port (destined for the United States) during the time period March 22, 2016 – September 30, 2017.  Consequently, given the approximate 3 – 4 weeks of time on the water, Tokyo Steel's U.S. sales computer file included shipment transactions during September 2017 that did not enter the United States until after September 2017.

15.     Tokyo Steel's Section C response also included a narrative portion that both provide specific answers to the USDOC questions and detailed the contents of each field in the submitted U.S. sales computer file.  And the third part of Tokyo Steel's Section C response was exhibits that provided additional supporting documentation requested by the USDOC.

16.      Of particular relevance was Tokyo Steel's response to question "field number 6.0 Customer Code"

> **FIELD NUMBER 6.0: Customer Code**
>
> FIELD NAME: CUSCODU

DESCRIPTION: Report the name of the customer or the internal accounting code designating the customer, as used in your normal course of business.

NARRATIVE: Provide a list of customer names and codes as an attachment to your narrative response.

**ANSWER**: Tokyo Steel has reported this field as requested. Tokyo Steel had the following U.S. customer(s) during the POR:

[                                                    ]

(Relevant pages of Tokyo Steel's Section C Response, including Exhibit C-5, are provided in **Attachment 6**).

17.     Tokyo Steel Exhibit C-5 made clear that Tokyo Steel's internal code for [        ] was [            ].

18.     Again, Tokyo Steel's Section C response contained a computer sales listing of every Tokyo Steel U.S. shipment of hot-rolled steel made during the POR1 time period.  Such sales listing indicated that there were a total of [        ] U.S. sales transactions with an invoice date in the POR1 time period.  Each sales transaction contained a number of different fields providing data and information requested by the USDOC.  Among others, such fields of the Tokyo Steel U.S. sales listing included:

| Field name | Field description |
|---|---|
| PRODCIDU1 & PRODCODU3 | Product code |
| CUSCODU1 | Primary customer |
| CUSCODU3 | End customer |
| ORDNUMU | Order number |
| ORDDATEU | Order date |
| INVOICEU | Invoice number |
| SALINDTU | Invoice date |
| SHIPDATU | Shipment date |
| VESSEL_NAME | Vessel name |
| STATEU | Destination state |
| QTYU1 | Shipment quantity (metric tons) |
| QTYU2 | Shipment quantity (kgs) |

(A print-out of sample transactions of the Tokyo Steel Section C (U.S. sales) database was provided to USDOC as Exhibit C-1 to Tokyo Steel's Section C Response.  This exhibit is provided in **Attachment 7**.)

19.     On July 11, 2018 the USDOC issued a supplemental questionnaire to Tokyo Steel to seek clarification, confirmation or additional information with respect to the data and information that Tokyo Steel had provide as part of the AD review.  Of particular relevance was the following question:

    16. You use at least [

                    ]. What is the official name of your U.S. customer and all

its affiliated companies that you deal with? Explain how they are related to each other and your interactions with them.

20.    On August 1, 2018 Tokyo Steel submitted to the USDOC its certified supplemental questionnaire response that set forth the following answer to the USDOC question above:

> **ANSWER**: . . [                ] is a shortened form, or another name for, [                ]. . . . This customer . . . is an unaffiliated trading company located in Japan to whom Tokyo Steel makes all sales destined to the US market.

**Attachment 8** (Relevant pages of Tokyo Steel's certified supplemental questionnaire response).

21.    This clarification response made by Tokyo Steel - in response to a specific question by USDOC - made crystal clear that "[                ]" was essentially a Tokyo Steel internal nickname for [                ]. Or stated differently, Tokyo Steel's only Japanese trading company customer for all of its U.S. shipments was [                ].

22.    Every computer file that we submitted to the USDOC contained a specific computer file name. The latest version of Tokyo Steel's U.S. sales database submitted to the USDOC was called tsussales02.

**The USDOC's Final AD Review Determination**

23.    On June 21, 2019 the USDOC released its final results for its AD review of Hot-Rolled Steel from Japan for the review period, March 22, 2016 – September 30, 2017. (A copy of USDOC's Final Determination and Issues and Decision Memorandum are provide in **Attachment 9**).

24.    The USDOC final results release consisted of, among other items the USDOC's calculation package detailing the specific AD margin calculation methodology employed and the databases used for the USDOC's calculation of Tokyo Steel's AD rate for POR1. (The relevant pages of the USDOC's calculation package for the final AD review results are provided in **Attachments 10 and 11**).

25.    The USDOC's final results calculation package makes clear that the USDOC utilized Tokyo Steel's U.S. sales database called tsussales02 to calculate both Tokyo Steel's AD rate <u>and</u> the importer-specific assessment AD rate.

**Confirmation that Sales Transactions to Optima Steel Were Included in USDOC's AD Assessment Rate Calculation for Tokyo Steel Provided to Customs.**

26.    In **Attachment 12** I provide those U.S. sales transactions that USDOC relied upon in calculating Tokyo Steel's AD rate of 2.06 percent and the importer specific assessment rate of $[      ] per MT. Specifically, I provided all those U.S. sales transactions for which the invoice date was during the POR. I note that all of these

sales had a CUSCODU of [            ] (indicating [                   ] was the customer).

27.     I set forth below a summary of all of Tokyo Steel's individual U.S. sales transactions (with a date of sale within the POR) submitted to the USDOC for the 2016-2017 hot-rolled AD review.  The summary below provides the total quantity associated with the name of each vessel used to export Tokyo Steel's hot-rolled steel to the United States.

| | Vessel Name | Sailing Month | Quantity (MT) | |
|---|---|---|---|---|
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| [ | | | | ] |
| | *TOTAL* | | [ | ] |

28.     Again, the total quantity indicated above equals the sum of all of Tokyo Steel's individual U.S. sales transactions that were included in the Commerce Department's antidumping rate calculation for the 2016-2017 antidumping review.  Such fact is evidenced by the fact that this total quantity ties exactly to the specific page in the Commerce Department's antidumping margin calculation "output" for deriving (a) Tokyo Steel's new AD cash deposit rate of 2.06% **and** (b) the importer specific AD assessment rate of [               ].

29.     The summary calculation of Tokyo Steel's new AD cash deposit rate is provided in the USDOC's "Final Results Margin Calculation for Tokyo Steel."  (A copy of the relevant pages are provided in **Attachment 10**).  As can be seen therein, the total quantity of [               ] was used to calculate Tokyo Steel's new AD rate of 2.06%.

30.     And the summary calculation of the USDOC's "importer specific AD assessment rate" is provided on in the USDOC's "Output" of its AD margin calculation program.  (Copies of the relevant pages are provided in **Attachment 11**).  As can be seen therein, the total quantity of [             ] (column B) was used to derive the "per-unit {AD} assessment rate" of [            ].

31.     The USDOC's customer specific assessment calculation page makes clear that the USDOC calculated only a single—just one—customer specific AD assessment rate for Tokyo Steel's hot-rolled steel AD review.  Had USDOC believed there were

Public Version

multiple U.S. customers, USDOC would have calculated multiple importer-specific assessment rates. But USDOC did not do so.

32.    Moreover, a comparison of the Optima's import entry documentation with the USDOC's company-specific assessment calculation page makes crystal clear that all of the sales transactions that make up Optima's import entries of hot-rolled steel during POR1 were the very same sales transactions that the USDOC utilized to calculate Tokyo Steel's AD assessment rate.

33.    **Exhibit 7** of the complaint provides the USDOC's liquidation instruction sent to CBP for the 2016-2017 AD review.  As detailed therein (page 2 of the pdf), the AD assessment rate for "[          ]" is [                    ].

I declare under the pains and penalties of perjury that the foregoing is true and correct.


Executed on March 8, 2021



Amber Jeffcoat


District of Columbia
Signed and sworn to (or affirmed) before me
on _5/8/2021_ by _Amber Jeffcoat_
    Date              Name(s) of Individual(s) making Statement

_____
Signature of Notarial Officer

_Paralegal_
Title of Office

My commission expires: _4/14/2025_

# List of Attachments

| | |
|---|---|
| Attachment 1 | USDOC's Initiation Notice for 2016-2017 AD Review of Hot-Rolled Steel from Japan |
| Attachment 2 | USDOC's Preliminary Determination and Preliminary Issues and Decision Memorandum for 2016-2017 AD Review of Hot-Rolled Steel from Japan |
| Attachment 3 | USDOC AD Questionnaire Issued to Tokyo Steel for 2016-2017 AD Review of Hot-Rolled Steel from Japan |
| Attachment 4 | Tokyo Steel's Certified Section A Questionnaire Response, dated February 20, 2018, submitted to USDOC (relevant pages) |
| Attachment 5 | Exhibit A-9 of Tokyo Steel's Certified Section A Questionnaire Response, dated February 20, 2018, submitted to USDOC (relevant pages) |
| Attachment 6 | Tokyo Steel's Certified Section C Questionnaire Response, dated March 8, 2018, submitted to USDOC (relevant pages) |
| Attachment 7 | Exhibit C-1 of Tokyo Steel Certified Section C Questionnaire Response (providing print-out of sample transactions from Tokyo Steel's Section C U.S. sales database submitted to USDOC). |
| Attachment 8 | Tokyo Steel's Certified Supplemental Sections A-C Questionnaire Response, dated August 1, 2018, submitted to USDOC (relevant pages) |
| Attachment 9 | USDOC's Final Determination and Final Issues and Decision Memorandum for 2016-2017 AD Review of Hot-Rolled Steel from Japan |
| Attachment 10 | USDOC's Final Analysis Memorandum for Tokyo Steel for 2016-2017 AD Review of Hot-Rolled Steel from Japan |
| Attachment 11 | USDOC AD Margin Calculation Documents for Tokyo Steel re 2016-2017 AD Review of Hot-Rolled Steel from Japan (relevant pages) |
| Attachment 12 | A list of all U.S. sales transactions that USDOC relied upon in calculating Tokyo Steel's AD rate of 2.06 percent and the company-specific rate of [                ] |

# ATTACHMENT 1


• Reinstated question on Intellectual Property Protection in Section 7 which had been collected in previous years.

From 2008–2015, the BRDIS collected R&D and innovation data from companies with five or more employees. In 2016, the BRDIS collected R&D and innovation data from companies with at least one paid employee. Beginning with the 2017 survey (collected in 2018), the BRDS will no longer collect innovation data, and only companies with at least 10 paid employees will be in scope. The Census Bureau will continue to collect R&D data from companies with fewer than 10 employees, and innovation data from all companies, however, beginning in 2017, these data will be collected on a new survey, the Annual Business Survey. Accordingly, we are also changing the name of the collection to the Business Research and Development Survey—dropping Innovation (BRDS).

Information from the BRDS will continue to support the America COMPETES Reauthorization Act of 2010 as well as other R&D-related initiatives introduced during the clearance period. Other initiatives that have used BRDS statistics include: The Science of Science and Innovation Policy (NSF); and Rising Above the Gathering Storm (National Research Council).

Policy officials from many Federal agencies rely on these statistics for essential information. Businesses and trade organizations rely on BRDS data to benchmark their industry's performance against others. For example, total U.S. R&D expenditures statistics have been used by the Bureau of Economic Analysis (BEA) to update the National Income and Product Accounts (NIPAs) and, in fact, the BEA recently has recognized and incorporated R&D as fixed investment in the NIPA. Accurate R&D data are needed to continue the development and effect subsequent updates to this detailed satellite account. Also, NSF, BEA and the Census Bureau periodically update a data linking project that utilizes BRDS data to augment global R&D investment information that is obtained from BEA's Foreign Direct Investment (FDI) and U.S. Direct Investment Abroad (USDIA) surveys. Further, the Census Bureau links data collected by BRDS with other statistical files. At the Census Bureau, historical company-level R&D data are linked to a file that contains information on the outputs and inputs of companies' manufacturing plants. Researchers are able to analyze the relationships between R&D funding and other economic variables by using micro-level data.

Individuals and organizations access the survey statistics via the Internet in annual InfoBriefs published by NSF's National Center for Science and Engineering Statistics (NCSES) that announce the availability of statistics from each cycle of BRDS and detailed statistical table reports that contain all of the statistics NSF produces from BRDS. Information about the kinds of projects that rely on statistics from BRDS is available from internal records of NSF's NCSES. In addition, survey statistics are regularly cited in trade publications and many researchers use the survey statistics from these secondary sources without directly contacting NSF or the Census Bureau.

*Affected Public:* Business or other for-profit.

*Frequency:* Annually.

*Respondent's Obligation:* Mandatory.

*Legal Authority:* Title 13, United States Code, Sections 8(b), 131, and 182; Title 42, United States Code, Sections 1861–76 (National Science Foundation Act of 1950, as amended).

This information collection request may be viewed at *www.reginfo.gov.* Follow the instructions to view Department of Commerce collections currently under review by OMB.

Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *OIRA_Submission@omb.eop.gov* or fax to (202) 395–5806.

**Sheleen Dumas,**

*Departmental PRA Lead, Office of the Chief Information Officer.*

[FR Doc. 2017–26385 Filed 12–6–17; 8:45 am]

**BILLING CODE 3510–07–P**

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

[B–50–2017]

### Foreign-Trade Zone (FTZ) 98—Birmingham, Alabama, Authorization of Production Activity, Brose Tuscaloosa, Inc., (Automotive Seats, Drives and Door Frames), Vance, Alabama

On August 2, 2017, Brose Tuscaloosa, Inc. submitted a notification of proposed production activity to the FTZ Board for its facility within FTZ 98 in Vance, Alabama.

The notification was processed in accordance with the regulations of the FTZ Board (15 CFR part 400), including notice in the **Federal Register** inviting public comment (82 FR 37191, August 9, 2017). On November 30, 2017, the

applicant was notified of the FTZ Board's decision that no further review of the activity is warranted at this time. The production activity described in the notification was authorized, subject to the FTZ Act and the FTZ Board's regulations, including Section 400.14.

Dated: December 1, 2017.

**Andrew McGilvray,**

*Executive Secretary.*

[FR Doc. 2017–26379 Filed 12–6–17; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

### Initiation of Antidumping and Countervailing Duty Administrative Reviews

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (the Department) has received requests to conduct administrative reviews of various antidumping and countervailing duty orders and findings with October anniversary dates. In accordance with the Department's regulations, we are initiating those administrative reviews.

**DATES:** Applicable December 7, 2017.

**FOR FURTHER INFORMATION CONTACT:** Brenda E. Brown, Office of AD/CVD Operations, Customs Liaison Unit, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW., Washington, DC 20230, telephone: (202) 482–4735.

**SUPPLEMENTARY INFORMATION:**

### Background

The Department has received timely requests, in accordance with 19 CFR 351.213(b), for administrative reviews of various antidumping and countervailing duty orders and findings with October anniversary dates.

All deadlines for the submission of various types of information, certifications, or comments or actions by the Department discussed below refer to the number of calendar days from the applicable starting time.

### Notice of No Sales

If a producer or exporter named in this notice of initiation had no exports, sales, or entries during the period of review (POR), it must notify the Department within 30 days of publication of this notice in the **Federal Register**. All submissions must be filed electronically at *http://access.trade.gov*

in accordance with 19 CFR 351.303.[1] Such submissions are subject to verification in accordance with section 782(i) of the Tariff Act of 1930, as amended (the Act). Further, in accordance with 19 CFR 351.303(f)(1)(i), a copy must be served on every party on the Department's service list.

### Respondent Selection

In the event the Department limits the number of respondents for individual examination for administrative reviews initiated pursuant to requests made for the orders identified below, the Department intends to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports during the period of review. We intend to place the CBP data on the record within five days of publication of the initiation notice and to make our decision regarding respondent selection within 30 days of publication of the initiation **Federal Register** notice. Comments regarding the CBP data and respondent selection should be submitted seven days after the placement of the CBP data on the record of this review. Parties wishing to submit rebuttal comments should submit those comments five days after the deadline for the initial comments.

In the event the Department decides it is necessary to limit individual examination of respondents and conduct respondent selection under section 777A(c)(2) of the Act:

In general, the Department has found that determinations concerning whether particular companies should be ''collapsed'' (*i.e.,* treated as a single entity for purposes of calculating antidumping duty rates) require a substantial amount of detailed information and analysis, which often require follow-up questions and analysis. Accordingly, the Department will not conduct collapsing analyses at the respondent selection phase of this review and will not collapse companies at the respondent selection phase unless there has been a determination to collapse certain companies in a previous segment of this antidumping proceeding (*i.e.,* investigation, administrative review, new shipper review, or changed circumstances review). For any company subject to this review, if the Department determined, or continued to treat, that company as collapsed with others, the Department

will assume that such companies continue to operate in the same manner and will collapse them for respondent selection purposes. Otherwise, the Department will not collapse companies for purposes of respondent selection. Parties are requested to (a) identify which companies subject to review previously were collapsed, and (b) provide a citation to the proceeding in which they were collapsed. Further, if companies are requested to complete the Quantity and Value (Q&V) Questionnaire for purposes of respondent selection, in general each company must report volume and value data separately for itself. Parties should not include data for any other party, even if they believe they should be treated as a single entity with that other party. If a company was collapsed with another company or companies in the most recently completed segment of this proceeding where the Department considered collapsing that entity, complete Q&V data for that collapsed entity must be submitted.

### Deadline for Withdrawal of Request for Administrative Review

Pursuant to 19 CFR 351.213(d)(1), a party that has requested a review may withdraw that request within 90 days of the date of publication of the notice of initiation of the requested review. The regulation provides that the Department may extend this time if it is reasonable to do so. In order to provide parties additional certainty with respect to when the Department will exercise its discretion to extend this 90-day deadline, interested parties are advised that the Department does not intend to extend the 90-day deadline unless the requestor demonstrates that an extraordinary circumstance has prevented it from submitting a timely withdrawal request. Determinations by the Department to extend the 90-day deadline will be made on a case-by-case basis.

### Separate Rates

In proceedings involving non-market economy (NME) countries, the Department begins with a rebuttable presumption that all companies within the country are subject to government control and, thus, should be assigned a single antidumping duty deposit rate. It is the Department's policy to assign all exporters of merchandise subject to an administrative review in an NME country this single rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a separate rate.

To establish whether a firm is sufficiently independent from government control of its export activities to be entitled to a separate rate, the Department analyzes each entity exporting the subject merchandise. In accordance with the separate rates criteria, the Department assigns separate rates to companies in NME cases only if respondents can demonstrate the absence of both *de jure* and *de facto* government control over export activities.

All firms listed below that wish to qualify for separate rate status in the administrative reviews involving NME countries must complete, as appropriate, either a separate rate application or certification, as described below. For these administrative reviews, in order to demonstrate separate rate eligibility, the Department requires entities for whom a review was requested, that were assigned a separate rate in the most recent segment of this proceeding in which they participated, to certify that they continue to meet the criteria for obtaining a separate rate. The Separate Rate Certification form will be available on the Department's Web site at *http://enforcement.trade.gov/nme/ nme-sep-rate.html* on the date of publication of this **Federal Register** notice. In responding to the certification, please follow the ''Instructions for Filing the Certification'' in the Separate Rate Certification. Separate Rate Certifications are due to the Department no later than 30 calendar days after publication of this **Federal Register** notice. The deadline and requirement for submitting a Certification applies equally to NME-owned firms, wholly foreign-owned firms, and foreign sellers who purchase and export subject merchandise to the United States.

Entities that currently do not have a separate rate from a completed segment of the proceeding [2] should timely file a Separate Rate Application to demonstrate eligibility for a separate rate in this proceeding. In addition, companies that received a separate rate in a completed segment of the proceeding that have subsequently made changes, including, but not

---

[1] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures,* 76 FR 39263 (July 6, 2011).

[2] Such entities include entities that have not participated in the proceeding, entities that were preliminarily granted a separate rate in any currently incomplete segment of the proceeding (*e.g.,* an ongoing administrative review, new shipper review, *etc.*) and entities that lost their separate rate in the most recently completed segment of the proceeding in which they participated.

Case 1:21-cv-00827-MAB   Document 21   Filed 07/09/21   Page 63 of 863
Barcode:3648974-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17
**Federal Register**/Vol. 82, No. 234/Thursday, December 7, 2017/Notices

**57707**

limited to, changes to corporate structure, acquisitions of new companies or facilities, or changes to their official company name,[3] should timely file a Separate Rate Application to demonstrate eligibility for a separate rate in this proceeding. The Separate Rate Status Application will be available on the Department's Web site at *http://enforcement.trade.gov/nme/ nme-sep-rate.html* on the date of publication of this **Federal Register** notice. In responding to the Separate Rate Status Application, refer to the instructions contained in the application. Separate Rate Status Applications are due to the Department no later than 30 calendar days of publication of this **Federal Register** notice. The deadline and requirement for submitting a Separate Rate Status Application applies equally to NME-owned firms, wholly foreign-owned firms, and foreign sellers that purchase and export subject merchandise to the United States.

For exporters and producers who submit a separate-rate status application or certification and subsequently are selected as mandatory respondents, these exporters and producers will no longer be eligible for separate rate status unless they respond to all parts of the questionnaire as mandatory respondents.

*Initiation of Reviews*

In accordance with 19 CFR 351.221(c)(1)(i), we are initiating administrative reviews of the following antidumping and countervailing duty orders and findings. We intend to issue the final results of these reviews not later than October 31, 2018.

| | Period to be reviewed |
|---|---|
| **Antidumping Duty Proceedings** | |
| Australia: Certain Hot-Rolled Steel Flat Products A–602–809 ............................................................................ | 3/22/16–9/30/17 |
| BlueScope Steel, Ltd. | |
| BlueScope Steel Americas, Inc | |
| Steelscape LLC | |
| Brazil: Carbon and Certain Alloy Steel Wire Rod A–351–832 ........................................................................... | 10/1/16–9/30/17 |
| ArcelorMittal Brasil SA | |
| Siderurgica Norte Brasil SA | |
| Sinobras | |
| Villares Metals SA | |
| Votorantim Siderurgia | |
| Brazil: Hot-Rolled Steel Flat Products A–351–845 ........................................................................................... | 3/22/16–9/30/17 |
| Aperam South America | |
| ArcelorMittal Brasil | |
| CSN—Companhia Siderurgica Nacional | |
| CSS—Companhia Siderurgica Suape | |
| Marcegaglia do Brasil | |
| Usiminas—Usinas Siderurgicas de Minas Gerais SA | |
| Japan: Certain Hot-Rolled Steel Flat Products A–588–874 ............................................................................... | 3/22/16–9/30/17 |
| Hanwa Co., Ltd | |
| Hitachi Metals, Ltd | |
| Honda Trading Canada, Inc | |
| JFE Steel Corporation | |
| JFE Shoji Trade America | |
| Kanematsu Corporation | |
| Kobe Steel, Ltd | |
| Mitsui & Co., Ltd | |
| Miyama Industry Co., Ltd | |
| Nippon Steel & Sumitomo Metal Corporation | |
| Nippon Steel & Sumikin Logistics Co., Ltd | |
| Nisshin Steel Co., Ltd | |
| Okaya & Co., Ltd | |
| Panasonic Corporation | |
| Saint-Gobain KK | |
| Shinsho Corporation | |
| Sumitomo Corporation | |
| Suzukaku Corporation | |
| Tokyo Steel Manufacturing Co., Ltd | |
| Toyota Tsusho Corporation Nagoya | |
| Mexico: Carbon and Certain Alloy Steel Wire Rod A–201–830 .......................................................................... | 10/1/16–9/30/17 |
| ArcelorMittal Mexico, S.A. de C.V | |
| ArcelorMittal Las Truchas, S.A. de C.V | |
| Deacero S.A.P.I. de C.V | |
| Ternium Mexico S.A. de C.V | |
| Republic of Korea: Hot-Rolled Steel Flat Products A–580–883 ......................................................................... | 3/22/16–9/30/17 |
| Daewoo International Corp | |
| Dongbu Steel Co., Ltd | |
| Dongkuk Industries Co., Ltd | |
| Hyundai Steel Co | |
| Marubeni-Itochu Steel Korea | |
| POSCO | |
| POSCO Processing & Service Co | |
| Soon Hong Trading Co | |
| Sungjin Co | |
| The Netherlands: Hot-Rolled Steel Flat Products A–421–813 ............................................................................. | 3/22/16–9/30/17 |
| Tata Steel Ijmuiden BV | |
| The People's Republic of China: Certain Passenger Vehicle and Light Truck Tires [4] A–570–016 ...................... | 8/1/16–7/31/17 |
| Cheng Shin Tire & Rubber (China) Co., Ltd. | |
| Shandong Haolong Rubber Tire Co., Ltd. | |
| The People's Republic of China: Certain Steel Nails [5] A–570–909 .................................................................... | 8/1/16–7/31/17 |

---

[3] Only changes to the official company name, rather than trade names, need to be addressed via a Separate Rate Application. Information regarding new trade names may be submitted via a Separate Rate Certification.

|  | Period to be reviewed |
|---|---|
| The People's Republic of China: Electrolytic Managanese Dioxide A–570–919 ................................................ | 10/1/16–9/30/17 |
|     Shenzhen Pengcheng South Industry and Trade Co., Ltd. |  |
| The People's Republic of China: Multilayered Wood Flooring[6] A–570–970 ................................................ | 12/1/15–11/30/16 |
|     Den Hua Sen Tai Wood Co. Ltd |  |
|     Hangzhou Hanje Tec Co. Ltd |  |
| The People's Republic of China: Steel Wire Garment Hangers A–570–918 ................................................ | 10/1/16–9/30/17 |
|     Da Sheng Hanger Ind. Co., Ltd |  |
|     Hangzhou Qingqing Mechanical Co. Ltd |  |
|     Hangzhou Yingqing Material Co. Ltd |  |
|     Hangzhou Yinte |  |
|     Hong Kong Wells Ltd. (USA) |  |
|     Hong Kong Wells Ltd |  |
|     Shanghai Guoxing Metal Products Co. Ltd |  |
|     Shanghai Jianhai International Trade Co. Ltd |  |
|     Shanghai Wells Hanger Co., Ltd |  |
|     Shangyu Baoxiang Metal Manufactured Co. Ltd |  |
|     Shaoxing Andrew Metal Manufactured Co. Ltd |  |
|     Shaoxing Dingli Metal Clotheshorse Co. Ltd |  |
|     Shaoxing Gangyuan Metal Manufactured Co. Ltd |  |
|     Shaoxing Guochao Metallic Products Co., Ltd |  |
|     Shaoxing Liangbao Metal Manufactured Co. Ltd |  |
|     Shaoxing Meideli Hanger Co. Ltd |  |
|     Shaoxing Shunji Metal Clotheshorse Co., Ltd |  |
|     Shaoxing Tongzhou Metal Manufactured Co. Ltd |  |
|     Shaoxing Zhongbao Metal Manufactured Co. Ltd |  |
|     Zhejiang Lucky Cloud Hanger Co. Ltd |  |
| Turkey: Hot-Rolled Steel Flat Products A–489–826 ................................................ | 3/22/16–9/30/17 |
|     Agir Haddecilik A.S |  |
|     Colakoglu Dis Ticaret A.S |  |
|     Colakoglu Metalurji, A.S |  |
|     Eregrli Demir ve Celik Fabrikalari T.A.S |  |
|     Gazi Metal Mamulleri Sanayi Ve Ticaret A.S |  |
|     Habas Industrial and Medical Gases Production Industries Inc |  |
|     Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi |  |
|     Iskenderun Iron & Steel Works Co |  |
|     MMK Atakas Metalurji |  |
|     Ozkan Iron and Steel Ind |  |
|     Toscelik Profile and Sheet Ind. Co. Tosyali Holding |  |
| **Countervailing Duty Proceedings** |  |
| Brazil: Carbon and Certain Alloy Steel Wire Rod C–351–833 ................................................ | 1/1/16–12/31/16 |
|     ArcelorMittal Brasil SA |  |
|     Sinobras—Siderurgica Norte Brasil SA |  |
|     Villares Metals SA |  |
|     Votorantim Siderurgia |  |
| Brazil: Hot-Rolled Steel Flat Products C–351–846 ................................................ | 1/15/16–12/31/16 |
|     Companhia Siderurgica Nacional S.A |  |
| Republic of Korea: Hot-Rolled Steel Flat Products C–580–884 ................................................ | 8/12/16–12/31/16 |
|     DCE Inc |  |
|     Dong Chuel America Inc |  |
|     Dongbu Steel Co., Ltd |  |
|     Dongkuk Industries Co., Ltd |  |
|     Hyewon Sni Corporation (H.S.I.) |  |
|     Hyundai Steel Company |  |
|     POSCO |  |
|     Soon Hong Trading Co., Ltd |  |
|     Sung-A Steel Co., Ltd |  |
| Turkey: Oil Country Tubular Goods[7] C–489–817 ................................................ | 1/1/16–12/31/16 |
|     Borusan Mannesmann Boru Sanayi ve Ticaret A.S |  |
|     Borusan Istikbal Ticaret |  |
|     Cayirova Boru San A.S |  |
|     Cayirova Boru Sanayi ve Ticaret A.S |  |
|     HG Tubulars Canada Ltd |  |
|     Yucel Boru Ihracat ve Pazarlama A.S |  |
|     Yucelboru Ihracat, Ithalat |  |
| **Suspension Agreements** |  |
| Russia: Uranium A–821–802 ................................................ | 10/1/16–9/30/17 |

## Duty Absorption Reviews

During any administrative review covering all or part of a period falling initiated on the antidumping duty order of Certain Steel Nails from the PRC for R-Time Group Inc.; Unicore Tianjin Fasteners Co. Ltd.; Anjing Caiquing Hardware Co., Ltd.; and Nanjing Caiquing Hardware Co. Ltd. The Department is now correcting that notice. The Department is initiating administrative reviews on the antidumping duty order of Certain Steel Nails from the PRC for the following companies: (1) Ri-Time Group Inc.; (2) Unicorn Tianjin Fasteners Co. Ltd.; (3) Nanjing Caiqing Hardware Co., Ltd.; (4) Hebei Handform Plastic Products Co. Ltd.; (5) Hebei Minghao Imp. & Exp.

Co. Ltd.; (6) Hengtuo Metal Products Co. Ltd; (7) Shandong Dinglong Import & Export Co., Ltd; (8) Nanjing Toua Hardware & Tools Co., Ltd.; and (9) Hebei Minmetals Co. Ltd.

[6] The companies listed above were inadvertently omitted from the initiation notice that published on February 13, 2017 (82 FR 10457).

[7] In the initiation notice that published on November 13, 2017 (82 FR 52268) the Department inadvertently duplicated the list of companies for Oil Country Tubular Goods from Tukey and included Tosyali Dis Ticaret A.S. in the initiation.

[4] The companies listed above were misspelled in the initiation notice that published on October 16, 2017 (82 FR 48051). The correct spelling of the companies is listed in this notice.

[5] In the initiation that published on October 16, 2017 (82 FR 48051), the Department incorrectly identified that an administrative review was

between the first and second or third and fourth anniversary of the publication of an antidumping duty order under 19 CFR 351.211 or a determination under 19 CFR 351.218(f)(4) to continue an order or suspended investigation (after sunset review), the Secretary, if requested by a domestic interested party within 30 days of the date of publication of the notice of initiation of the review, will determine whether antidumping duties have been absorbed by an exporter or producer subject to the review if the subject merchandise is sold in the United States through an importer that is affiliated with such exporter or producer. The request must include the name(s) of the exporter or producer for which the inquiry is requested.

## Gap Period Liquidation

For the first administrative review of any order, there will be no assessment of antidumping or countervailing duties on entries of subject merchandise entered, or withdrawn from warehouse, for consumption during the relevant provisional-measures ''gap'' period, of the order, if such a gap period is applicable to the POR.

## Administrative Protective Orders and Letters of Appearance

Interested parties must submit applications for disclosure under administrative protective orders in accordance with the procedures outlined in the Department's regulations at 19 CFR 351.305. Those procedures apply to administrative reviews included in this notice of initiation. Parties wishing to participate in any of these administrative reviews should ensure that they meet the requirements of these procedures (*e.g.,* the filing of separate letters of appearance as discussed in 19 CFR 351.103(d)).

## Factual Information Requirements

The Department's regulations identify five categories of factual information in 19 CFR 351.102(b)(21), which are summarized as follows: (i) Evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by the Department; and (v) evidence other than factual information

described in (i)–(iv). These regulations require any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct. The regulations, at 19 CFR 351.301, also provide specific time limits for such factual submissions based on the type of factual information being submitted. Please review the final rule, available at *http://enforcement.trade.gov/frn/2013/1304frn/2013-08227.txt,* prior to submitting factual information in this segment.

Any party submitting factual information in an antidumping duty or countervailing duty proceeding must certify to the accuracy and completeness of that information.[8] Parties are hereby reminded that revised certification requirements are in effect for company/government officials as well as their representatives. All segments of any antidumping duty or countervailing duty proceedings initiated on or after August 16, 2013, should use the formats for the revised certifications provided at the end of the *Final Rule.*[9] The Department intends to reject factual submissions in any proceeding segments if the submitting party does not comply with applicable revised certification requirements.

## Extension of Time Limits Regulation

Parties may request an extension of time limits before a time limit established under Part 351 expires, or as otherwise specified by the Secretary. *See* 19 CFR 351.302. In general, an extension request will be considered untimely if it is filed after the time limit established under Part 351 expires. For submissions which are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. on the due date. Examples include, but are not limited to: (1) Case and rebuttal briefs, filed pursuant to 19 CFR 351.309; (2) factual information to value factors under 19 CFR 351.408(c), or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2), filed pursuant to 19

CFR 351.301(c)(3) and rebuttal, clarification and correction filed pursuant to 19 CFR 351.301(c)(3)(iv); (3) comments concerning the selection of a surrogate country and surrogate values and rebuttal; (4) comments concerning U.S. Customs and Border Protection data; and (5) quantity and value questionnaires. Under certain circumstances, the Department may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, the Department will inform parties in the letter or memorandum setting forth the deadline (including a specified time) by which extension requests must be filed to be considered timely. This modification also requires that an extension request must be made in a separate, stand-alone submission, and clarifies the circumstances under which the Department will grant untimely-filed requests for the extension of time limits. These modifications are effective for all segments initiated on or after October 21, 2013. Please review the final rule, available at *http://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm,* prior to submitting factual information in these segments.

These initiations and this notice are in accordance with section 751(a) of the Act (19 U.S.C. 1675(a)) and 19 CFR 351.221(c)(1)(i).

Dated: December 1, 2017.

**James Maeder,**

*Senior Director performing the duties of Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2017–26383 Filed 12–6–17; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

## International Trade Administration

[A–570–900]

## Diamond Sawblades and Parts Thereof From the People's Republic of China: Initiation of Anti-Circumvention Inquiry

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** In response to a request from Diamond Sawblades Manufacturers' Coalition (the petitioner), the Department of Commerce (the Department) is initiating an anti-circumvention inquiry to determine whether certain imports of diamond sawblades and parts thereof (diamond sawblades) comprised of cores and

---

However, as noted in that initiation notice, this company was excluded from the CVD order as a result of litigation. *See Oil Country Tubular Goods from the Republic of Turkey: Amendment of Countervailing Duty Order,* 82 FR 46483 (October 26, 2017). This notice serves as a correction.

[8] *See* section 782(b) of the Act.

[9] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* the frequently asked questions regarding the *Final Rule,* available at *http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

# ATTACHMENT 2

is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

## Notification to Interested Parties

This determination is issued and published in accordance with sections 735(d) and 777(i)(1) of the Act and 19 CFR 351.210(c).

Dated: November 5, 2018.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix

### Scope of the Investigation

The merchandise covered by this investigation is welded carbon and alloy steel pipe (including stainless steel pipe), more than 406.4 mm (16 inches) in nominal outside diameter (large diameter welded pipe), regardless of wall thickness, length, surface finish, grade, end finish, or stenciling. Large diameter welded pipe may be used to transport oil, gas, slurry, steam, or other fluids, liquids, or gases. It may also be used for structural purposes, including, but not limited to, piling. Specifically, not included is large diameter welded pipe produced only to specifications of the American Water Works Association (AWWA) for water and sewage pipe.

Large diameter welded pipe used to transport oil, gas, or natural gas liquids is normally produced to the American Petroleum Institute (API) specification 5L. Large diameter welded pipe may also be produced to American Society for Testing and Materials (ASTM) standards A500, A252, or A53, or other relevant domestic specifications, grades and/or standards. Large diameter welded pipe can be produced to comparable foreign specifications, grades and/or standards or to proprietary specifications, grades and/or standards, or can be non-graded material. All pipe meeting the physical description set forth above is covered by the scope of this investigation, whether or not produced according to a particular standard.

Subject merchandise also includes large diameter welded pipe that has been further processed in a third country, including but not limited to coating, painting, notching, beveling, cutting, punching, welding, or any other processing that would not otherwise remove the merchandise from the scope of the investigation if performed in the country of manufacture of the in-scope large diameter welded pipe.

The large diameter welded pipe that is subject to this investigation is currently classifiable in the Harmonized Tariff Schedule of the United States (HTSUS) under subheadings 7305.11.1030, 7305.11.1060, 7305.11.5000, 7305.12.1030, 7305.12.1060, 7305.12.5000, 7305.19.1030, 7305.19.1060, 7305.19.5000, 7305.31.4000, 7305.31.6010, 7305.31.6090, 7305.39.1000 and 7305.39.5000. While the HTSUS subheadings are provided for convenience and customs

purposes, the written description of the scope of this investigation is dispositive.

[FR Doc. 2018–24806 Filed 11–13–18; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–588–874]**

### Certain Hot-Rolled Steel Flat Products From Japan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016–2017

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) preliminarily determines that Nippon Steel & Sumitomo Metal Corporation (Nippon Steel) and Tokyo Steel Manufacturing Co., Ltd. (Tokyo Steel), the two companies selected for individual examination, sold subject merchandise in the United States at prices below normal value during the period of review (POR). Additionally, Commerce preliminarily determines that three other companies for which we initiated reviews had no shipments during the POR. We invite interested parties to comment on these preliminary results.

**DATES:** Applicable November 14, 2018.

**FOR FURTHER INFORMATION CONTACT:** Myrna Lobo or Jack Zhao, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2371 or (202) 482–1396, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

Commerce is conducting an administrative review of the antidumping duty order on certain hot-rolled steel flat products (hot-rolled steel) from Japan. The notice of initiation of this administrative review was published on December 7, 2017.[1] This review covers 20 producers and exporters of the subject merchandise. The POR is March 22, 2016, through September 30, 2017. Commerce selected two mandatory respondents for individual examination: Nippon Steel and Tokyo Steel.

[1] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews,* 82 FR 57705 (December 7, 2017).

## Scope of the Order

The merchandise covered by the order is certain hot-rolled steel flat products. For a complete description of the scope of the order, *see* the Preliminary Decision Memorandum.[2]

## Methodology

Commerce is conducting this review in accordance with section 751(a) of the Tariff Act of 1930, as amended (the Act). Export price and constructed export price are calculated in accordance with section 772 of the Act. NV is calculated in accordance with section 773 of the Act.

For a full description of the methodology underlying our conclusions, *see* the Preliminary Decision Memorandum. The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov,* and to all parties in the Central Records Unit, Room B8024 of the main Department of Commerce building. In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *http://enforcement.trade.gov/ frn/*. The signed and electronic versions of the Preliminary Decision Memorandum are identical in content. A list of the topics discussed in the Preliminary Decision Memorandum is attached as the Appendix to this notice.

## Preliminary Determination of No Shipments

Among the companies under review, four companies, Hitachi Metals, Ltd. (Hitachi), Honda Trading Canada, Inc. (Honda), Mitsui & Co. Ltd. (Mitsui), and Panasonic Corporation (Panasonic) properly filed statements reporting that they made no shipments of subject merchandise to the United States during the POR. Based on the certifications submitted and our analysis of Customs and Border Protection (CBP) information, we preliminarily determine that Hitachi, Honda, and Panasonic had no shipments during the POR.[3]

[2] *See* Memorandum, "Decision Memorandum for the Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments: Certain Hot-Rolled Steel Flat Products from Japan; 2016–2017," dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

[3] *See* Hitachi Letter, "Antidumping Duty Administrative Review of Certain Hot-Rolled Steel Flat Products: Hitachi No Shipment Letter," dated December 18, 2017; *see also* Honda Letter, "Administrative Review of Certain Hot-Rolled Steel
Continued

Consistent with its practice, Commerce finds that it is not appropriate to preliminarily rescind the review with respect to these companies but, rather, to complete the review and issue appropriate instructions to CBP based on the final results of this review. We intend to solicit more information and comments with respect to Mitsui's no shipment certification.[4]

## Preliminary Results of the Review

As a result of this review, we preliminarily determine the following weighted-average dumping margins for the period March 22, 2016, through September 30, 2017:

| Exporter/producer | Weighted-average dumping margin (percent) | |
|---|---|---|
| Nippon Steel & Sumitomo Metal Corporation [5] ............................................. | 0.54. | |
| Nisshin Steel Co., Ltd. [6] ............................................. | 3/22/2016 to 3/12/2017 ................ 1.46 [7] ....................... | 3/13/2017 to 9/30/2017. 0.54. [8] |
| Tokyo Steel Manufacturing Co., Ltd ............................................. | 7.64 | |

Review-Specific Average Rate Applicable to the Following Companies: [9]

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| Hanwa Co., Ltd ............................................. | 1.46 |
| JFE Steel Corporation [10] ............................................. | 1.46 |
| JFE Shoji Trade America ............................................. | 1.46 |
| Kanematsu Corporation ............................................. | 1.46 |
| Kobe Steel, Ltd. ............................................. | 1.46 |
| Mitsui & Co., Ltd. ............................................. | 1.46 |
| Miyama Industry Co., Ltd. ............................................. | 1.46 |
| Nippon Steel & Sumikin Logistics Co., Ltd. ............................................. | 1.46 |
| Okaya & Co. Ltd. ............................................. | 1.46 |
| Saint-Gobain KK ............................................. | 1.46 |
| Shinsho Corporation ............................................. | 1.46 |
| Sumitomo Corporation ............................................. | 1.46 |
| Suzukaku Corporation ............................................. | 1.46 |
| Toyota Tsusho Corporation Nagoya ............................................. | 1.46 |

## Assessment Rates

Upon completion of the administrative review, Commerce shall determine, and CBP shall assess, antidumping duties on all appropriate entries.

Pursuant to 19 CFR 351.212(b)(1), where the mandatory respondents reported the entered value for their U.S. sales, we calculated importer-specific *ad valorem* duty assessment rates based on the ratio of the total amount of dumping calculated for the examined sales to the total entered value of the sales for which entered value was reported. Where the mandatory respondents did not report entered value, we calculated the entered value

---

Flat Products from Japan: Honda Trading Canada, Inc.'s No Shipment Certification," dated December 22, 2017; *see also* Mitsui Letter, "Antidumping Administrative Review of Certain Hot-Rolled Steel Flat Products: Mitsui No Shipment Notification," dated January 5, 2018; *see also* Panasonic Letter, "Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan: Panasonic Corporation No Shipment Certification," dated January 5, 2018. *See also* Public Memorandum, "Re: No shipment inquiry with respect to the companies below during the period 03/22/2016 through 09/30/2017," dated October 23, 2018.

[4] *See* Business Proprietary Memorandum, "Re: No shipment inquiry with respect to the companies below during the period 03/22/2016 through 09/30/2017," dated October 23, 2018.

[5] We collapsed Nippon Steel & Sumikin Bussan Corporation with Nippon Steel & Sumitomo Metal Corporation in the underlying investigation. *See Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Determination of Sales at Less than*

*Fair Value and Postponement of Final Determination*, 81 FR 15222 (March 22, 2016) and accompanying Preliminary Decision Memorandum at 6–7.

[6] We have collapsed Nisshin Steel Co., Ltd. and Nippon Steel & Sumitomo Metal Corporation as of March 13, 2017. *See* Preliminary Decision Memorandum at 9.

[7] Entries of subject merchandise produced/exported by Nisshin Steel Co., Ltd. made prior to March 13, 2017 are subject to the all others rate calculated in this administrative review. See Memorandum re: Calculation of the Review-Specific Average Rate for the Preliminary Results, dated concurrently with this notice.

[8] Entries of subject merchandise produced/exported by Nisshin Steel Co., Ltd. made on/or after March 13, 2017 are subject to the AD rate assigned to Nippon Steel in this administrative review.

[9] This rate is based on the weighted-average margin using the publicly-ranged sales value of mandatory respondents, and is the best proxy of the

actual weighted-average margin determined for the mandatory respondents. Due to requests to protect business proprietary information, we cannot apply our normal methodology of calculating a weighted-average margin. *See Ball Bearings and Parts Thereof from France, et al.: Final Results of Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part*, 75 FR 53661, 53663 (September 1, 2010); *see also* Memorandum re: Calculation of the Review-Specific Average Rate for the Preliminary Results, dated concurrently with this notice.

[10] We collapsed JFE Shoji Trade Corporation with JFE Steel Corporation in the underlying investigation. *See Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Determination of Sales at Less than Fair Value and Postponement of Final Determination*, 81 FR 15222 (March 22, 2016) and accompanying Preliminary Decision Memorandum at 8–9.

in order to calculate the assessment rate. Where either the respondent's weighted-average dumping margin is zero or *de minimis* within the meaning of 19 CFR 351.106(c)(1), or an importer-specific rate is zero or *de minimis*, we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties.

For the companies which were not selected for individual review, we will assign an assessment rate based on the average [11] of the cash deposit rates calculated for the two mandatory respondents. The final results of this review shall be the basis for the assessment of antidumping duties on entries of merchandise covered by the final results of this review and for future deposits of estimated duties, where applicable.[12]

We intend to issue liquidation instructions to CBP 15 days after publication of the final results of this review.

## Cash Deposit Requirements

The following deposit requirements will be effective for all shipments of the subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of the final results of this administrative review, as provided by section 751(a)(2)(C) of the Act: (1) The cash deposit rate for each specific company listed above will be that established in the final results of this review, except if the rate is less than 0.50 percent and, therefore, *de minimis* within the meaning of 19 CFR 351.106(c)(1), in which case the cash deposit rate will be zero; (2) for previously investigated companies not participating in this review, the cash deposit will continue to be the company-specific rate published for the most recently completed segment of this proceeding in which the company participated; (3) if the exporter is not a firm covered in this review, or the underlying investigation, but the manufacturer is, the cash deposit rate will be the rate established for the most recent segment for the manufacturer of the merchandise; and (4) the cash deposit rate for all other manufacturers or exporters will continue to be 5.58 percent, the all-others rate established in the underlying investigation.[13] These

deposit requirements, when imposed, shall remain in effect until further notice.

## Disclosure and Public Comment

Commerce intends to disclose the calculations performed in connection with these preliminary results to interested parties within five days after the date of publication of this notice.[14] Interested parties may submit case briefs not later than 30 days after the date of publication of this notice.[15] Rebuttal briefs, limited to issues raised in the case briefs, may be filed no later than five days after the time limit for filing case briefs.[16] Parties who submit case briefs or rebuttal briefs in this proceeding are encouraged to submit with each argument: (1) A statement of the issue; (2) a brief summary of the argument; and (3) a table of authorities.[17] Case and rebuttal briefs should be filed using ACCESS.[18]

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing must submit a written request to the Assistant Secretary for Enforcement and Compliance, filed electronically via ACCESS. An electronically-filed request for a hearing must be received successfully in its entirety by ACCESS by 5 p.m. Eastern Time within 30 days after the date of publication of this notice.[19] Hearing requests should contain: (1) The party's name, address, and telephone number; (2) the number of participants; and (3) a list of issues to be discussed. Issues raised in the hearing will be limited to issues raised in the briefs. If a request for a hearing is made, parties will be notified of the time and date for the hearing to be held at the U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.[20]

Commerce intends to issue the final results of this administrative review, including the results of its analysis of issues raised in any written briefs, not later than 120 days after the publication of these preliminary results in the **Federal Register**, unless otherwise extended.[21]

## Notification to Importers

This notice also serves as a preliminary reminder to importers of their responsibility under 19 CFR

351.402(f) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in Commerce's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

We are issuing and publishing these results in accordance with sections 751(a)(1) and 777(i)(1) of the Act.

Dated: November 1, 2018.

**James Maeder,**

*Associate Deputy Assistant Secretary, for Antidumping and Countervailing Duty Operations, performing the duties of Deputy Assistant Secretary, for Antidumping and Countervailing Duty Operations.*

## Appendix

**List of Topics Discussed in the Preliminary Decision Memorandum**

I. Summary
II. Background
III. Period of Review
IV. Scope of the Order
V. Preliminary Determination of No Shipments
VI. Single Entity Analysis
VII. Use of Facts Available and Adverse Facts Available
 A. Legal Authority
 B. Application of Facts Available to Nippon Steel
 C. Application of Facts Available with an Adverse Inference
VIII. Review-Specific Average Rate for Non-Examined Companies
IX. Discussion of the Methodology
 A. Normal Value Comparisons
 1. Determination of Comparison Method
 2. Results of the Differential Pricing Analysis
 B. Date of Sale
 C. Product Comparisons
 D. Export Price and Constructed Export Price
 E. Normal Value
 1. Home Market Viability
 2. Affiliated Party Transactions and Arm's-Length Test
 3. Level of Trade
 4. Cost of Production Analysis
 5. Calculation of Normal Value Based on Home Market Prices
X. Currency Conversion
XI. Recommendation

[FR Doc. 2018–24794 Filed 11–13–18; 8:45 am]

**BILLING CODE 3510-DS-P**

---

[11] This rate was calculated as disclosed in footnote 8, above.

[12] *See* section 751(a)(2)(C) of the Act.

[13] *See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and*

*Antidumping Duty Orders,* 81 FR 67962 (October 3, 2016).

[14] *See* 19 CFR 351.224(b).

[15] *See* 19 CFR 351.309(c)(1)(ii).

[16] *See* 19 CFR 351.309(d)(1).

[17] *See* 19 CFR 351.309(c)(2) and (d)(2).

[18] *See* 19 CFR 351.303.

[19] *See* 19 CFR 351.310(c); 19 CFR 351.303(b)(1).

[20] *See* 19 CFR 351.310(c).

[21] *See* Section 751(a)(3)(A) of the Act.

UNITED STATES DEPARTMENT OF COMMERCE
**International Trade Administration**
Washington, D.C. 20230

A-588-874
Administrative Review
03/22/2016 - 9/30/2017
**Public Document**
Office VII: JJZ/ML

**DATE:**  November 1, 2018

**MEMORANDUM TO:**  James Maeder
Associate Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations
 performing the duties of Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations

**FROM:**  Edward Yang
Senior Director, Office VII
Antidumping and Countervailing Duty Operations

**SUBJECT:**  Decision Memorandum for the Preliminary Results of
Antidumping Duty Administrative Review and Preliminary
Determination of No Shipments: Certain Hot-Rolled Steel Flat
Products from Japan; 2016-2017

---

## I.  SUMMARY

In response to requests from interested parties, the Department of Commerce (Commerce) is
conducting an administrative review of the antidumping duty (AD) order on certain hot-rolled
steel flat products (hot-rolled steel) from Japan for the period of review (POR) March 22, 2016,
through September 30, 2017.  This review covers 20 producers/exporters of the subject
merchandise.  Commerce selected two mandatory respondents for individual examination,
Nippon Steel & Sumitomo Metal Corporation (Nippon Steel) and Tokyo Steel Manufacturing
Co., Ltd. (Tokyo Steel).  We preliminarily determine that sales of the subject merchandise were
made below normal value (NV) during the POR.

## II.  BACKGROUND

On October 3, 2016, Commerce published in the *Federal Register* the AD order on hot-rolled
steel from Japan.[1]  On October 4, 2017, we published in the *Federal Register* a notice of
opportunity to request an administrative review of the *Order*.[2]  On October 31, 2017, the

---

[1] *See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands,
the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for
Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders*, 81 FR 67962 (October
3, 2016) (*Order*).
[2] *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request*



Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

petitioners[3] requested an administrative review of 20 Japanese hot-rolled steel producers/exporters.[4]  Based on those timely requests, on December 7, 2017, we initiated an administrative review on these 20 companies.[5]

In the *Initiation Notice*, we stated that, in the event we limited the number of respondents selected for individual examination, we intended to select respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports during the POR.[6]  On December 13, 2017, Commerce released U.S. import data from CBP for the purpose of respondent selection, and provided an opportunity for interested parties to comment on these data.[7]  No interested parties commented on the information contained in the CBP Data Memorandum.

As required by the *Initiation Notice*, four companies timely notified Commerce that they made no shipments of subject merchandise during the POR.

On January 16, 2018, we selected the two producers or exporters accounting for the largest volume of subject merchandise during the POR, in alphabetical order, Nippon Steel and Tokyo Steel as mandatory respondents.[8]  On January 19, 2018, we issued standard AD questionnaires to Nippon Steel and Tokyo Steel.[9]  Nippon Steel and Tokyo Steel submitted timely responses to Section A of the Initial Questionnaire on February 20, 2018,[10] and to the remaining sections of the Initial Questionnaire on March 15, 2018 and March 8, 12 and 19, 2018, respectively.[11]

On July 11, 2018, Commerce issued a supplemental questionnaire to Tokyo Steel regarding its responses to sections A through C of the Initial Questionnaire, and Commerce received responses to this supplemental questionnaire on August 1, 2018.[12]  Commerce issued two supplemental questionnaires to Tokyo Steel regarding its response to section D of the Initial

---

*Administrative Review*, 82 FR 46217 (October 4, 2017).

[3] The petitioners are AK Steel Corporation, ArcelorMittal USA LLC, Nucor Corporation, SSAB Enterprises, LLC, Steel Dynamics, Inc., and United States Steel Corporation (collectively, the petitioners).

[4] *See* the petitioners' October 31, 2017 Letter "re: Certain Hot-Rolled Steel Flat Products from Japan: Request for Administrative Review."

[5] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 FR 57705 (December 7, 2017) (*Initiation Notice*).

[6] *See Initiation Notice*, 82 FR at 57706.

[7] *See* December 13, 2017 Memorandum "Administrative Review of the Antidumping Duty Order on Hot-Rolled Steel Flat Products from Japan: Release of U.S. Customs Entry Data for Respondent Selection," dated December 13, 2017 (CBP Data Memorandum). The deadline was then extended to December 22, 2017.

[8] *See* January 16, 2018 Memorandum "Re: Respondent Selection for the Administrative Review of the Antidumping Duty Order of Certain Hot-Rolled Steel Flat Products from Japan".

[9] *See* Commerce's January 19, 2018 Letters to Nippon Steel and Tokyo Steel (Initial Questionnaire).

[10] *See* Nippon Steel's February 20, 2018 Section A Questionnaire Response (Nippon Steel AQR) and Tokyo Steel's February 20, 2018 Section A Questionnaire Response (Tokyo Steel AQR).

[11] *See* Nippon Steel's March 15, 2018 Sections B-E Questionnaire Response (Nippon Steel BQR, CQR, DQR and EQR), and Tokyo Steel's March 8, 12 and 19, 2018 Section B-D Questionnaire Response (Tokyo Steel BQR, CQR, DQR).

[12] *See* Tokyo Steel's August 1, 2018 Letter "re: Tokyo Steel's First Supplemental Section A-C Questionnaire Response, *Certain Hot-Rolled Steel Flat Products from Japan*."

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

Questionnaire on June 19, and August 16, 2018, respectively, and Commerce received responses to these supplemental questionnaires on July 5, and August 23, 2018, respectively.[13]

On July 11, 2018, Commerce issued a supplemental questionnaire to Nippon Steel regarding its responses to sections A through C of the Initial Questionnaire, and Commerce received responses to this supplemental questionnaire on August 10, 2018.[14]   Commerce issued sections E and D supplemental questionnaires to Nippon Steel on July 9, and July 13, 2018, respectively, and Commerce received responses to these supplemental questionnaires on July 30, and August 10, 2018, respectively.[15]

The petitioners commented on Nippon Steel's questionnaire responses on March 9, May 29, and September 27, 2018.[16]   The petitioners commented on Tokyo Steel's questionnaire responses on March 8 and April 18, 2018.[17]   On October 15, 2018, Nippon Steel responded to the petitioners' comments on Nippon Steel's supplemental questionnaire responses.[18]   On October 16, the petitioners submitted pre-preliminary comments for Tokyo Steel.[19]   On October 22, Tokyo Steel responded to the petitioners' pre-preliminary comments for Tokyo Steel.[20]   On October 22, the petitioners submitted pre-preliminary comments for Nippon Steel.[21]

On January 23, 2018, Commerce exercised its discretion to toll all deadlines affected by the closure of the Federal Government from January 20 through 22, 2018.[22]   On June 20 and September 27, 2018, Commerce extended the deadline for the preliminary results of this review to no later than November 2, 2018.[23]

---

[13] *See* Tokyo Steel's July 5 and August 23, 2018 Letters "re: Tokyo Steel's Section D Supplemental Questionnaire Response, *Certain Hot-Rolled Steel Flat Products from Japan*," and "re: Tokyo Steel's Second Supplemental Section D Questionnaire Response, *Certain Hot-Rolled Steel Flat Products from Japan*" (Tokyo Steel 2SDR).

[14] *See* Nippon Steel's August 10, 2018 Letter "re: Certain Hot-Rolled Steel Flat Products from Japan: Nippon Steel's Response to Commerce's Sections A, B, and C Supplemental Questionnaire."

[15] *See* Nippon Steel's July 30 and August 10, 2018 Letters "re: Certain Hot-Rolled Steel Flat Products from Japan: Nippon Steel's Response to Commerce's Section E Supplemental Questionnaire," and "re: Certain Hot-Rolled Steel Flat Products from Japan: Nippon Steel's Response to Commerce's Section D Supplemental Questionnaire" (Nippon Steel SDR).

[16] *See* the petitioners' letters commenting on Nippon Steel's questionnaire responses on March 9, May 29, and September 27, 2018, respectively.

[17] *See* the petitioners' letters commenting on Tokyo Steel's questionnaire responses on March 8 and April 18, 2018, respectively.

[18] *See* Nippon Steel's October 15, 2018 Letter, "Re: Certain Hot-Rolled Steel Flat Products from Japan: Response to Petitioner's Comments on Nippon Steel's Questionnaire Responses."

[19] *See* the petitioners' October 16, 2018 Letter "re: Certain Hot-Rolled Steel Flat Products from Japan: Pre-Preliminary Comments on Tokyo's First Supplemental Questionnaire Responses."

[20] *See* Tokyo Steel's October 22, 2018 Letter "re: Tokyo Steel's Response to Petitioners' Pre-Preliminary Comments Certain Hot-Rolled Steel Flat Products from Japan."

[21] *See* Nippon Steel's October 22, 2018 Letter "re: Certain Hot-Rolled Steel Flat Products/rom Japan: Pre-Preliminary Comments on Nippon Steel's Questionnaire Responses."

[22] *See* January 23, 2018 Memorandum re: Deadlines Affected by the Shutdown of the Federal Government.  All deadlines in this segment of the proceeding affected by the closure of the Federal Government have been extended by three days.

[23] *See* June 20, 2018 Memorandum "Certain Hot-Rolled Steel Flat Products from Japan: Extension of Deadline for

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

We are conducting this review in accordance with section 751 of the Tariff Act of 1930, as amended (the Act).

## III. PERIOD OF REVIEW

The POR is March 22, 2016, through September 30, 2017.

## IV. SCOPE OF THE ORDER

The products covered by this order are certain hot-rolled, flat-rolled steel products, with or without patterns in relief, and whether or not annealed, painted, varnished, or coated with plastics or other non-metallic substances. The products covered do not include those that are clad, plated, or coated with metal. The products covered include coils that have a width or other lateral measurement ("width") of 12.7 mm or greater, regardless of thickness, and regardless of form of coil (*e.g.*, in successively superimposed layers, spirally oscillating, etc.). The products covered also include products not in coils (*e.g.*, in straight lengths) of a thickness of less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness. The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieve subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges). For purposes of the width and thickness requirements referenced above:

(1)     where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the resulting measurement makes the product covered by the existing antidumping[24] or countervailing duty[25] orders on Certain Cut-To-Length Carbon-Quality Steel Plate Products From the Republic of Korea (A-580-836; C-580-837), and

(2)     where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the measurement at its greatest width or thickness applies.

---

Preliminary Results of Antidumping Duty Administrative Review – 2016-2017"; and September 27, 2018 Memorandum "Certain Hot-Rolled Steel Flat Products from Japan: Extension of Deadline for Preliminary Results of Antidumping Duty Administrative Review – 2016-2017".

[24] *See Notice of Amendment of Final Determinations of Sales at Less Than Fair Value and Antidumping Duty Orders: Certain Cut-to-Length Carbon-Quality Steel Plate Products From France, India, Indonesia, Italy, Japan and the Republic of Korea*, 65 FR 6585 (February 10, 2000).

[25] *See Notice of Amended Final Determinations: Certain Cut-to-Length Carbon-Quality Steel Plate From India and the Republic of Korea; and Notice of Countervailing Duty Orders: Certain Cut-To-Length Carbon-Quality Steel Plate From France, India, Indonesia, Italy, and the Republic of Korea*, 65 FR 6587 (February 10, 2000).

4

Steel products included in the scope of this order are products in which: (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by weight; and (3) none of the elements listed below exceeds the quantity, by weight, respectively indicated:

- 2.50 percent of manganese, or
- 3.30 percent of silicon, or
- 1.50 percent of copper, or
- 1.50 percent of aluminum, or
- 1.25 percent of chromium, or
- 0.30 percent of cobalt, or
- 0.40 percent of lead, or
- 2.00 percent of nickel, or
- 0.30 percent of tungsten, or
- 0.80 percent of molybdenum, or
- 0.10 percent of niobium, or
- 0.30 percent of vanadium, or
- 0.30 percent of zirconium.

Unless specifically excluded, products are included in this scope regardless of levels of boron and titanium.

For example, specifically included in this scope are vacuum degassed, fully stabilized (commonly referred to as interstitial-free (IF)) steels, high strength low alloy (HSLA) steels, the substrate for motor lamination steels, Advanced High Strength Steels (AHSS), and Ultra High Strength Steels (UHSS). IF steels are recognized as low carbon steels with micro-alloying levels of elements such as titanium and/or niobium added to stabilize carbon and nitrogen elements. HSLA steels are recognized as steels with micro-alloying levels of elements such as chromium, copper, niobium, titanium, vanadium, and molybdenum. The substrate for motor lamination steels contains micro-alloying levels of elements such as silicon and aluminum. AHSS and UHSS are considered high tensile strength and high elongation steels, although AHSS and UHSS are covered whether or not they are high tensile strength or high elongation steels.

Subject merchandise includes hot-rolled steel that has been further processed in a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the hot-rolled steel.

All products that meet the written physical description, and in which the chemistry quantities do not exceed any one of the noted element levels listed above, are within the scope of this order unless specifically excluded. The following products are outside of and/or specifically excluded from the scope of this order:

5

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

- Universal mill plates (*i.e.*, hot-rolled, flat-rolled products not in coils that have been rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, of a thickness not less than 4.0 mm, and without patterns in relief);
- Products that have been cold-rolled (cold-reduced) after hot-rolling;[26]
- Ball bearing steels;[27]
- Tool steels;[28] and
- Silico-manganese steels;[29]

The products subject to this order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers: 7208.10.1500, 7208.10.3000, 7208.10.6000, 7208.25.3000, 7208.25.6000, 7208.26.0030, 7208.26.0060, 7208.27.0030, 7208.27.0060, 7208.36.0030, 7208.36.0060, 7208.37.0030, 7208.37.0060, 7208.38.0015, 7208.38.0030, 7208.38.0090, 7208.39.0015, 7208.39.0030, 7208.39.0090, 7208.40.6030, 7208.40.6060, 7208.53.0000, 7208.54.0000, 7208.90.0000, 7210.70.3000, 7211.14.0030, 7211.14.0090, 7211.19.1500, 7211.19.2000, 7211.19.3000, 7211.19.4500, 7211.19.6000, 7211.19.7530, 7211.19.7560, 7211.19.7590, 7225.11.0000, 7225.19.0000, 7225.30.3050, 7225.30.7000, 7225.40.7000, 7225.99.0090, 7226.11.1000, 7226.11.9030, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.5000, 7226.91.7000, and 7226.91.8000.  The products subject to the order may also enter under the following HTSUS numbers: 7210.90.9000, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7214.99.0060, 7214.99.0075, 7214.99.0090, 7215.90.5000, 7226.99.0180, and 7228.60.6000.

The HTSUS subheadings above are provided for convenience and U.S. Customs and Border Protection purposes only.  The written description of the scope of the order is dispositive.

---

[26] For purposes of this scope exclusion, rolling operations such as a skin pass, levelling, temper rolling or other minor rolling operations after the hot-rolling process for purposes of surface finish, flatness, shape control, or gauge control do not constitute cold-rolling sufficient to meet this exclusion.

[27] Ball bearing steels are defined as steels which contain, in addition to iron, each of the following elements by weight in the amount specified: (i) not less than 0.95 nor more than 1.13 percent of carbon; (ii) not less than 0.22 nor more than 0.48 percent of manganese; (iii) none, or not more than 0.03 percent of sulfur; (iv) none, or not more than 0.03 percent of phosphorus; (v) not less than 0.18 nor more than 0.37 percent of silicon; (vi) not less than 1.25 nor more than 1.65 percent of chromium; (vii) none, or not more than 0.28 percent of nickel; (viii) none, or not more than 0.38 percent of copper; and (ix) none, or not more than 0.09 percent of molybdenum.

[28] Tool steels are defined as steels which contain the following combinations of elements in the quantity by weight respectively indicated: (i) more than 1.2 percent carbon and more than 10.5 percent chromium; or (ii) not less than 0.3 percent carbon and 1.25 percent or more but less than 10.5 percent chromium; or (iii) not less than 0.85 percent carbon and 1 percent to 1.8 percent, inclusive, manganese; or (iv) 0.9 percent to 1.2 percent, inclusive, chromium and 0.9 percent to 1.4 percent, inclusive, molybdenum; or (v) not less than 0.5 percent carbon and not less than 3.5 percent molybdenum; or (vi) not less than 0.5 percent carbon and not less than 5.5 percent tungsten.

[29] Silico-manganese steel is defined as steels containing by weight: (i) not more than 0.7 percent of carbon; (ii) 0.5 percent or more but not more than 1.9 percent of manganese, and (iii) 0.6 percent or more but not more than 2.3 percent of silicon.

6

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

## V.   PRELIMINARY DETERMINATION OF NO SHIPMENTS

Hitachi Metals, Ltd. (Hitachi), Honda Trading Canada, Inc. (Honda), Mitsui & Co. Ltd. (Mitsui), and Panasonic Corporation (Panasonic), each submitted a no shipments certification.[30]  Customs and Border Protection (CBP) confirmed that Hitachi, Honda, and Panasonic had no shipments during the POR.[31]  Based on the evidence on the record, we preliminarily determine that Hitachi, Honda, and Panasonic did not have shipments during the POR.  Consistent with our practice, we find that it is not appropriate to rescind the review in part, but rather, to complete the review with respect to the above-mentioned companies and issue appropriate instructions to CBP based on the final results of the review.

Based on information received from CBP, we will continue to include Mitsui with the companies under review and make a determination for the final results.

## VI.   SINGLE ENTITY ANALYSIS

Section 771(33) of the Act identifies persons that shall be considered "affiliated" or "affiliated persons," if:  (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants; (B) Any officer or director of an organization and such organization; (C) Partners; (D) Employer and employee; (E) Any person directly or indirectly owning,  controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization; (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and (G) Any person who controls any other person and such other person.  Section 771(33) of the Act further states that a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.  Commerce's regulations at 19 CFR 351.102(b)(3) state that in determining whether control over another person exists within the meaning of section 771(33) of the Act, Commerce will not find that control exists unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.[32]

Section 351.401(f) of Commerce's regulations outlines the criteria for treating affiliated producers as a single entity for purposes of antidumping proceedings:

---

[30] See Hitachi Letter, "Antidumping Duty Administrative Review of Certain Hot-Rolled Steel Flat Products:  Hitachi No Shipment Letter," dated December 18, 2017; see also Honda Letter, "Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan:  Honda Trading Canada, Inc.'s No Shipment Certification," dated December 22, 2017; see also Mitsui Letter, "Antidumping Administrative Review of Certain Hot-Rolled Steel Flat Products: Mitsui No Shipment Notification," dated January 5, 2018; see also Panasonic Letter, "Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan:  Panasonic Corporation No Shipment Certification," dated January 5, 2018.
[31] See Public Memorandum, "Re:  No shipment inquiry with respect to the company below during the period 03/22/2016 through 09/30/2017," dated October 23, 2018; see also Business Proprietary Memorandum, "Re:  No shipment inquiry with respect to the company below during the period 03/22/2016 through 09/30/2017," dated October 23, 2018.
[32] See also Antidumping Duties; Countervailing Duties; Final Rule, 62 FR 27296, 2727298 (May 19, 1997).

(1) In general.  In an antidumping proceeding under this part, the Secretary will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production.

(2) Significant potential for manipulation. In identifying a significant potential for the manipulation of price or production, the factors the Secretary may consider include:

    (i)    The level of common ownership;

    (ii)    The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and

    (iii)    Whether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers.[33]

Commerce has long recognized that it is appropriate to treat certain groups of companies as a single entity and to determine a single weighted-average margin for that entity to determine margins accurately and to prevent manipulation that would undermine the effectiveness of the antidumping law.[34]  While section 19 CFR 351.401(f) explicitly applies to producers, Commerce has found it to be instructive in determining whether non-producers should be collapsed and has used the criteria outlined in the regulation in its analysis.  In a number of past cases, Commerce has treated exporting companies as a single entity,[35] as well as producers and exporters as a single entity.[36]  In the investigation, Commerce found that producer Nippon Steel and exporter Nippon Steel and Sumikin Bussan Corporation are affiliated pursuant to section 771(33)(E) of the Act and that these companies should be treated as a single entity for AD purposes pursuant to 19 CFR 351.401(f).[37]  For this administrative review, we will continue to treat Nippon Steel and Sumikin Bussan Corporation as a single entity based as on the evidence in the record of this

---

[33] *See* 19 CFR 351.401(f).

[34] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value:  Certain Frozen and Canned Warmwater Shrimp from Brazil*, 69 FR 76910 (December 23, 2004) and accompanying Issues and Decision Memorandum at Comment 5

[35] *Id.*

[36] *Certain Welded Carbon Steel Standard Pipes and Tubes from India:  Preliminary Results of Antidumping Duty Administrative Review*, 75 FR 33578, 33580-33581 (June 14, 2010), unchanged in *Certain Welded Carbon Steel Standard Pipes and Tubes from India: Final Results of Antidumping Duty Administrative Review*, 75 FR 69626 (November 15, 2010).

[37] *See Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination, 81 FR 15222 (March 22, 2016) (Preliminary Determination) and accompanying Preliminary Decision Memorandum* at the "Single Entity Analysis" section, unchanged in *Certain Hot-Rolled Steel Flat Products from Japan: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 53409 (August 12, 2016).

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

proceeding. No new information has been provided to indicate that the status of these two companies' relationship has changed.

Nippon Steel and Nisshin Steel Co., Ltd.

We have preliminarily determined that Nisshin Steel Co., Ltd. (Nisshin) is affiliated with Nippon Steel, pursuant to section 771(33)(E) of the Act and that these companies should be treated as a single entity for AD purposes, pursuant to 19 CFR 351.401(f). Nippon Steel stated in its Section A questionnaire response that, on March 13, 2017, it acquired additional shares in Nisshin, and increased its ownership to 51 percent of Nisshin's total outstanding shares.[38] Prior to March 13, 2017, Nippon Steel owned 8.31 percent of Nisshin's shares.[39] Both Nippon Steel and Nisshin are the producers of the subject merchandise and exported subject merchandise to the United States during the POR.[40] These companies, therefore, are affiliated in accordance with section 771(33)(E) of the Act.

Due to the fact that Nippon Steel owns a majority of Nisshin's stocks, we preliminarily find that, in accordance with 19 CFR 351.401(f), it is appropriate to collapse Nippon Steel and Nisshin, effective March 13, 2017, because: (1) these two entities are affiliated pursuant to section 771(33)(F) of the Act as the level of the common ownership is significant; (2) Nippon Steel and Nisshin have the facilities to produce identical or similar products, such that substantial retooling would not be required to restructure manufacturing priorities; and (3) we find that there exists a significant potential for manipulation of price or production if Nippon Steel and Nisshin do not receive the same antidumping duty rate, in a way that the producer with the lower rate would increase production and export to the United States.[41] With respect to the significant potential for manipulation, we find, in accordance with 19 CFR 351.401(f)(2), that: (1) there is common ownership through Nippon Steel's majority stake of Nisshin's shares which legally and operationally would allow Nippon Steel to be in a position to exercise restraint or direction over Nisshin;[42] (2) Nippon Steel and Nisshin have intertwined operations, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between these two affiliated producers.[43] Therefore, in accordance with 19 CFR 351.401(f) and Commerce's practice,[44] effective March 13, 2017, the

---

[38] *See* Nippon Steel's SAQR, at A-1.

[39] *See* Letter from Nippon Steel, "Re: Certain Hot-Rolled Steel Flat Products from Japan: Response to Petitioners' Comments on NSSMC's Questionnaire Responses," dated October 15, 2018.

[40] *Id.* and U.S. sales database.

[41] *See, Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination* , 75 FR 24885 (May 6, 20107) and accompanying Issues and Decision Memorandum, unchanged for the final.

[42] *See* Nippon Steel's SAQR, at A-1.

[43] *See* Nippon Steel's SAQR, at Exhibit A-5 (the list of directors of consolidated subsidiaries), Exhibit A-6 (the combined list of subsidiaries and affiliates), and Exhibit A-16 (the combined list of affiliated customers).

[44] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Coated Free Sheet Paper from Indonesia*, 72 FR 60636 (October 25, 2007) and accompanying Issues and Decision Memorandum; *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from Indonesia: Final Determination of Sales at Less Than Fair Value*, 75 FR 59223 (September 27, 2010) and accompanying Issues and Decision Memorandum.

date as of which Nippon Steel owned 51 percent of Nisshin, we determine to treat Nippon Steel and Nisshin as a single entity for the purposes of the preliminary results.[45]  We intend to assign these companies the same cash deposit rate.

## VII.   USE OF FACTS AVAILABLE AND ADVERSE FACTS AVAILABLE

### A.  Legal Authority

Sections 776(a)(1) and 776(a)(2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply facts otherwise available in reaching the applicable determination if necessary information is not on the record, or if an interested party: (A) withholds information that has been requested by Commerce; (B) fails to provide such information in a timely manner or in the form or manner requested subject to section 782(c)(1) and (e) of the Act; (C) significantly impedes a proceeding; or (D) provides such information but the information cannot be verified as provided for in section 782(i) of the Act.

Section 782(c)(1) of the Act provides that, if an interested party "promptly after receiving a request from {Commerce} for information, notifies {Commerce} that such party is unable to submit the information requested in the requested form and manner," Commerce shall consider the ability of the interested party to provide the requested information, and may modify the requirements to avoid imposing an unreasonable burden on that party.

Section 782(d) of the Act provides that, if Commerce determines that a response to a request for information does not comply with the request, Commerce shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person an opportunity to remedy or explain the deficiency.  If that person submits further information that continues to be unsatisfactory, or this information is not submitted within the applicable time limits, Commerce may, subject to section 782(e) of the Act, disregard all or part of the original and subsequent responses, as appropriate.

Section 782(e) of the Act states that Commerce shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority if: (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

Section 776(b) of the Act provides that Commerce may use an adverse inference in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.  In doing so, Commerce is not

---

[45] *See* November 2, 2018 Memorandum, re:  Preliminary Results Margin Calculation for Nippon Steel & Sumitomo Metal Corporation (Nippon Steel Preliminary Calculation Memorandum).

10

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

required to determine, or make any adjustments to, a weighted average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information.[46]  Section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the investigation, a previous administrative review, or other information placed on the record.  In addition, the SAA explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[47]  Further, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[48]  The Court of Appeals for the Federal Circuit, in *Nippon Steel*, explained that the ordinary meaning of "best" means "one's maximum effort," and that the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do.[49]  Further, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[50]

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than on information obtained in the course of a review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal.  Secondary information is defined as information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 of the Act concerning the subject merchandise.[51]

### B.  Application of Facts Available to Nippon Steel

As noted further below in this section, Nippon Steel did not provide certain requested information necessary for Commerce to calculate dumping margins for Nippon Steel in this review.  Specifically, Nippon Steel did not submit the downstream sales of certain affiliated home market resellers whose sales failed the arm's-length test.  As such, necessary information is not on the record of this review.  In addition, Nippon Steel withheld information requested by Commerce, failed to provide such information by the deadlines for submission of the information or in the form and manner requested by Commerce, and significantly impeded this proceeding.  Accordingly, the use of facts available is warranted in determining AD margin for Nippon Steel, pursuant to sections 776(a)(1) and (2)(A), (B), and (C) of the Act.

---

[46] *See* Section 776(b)(1)(B) of the Act.

[47] *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. 103-316, Vol. 1, 103d Cong. (1994) (SAA) at 870.

[48] *See, e.g.*, *Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382-83* (Fed. Cir. 2003) (*Nippon Steel*); *Notice of Final Determination of Sales at Less Than Fair Value: Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); *Antidumping Duties, Countervailing Duties*, 62 FR 27296, 27340 (May 19, 1997) (*Preamble*).

[49] *See Nippon Steel*, 337 F.3d at 1382.

[50] *Id.* at 1382-83; *see also Preamble*, 62 FR at 27340.

[51] *See* 19 CFR 351.308(c)(1).

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

### C. Application of Facts Available with an Adverse Inference

In the initial and supplemental questionnaires, Commerce requested that Nippon Steel report sales of all its home market affiliated downstream resellers for the sales between Nippon Steel and the affiliates were not made at arm's length.[52]  Nippon Steel's sales to these affiliated customers accounted for more than five percent of its total sales of foreign-like product in the home market.[53]  In its supplemental questionnaire response, Nippon Steel stated that it was unable to obtain the downstream sales for certain affiliated resellers, although it expended a significant amount of time and resources attempting to collect all downstream sales data.[54]  Nippon Steel stated it had made multiple round of requests and put the correspondence in which it requested the resell information from its affiliated resellers on the record.[55]  Nippon Steel reported that  certain affiliated resellers could not and/or would not provide this information in the detail and format required by Commerce.[56]

The fact that the record shows that Nippon Steel contacted all of its affiliated resellers with multiple rounds of correspondence and telephone calls, even before the review was initiated, does not change the fact that the necessary home market price data are missing from the record. The home market sales information is fundamental data, without which Commerce cannot perform the dumping calculation required by the statute.  Respondents cannot be allowed to shield certain home market sales prices from disclosure and use in the dumping calculations in situations where it made non-arm's-length sales to affiliated parties.  Putting respondents in a position to pick and choose which affiliated party downstream sales will be reported would create significant potential and incentives to manipulate margin calculations.  In addition to ownership leverage, respondents have absolute veto power over whether to sell to, or continue to do business with, an affiliate.  In fact, Nippon Steel is the one that establishes the prices to its affiliates, and is in a position to make them at arm's-length prices or not. We have preliminarily determined that Nippon Steel is in a position to induce these companies to report their downstream sales.[57]  As such, Nippon Steel has failed to cooperate to the best of its ability in obtaining these companies' downstream sales.  Pursuant to 776(b) of the Act, we are using an adverse inference in applying the facts otherwise available, because Nippon Steel has failed to cooperate to the best of its ability to comply with our request for information.  As adverse facts available, we have preliminarily applied the highest Nippon Steel home market product matching control number (CONNUM)-specific price for unaffiliated customers to these unreported affiliated resellers' resales.[58]

---

[52] *See* Commerce's initial questionnaire and supplemental questionnaires, dated July 11, 2018 at question 6.
[53] *See* Nippon Steel's BQR and Home Sale database.
[54] *See* Nippon Steel's SQR at 3-5.
[55] *See* Nippon Steel's SQR at Revised Exhibit B-23.
[56] *See* Nippon Steel's SQR at 3-5.
[57] *See* Nippon Steel's SQR at Revised Exhibit B-23.
[58] *See* Nippon Steel Preliminary Calculation Memorandum.

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

## VIII.  REVIEW-SPECIFIC AVERAGE RATE FOR NON-EXAMINED COMPANIES

The statute and Commerce's regulations do not address the establishment of a rate to be applied to companies not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act.  Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in a market economy investigation, for guidance when calculating the rate for companies which were not selected for individual examination in an administrative review.  Under section 735(c)(5)(A) of the Act, the all-others rate is normally "an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero or *de minimis* margins, and any margins determined entirely {on the basis of facts available}."

In this review, we have preliminarily calculated weighted-average dumping margins for Nippon Steel and Tokyo Steel that are not zero, *de minimis*, or determined entirely on the basis of facts available.  Accordingly, Commerce preliminarily has assigned to companies not individually examined a margin of 1.46 percent, which is the weighted average of Nippon Steel's and Tokyo Steel's calculated weighted-average dumping margins.[59]

## IX.  DISCUSSION OF THE METHODOLOGY

### A.  Normal Value Comparisons

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Nippon Steel's and Tokyo Steel's sales of subject merchandise were made at less than NV, Commerce compared the export price (EP) or constructed export price (CEP), as appropriate, to the NV as described in the "Export Price and Constructed Export Price" and "Normal Value" sections of this memorandum.

#### 1.  Determination of Comparison Method

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates weighted-average dumping margins by comparing weighted-average NVs to weighted-average EPs (or CEPs) (*i.e.*, the average-to-average method) unless the Secretary determines that another method is appropriate in a particular situation.  In less-than-fair-value investigations, Commerce examines whether to compare weighted-average NVs with the EPs (or CEPs) of individual sales (*i.e.*, the average-to-transaction method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act.  Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of administrative reviews,

---

[59] *See* August 3, 2018 Memorandum re: Review-Specific Average Rate for Non-Examined Companies.

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in administrative reviews is, in fact, analogous to the issue in less-than-fair-value investigations.[60]

In recent investigations, Commerce applied a "differential pricing" analysis for determining whether application of the average-to-transaction method is appropriate in a particular situation pursuant to 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[61]  Commerce finds that the differential pricing analysis used in recent investigations may be instructive for purposes of examining whether to apply an alternative comparison method in this administrative review. Commerce will continue to develop its approach in this area based on comments received in this and other proceedings, and on Commerce's additional experience with addressing the potential masking of dumping that can occur when Commerce uses the average-to-average method in calculating a respondent's weighted-average dumping margin.

The differential pricing analysis used in these preliminary results examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods.  The analysis evaluates all export sales by purchaser, region and time period to determine whether a pattern of prices that differ significantly exists.  If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin.  The analysis incorporates default group definitions for purchasers, regions, time periods, and comparable merchandise.  Purchasers are based on the reported (consolidated) customer codes.  Regions are defined using the reported destination code (i.e., zip, state) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the period of review based upon the reported date of sale.  For purposes of analyzing sales transactions by purchaser, region and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region and time period, that Commerce uses in making comparisons between EP (or CEPs) and NV for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "Cohen's $d$ test" is applied. The Cohen's $d$ coefficient is a generally recognized statistical measure of the extent of the difference between the mean (i.e., weighted-average price) of a test group and the mean (i.e., weighted-average price) of a comparison group.  First, for comparable merchandise, the Cohen's $d$ coefficient is calculated when the test and comparison groups of data for a particular purchaser, region or time period each have at least two observations, and when the sales quantity for the

---

[60] See Ball Bearings and Parts Thereof from France, Germany, and Italy: Final Results of Antidumping Duty Administrative Reviews; 2010–2011, 77 FR 73415 (December 10, 2012), and accompanying Issues and Decision Memorandum at comment 1; see also Apex Frozen Foods Private Ltd. v. United States, 37 F. Supp. 3d 1286, 1322 (CIT 2014), aff'd, 862 F.3d 1337 (Fed. Cir. 2017); see also JBF RAK LLC v. United States, 790 F.3d 1358, 1363-65 (Fed. Cir. 2015) ("{t}he fact that the statute is silent with regard to administrative reviews does not preclude Commerce from filling gaps in the statute to properly calculate and assign antidumping duties") (citations omitted).

[61] See, e.g., Xanthan Gum from the People's Republic of China: Final Determination of Sales at Less Than Fair, 78 FR 33351 (June 4, 2013); Steel Concrete Reinforcing Bar from Mexico: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, 79 FR 54967 (September 15, 2014); and Welded Line Pipe from the Republic of Turkey: Final Determination of Sales at Less Than Fair Value, 80 FR 61362 (October 13, 2015).

14

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise. Then, the Cohen's $d$ coefficient is used to evaluate the extent to which the prices to the particular purchaser, region or time period differ significantly from the prices of all other sales of comparable merchandise. The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's $d$ test: small, medium or large (0.2, 0.5 and 0.8, respectively). Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the mean of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists. For this analysis, the difference is considered significant, and the sales in the test group are found to pass the Cohen's $d$ test, if the calculated Cohen's $d$ coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

Next, the "ratio test" assesses the extent of the significant price differences for all sales as measured by the Cohen's $d$ test. If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test account for 66 percent or more of the value of total sales, then the identified pattern of prices that differ significantly supports the consideration of the application of the average-to-transaction method to all sales as an alternative to the average-to-average method. If the value of sales to purchasers, regions, and time periods that pass the Cohen's $d$ test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's $d$ test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's $d$ test. If 33 percent or less of the value of total sales passes the Cohen's $d$ test, then the results of the Cohen's $d$ test do not support consideration of an alternative to the average-to-average method.

If both tests in the first stage (*i.e.*, the Cohen's $d$ test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that an alternative comparison method should be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can appropriately account for such differences. In considering this question, Commerce tests whether using an alternative comparison method, based on the results of the Cohen's $d$ and ratio tests described above, yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only. If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences such as those observed in this analysis, and, therefore, an alternative comparison method would be appropriate. A difference in the weighted-average dumping margins is considered meaningful if 1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the appropriate alternative method where both rates are above the *de minimis* threshold, or 2) the resulting weighted-average dumping margins between the average-to-average method and the appropriate alternative method move across the *de minimis* threshold.

Interested parties may present arguments and justifications in relation to the above-described differential pricing approach used in these preliminary results, including arguments for modifying the group definitions used in this proceeding.

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

2. *Results of the Differential Pricing Analysis*

*Nippon Steel*

Based on the results of the differential pricing analysis, Commerce preliminarily finds that 37.01 percent of the value of U.S. sales pass the Cohen's *d* test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce preliminarily determines that the average-to-average method cannot account for such differences because the weighted-average dumping margin crosses the *de minimis* threshold when calculated using the average-to-average method and when calculated using an alternative comparison method based on applying the average-to-transaction method to all U.S. sales.  Thus, for these preliminary results, Commerce is applying the average-to-transaction method to those sales identified as passing the Cohen's *d* test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's *d* test.[62]

*Tokyo Steel*

Based on the results of the differential pricing analysis, Commerce preliminarily finds that 94.33 percent of the value of U.S. sales pass the Cohen's *d* test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, Commerce preliminarily determines that the average-to-average method cannot account for such differences because there is a meaningful difference in the weighted-average dumping margins when calculated using the average-to-average method and the alternative comparison methods.  Thus, for these preliminary results, Commerce is applying the average-to-transaction comparison method to all U.S. sales to calculate the weighted-average dumping margin for Tokyo Steel.[63]

**B. DATE OF SALE**

Section 351.401(i) of Commerce's regulations states that, normally, we will use invoice date as recorded in the producer's or exporter's records kept in the ordinary course of business, as the date of sale.  Furthermore, if the shipment date precedes the invoice date, then Commerce will use the shipment date as the date of sale.  The regulation provides that we may use a date other than the invoice date if Commerce is satisfied that a different date better reflects the data on

---

[62] *See* Nippon Steel Preliminary Calculation Memorandum.
[63] *See* November 2, 2018 Memorandum, re:  Preliminary Results Margin Calculation for Tokyo Steel (Tokyo Steel Preliminary Calculation Memorandum).

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

which the material terms of sale are established.[64]  Furthermore, if the shipment date precedes the invoice date, then Commerce will use the shipment date as the date of sale.[65]

*Nippon Steel*

Nippon Steel reported the date of invoice for home market sales as date of sale, and reported date of invoice for U.S. market sales for its EP sales and certain Steelscape's CEP sales.[66]  Consistent with our regulations and record evidence, we are using the invoice date as the date of sale for most of the sales.  For certain Steelscape's CEP sales with shipment date prior to the date of invoice, Nippon Steel reported the date of shipment as the date of sale.[67]  Consistent with Commerce's practice of using the earlier of shipment or invoice date as the date of sale, we used shipment date as the date of sale in such instances.

*Tokyo Steel*

Tokyo Steel reported the date of invoice as the date of sale for its sales in the home market as well as the U.S. market. [68]  For the U.S. market, Tokyo Steel reported that it had only EP sales, and changes do occur in the material terms of sales between the purchase order date and the invoice date although they are rare.[69]  Consistent with Commerce's regulation and record evidence, we used the invoice date as the date of sale for both markets.

## C.  PRODUCT COMPARISONS

In accordance with section 771(16) of the Act, we considered all products produced and sold by the respondents in Japan during the POR that fit the description in the "Scope of the Order" section, above, to be foreign like products for purposes of determining appropriate product comparisons to U.S. sales.  We compared U.S. sales to sales made in the home market, where appropriate.  Where there were no sales of identical merchandise in the home market made in the ordinary course of trade to compare to U.S. sales, we compared U.S. sales to sales of the most similar foreign like product made in the ordinary course of trade.

In making product comparisons, we matched foreign like products based on prime versus non-prime merchandise and the physical characteristics reported by the respondents in the following order of importance: paint, carbon, quality, strength, thickness, width, form, pickled and pattern.

---

[64] *See* 19 CFR 351.401(i); *see also Yieh Phui Enterprise Co. v. United States*, 791 F. Supp. 2d 1319 (CIT 2011) (affirming that Commerce may use invoice date unless a party demonstrates that the material terms of its sale were established on another date); *Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090-1092 (CIT 2001).

[65] *See Certain Frozen Warmwater Shrimp from Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 72 FR 52065 (September 12, 2007), and accompanying IDM at Comment 11; *Notice of Final Determination of Sales at Less Than Fair Value: Structural Steel Beams from Germany*, 67 FR 35497 (May 20, 2002), and accompanying IDM at Comment 2.

[66] *See* Nippon Steel's March 25, 2018 Section B response at B-25, and Section C response at C-25.

[67] *Id.*

[68] *See* Tokyo Steel's March 12, 2018 Section B response at 22, and Section C response at 19.

[69] *See* Tokyo Steel's March 12, 2018 Section C response at 16 and August 1, 2018 supplemental response at 3.

17

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

For Nippon Steel's and Tokyo Steel's sales of hot-rolled steel in the United States, the reported control number (*i.e.* CONNUM) identifies the characteristics of the hot-rolled steel as exported by Nippon Steel and Tokyo Steel.

## D.  EXPORT PRICE AND CONSTRUCTED EXPORT PRICE

Section 772(a) of the Act defines EP as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c)."  Section 772(b) of the Act defines CEP as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d)."  As explained below, we based the U.S. price on EP and CEP for Nippon Steel and on EP for Tokyo Steel.

*Nippon Steel*

We based EP on the price to the first unaffiliated purchaser in the United States.  We made deductions for movement expenses, in accordance with section 772(c)(2)(A) of the Act, which included, where appropriate, foreign inland freight, foreign brokerage and handling, U.S. brokerage and handling, international freight, marine insurance, and U.S. inland freight.

We calculated the CEP based on the price to the first unaffiliated purchaser in the United States.  We made deductions from the starting price for any movement expenses (*e.g.*, foreign inland freight, foreign brokerage and handling, U.S. brokerage and handling, international freight, marine insurance, and U.S. inland freight), in accordance with section 772(c)(2)(A) of the Act.[70] In addition, we made an adjustment to price for the cost of any further manufacturing or assembly for sales used in the calculations, in accordance with section 772(d)(2) of the Act.

In accordance with section 772(d)(1) of the Act, we calculated the CEP by deducting selling expenses associated with economic activities occurring in the United States, which include direct selling expenses (imputed credit expenses, bank charges, and other direct selling expenses) and indirect selling expenses.  Finally, we made an adjustment for profit allocated to these expenses, in accordance with section 772(d)(3) of the Act.  In accordance with section 772(f) of the Act, we calculated the CEP profit rate using the expenses incurred by Nippon Steel and its U.S. affiliate on their sales of the subject merchandise in the United States and the profit associated with those sales.[71]

---

[70] *See* Nippon Steel Preliminary Calculation Memorandum.
[71] *Id*.

18

*Tokyo Steel*

We based EP on the price to the first unaffiliated purchaser in the United States. We made deductions for movement expenses in accordance with section 772(c)(2)(A) of the Act, for foreign brokerage and handling expenses. We also made adjustments for billing adjustments, where appropriate.

## E. NORMAL VALUE

### 1. Home Market Viability

In order to determine whether there is a sufficient volume of sales in the home market to serve as a viable basis for calculating NV, *i.e.*, the aggregate volume of home market sales of the foreign like product is equal to or greater than five percent of the aggregate volume of U.S. sales, we normally compare the respondent's volume of home market sales of the foreign like product to the volume of U.S. sales of the subject merchandise, in accordance with sections 773(a)(1)(A) and (B) of the Act. If we determine that no viable home market exists, we may, if appropriate, use a respondent's sales of the foreign like product to a third country market as the basis for comparison market sales, in accordance with section 773(a)(1)(C) of the Act and 19 CFR 351.404.

In this review, we determined that the aggregate volume of home market sales of the foreign like product for each respondent was greater than five percent of the aggregate volume of its U.S. sales of the subject merchandise. Therefore, we used home market sales as the basis for NV for both respondents, in accordance with section 773(a)(1)(B) of the Act.

### 2. Affiliated-Party Transactions and Arm's-Length Test

Commerce may calculate NV based on a sale to an affiliated party only if it is satisfied that the price to the affiliated party is comparable to the price at which sales are made to parties not affiliated with the exporter or producer, *i.e.*, sales were made at arm's-length prices.[72] Commerce excludes home market prices to affiliated customers that are not made at arm's-length prices from our margin analysis because Commerce considered them to be outside the ordinary course of trade. Consistent with 19 CFR 351.403(c) and (d) and our practice, "Commerce may calculate normal value based on sales to affiliates if satisfied that the transactions were made at arm's length."[73]

In this review, Nippon Steel sold foreign like product to affiliated customers in the home market as defined in section 771(33) of the Act. Consequently, we conducted the arm's-length test on these sale between Nippon Steel and its affiliated customers and determined that the prices were

---

[72] *See* 19 CFR 351.403(c).

[73] *See China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1367 (CIT 2003), aff'd, 306 F. Supp. 2d 1291 (CIT 2004) (citing *Light-Walled Rectangular Pipe and Tube from Mexico: Preliminary Results and Partial Rescission of Antidumping Duty Administrative Review*, 76 FR 55352, 55355 (September 7, 2011) (*Mexican Pipe*)).

19

not arm's-length prices and will not use them in the normal value calculation because we considered the failed-test sales to be outside the ordinary course of trade.[74]  Once the prices to the affiliated parties fail the arm's-length test, we will generally rely on the affiliate resellers' prices to its customers for NV for the margin calculations.

3.  *Level of Trade*

Section 773(a)(1)(B)(i) of the Act states that, to the extent practicable, Commerce will calculate NV based on sales at the same level of trade (LOT) as the U.S. sales.  According to 19 CFR 351.412(c)(2), sales are made at different LOTs if they are made at different marketing stages (or their equivalent), and substantial differences in selling activities are a necessary, but not sufficient, condition for determining that there is a difference in the stages of marketing.[75]  In order to determine whether the home market sales are at different marketing stages than the U.S. sales, we examine the distribution chain in each market, including selling functions and customer categories, and the level of selling activities for each type of sale.

Pursuant to section 773(a)(1)(B)(i) of the Act, in identifying LOTs, we consider the starting price before adjustments for EP and home market sales,[76]  and the starting price as adjusted under section 772(d) of the Act for CEP sales.[77]

When Commerce is unable to match U.S. sale to sales in the home market at the same LOT as the EP or CEP, Commerce may compare the U.S. sale to sales at a different LOT in the home market.  In comparing EP or CEP sales at a different LOT in the home market, where available data make it possible, we make a LOT adjustment under section 773(a)(7)(A) of the Act.  Finally, for CEP sales only, if the NV LOT is at a more advanced stage of distribution than the LOT of CEP but the data available do not provide a basis to determine whether the difference in LOTs is demonstrated to affect price comparability (*i.e.*, no LOT adjustment is possible), Commerce will grant a CEP offset, as provided in section 773(a)(7)(B) of the Act.[78]

In this administrative review, we obtained information from each respondent regarding the marketing stages involved in making their reported home market and U.S. sales, including a description of the selling activities performed by each respondent for each channel of distribution.  Our LOT findings are summarized below.

---

[74] *See* section 771(15) of the Act and 19 CFR 351.102(b).
[75] *See* Certain Orange Juice from Brazil:  Final Results of Antidumping Duty Administration Review and Notice of Intent Not To Revoke Antidumping Duty Order in Part, 75 FR 50999 (August 18, 2010) (OJ Brazil), and accompanying Issues and Decision Memorandum (IDM) at Comment 7.
[76] Where NV is based on CV, we determine the NV LOT based on the LOT of the sales from which we derive selling, general and administrative (SG&A) expenses, and profit for CV, where possible.  See 19 CFR 351.412(c)(1).
[77] *See Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1314-16 (Fed. Cir. 2001).
[78] *See OJ Brazil* IDM at Comment 7.

20

*Nippon Steel*

In the home market, Nippon Steel sells merchandise under consideration through three channels of distribution.[79]  In channel 1, Nippon Steel negotiates sales with affiliated and unaffiliated primary customers through affiliated and unaffiliated trading companies, this channel of distribution accounts for the vast majority of the group's home market sales.[80]  In channel 2, Nippon Steel sells to affiliated and unaffiliated trading companies that re-sell the steel in quantities and prices negotiated by the trading companies.[81]  In channel 3, Nippon Steel sells directly to affiliated and unaffiliated primary customers without the assistance of the trading companies.[82]  In connection with all three types of sales, Nippon Steel performed the following categories of selling functions: production planning, strategic planning & marketing, order evaluation, order/invoice system, end-user sales contact, advertising, warranty, technical services, administration, packing, freight & delivery.[83]  Further, Nippon Steel reported performing the essentially the same functions at the same relative level of intensity for all of its home market sales.  On this basis, we preliminary determine that all home market sales are at the same LOT.[84]

Nippon Steel reported that it made U.S. sales through one channel of distribution.  However, we find that Nippon Steel made sales through two channels of distribution: EP sales through unaffiliated trading companies for sales to unaffiliated U.S. customers and CEP sales by Nippon Steel's affiliated U.S. further manufacturers to unaffiliated customers.  We find that Nippon Steel performed all selling functions at the same relative level of intensity,[85] as Nippon Steel negotiates prices with the assistance of the trading companies, and the trading companies arrange transport to the primary customers.[86]  Thus, we preliminarily determined that Nippon Steel's U.S. sales are made at the same LOT.

We then compared the home market LOT to the U.S. LOT and found that the selling functions Nippon Steel performed for its home market customers are virtually the same as those performed for its U.S. customers at a similar level of intensity.  The only difference is that Nippon Steel coordinates freight & delivery at a relatively lower level of intensity for U.S. sales.  This difference is not sufficient to determine that Nippon Steel's LOT for U.S. sales is different from the home market LOT.  Therefore, we preliminarily determine that home market sales and the U.S. were made at the same LOT, and that no LOT adjustment was warranted.  Because Nippon Steel's home market LOT is not at a more advanced stage of distribution than its U.S. LOT, a CEP offset is not warranted.

---

[79] *See* Nippon Steel IQR Section A at A-24
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *See* Nippon Steel IQR Section A at Exhibit A-10.
[84] *Id.*
[85] *Id.*
[86] *See* Nippon Steel IQR Section A at A-29.

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

*Tokyo Steel*

In the home market, Tokyo Steel sells merchandise under consideration through three channels of distribution.[87]  In channel 1, Tokyo Steel sells to a trading company who then sells the merchandise to distributors or end users.  In channel 2, Tokyo Steel sells directly to distributors, and in channel 3, Tokyo Steel sells directly to end users.  In connection with all three types of sales, Tokyo Steel performed the following categories of selling functions: sales forecasting, sales promotion, packing, order input/processing, direct sales personnel, sales/marketing support, market research, freight and delivery.[88]  Further, Tokyo Steel reported performing essentially the same functions at the same relative level of intensity for all of its home market sales.  On this basis, we preliminary determine that all home market sales are at the same LOT.[89]

Tokyo Steel reported that it made U.S. sales through a Japanese trading company.[90]  The selling functions performed were nearly the same as those performed for home market customers.  Thus, we find that Tokyo Steel had one channel of distribution in the U.S. market and preliminarily determine that all Tokyo Steel's U.S. sales are made at the same LOT.

We then compared the home market LOT to the U.S. LOT and found that the selling functions Tokyo Steel performed for its home market customers are nearly the same as those performed for its U.S. customers at a similar level of intensity.  Therefore, we preliminarily determine that home market sales and the U.S. were made at the same LOT, and that no LOT adjustment was warranted.

### 4.   *Cost of Production Analysis*

In accordance with section 773(b)(2)(A) of the Act, we requested cost information from the respondents in this review to determine if there were reasonable grounds to believe or suspect that sales of foreign like product had been made at prices less than the COP of the product.[91]  We examined Nippon Steel's and Tokyo Steel's cost data and preliminarily determine that our quarterly cost methodology is not warranted.  Accordingly, we are applying our standard methodology of using annual costs based on the reported data.

### a.   *Calculation of COP*

In accordance with section 773(b)(3) of the Act, we calculated COP based on the sum of the costs of materials and fabrication for the foreign like product, plus amounts for general and administrative (G&A) expenses and interest expenses.

---

[87] *See* Tokyo Steel IQR Section A at 11.
[88] *See* Tokyo Steel IQR Section A at Exhibit A-8.
[89] *Id.*
[90] *Id*.
[91] *See* Nippon Steel DQR and Tokyo Steel DQR.

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

*Nippon Steel*

We relied on the COP data submitted by Nippon Steel except as follows:[92]

- We adjusted the reported transfer prices of lump iron ore, fine iron ore and iron ore pellets to reflect higher market prices in according with section 773(f)(2) of the Act.[93]

- We revised the financial expenses of Nisshin to reflect Nippon Steel's financial expense rate calculated at the highest level of consolidation.[94]

- We adjusted Steelscape LLC's reported cost of services obtained from an affiliated party to reflect transfer prices, in accordance with section 773(f)(3) of the Act, because the transfer prices were higher in comparison to the affiliate's reported cost and market prices.[95]

*Tokyo Steel*

We relied on the COP data submitted by Tokyo Steel except as follows:[96]

- We increased Tokyo Steel's total cost of manufacturing (TOTCOM) for the reconciliation difference between the company's TOTCOM reflect in its normal course of business and the total extended TOTCOM reported in its cost data file.[97]

- We increased the numerator of Tokyo Steel's general and administrative expense rate to include certain expenses related to idled assets.[98]

    b.  *COP Test*

On a product-specific basis, pursuant to section 773(a)(1)(B)(i) of the Act, we compared the adjusted weighted-average COPs to the home market sales prices of the foreign like product, in order to determine whether the sales prices were below the COPs.  For purposes of this comparison, we used COPs exclusive of selling and packing expenses.  The prices were exclusive of any applicable billing adjustments, movement charges, actual direct and indirect selling expenses, and packing expenses.

---

[92] *See* Nippon Steel SDR at exhibit SD-1.
[93] *See* Nippon Steel Preliminary Calculation Memorandum.
[94] *Id.*
[95] *Id.*
[96] *See* Tokyo Steel 2SDR at exhibit SD2-1.
[97] *See* Memorandum to Neal M. Halper, Cost of Production and Constructed Value Calculation Adjustments for the Preliminary Results – Tokyo Steel Manufacturing Co., Ltd., dated November 2, 2018, at 1.
[98] *Id.*

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

   *c.   Results of the COP Test*

In determining whether to disregard home market sales made at prices below the COP, we examined, in accordance with sections 773(b)(1)(A) and (B) of the Act, whether: 1) within an extended period of time, such sales were made in substantial quantities; and 2) such sales were made at prices which permitted the recovery of all costs within a reasonable period of time in the normal course of trade. In accordance with sections 773(b)(2)(B) and (C) of the Act, where less than 20 percent of a respondent's home market sales of a given product are at prices less than the COP, we do not disregard any below-cost sales of that product because we determine that in such instances the below-cost sales were not made within an extended period of time and in "substantial quantities." Where 20 percent or more of a respondent's sales of a given product are at prices less than the COP, we disregard the below-cost sales because: 1) they were made within an extended period of time in "substantial quantities," in accordance with sections 773(b)(2)(B) and (C) of the Act; and, 2) based on our comparison of prices to the weighted-average COPs for the POR, they were at prices which would not permit the recovery of all costs within a reasonable period of time, in accordance with section 773(b)(2)(D) of the Act.

We found that, for each respondent, more than 20 percent of sales of certain home market products during the POR were at prices less than the COP and, in addition, such sales did not permit for the recovery of costs within a reasonable period of time. We, therefore, excluded these sales and used the remaining sales, as the basis for determining NV, in accordance with section 773(b)(1) of the Act.

   *5.   Calculation of NV Based on Home Market Prices*

*Nippon Steel*

We increased, where appropriate, the starting price to account for billing adjustments, in accordance with 19 CFR 351.401(c). We also made a deduction from the starting price for inland freight, under section 773(a)(6)(B)(ii) of the Act.

For comparisons made to EP sales (Nippon Steel U.S. sales Channel 1), we made adjustments for differences in circumstances of sale (COS) pursuant to section 773(a)(6)(C)(iii) of the Act. We made COS adjustments by deducting direct selling expenses incurred for home-market sales (*e.g.*, imputed credit) and adding U.S. direct selling expenses (*e.g.*, imputed credit), where appropriate.

For comparisons to CEP sales (Nippon Steel U.S. sales Channels 2), in accordance with section 773(a)(6)(C)(iii) of the Act and 19 CFR 351.410, we deducted from NV direct selling expenses (*e.g.*, imputed credit).

For comparisons to both EP and CEP sales, we deducted home-market packing costs and added U.S. packing costs, in accordance with sections 773(a)(6)(A) and (B) of the Act. When comparing U.S. sales with home market sales of similar merchandise, we also made adjustments for differences in costs attributable to differences in the physical characteristics of the

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

merchandise, in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411.  We based this adjustment on the difference in the variable cost of manufacturing for the foreign like product and subject merchandise.[99]

*Tokyo Steel*

With respect to Tokyo Steel, we made adjustments to the starting price for billing adjustments, discounts, and sales promotion expenses, where appropriate.  We also made a deduction from the starting price for certain movement expenses under section 773(a)(6)(B)(ii) of the Act.[100]

In addition, we made adjustments for differences in COS, pursuant to section 773(a)(6)(C)(iii) of the Act, by deducting direct selling expenses incurred for home-market sales (*e.g.*, imputed credit) and adding U.S. direct selling expenses (*e.g.*, imputed credit), where appropriate.

We deducted home-market packing costs and added U.S. packing costs, in accordance with sections 773(a)(6)(A) and (B) of the Act.  When comparing U.S. sales with home market sales of similar merchandise, we also made adjustments for differences in costs attributable to differences in the physical characteristics of the merchandise, in accordance with section 773(a)(6)(C)(ii) of the Act and 19 CFR 351.411.  We based this adjustment on the difference in the variable cost of manufacturing for the foreign like product and subject merchandise.[101]

## X.   CURRENCY CONVERSION

We made currency conversions into U.S. dollars in accordance with section 773A of the Act and 19 CFR 351.415, based on the exchange rates in effect on the date of the U.S. sales as certified by the Federal Reserve Bank.

---

[99] *See* 19 CFR 351.411(b).
[100] *See* Tokyo Steel Preliminary Calculation Memorandum.
[101] *See* 19 CFR 351.411(b).

Filed By: Jun Jack Zhao, Filed Date: 11/7/18 1:43 PM, Submission Status: Approved

Barcode:3770225-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

## XI.    RECOMMENDATION

We recommend applying the above methodology for these preliminary results.

☒                              ☐
_____           _____
Agree                          Disagree

11/1/2018

X  *James Maeder*
_____

Signed by: JAMES MAEDER

James Maeder
Associate Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations
  performing the duties of Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

26

# ATTACHMENT 3

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17



UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-588-874
Administrative Review
03/22/2016 – 09/30/2017
**Public Document**
E&C Office VII: JJZ

January 19, 2018

Daniel L. Porter, Esq.
*Tokyo Steel Manufacturing Co., Ltd*
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dear Mr. Porter:

I am writing to you on behalf of Enforcement and Compliance, a unit of the United States
Department of Commerce.  On December 7, 2017, we initiated an administrative review of the
antidumping duty order on certain hot-rolled steel flat products (hot-rolled steel) in order to
determine whether merchandise imported into the United States that you are believed to produce
and/or export is being sold at dumped prices.  Dumping occurs when imported merchandise is
sold in, or for export to, the United States at less than the normal value of the merchandise; *i.e.*,
the United States price is less than the price at which identical or similar merchandise is sold in a
foreign market (usually the home market of the producer and/or exporter of the merchandise), or
is less than the constructed value of the merchandise.  The product covered by this review is hot-
rolled steel from Japan.  We are examining sales, entries or shipments during the period of
March 22, 2016 through September 30, 2017.  We initiated the review based on a request filed
by AK Steel Corporation, ArcelorMittal USA LLC, Nucor Corporation, SSAB Enterprises, LLC,
Steel Dynamic, Inc., and United States Steel Corporation (the petitioners), on behalf of the
United States industry producing the merchandise under review.

We are soliciting the information requested in the enclosed questionnaire to determine whether
subject merchandise that you produced and/or exported was in fact sold in, or to, the United
States at dumped prices.  General instructions for responding to the questionnaire follow
immediately after the table of contents.  We have divided the questionnaire into five sections, A
through E, and attached supplemental information, including a glossary of terms, in Appendices I
through VII.  Please review the contents page and ensure that you have received all the sections
of the questionnaire.  If you have not received the entire questionnaire, please contact the official
in charge immediately.

You are requested to respond to sections A (General Information), B (Sales in the Home Market
or to Third Countries), and C (Sales to the United States), and section D (Cost of



INTERNATIONAL
**T R A D E**
ADMINISTRATION

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

Production/Constructed Value).[1]  If, after examining sections A and C of the questionnaire, you conclude that your company and its affiliates did not have any U.S. sales or shipments during the review period identified above, please submit a statement to that effect, following the data submission requirements specified in the general instructions.  If you do not submit such a statement for the administrative record in this case, we may conclude that your company has not been responsive to this questionnaire and may proceed on the basis of the facts otherwise available, as defined in the glossary at Appendix I of the attached questionnaire.

If any of the products covered by this review underwent additional processing in the United States before they were delivered to customers unaffiliated with your company, you are in general required to respond to section E (Cost of Further Manufacturing or Assembly Performed in the United States).  However, if you believe the value added in the United States exceeds substantially the value of the merchandise imported into the United States (*i.e.*, the value added in the United States represents at least 65 percent of the price of the merchandise charged to the first customers unaffiliated with your company), please contact the official in charge in writing immediately.

Please refer to the cover page and general instructions of the enclosed questionnaire for the time period covered by this review, the due dates for responding to the questionnaire, and the instructions for filing the response.  We remind you that, beginning August 5, 2011, with certain, limited exceptions, all submissions for all proceedings must be filed electronically using Enforcement and Compliance's ACCESS.  An electronically filed document must be received successfully in its entirety by the Department's electronic records system, ACCESS, by 5 p.m. Eastern Time (ET) on the date indicated on the cover page of the enclosed questionnaire.  Documents excepted from the electronic submission requirements must be filed manually (*i.e.*, in paper form) with the APO/Dockets Unit in Room 18022 and stamped with the date and time of receipt by 5 p.m. ET on the due date established here within.

For your convenience, the Department has the following resources available online to assist you in complying with these electronic filing procedures:

ACCESS:  Help Link
https://access.trade.gov/help.aspx

ACCESS:  External User Guide
https://access.trade.gov/help/ACCESS%20User%20Guide.pdf

---

[1] On June 29, 2015, President Obama signed into law The Trade Preferences Extension Act of 2015, Public Law 114-27 (the "Act"), which provides a number of amendments to the antidumping duty ("AD") and countervailing duty ("CVD") laws.  Under the amendment of Section 773(b)(2) of the Tariff Act of 1930, 19 U.S.C. § 1677b(b)(2), the Department will request constructed value and cost of production information from respondent companies in all AD proceedings.  Therefore, you must submit a full response to Section D of this questionnaire.

2

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

ACCESS:  Handbook on Electronic Filing Procedures
https://access.trade.gov/help/Handbook%20on%20Electronic%20Filling%20Procedures.pdf

*Federal Register* notice:  *Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures*, 76 FR 39263 (July 6, 2011) http://www.gpo.gov/fdsys/pkg/FR-2011-07-06/pdf/2011-16352.pdf and *Enforcement and Compliance:  Change of Electronic Filing System Name,* 79 FR 69046 (November 20, 2014) http://www.gpo.gov/fdsys/pkg/FR-2014-11-20/pdf/2014-27530.pdf

Please note that revised certification requirements are in effect for company/government officials as well as their representatives.  In all segments of antidumping duty or countervailing duty proceedings initiated on or after August 16, 2013, parties submitting factual information must use the formats for the revised certifications provided at the end of the *Final Rule*.[2]  Templates for these certifications are included as an appendix to this questionnaire.

The Department must conduct this administrative review in accordance with statutory and regulatory deadlines.  If you are unable to respond completely to every question in the attached questionnaire by the established deadline, or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response.  If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline.  Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request.  Section 351.302(c) of the Department's regulations requires that all extension requests be in writing and state the reasons for the request.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If the Department does not receive either the requested information or a written extension request before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding.  The Department will not accept any requested information submitted after the deadline.  As required by section 351.302(d) of our regulations, we will reject such submissions as untimely.  Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

---

[2] *See Certification of Factual Information To Import Administration During Antidumping and Countervailing Duty Proceedings*, 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* the frequently asked questions regarding the *Final Rule*, available at http://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.  Templates for these certifications are included as an appendix to this questionnaire.

Filed By: Jun Jack Zhao, Filed Date: 1/19/18 12:50 PM, Submission Status: Approved

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

Should you have any questions about this matter, please contact Jack Zhao at (202) 482-1396.

Sincerely,

Thomas Gilgunn
Program Manager
 AD/CVD Operations, Office VII

Enclosure

4

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

# UNITED STATES DEPARTMENT OF COMMERCE
## ENFORCEMENT AND COMPLIANCE
## ANTIDUMPING AND
## COUNTERVAILING DUTY OPERATIONS

## OFFICE VII

## REQUEST FOR INFORMATION

## ANTIDUMPING DUTY ADMINISTRATIVE REVIEW

### Tokyo Steel Manufacturing Co., Ltd

### Japan

### Certain Hot-Rolled Steel Flat Products

**PERIOD OF REVIEW: 3/22/2016 – 9/30/2017**

**RESPONSE DUE DATE:**

    **Section A:**     **February 9, 2018**
    **Sections B-D:**  **February 26, 2018**

**OFFICIALS IN CHARGE:**

**NAME: Jack Zhao**               **NAME: Thomas Gilgunn**
**PHONE:** (202) 482-1396       **PHONE:** (202) 482-4236
**FAX:**     (202) 482-1388       **FAX:**     (202) 482-1388
**E-MAIL:** junjack.zhao@trade.gov    **E-MAIL:** Thomas.Gilgunn@trade.gov

**A response must be submitted electronically using Enforcement and Compliance's
ACCESS at** http://access.trade.gov**.**

For the electronic filing regulations, please refer to: *Antidumping and Countervailing Duty
Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures*, 76 FR
39263 (July 6, 2011) and *Enforcement and Compliance: Change of Electronic Filing System
Name,* 79 FR 69046 (November 20, 2014). You may also obtain the following electronic filing
guidelines on the ACCESS website (http://access.trade.gov): ACCESS External User Guide,
ACCESS Handbook.

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

CONTENTS

General Instructions

Section A            Organization, Accounting Practices, Markets and Merchandise

Section B            Sales in the Home Market or to a Third Country

Section C            Sales to the United States

Section D            Cost of Production and Constructed Value

Section E            Cost of Further Manufacture or Assembly Performed in the United States

Appendix I           Glossary of Terms

Appendix II          Instructions for Submitting Computer Databases and Spreadsheets

Appendix III         Description of Products Under Review

Appendix IV          Certifications of Factual Accuracy and Certificate of Service

Appendix V           Case-Specific Questions and Modifications, Including Matching Criteria

Appendix VI          Arms-Length Sales to Affiliated Parties

Appendix VII         Sales Database Summaries

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

## GENERAL INSTRUCTIONS

> **Note:** *The latest antidumping questionnaires, antidumping procedures manual, which provides guidance useful for calculating much of the information requested below, and relevant laws and regulations can be found at the following links:*
>
> Antidumping Questionnaires
> http://enforcement.trade.gov/questionnaires/questionnaires-ad.html
> Antidumping Procedures Manual
> http://enforcement.trade.gov/admanual/index.html
> Laws and Regulations
> http://enforcement.trade.gov/regs/index.html

This questionnaire requests information to enable the United States Department of Commerce (the Department) to determine whether your company dumped the **subject merchandise** in the United States.[1]  **Dumping** is the sale of merchandise to the United States at prices below the **normal value** of the merchandise.  If you have questions, we urge you to consult with the **official in charge** named on the cover page.  If for any reason you do not believe that you can complete the response to the questionnaire by the date specified on the cover page of this questionnaire, or in the form requested, you should contact the official in charge immediately.  You must formally request an extension of time in writing.  Any extension will be approved in writing; otherwise the original deadlines will apply.

Your response to the questionnaire should include all of the information requested.  It is essential and in your interest that the Department receive complete information early in the proceeding to ensure a thorough and accurate analysis and to provide all parties the fullest opportunity to review and comment on your submission and the Department's analysis.  We appreciate your cooperation in this review.

> **Note:** *This review will be conducted on a schedule dictated by law.  If you fail to provide accurately the information requested within the time provided, the Department may be required to base its findings on the* ***facts available.*** *If you fail to cooperate with the Department by not acting to the best of your ability to comply with a request for information, the Department may use information that is adverse to your interest in conducting its analysis.*

This questionnaire consists of the following sections:

> Section A requests information about your organization and accounting practices, and general information regarding sales of the merchandise under review.

---

[1] In each section of the questionnaire, the first use of each term included in the Glossary of Terms at Appendix I is shown in bold typeface.

G-2

Section B requests information about your **home market**, or where appropriate, a **third-country** market,[2] including a sales list and other information necessary for us to calculate the normal value of the merchandise.

Section C requests information about the United States market, including a sales list and other data necessary to calculate the price in or to the United States market.

Section D requests information about the **cost of production** of merchandise sold in the foreign market and the **constructed value** of merchandise sold in or to the United States, which may be required in connection with the calculation of normal value.

Section E requests information about further manufacturing or assembly in the United States prior to delivery to un**affiliated** United States customers.

Please comply with the following general instructions for filing and preparing your response to this questionnaire.

I.      **Instructions for Filing the Response**

The following instructions apply to your response to this questionnaire and all other documents you submit to the Department during the course of this proceeding, such as responses to additional questionnaires, extension requests, and case briefs.

> **Note:**  Please label the electronic files that you upload in a manner indicating their specific contents.  For example, ABC Ltd March 15 QR – Exhibits 10-15, rather than ABC Ltd March 15 QR – part 3.  If possible, please do not split exhibits between electronic files.

A.      Due Date

   1. All submissions must be made electronically using the Department's ACCESS website at http://access.trade.gov.  If an exception to the electronic filing requirement applies, you must address and manually submit your response to the address indicated on the cover page of this questionnaire.  To determine if your response qualifies for manual filing, see the section on "Manual Filing" below.  All laws, regulations, and other descriptive materials that supplement your responses should be submitted on the same date as the initial response.

   2. The **business proprietary** response should be submitted on the day specified on the cover page of this questionnaire.  The **public version** of the response may be filed one business day after the proprietary response.

---

[2] Hereafter referred to as your **foreign market**.

3. An electronically filed document must be received successfully in its entirety by ACCESS by 5 p.m. Eastern Time (ET) on the due date, unless an earlier time is specified.  Where applicable, a submitter must manually file a document between the hours of 8:30 a.m. and 5 p.m. ET on the due date, unless an earlier time is specified.

B.   Format

1. You are required to state in the upper right-hand corner of your cover letter the following information in the following format:

   a. on the first line, indicate the case number stated on the cover page to this questionnaire;

   b. on the second line, indicate the total number of pages in the document including cover pages, appendices, and any unnumbered pages;

   c. on the third line, indicate the specific segment of the proceeding, (*e.g.*, investigation, administrative review, scope inquiry, suspension agreement, *etc.*) and, if applicable, indicate the complete period of review (MM/DD/YY - MM/DD/YY);

   d. on the fourth line, indicate the Department office conducting the proceeding;

   e. on the fifth and subsequent lines, indicate whether any portion of the document contains business proprietary information and, if so, list the page numbers containing business proprietary information; and indicate the business proprietary/public status of the document and whether you agree or object to release of the submitted information under **administrative protective order** (APO) by stating one of the following:
      - "Business Proprietary Document -- May Be Released Under APO,"
      - "Business Proprietary Document -- May Not Be Released Under APO,"
      - "Business Proprietary/APO Version-- May Be Released Under APO," as applicable,
      - "Public Version," or
      - "Public Document."

2. Please include a "Re:" line on the cover letter of your response, or any other submissions you make during this proceeding.  In the Re:  line, briefly summarize the purpose of your submission, *e.g.*, "response to questionnaire," "case brief."

3. Prepare your response in typed form and in English (*see* 351.303(d) and (e) for these and other formatting requirements).  Include an original and translated version of all pertinent portions of non-English language documents that accompany your response, including financial statements.

4. Repeat the question to which you are responding in your narrative submission and place your answer directly below it.  The Department will provide an electronic version of this questionnaire for your convenience.

5. Please respond to each question.  If a particular question does not apply, please state so and explain why in your response.  Failure to do so could lead to the use of adverse inferences for that particular question.

6. In each of your answers, please identify your source of information.  Please include with your response copies of source documents necessary to understand your response.  For additional information sources not included in your response, indicate the location where the documents or electronic data systems are maintained.  If information is maintained at multiple locations, please list in an appendix to your response these locations along with notes indicating the information maintained at each location.  This information is used by the Department to prepare for **verification**.

7. Include all worksheets, financial reports, and other requested documents as appendices to your response.

8. Provide a table of attachments.  Assign a number to each attachment and include a descriptive name for each attachment and its number in the table.

9. All monetary amounts should be shown in the currency in which they were originally denominated, and in the currency in which they are registered in your accounts (if the two are different).  Also, report the actual exchange rate used for a particular conversion.  For all values adjusted for inflation, please provide the data in both nominal and adjusted terms and explain how these values were adjusted.

   Identify all units of measurement, currencies, and conversion factors used in your narrative response, worksheets, or other appendices.  For electronic databases submitted in antidumping proceedings, you must complete Appendix VII, which is a template providing a standard format for reporting the units of measurement, currencies, and conversion factors.  Please complete a separate template for each database submitted (home market sales, U.S. sales, cost, *etc.*) and be sure to provide the requested data for each numerical field in the database.  In addition, for antidumping proceedings, please refer to Appendix II (not included for countervailing duty (CVD) proceedings), which includes additional information for submitting databases.

10. It is your responsibility to contact the official in charge if subsequent to your filing there are events that affect your response (*e.g.*, changes in your cost accounting system are relevant to antidumping proceedings, and changes as a result of an audit are relevant to both antidumping and CVD proceedings).

C. <u>Manual Filing</u>
1. All submissions must be filed electronically. Only under the following four circumstances will the Department accept a hardcopy response that is manually filed:

- Documents exceeding 500 pages in length <u>may</u> be filed manually (in paper form) in the APO/Dockets Unit. This is referred to as a "bulky document."

- Data files greater than 20 MB <u>must</u> be filed manually on CD-ROM or DVD.

- If the ACCESS system is unable to accept filings continuously or intermittently over the course of any period of time greater than one hour between 12:00 p.m. and 4:30 p.m. ET or for any duration of time between 4:31 p.m. and 5:00 p.m. ET, then a person may manually file the document in the APO/Dockets Unit. The Department will provide notice of such technical failures on the ACCESS Help Desk line at 202-482-3150 and on the Enforcement and Compliance website, which is http://www.trade.gov/enforcement.

- Apart from the above, if you are unable to comply with the electronic filing requirement, as provided in 19 CFR 351.103(c) of the Department's regulations, and in accordance with section 782(c) of the Tariff Act of 1930, as amended (the Act), you must promptly notify the official in charge and submit a full written explanation of the reasons you are unable to file the document electronically. You must also suggest alternative forms in which to submit the information. The Department will consider the ability of a submitter and may modify the electronic filing requirement on a case-by-case basis.

2. All manually filed documents must be accompanied by a cover sheet generated in ACCESS. For manually filed bulky documents, separator sheets must also be generated and used.

3. If your response qualifies as a bulky document and you opt to file it manually, you must file two identical paper copies of the document. For all other authorized manual submissions, only one paper copy is required.

4. Manual submissions must be addressed and submitted to:
**Secretary of Commerce**
**Attention: Enforcement and Compliance, AD/CVD Operations Office VII**
**APO/Dockets Unit, Room 18022**
**U.S. Department of Commerce**
**Fourteenth Street and Constitution Avenue, N.W.**
**Washington, D.C. 20230**

D.    Certification

1. Submit the required **certification of accuracy**.  Providers of information and the person(s) submitting it, if different (*e.g.*, a legal representative), must certify that they have read the submission and that the information submitted is accurate and complete.  The Department cannot accept questionnaire responses that do not contain the certification statements.  Forms for such certification are included as appendices to this questionnaire.  You may photocopy this form and submit a completed copy with each of your submissions.

2. Provide the required **certificate of service** (included as an appendix) with each business proprietary document and public version submitted to the Department.

3. Signed certifications of accuracy and certificates of service should be scanned and appended to the appropriate electronic documents filed in ACCESS.

E.    Business Proprietary Information and Summarization of Business Proprietary Information

1. Request business proprietary treatment for information submitted that you do not wish to be made publicly available.  As a general rule, the Department places all correspondence and submissions received in the course of an antidumping or countervailing duty proceeding in a public reading file.  However, information deemed to be proprietary information will not be made available to the public.  If you wish to make a request for proprietary treatment for particular information, refer to sections 351.304, 351.305, and 351.306 of the Department's regulations.  You must submit the request for proprietary treatment at the same time as the claimed business proprietary information is submitted to the Department.

2. Utilize the "one-day lag rule" under section 351.303(c)(2) of the Department's regulations if you wish an additional day to review the final bracketing of business proprietary information in a document and to prepare the required public version.  The filing requirements under the one-day lag rule provide for a party to file only the business proprietary document  within the applicable time limit (section 351.303(c)(2)(i)).  By the close of business one business day after the date the business proprietary document is filed, the person must file the complete final business proprietary document (section 351.303(c)(2)(ii)).  The final business proprietary document must be identical to the original document except for any bracketing corrections.

3. By the close of business one business day after the date the business proprietary document is filed (refer to the "one-day lag rule" in the preceding paragraph), submit the public version of your response (section 351.303(c)(2)(iii)).  A public version must contain:

    a.  a non-proprietary (public) version of your response that is in sufficient detail to permit a reasonable understanding of the information submitted in confidence, and/or

    b.  an itemization of particular information that you believe you are unable to summarize.  State the reasons why you cannot summarize each piece of information.

*Note:  The summarization requirement does not apply solely to the narrative portion of your response.  It applies equally to worksheets and other appendices to your response, and even to sales and cost databases submitted in antidumping proceedings.  Generally, numerical data, such as that provided in sales and cost databases in antidumping proceedings, are adequately summarized only if grouped or presented in terms of indices or figures ranged within 10 percent of the actual figure.  If a particular portion of data is voluminous, use ranged figures for at least one percent of the voluminous portion.*

*Responses, or portions thereof, that are not adequately summarized may be rejected from the record of this proceeding.*

4.  Submit the statements required regarding limited release of business proprietary information under the provisions of an APO.  U.S. law permits limited disclosure to representatives of parties (*e.g.*, legal counsel) of certain business proprietary information, including electronic business proprietary information, under an APO.  (Note that data received under an APO cannot be shared with others who are not covered by the APO.)  Under the provisions governing APO disclosure, you must submit either:

    a.  a statement agreeing to permit the release under APO of information submitted by you in confidence during the course of the proceeding, or

    b.  a statement itemizing those portions of the information which you believe should not be released under APO, together with arguments supporting your objections to that release.

We are required by our regulations to reject, at the time of filing, submissions of business proprietary information that do not contain one of these statements.  As discussed above, you must state in the upper right-hand corner of the cover letter accompanying your questionnaire response whether you agree or object to release of the submitted information under APO (*e.g.*, May Be Released Under APO or May Not Be Released Under APO).  (*See* section 351.304 of the Department's regulations for specific instructions.[3])

---

[3] If you do not agree to release under APO all or part of the proprietary information, but we determine that the information should be released, you will have the opportunity to withdraw the information (*see* section 351.304(d)

5.  Place brackets ("[ ]") around information for which you request business proprietary treatment.  Place double brackets ("[[ ]]") around information for which you request proprietary treatment and which you do not agree to release under APO.

6.  Provide to all parties whose representatives have been granted APO access and who are listed on the Department's most recent APO Service List, a complete copy of the submission--proprietary document and public version, except for that information which you do not agree to release under APO.  (APO service lists, as well as public service lists, are maintained at http://enforcement.trade.gov/apo/apo-svc-lists.html, and are also either attached to the cover letter of this questionnaire or will be provided by a subsequent letter from the Department.)  If you exclude information because you do not agree to release it under APO, you must submit the complete business proprietary version, wherein information in double brackets has been excluded.  This version of the response must be marked "Business Proprietary/APO Version - May Be Released Under APO" on the cover page.  For parties that do not have access to information under APO, please provide a public version only.

> *Note:*  *A chart summarizing AD/CVD document filing requirements can be found at* *http://enforcement.trade.gov/filing/index.html.*  *Detailed and supplemental information concerning APOs, including the APO Handbook, a complete set of APO regulations, and APO application forms and service lists, can be found at* *http://enforcement.trade.gov/apo/index.html*

F.    Government Confidential Information

Any government confidential information submitted to us should be clearly labeled, preferably with the national security classification mark of the responsible authority.  The appropriate authority should also submit a statement explaining, in detail, why the information is confidential.

Please note that any company-specific information submitted by government authorities, for which the government is acting merely as a conduit, is not entitled to government confidential treatment; such information is covered by the business proprietary information guidelines outlined above.

G.    Verification

All information submitted may be subject to verification.  Failure to allow full and complete verification of any information may affect the consideration accorded to that or any other verified or non-verified item in the responses.

---

of our regulations).  However, any information which you withdraw will be taken out of the official record and will not be used in our determination.

H.   <u>Extension Requests</u>

The Department must conduct this proceeding in accordance with statutory and regulatory deadlines.  If you are unable to respond completely to every question in the attached questionnaire by the established deadline, or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response.  If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline.  Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request.  Section 351.302(c) of the Department's regulations requires that all extension requests be in writing and state the reasons for the request.  Any extension granted in response to your request will be in writing; otherwise the original deadline will apply.

If the Department does not receive either the requested information or a written extension request before 5:00 pm ET on the established deadline, we may conclude that you have decided not to cooperate in this proceeding.  The Department will not accept any requested information submitted after the deadline.  As required by section 351.302(d) of our regulations, we will reject such submissions as untimely.  Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

## II.   **Additional Instructions for Preparing an Antidumping Questionnaire Response**

A.   Report all **price adjustments,** sales expenses, and cost data in the computer data files requested in sections B, C, and D of this questionnaire.  Report price adjustments and expenses on an allocated basis (*e.g.*, on an average basis) only when price adjustments and expenses cannot be tied to a specific sale (*e.g.*, indirect selling expenses).

The Department will accept allocated price adjustments and expenses only if you can demonstrate that the allocation is calculated on as specific a basis as is feasible (*e.g.*, on a customer-specific basis, product-specific basis, and/or monthly-specific basis, etc.) and is not unreasonably distortive.  In doing so, provide a complete explanation of:  (1) how the price adjustments or expenses are recorded in your records; (2) why you cannot report the price adjustment or expense on a more specific basis using your records; and, (3) why your allocation methodology does not cause inaccuracies or distortions.  For example, if you must allocate an expense between subject and non-subject merchandise and you perform the allocation on the basis of sales value, show that subject and non-subject merchandise incur, or should incur, the expense in such proportions.  Include the allocation formula and supporting worksheets in your response.

B.  The narrative portion of your response should include an explanation of each price adjustment, sales expense, and cost field reported in your databases. Such explanations should include a discussion of the nature of the price adjustment, expense, or cost, as well as a detailed description of the calculation used (including samples). Explain whether sales expenses relate directly or indirectly to your sales of the subject merchandise. Please refer to the Glossary of Terms included as an appendix for a definition of **direct** and **indirect expenses**.

C.  Report all revenues and expenses in the currencies in which they were earned or incurred.

D.  Revenues and expenses should be identified by name and by the account or sub-account codes listed in your chart of accounts.

E.  Prepare only a single response for you and your **affiliates** involved with the production or sale of the products under investigation during the **period of review** (POR) in the foreign market or the United States. In other words, report the sales and cost information of these affiliates and your sales and cost information in the same computer data files and submit only one narrative response. However, clearly separate your answers regarding each company for which you are reporting information. Likewise, each record in your electronic sales databases should indicate which company is the manufacturer and which is the seller. Each record in your cost database should indicate the manufacturer.

F.  If (a) you are uncertain whether a company is affiliated with you; (b) you do not believe you are able to prepare a response that includes the information of a known affiliate; or, (c) you do not believe it is appropriate to prepare a response that includes the information of a known affiliate, contact the official in charge immediately.

G.  If you make sales to unaffiliated customers in the United States through an affiliated reseller located in the United States, your sales will generally be classified as **constructed export price** sales. For these sales, the Department deducts from the price to the unaffiliated customer all selling, distribution, and manufacturing expenses incurred in the United States. The Department also makes a deduction for profit attributable to U.S. operations. The Department will typically calculate a profit rate based on your reported revenues and expenses (in the United States and the foreign market).

H.  You must report all sales, including those sales which you believe are outside the **ordinary course of trade**. If you claim that some sales are outside the ordinary course of trade, you should then identify those sales. You must include a complete explanation in your narrative of why you consider those sales to be outside the ordinary course of trade.

## III.   **Submission of Computer Databases and Spreadsheets**

Refer to Appendix II for additional instructions

**IV.**    <u>**Separate Letter of Appearance Required**</u>

Section 351.103(d)(1) of the Department's regulations states that "with the exception of a petitioner filing a petition in an investigation, to be included on the public service list for a particular segment, each interested party must file a letter of appearance."  The letter of appearance must be filed separately from any other document (with the exception of an application for APO access).

*Last Revised July 31, 2013*

# SECTION A

## Organization, Accounting Practices, Markets and Merchandise

1. <u>Quantity and Value of Sales</u>

Information on the quantity and value of sales is necessary to determine whether we will attempt to compare the prices of merchandise under review sold to the United States market to (a) the prices of comparable merchandise in your **home market**, (b) prices of comparable merchandise in a **third-country** market or (c) **constructed value**.[1]  Refer to the term **viability** in the Glossary of Terms at Appendix I for a more complete discussion.

In this questionnaire we generally refer to the home market or third-country market selected for the calculation of normal value as the **foreign market.**

   a.   State the total quantity and value of the merchandise under review that you sold during the period of review (POR) in (or to):

      i.    the United States,
      ii.   the home market, and
      iii.  each of the three largest third-country markets.[2]

   Also state the quantity and value of the merchandise entered into the United States during the POR.  If you had **constructed export price** sales (*i.e.*, sales to unaffiliated U.S. customers through an affiliated U.S. importer) but no entries during the POR, please notify the official in charge immediately.

   A chart for reporting the sales quantity and value is included at the end of this section.

---

[1] Throughout this questionnaire, whenever we refer to the "products under review" or "merchandise under review," we are referring generally to all products within the scope of the review that your company sold during the period of review in any market.  When we use the term **subject merchandise,** we are referring to products sold to the United States.  When we use the term **foreign like product,** we are referring to products sold in your home market or exported to a country other than the United States.  We have provided a description of the merchandise under review in Appendix III.

[2] If the Department has requested that you file your response to section A before your responses to sections B and C, in responding to this question, you may use the **date of sale** you use in your accounting system to determine the quantity and value sold during the period of review.  However, the viability of your home and third county markets will ultimately be based on the date of sale used in your responses to sections B and C of this questionnaire.  Accordingly, if you use the date of sale you employ in your accounting system to prepare section A, but expect to use a different date of sale in the preparation of sections B and C, and your section A response for home market sales is close to the threshold of five percent of U.S. sales, contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

A-2

Complete a combined chart for merchandise produced and sold by your company and its affiliates and, where appropriate, a separate chart for the merchandise of each unaffiliated manufacturer whose merchandise under review you sold during the POR. Report the value of all sales in U.S. dollars and convert your quantity of sales to a uniform unit of measure; list the conversion rates used. To the extent possible, sales values should be reported based on the same terms of sale. For sales of merchandise further manufactured or consumed by affiliates in the United States, report the quantity and value (based on the prices you charge to your U.S. affiliate) of the product as imported into the United States, and not as the further processed product.

b.  Report separately the quantity and value of sales in the home market and, if necessary, to each of the three largest third countries, that were made to affiliates.

c.  If you sold to affiliated customers, also report separately the quantity and value such sales represent as a percentage of all home market sales and of sales in each of the largest third country markets, respectively.

d.  Report third-country market information in the chart only if the volume of home market sales of the foreign like product is less than five percent of the volume of United States sales of the subject merchandise. If the volume of your home market sales of the foreign like product is less than five percent of the volume of your sales to the United States of the subject merchandise (or if, for other reasons, you do not believe that your home market sales are usable as a basis for normal value), contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter) because the Department, except in unusual situations, will not use your home market as the basis for calculating **normal value**. If home market sales are less than 5 percent of U.S. sales, you may present to the Department any special circumstances which might justify why your home market should be used as the basis for normal value.

e.  If your home market does not meet the five percent threshold described above, report the sales to each of the three largest (by volume) third-country markets (provided each meets the five percent threshold) in the chart and respond to each of the remaining questions in this section of the questionnaire by describing each of these three third-country markets. If the volume of your largest third-country market sales of the foreign like product is also less than five percent of the volume of your sales to the United States of the subject merchandise, do not report this market. If this is the case, you are required to respond to section D of this questionnaire.

f.  If there are special circumstances that you believe the Department should consider in selecting a third-country market for determining normal value, please describe these circumstances (*e.g.*, similarity of merchandise, similarity of channels of distribution) for each of the three largest third-country markets. In addition, if you believe that the foreign like product sold in the three largest third-country markets is not appropriate

A-3

for comparison to the subject merchandise, then also report any third-country sales for the market to which you sold merchandise that is best compared to the U.S. market.  Describe the circumstances that make that market appropriate for making comparisons.

g.  If you export merchandise for entry into a foreign trade zone (FTZ), into a bonded warehouse in the United States, or under a temporary import bond, this may affect the way we treat these sales.  Please note whether your merchandise goes into a FTZ or a bonded warehouse and contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter) to discuss the reporting requirements.

h.  In your response to Section B and Section C, provide a complete package of documents and worksheets demonstrating how you identified the sales you reported to the Department in your quantity and value chart and in your comparison market and U.S. market sales databases and reconciling the reported sales to the total sales listed in your general ledger.  Include a copy of all computer programs used to separate the reported sales from your total sales and to calculate expenses.

i.  If you sold merchandise that falls under the description of the merchandise under consideration (as described in Appendix III), but which was produced in more than one country, explain how you determined the country of origin of the merchandise for individual sales.  If all the merchandise you sold originated in one country, so indicate, and explain how you can be sure of this.

2.  <u>Corporate Structure and Affiliations</u>

The purpose of the questions concerning operational and legal structures and affiliations is to provide the Department with an understanding of your company and its role in the manufacture, sale and distribution of the merchandise under review.  The Department requests information not only about your company but also about affiliates, because it may be necessary to use information gathered from affiliated parties to establish prices, selling and general expenses, and production costs.  In responding to questions about **affiliated persons**, please refer to the definition provided in the Glossary of Terms at Appendix I.  For the purposes of the following questions, a "person" includes any company, organization, individual, partnership or group.

a.  Provide an organization chart and description of your company's operating structure.  Describe the general organization of the company and each of its operating units.  For example, if your operations are structured by product or families of products, provide a description of each product group; if your operations are structured by function, provide a list of functional groups and the activities performed by each.

Although you may provide a general description of the structure of the company as a whole, it is particularly important that the description of those units involved in the

A-4

development, production, sale and/or distribution of the merchandise under review be sufficiently detailed to provide the Department with a good working understanding of how these units function within the company.

b.   Provide a list of all the production facilities, sales office locations, research and development facilities and administrative offices involved in the development, production, sale and/or distribution of the merchandise under review operated by your company and its affiliates.  Please briefly describe the purpose of each.  Provide a complete address and telephone number for each of these plants, offices, and other facilities.

c.   Provide an organization chart and description of your company's legal structure. Include any parent companies and subsidiaries of your company and all other persons affiliated with your company and provide a description of all such persons.

d.   Provide a list of:  (1) the shareholders who directly or indirectly own, control or hold with power to vote, 5 percent or more of your company's outstanding voting stock; (2) the ten shareholders with the highest ownership percentage of your company, if such information is not provided in response to 1 above; (3) all companies in which your company directly or indirectly owns, holds or controls with power to vote, 5 percent or more of the outstanding voting stock; (4) if your company is a subsidiary of another company, the ten largest shareholders of your parent company and of the other subsidiaries of your parent company which are involved in the development, production, sale and/or distribution of the merchandise under review; and (5) if your parent company is itself a subsidiary of another company, the ten largest shareholders of its parent company.  For all of the above, state the percentage of voting stock owned, held or controlled, directly or indirectly.

Explain fully any business relationships your company had or has with the owners of the companies listed above and the effect such relationships may have on the development, production, sales or distribution of the merchandise under review.

If any of the affiliated persons identified above are in turn affiliated with other persons that are involved in the development, production (including inputs), sale and/or distribution of the merchandise under review, provide a list of those persons and describe the nature of the affiliation (*e.g.*, shared directors or managers, equity ownership, close supplier relationship).  Include any such affiliated persons in the chart you provided in response to this section.  Also, describe the nature of each person's involvement with the merchandise under review.

e.   State whether your company is part of a group.  Examples of groups are:  (1) a parent company and its subsidiaries; (2) a defined corporate group (*e.g.*, kieretsu or chaebol); (3) a network of companies with cross ownership; (4) two or more companies involved in the development, production, sale and/or distribution of the merchandise under review which are directly or indirectly controlled by a family or

investor group.  For more information pertaining to control, *see* section 771(33)(F) and (G) of the Act, section 351.102(b) of the regulations, the definition of **affiliated persons** in Appendix I and questions f and h below.

If your company is part of a group, provide:

    i.    An organization chart of the companies in the group.

    ii.    The amount of outstanding voting stock directly or indirectly owned, held or controlled, with power to vote, of each company in the group by: (a) any other company in the group; (b) any member of the family group; and/or (c) any member of the investor group.

    iii.    The names of the officers, director and managers of each company in the group and indicate whether any of them is also: (a) an officer, director or manager of another company in the group; (b) a member of the family group; and/or (c) a member of the investor group.

        Explain all business or operational relationships affecting the development, production, sale and/or distribution of the merchandise under review which your company has or had with the parent company, any other company in the group, any member of the family group, and/or any member of the investor group.  Such business or operational relationships may include, but are not limited to, shared managers, employees, facilities, and borrowings.

f.    State whether your company is under "common control" with another person by a third person (*e.g.*, a family group or investor group) and/or whether your company and another person commonly control a third person (*e.g.*, a joint venture).  Control exists where a person is legally or operationally in a position to exercise restraint or direction over another person.  Some factors, individually or in aggregate, which may influence your review for determining whether or not control may exist include, for example, ownership (with power to vote) of the voting stock of a company, substantial borrowings, intertwined business operations, and common officers, directors, or managers.

    If there is such a relationship, describe the nature of the relationship (*e.g.*, ownership percentage, common officers/directors), your business relationship with such company or person and the effect such relationship may have on the development, production, sale and/or distribution of the merchandise under review.

g.    If your company is affiliated with another producer that manufactures or has the potential to manufacture the merchandise under review, identify that producer and explain whether your company and the affiliated producer manufactures or could manufacture identical or similar products without substantial retooling of either facility.

If you do not believe that the affiliated producer and your company could manufacture identical or similar products without substantial retooling, please explain the reasons for your conclusion and provide support for such a conclusion.

For each affiliated producer or potential producer of the merchandise under review: (1) state the level of common ownership (*e.g.*, the amount of cross equity ownership between the producers and/or ownership by any third party of both of the producers); (2) provide the names of any officers, directors and/or managerial employees of one company who are also officers, directors and/or managerial employees of the other company or of a company that is affiliated with both your company and the other producer; and (3) explain any intertwined operations (*e.g.,* shared employees and/or shared facilities, shared sales information, common involvement in production and pricing decisions, and transactions between your company and the affiliated producers).  Please refer to Appendix I for the definition of affiliated parties.

h.  Identify all suppliers, (sub)contractors, lenders, exporters, distributors, resellers, and other persons involved in the development, production, sale and/or distribution of the merchandise under review which the Department may also consider affiliated with your company, in accordance with section 771(33) of the Act and sections 351.102(b) and 351.401(f) of the regulations.  Some factors which you should consider include, for example, whether you acquire a significant amount of a major input from only a single supplier, the length of time your company has had a relationship with a supplier, (sub)contractor, distributor, exporter or reseller, the exclusivity of the relationship, all business relationships your company has or had with these persons, and other relationships between your company and the other person (*e.g.*, director/manager relationships).[3]

i.  Identify all business transactions that may directly or indirectly affect the development, production, sale and/or distribution of the merchandise under review which your company has or had with any affiliate (except to the extent you have provided this in response to one of the questions above).

Examples of such business transactions may include, but are not limited to, loans made by or to an affiliate, purchases and resales of the merchandise under review by an affiliated reseller, purchases made from a close supplier, and/or transactions with joint ventures, or a company acting as an agent for your company's sales.

---

[3] Reported affiliations, selling expenses shared by, or distributed to, business associates, and/or the existence of commissions reported in questionnaire sections B and C may be used to further analyze the potential existence of affiliations between the respondent, its customers, and other relevant entities.

3.    <u>Distribution Process</u>

The description you provide of your distribution and sales processes (*see also* question 4 below) is intended to provide the Department with the information necessary to make appropriate comparisons of sales at the same **level of trade** or to make a **level of trade adjustment**, if appropriate, when sales are compared at different levels of trade.  Therefore, the Department requires detailed information about your channels of distribution, the categories of customers to whom you sell, the selling activities or services associated with each channel of distribution and category of customer, and the level of selling expenses for each channel and category of customer.  Your response to this section is required regardless of whether you believe differences in levels of trade exist.  Your response should include all the information requested and all information the Department should consider in making a comparison.

     a.    Provide a flow chart and description of each of your company's channels (or methods) of distribution in both the U.S. market and the foreign market.  For example, for certain of your sales you may manufacture to order and ship directly to customers; for other sales you may ship from inventory maintained in distribution warehouses; additional sales may be made through consignees; *etc*.

     b.    Provide a list of the categories of customers (*e.g.*, distributor, wholesaler, retailer, end-user) that purchase through each channel of distribution.  In the case of **constructed export price** (CEP) transactions (*i.e.*, sales to unaffiliated U.S. customers through an affiliated U.S. importer[4]), describe both your affiliated U.S. importer(s) and your importer's unaffiliated customers.

     c.    Provide a complete list of all the selling activities performed and services offered in the U.S. market and the foreign market.  Selling activities or services might include inventory maintenance, technical advice, warranty services, freight and delivery arrangements, advertising, and any other sales support activities.  Please specify which services are provided by your company and which are provided by an affiliate.  Describe each activity or service in detail.  Identify the expense field in which the expenses associated with each selling activity will be captured in your response to sections B and C.

         Please prepare a chart showing all selling functions you performed for each channel of distribution in the home market and the U.S. market.  If you wish to distinguish between levels of function performance, you may.  For example, if technical consultation is done for two channels, but more is done in one channel than the other, you might wish to indicate this difference by assigning a code for each level of activity.  For each instance, however, you must provide a narrative explanation.

         You should also indicate functions where differences may exist but are not easily categorized as "more" or "less" performed between channels.  For example, if you

---

[4] Please refer to the Glossary of Terms at Appendix I for a more exact definition.

A-8

pack the merchandise under review in bulk for sales in one channel but not in another channel, you should indicate this difference between channels.  In addition, in this chart, indicate who performs the selling functions (the foreign parent, the U.S. affiliate, or both).  If more than one sales unit performed the selling functions, please indicate all such sales units involved, and describe and rate the extent to which each performs the selling functions.  For purposes of this chart, when preparing the column(s) for CEP sales, use different columns for the sale to the U.S. affiliate and for the sale to the unaffiliated customer.

A sample chart is included at the end of this section.  The items included in this sample chart are for illustrative purposes only, and are not intended to be exhaustive.  Your chart should include all the selling functions performed by your company and its U.S. affiliates for all your channels of trade, regardless of whether those functions are included in the sample chart.  Show the degree of involvement for each selling activity/function; *i.e.*, indicate each selling activity/function with "None," "Low," "Medium," or "High" on the chart.

d.      For each category of customer (*see* part 3.b. above) to which you sold in each channel of distribution (*see* part 3.a. above) (*i.e.*, for each combination of distribution channel and customer category), provide the information requested below.

    i.      From the list of selling activities and services you created in response to part 3.c. above, identify those activities or services performed.  In the case of consignment sales, also describe any consignment arrangements and the activities of the consignee.

    ii.      Indicate where and by whom each selling activity was performed on your reported sales.

    iii.      Describe the degree to which each selling activity was performed on your reported sales.

    iv.      If you had CEP sales, explain how each U.S. selling activity supported specific steps in your U.S. distribution system.

For constructed export price sales to the United States, if any, provide the information requested above for <u>both</u> your transactions with your affiliated importer and your U.S. affiliate's resales to unaffiliated U.S. customers.

e.      Explain whether the prices you charge for the subject merchandise in the U.S. market and the foreign like product in the foreign market vary depending on the channel of distribution through which you sell and/or the customer category to whom you sell.  If so, please explain how prices vary and why.

f.      If you have made CEP sales to the United States and you claim that a CEP offset should be made in calculating normal value, the Department's **regulations** require the Department to examine price differences between levels of trade for sales in the foreign market of broader or different product lines.  Under the antidumping

A-9

regulations, the Department may grant a CEP offset only if it is unable to calculate a level of trade adjustment using such information (and if other requirements are met). Therefore, if you are claiming that a CEP offset should be made, then you must provide the information requested in 3.a through 3.d, above, with respect to other products your company sold in the foreign market, including any merchandise that is not a foreign like product. If you made sales of any merchandise at a level of trade similar to the level of trade of your CEP sales[5], provide average price information for the products sold at that level of trade and either of the levels of trade at which the foreign like product was also sold. You may provide your response to this question with your response to section B of this questionnaire.

4.    Sales Process

The **date of sale** for your sales to the United States and the foreign market is important to the Department's analysis. It will determine which sales records are reported in response to sections B and C of this questionnaire and the exchange rate used to convert normal value into U.S. dollars. Note, however, that the Department's criteria for determining date of sale may differ from those that you apply in the normal course of business. A description of the Department's criteria is included in the Glossary of Terms at Appendix I; please use these criteria in preparing your response to this questionnaire. If you have difficulty deciding which date to use as the date of sale, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

a.    State what you are using as date of sale (*e.g.*, invoice date, *etc.*). If date of sale varies within or between markets, please explain.

b.    Describe the sales process for each method or channel of distribution described in response to question 3 above. Include a description of each step in the sales process.

c.    Explain how you determined the ultimate customer or market for the products sold through resellers. For these sales, explain whether you restrict the reseller's volume or geographic area for distribution. In addition, explain whether you provide customer lists to or make joint sales calls with the reseller, or provide post-sales support or purchase incentives to the reseller's customers. Provide written sales contracts or sales terms with these resellers. In addition, indicate whether different packing is required for products sold for export or domestic consumption or whether documentation is required with respect to exported merchandise. Finally, explain whether you classify these sales as export or home market sales in your business records, and describe the criteria you use to classify sales.

---

[5] The level of trade for CEP sales is determined *net* of selling activities or services associated with economic activities performed in the United States in selling the subject merchandise to unaffiliated customers. In general, this means that the relevant level is the level of trade of your transactions with your affiliated U.S. reseller. Please refer to **constructed export price** and **level of trade** in the Glossary of Terms.

d.      Describe your agreement(s) for sales in the United States and the foreign market (*e.g.*, long-term purchase contract, short-term purchase contract, purchase order, order confirmation).  Provide a copy of each type of agreement and all sales-related documentation generated in the sales process (including the purchase order, internal and external order confirmation, invoice, and shipping and export documentation) for a sample sale in the foreign market and U.S. market during the POR.

**Note:**  *Your Section B and Section C responses should identify which sales records in your comparison market and U.S. market sales databases are covered by the documentation provided here (see Section B and Section C).*

e.      Describe the types of changes that occur after the initial agreement that affect the terms of the sale other than delivery dates.

f.      Provide the approximate percentage of sales of the merchandise under review in the United States market and the foreign market made pursuant to each type of agreement listed in response to question 4.d. above.

g.      Provide copies of all price lists used in sales of the merchandise under review to the United States and to the foreign market and identify the types of sales to which these price lists pertain.  Include any **discount** or **rebate** schedules used with each price list.

h.      Describe your invoicing practice(s) for each channel of distribution described in response to question 3 above.  Explain when invoices are issued in relation to when the merchandise is shipped.  Also explain any circumstances under which you deviate from the usual practice and describe how often this occurs.

5.   Sales to Affiliated Persons (Affiliates) in the Foreign Market

An affiliated customer is considered to have resold the foreign like product if the product sold by the affiliate is within the definition of the merchandise in Appendix III.  This is the case whether the affiliate resold the product in the same condition as it was purchased or whether the affiliate processed the product before resale.  The affiliated customer is considered to have "consumed" the foreign like product if the affiliate uses it in the production of merchandise which does not fall within the description of the merchandise provided in Appendix III.

a.      Provide a list of affiliates that purchased and resold the foreign like product in the foreign market.  Also, please state the approximate percentage of your sales of the foreign like product in the foreign market which were made by these affiliates.

b.      Describe the services provided by each of the affiliated resellers.  For example, explain whether the reseller acts as a sales agent ordering and reselling in the same lot sizes without taking physical possession of the merchandise or whether the reseller

warehouses the merchandise and resells it in different lot sizes or in a further processed form of the foreign like product. In addition, explain whether the reseller provides warranties and technical or customer service, registration services, or arranges for transportation to the unaffiliated customer.

c.       Provide a list of affiliates that purchased the foreign like product for consumption in the foreign market or elsewhere. Explain your policy for establishing prices to such affiliates. Indicate the approximate percentage of sales of the foreign like product that were made to these affiliates.

6.       Accounting/Financial Practices

A detailed understanding of your accounting and financial practices will help to ensure an accurate **verification**, and is necessary for the Department to analyze your reporting and allocation of expenses.

a.       Describe your company's accounting and financial reporting practices, including your normal corporate accounting period.

b.       Please provide the following financial documents for the two most recently completed fiscal years plus all subsequent monthly or quarterly statements: (1) chart of accounts; (2) audited, consolidated and unconsolidated financial statements (including any footnotes and auditor's opinion); (3) internal financial statements or profit and loss reports of any kind that are prepared and maintained in the normal course of business for the merchandise under review or, in the absence of such reports, for the product line that corresponds most closely to the definition of the merchandise under review, including those for the next largest and smallest categories of merchandise and for the next largest and smallest internal business unit producing or selling the merchandise under review; (4) financial statements or other relevant documents (*i.e.*, profit and loss reports) of all affiliates involved in the production or sale of the subject merchandise in the foreign market and the U.S. market, of all affiliated suppliers to these affiliates, and of the parent(s) of these affiliates; (5) any financial statement or other financial report filed with the local or national government of the country in which your company is located.

c.       If in any month during the period of review the annual inflation rate in the foreign market was in excess of 25 percent, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter). We may request that you respond to a modified questionnaire. (These instructions are provided to alert the Department to high inflation rates that might require adjustments to costs.)

7.   <u>Merchandise</u>

The questions that follow relate to the merchandise under review sold in the United States and the foreign market.

a.   Provide a description of the types of merchandise under review produced and/or sold by your company.  Include an explanation of the differences and similarities of the merchandise under review sold in the foreign market and that exported to the United States.

b.   Provide a key to your product codes assigned to the merchandise in the normal course of business, including an explanation of the full range of prefixes, suffixes, or other notations that identify special features.  Explain whether identical products are listed under different product codes in the United States and the foreign market.  If so, provide a list showing how identical products are identified by product codes for each market.

c.   Describe the parts, materials, specifications, applications, standards, and production processes employed in the production of the merchandise sold in the foreign market and sold in and/or to the United States.  Include copies of the industry specifications or standards for each market.  Explain other factors that differentiate the products under review sold by your company.

d.   Provide all catalogs and brochures issued by or on behalf of your firm and affiliates that include the merchandise under review sold by your firm in the United States and in the foreign market.  If translating the foreign market catalogs and brochures is burdensome, contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).  If this information is voluminous, please provide a table of contents for each catalog or brochure.  The table of contents should be translated into English if it is in another language.

Additionally, if your firm has a website, identify the URL address and provide a copy of the site index.  If the site index is in a language other than English, provide a translation.

e.   If your merchandise is sold in the foreign market in different quantity units than in the United States, describe any conversion factors necessary to put the sales on the same basis.

f.   State whether you had any transactions involving merchandise samples in either your foreign market of the U.S. market.  Describe the terms and circumstances of any such transactions.

8.    Further Manufacture or Assembly in the United States

This section of the questionnaire concerns subject merchandise exported to the United States and changed in value or physical condition (**further manufacture**) prior to delivery to the first unaffiliated customer in the United States.

Provide the following information with respect to merchandise that is further manufactured or assembled in the United States by an affiliate or contractor.

   a.    Provide a list and description of the products sold to unaffiliated customers during the POR that were produced from or incorporate subject merchandise.  For each such product sold, identify the particular subject merchandise used to produce that final product.

   b.    Provide the weighted-average net price for the period of review charged to the affiliated importer for each product included in the review that has been further manufactured and the weighted-average net price for the period of review charged the unaffiliated U.S. customers for each further manufactured final product.  For each further manufactured product sold during the POR, list the product code and name of the subject merchandise included in that product, the net unit transfer price charged the affiliated importer, the amount of the subject merchandise consumed in the production of the further manufactured product, and the total value of the consumed subject merchandise (unit transfer price multiplied by the number of units consumed in production).[6]

   c.    Explain how you determined the net unit transfer price.

9.    Exports Through Intermediate Countries

If you are aware that any of the merchandise you sold to third countries was ultimately shipped to the United States, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

10.    Sales of Merchandise Under Review Supplied by an Unaffiliated Producer.

Please respond to this section of the questionnaire if neither your company nor an affiliate produced the merchandise under review that you sold either in the comparison market or to the United States.

---

[6] This question is designed to provide the Department with the information necessary to determine whether the value-added in the United States exceeds substantially the value of the subject merchandise that has been processed. You may provide this information in any format that supplies the appropriate information.

A-14

a.     Provide the names, addresses, phone numbers, email addresses, and facsimile numbers of those companies that supplied you with the merchandise under review that your company or an affiliate sold to the United States or to the foreign market.

b.     State whether the supplier of the merchandise under review knew or had reason to know the ultimate destination of any merchandise purchased by your company at the time of sale.  For example, did you request that the supplier ship the merchandise directly to the United States; was the destination apparent from the product codes or other markings; were there product characteristics or features typical of the United States market?  Was there an explicit or implicit understanding giving permission to or responsibility for exporting to the United States, or restricting, discouraging, or prohibiting sales in the home market, the foreign market or elsewhere?  Does the supplier have the right to review your sales records?  Does the supplier provide after-sales service in the U.S., participate in U.S. sales calls and/or activities, or provide sales incentives to your customers?

**FORMAT FOR REPORTING QUANTITY AND VALUE OF SALES**

| Market | Period of Review | Unit of Measure | Total Quantity Entered | Total Quantity Sold | Total Value of Entries in U.S. Dollars | Total Value of Sales in U.S. Dollars |
|---|---|---|---|---|---|---|
| United States<br>1. Export Price<br><br>2. Constructed<br>   Export Price<br><br>3. Further<br>Manufactured<br><br>Total | | | | | | |
| Home<br>1. Affiliated<br>2. Unaffiliated<br>Total | | | | | | |
| Third Country 1<br>1. Affiliated<br>2. Unaffiliated<br>Total | | | | | | |
| Third Country 2<br>1. Affiliated<br>2. Unaffiliated<br>Total | | | | | | |
| Third Country 3<br>1. Affiliated<br>2. Unaffiliated<br>Total | | | | | | |

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

A-16

## SAMPLE SELLING FUNCTIONS CHART

Functions adjusted for under 772(d)

| Selling Activity/Function | Home Market Channel 1 | Home Market Channel 2 | Export to US affiliate (CEP sales) | US Channel 4 US affiliate to unaffiliated customer (CEP sales) | US Channel 5 |
|---|---|---|---|---|---|
| Sales Forecasting | | | | | |
| Strategic/Economic Planning | | | | | |
| Personnel Training/Exchange | | | | | |
| Engineering Services | | | | | |
| Advertising | | | | | |
| Sales Promotion | | | | | |
| Distributor/Dealer Training | | | | | |
| Procurement/Sourcing Services | | | | | |
| Packing | | | | | |
| Inventory Maintenance | | | | | |
| Order Input/Processing | | | | | |
| Direct Sales Personnel | | | | | |
| Sales/Marketing Support | | | | | |
| Market Research | | | | | |
| Technical Assistance | | | | | |
| Provide Rebates | | | | | |
| Provide Cash Discounts | | | | | |
| Pay Commissions | | | | | |
| Provide Warranty Service | | | | | |
| Provide Guarantees | | | | | |
| Provide After-Sales Services | | | | | |
| Perform Repacking | | | | | |
| Provide Freight and Delivery | | | | | |
| Provide Post-Sale Warehousing | | | | | |

# SECTION B

## Sales in the Home Market
## or to a Third Country

### I.        General Explanation

This section of the questionnaire provides instructions for reporting your sales of the **foreign like product** in your home market or a third-country market.  The choice of the appropriate market is based, in part, on your response to question 1 in section A.

For simplicity, the instructions refer to the **foreign market** or **comparison market**.  The foreign market is the home market or a third-country market, whichever will be used to determine normal value.

Please submit a copy of the computer program/spreadsheet/worksheet that you used to calculate the prices, expenses, and adjustments reported in your foreign-market sales lists.  The documentation submitted should provide detail on any formulas used for the calculation of the figures provided in the sales lists, identify any factors used therein, and identify the price or unit basis to which the factors are applied.

### II.       Computer File of Foreign Market Sales

A.      Sales Reporting

In accordance with the instructions provided in this section, prepare a computer data file containing sales of the foreign like product made in the comparison market.  Because **contemporaneous sales** must be used to determine **normal value**, the reporting period for these sales depends on the dates of sale for the U.S. sales you report in response to section C of this questionnaire.  Report all sales of the foreign like product during the three months preceding the earliest month of U.S. sales, all months from the earliest to the latest month of U.S. sales, and the two months after the latest month of U.S. sales.  If this is less than twelve months in total, please contact the official in charge immediately.

Report all sales of the foreign like product, whether or not you consider particular merchandise to be that which is most appropriately compared to your sales of the subject merchandise.  The Department will then select the appropriate comparison sales from your sales listing.  Do not, however, report canceled sales.

For sales of merchandise that have been shipped to the customer and invoiced by the time this response is prepared, each "record" in the computer data file should correspond to an invoice line item (*i.e.*, each unique product included on the invoice). For sales of merchandise that have not yet been shipped and invoiced (in whole or in part) to the customer, a "record" should correspond to the unshipped portion of the sale.

Each computer record submitted should contain the information requested concerning the product sold, the terms of the sale, the selling expenses incurred and other information. The following portion of section B describes the information the Department requires.

B.    Sales to Affiliated Customers in the Comparison Market

This section applies to respondents who made sales of the foreign like product to affiliated parties in the comparison market.[1]  If you did not make sales to affiliated parties in the comparison market during the reporting period for comparison market sales, as described above, please disregard this section and proceed to section C, below.

In general, if you sold to an affiliate that resold the merchandise to an unaffiliated party in the comparison market, report the affiliate's resales during the reporting period for comparison market sales, to unaffiliated customers rather than your sales to the affiliate. However, certain exceptions apply; these are described below.

1.    If your aggregate sales to all affiliated customers in the comparison market constitute less than five percent of your total sales in the comparison market, report your sales to the affiliated customers rather than the affiliates' resales to unaffiliated customers.

2.    If your sales to all affiliates, in the aggregate, are equal to or greater than five percent of your total sales in the comparison market, then the following instructions apply.

a.    If you had sales of the foreign like product to an affiliated reseller, and you can demonstrate that those sales were arm's-length transactions, you may report your sales to that affiliate rather than that affiliate's resales to unaffiliated customers.  However, if the affiliated reseller also consumed some of the merchandise, skip to paragraph B.2.b. below.  (By "consumed" we mean used in the production of merchandise that does not fall within the description provided in Appendix III.)  Conduct your analysis of sales to affiliates in accordance with the guidelines set forth in Appendix VI, and provide copies of the program and output as well as worksheets illustrating and explaining your results.

*Note:*  *We may apply facts available, including an adverse inference, pursuant to Sections 776(a) and (b) of the Tariff Act of 1930, as amended (the Act), in determining your dumping margin if you do not provide the affiliate's sales to the first unaffiliated party, and also do not show that you determined, and how you determined, that your sales to affiliated parties were made at arm's length in accordance with the guidelines set forth in Appendix VI.*

---

[1] *See* the definition of **affiliated person** in Appendix I.

In addition, if you report affiliated-party sales and complete documentation concerning the affiliated party test that appears to indicate that the sales to the affiliate were made at arm's length, but we later determine that you did not demonstrate that the affiliated party sales passed the arm's length test, we may require that you report the affiliates' sales to the first unaffiliated customers under an accelerated deadline later in the review.

b.        If you had sales to an affiliated party that consumed all or some of the merchandise (*i.e.*, used it in the production of merchandise that does not fall within the description provided in Appendix III), then report all of your sales to that affiliate, whether the merchandise was consumed or resold by the affiliate. Conduct an arm's-length analysis of sales to the affiliate in accordance with the guidelines set forth in Appendix VI, and provide copies of the program and output as well as worksheets illustrating and explaining your results.  If you cannot demonstrate that your sales to the affiliate were at arm's-length prices, then you must also report the affiliate's sales to unaffiliated customers; however, in any case you must report your sales to the affiliate.

> **_Note:_**  *We may apply facts available, including an adverse inference, pursuant to Sections 776(a) and (b) of the Act, in determining your dumping margin if you do not provide the affiliate's sales to the first unaffiliated party, and also do not show that you determined, and how you determined, that your sales to affiliated parties were made at arm's length in accordance with the guidelines set forth in Appendix VI.*

In addition, if you report affiliated-party sales and complete documentation concerning the affiliated party test that appears to indicate that the sales to the affiliate were made at arm's length, but we later determine that you did not demonstrate that the affiliated party sales passed the arm's length test, we may require that you report the affiliates' sales to the first unaffiliated customers under an accelerated deadline later in the review.

c.        If you have questions regarding which of the above situations applies to your company, or believe you have a situation not described above, contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

## III.   __Summary of Data Fields for Foreign Market__

Please complete the comparison market sales database summary that appears in Appendix VII.

At the top of the spreadsheet is a place to indicate the date the spreadsheet was submitted to the Department.  You are responsible for ensuring that the spreadsheet is consistent with the accompanying narrative response and any accompanying databases submitted on electronic

media. Each time you revise your questionnaire response, such as in answer to a supplemental questionnaire, and your response requires a change in a spreadsheet, you must submit a revised spreadsheet with the date the revision is submitted to the Department.

Please submit the worksheet computer file in a standard spreadsheet format, such as Excel. You must include as well a printout of this spreadsheet that is identical in content to the computer file.

If you have any questions concerning completion and submission of this spreadsheet, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

The chart that follows is a summary of the data fields for the foreign market sales file which are described in the remainder of this section of the questionnaire. In addition to the field number, description and name, the chart lists the page number in this section that contains the instructions for completing the field itself and the narrative response. Please refer to Appendix II Instructions for Submitting Computer Data for instructions on preparing the electronic file.

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 0.0 | Sequential Number | SEQH |
| 1.0 | Complete Product Code | PRODCODH[2] |
| 2.0 | Matching Control Number | CONNUMH |
| 3.1 thru 3.n | Product Characteristics | |
| 4.0 | Customer Code | CUSCODH |
| 4.1 | Consolidated Customer Code | CCUSCODH |
| 5.0 | Customer Relationship | CUSRELH |
| 6.0 | Customer Category | CUSCATH |
| 7.0 | Channel of Distribution | CHANNELH |
| 8.0 | Sale Invoice Date | SALINDTH |
| 9.0 | Date of Sale | SALEDATH |
| 10.0 | Sale Invoice Number | INVOICEH |
| 11.0 | Date of Shipment | SHIPDATH |
| 12.0 | Date of Receipt of Payment | PAYDATEH |
| 13.0 | Terms of Delivery | SALETERH |
| 14.0 | Terms of Payment | PAYTERMH |
| 15.0 | Quantity | QTYH |
| 16.0 | Quantity Unit of Measure | QTYUNITH |
| 17.0 | Gross Unit Price | GRSUPRH |

---

[2] For Third-Country sales, replace the "H" at the end of all field names with a "T".

Filed By: Jun Jack Zhao, Filed Date: 1/19/18 12:50 PM, Submission Status: Approved

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 18.1-n | Billing Adjustments | BILLADJH |
| 19.1 | Early Payment Discounts | EARLPYH |
| 19.2 | Quantity Discounts | QTYDISH |
| 19.3-19.n | Other Discounts | OTHDIS(1-n)H |
| 20.1-20.n | Rebates | REBATE(1-n)H |
| 21.0 | Level of Trade | LOTH |
| 22.0 | Level of Trade Adjustment | LOTADJH |
| 23.0 | Inland Freight - Plant to Distribution Warehouse | INLFTWH |
| 24.0 | Warehousing Expense | WAREHSH |
| 25.0 | Inland Freight - Plant/Warehouse to Customer | INLFTCH |
| 26.0 | Inland Insurance | INSUREH |
| 27.0 | Destination | DESTH |
| 28.0 | Commissions | COMMH |
| 29.0 | Selling Agent | SELAGENH |
| 30.0 | Selling Agent Relationship | SELARELH |
| 31.0 | Credit Expenses | CREDITH |
| 32.0 | Late Payment Fee | LATEPAYH |
| 33.0 | Advertising Expenses | ADVERTH |
| 34.0 | Warranty Expense | WARRH |
| 35.0 | Technical Service Expense | TECHSERH |
| 36.0 | Royalties | ROYALH |
| 37.1-37.n | Other Direct Selling Expenses | DIRSELH |
| 38.0 | Indirect Selling Expenses | INDIRSH |
| 39.0 | Inventory Carrying Costs | INVCARH |
| 40.0 | Packing Cost | PACKH |
| 42.0 | Manufacturer | MFRH |
| 43.0 | Samples | SAMPLEH |
| **Additional Fields for Third-Country Sales** | | |
| 44.0 | International Freight | INTNFRT |
| 45.0 | Marine Insurance | MARNINT |
| 46.0 | Third-Country Inland Freight from Port to Warehouse | INLFPWT |
| 47.0 | Third-Country Inland Freight from Warehouse to the Unaffiliated Customer | INLFWCT |
| 48.0 | Third-Country Inland Insurance | TCINLINT |
| 49.0 | Third-Country Brokerage and Handling | TCBRKHT |
| 50.0 | Third-Country Customs Duty | TCDUTYT |

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 51.0 | Duty Drawback | DTYDRAWT |

## IV.  Foreign Market Sales Reconciliation

Please provide a complete package of documents and worksheets demonstrating how you identified the sales you reported to the Department and reconciling the reported sales to the total sales listed in your general ledger.  Include a copy of all computer programs used to separate the reported sales from your total sales and to calculate expenses.

## V.  Reporting of Expenses

For each expense data field reported in the sales database, using the chart of accounts, please identify the account(s) used to calculate such expense.  In addition, for each reported field, provide all sub accounts to the account referenced.

This information can be provided in chart form.  For example, for movement expenses, please report the expenses in the following manner:

| Field | Main Account | Sub Accounts |
|---|---|---|
| Port Charges (PORTCHGH) | Account 030 Handling | Account 031 Port XYZ Account 0312 XXX |

Each field used to report expenses should thus identify all accounts which were used to calculate such expense.

## VI.  Instructions for the Narrative Response and the Computer File of Foreign Market Sales

The following instructions combine the questionnaire with the computer data file format.  "FIELD NUMBER" includes the number and descriptive name of the field in the computer data file.  "FIELD NAME" is the variable name for the submitted printouts of the data file.  "DESCRIPTION" describes the information you should report in the field of the computer data file, and "NARRATIVE" describes the additional information we request you provide, not in the computer data file, but in the narrative response.

| Fields 1 through 3 |
|---|
| Report the information requested concerning the product sold.  Fields 1 and 2 are reserved for the product code and a "matching" control number the Department will use in the calculation of the dumping margin.  Fields numbered 3.1 to 3.n specify the product characteristics requested by the Department.  You may add additional product characteristics in separate fields.  However, if you add characteristics not specified in the questionnaire, describe in the narrative response why you believe that the Department should use this information to define **identical** and **similar merchandise**.  At this point, do not incorporate |

B-7

> these additional product characteristics into your response to CONNUMH (Field Number 2.0).

**FIELD NUMBER 0.0**:      **Sequential Number**

FIELD NAME:      SEQH

DESCRIPTION:      Assign a unique sequential number to each sales record.  This sales record number should remain constant in all future submissions (*i.e.*, sales record line items should not be renumbered during the course of this segment). This field will assist you in reconciling our calculations with the data you submit in your response.

**FIELD NUMBER 1.0:**      **Complete Product Code**

FIELD NAME:      PRODCODH (or PRODCODT)[3]

DESCRIPTION:      Report the commercial product code assigned by your company in the normal course of business to the specific product sold.

NARRATIVE:      The product code should be described in response to question 7 b in section A of this questionnaire.

**FIELD NUMBER 2.0:**      **Matching Control Number**

FIELD NAME:      CONNUMH

DESCRIPTION:      Assign a control number to each unique product reported in the section B sales data file.  Identical products should be assigned the same control number in each record in every file in which the product is referenced (*e.g.*, products with identical physical characteristics reported in the foreign market sales file and the U.S. market sales file should have the same control number).

The following fields should be included in the construction of the CONNUM:

**FIELD NUMBER 3.1:**      **Painted**

FIELD NAME:      PAINTH

DESCRIPTION:      30 = Painted (Polyvinylidene Fluoride (PVDF)), regardless of whether or not laminated

---

[3] If you are reporting sales made to a third-country, replace the "H" at the end of all field names with a "T".

40 = Painted (Other than PVDF), regardless of whether or not
    laminated
80 = Laminated but not painted
90 = Neither painted, nor laminated

The classification of "painted" does not include pretreatments such
as phosphatizing or chromatizing alone, nor does it include
temporary oils or greases.

**FIELD NUMBER 3.2:**      **Minimum Specified Carbon Content**

    FIELD NAME:      CARBONH

    DESCRIPTION:    1 =    < 0.26 percent, or no minimum specified (*e.g.*, ASTM
                A506 designation 4012, ASTM A1011 designation
                SS grade 30 (205), *etc.*)
           2 =    $\geq$ 0.26 percent but < 0.68 percent (*e.g.*, ASTM A506
                designation 8630)
           3 =    $\geq$ 0.68 percent but < 0.85 percent
           4 =    $\geq$ 0.85 percent (*e.g.*, ASTM A506 designation E51100)

Report the code based on the minimum carbon content required for
the product.

**FIELD NUMBER 3.3:**      **Quality**

    FIELD NAME:      QUALITYH

    DESCRIPTION:    20 = Ultra High Strength Steel (UHSS) or Advanced High Strength Steel
              (AHSS) that is not classifiable in another listed Quality
              subcategory (*e.g.*, ASTM A1011 designation UHSS grade 90 (620)
              Type 1)

           30 = Pressure Vessel / Boiler Quality (*e.g.*, ASTM A299, ASTM
              A841, ASTM A515, ASTM A 516, ASTM A285, ASTM
              A537, ASTM A204, ASTM A387, ASTM  A302, ASTM
              A533, JIS G3103, JIS G3115, JIS G3116, KS D3560, KS
              D3540, EN 10028-2, EN 10207, *etc.*).

           33 =  Atmospheric Corrosion Resistance/Weathering Quality (*e.g.*,
              ASTM A242, ASTM A588, ASTM A606, ASTM A871, JIS
              G3114, JIS G3125, KS D3529, EN 10025-5, *etc.*)

           35 = High Strength Low Alloy Steel that is not classifiable in
              another listed Quality subcategory ((*e.g.*, ASTM A572,

ASTM A1018 designation HSLAS grade 45 (310) Class 1, *etc.*)

40 = Steels Designated with Properties for Line Pipe Specifications (*e.g.*, API 5L, EN 10208-2, *etc.*)

50 = Structural Steel that is not classifiable in another listed Quality subcategory (*e.g.*, ASTM A1018 designation SS grade 30 (205), ASTM A506, *etc.*)

65 = Commercial Steel (*e.g.*, ASTM A1018 designation CS grade 1015, *etc.*)

80 = Drawing Steel (whether or not special killed) (*e.g.*, ASTM A1018 designation DS Type A, ASTM A507, etc.)

95 = Deep Drawing Steel  (*e.g.*, Deep Drawing Quality, Deep Drawing Quality Special Killed, Extra Deep Drawing Quality, Extra Deep Drawing Quality Special Killed, etc.), whether or not fully stabilized (interstitial-free) or special killed) (*e.g.*, ASTM A424 Type III)

Use additional number codes for each additional Quality you propose.  Provide a detailed narrative description of each additional Quality you propose, and explain what differentiates each of those from the ones which are listed above.

For products you report under code 40, report in field 2.3 and in the chart referenced in the narrative for the Minimum Specified Yield Strength field below the line pipe specification (*e.g.*, API 5L) and line pipe specification grade (*e.g.*, X42) by which the flat-rolled product is identified.  However, for each such product, identify in your narrative what if any hot-rolled steel specification grade/type/designation applies to the product in question.

**FIELD NUMBER 3.4:**         **Minimum Specified Yield Strength**

FIELD NAME:         STRENGTHH

DESCRIPTION:         1 = Minimum specified yield strength of < 35,000 psi
2 = Minimum specified yield strength of $\geq$ 35,000 psi but $\leq$ 50,000 psi
3 = Minimum specified yield strength of > 50,000 psi but $\leq$ 80,000 psi
4 = Minimum specified yield strength of > 80,000 psi

For example, under ASTM A1011, the minimum specified yield strength for "Designation SS grade 60" is 60,000 psi, and should be reported as code "3".

Where no minimum yield strength is required, but a typical minimum is identified within the specification from a standards organization such as ASTM, utilize that information to determine the proper code to report (*e.g.*, under ASTM A1011, the typical range of yield strengths for "Designation CS Type B" is identified as 30,000 psi to 50,000 psi, resulting in a "typical" minimum of 30,000 psi, which in turn falls under reporting code "1").

If no such requirements or guidance on minimum specified yield strength are identified in the specification for the product in question, explain in detail your rationale for using one of the above reporting codes to report this field for the product (do not create additional reporting codes).

If no requirements or guidance on minimum specified yield strength are identified in the specification for the product in question, and if the best basis for determining a reasonable proxy for minimum yield strength is production experience, then your identification of the proper reporting code should be based upon the following: the lowest actual yield strength of the specification/designation/type/grade in question which were produced during the POI (rather than an average or sampling of actual measured yield strengths).

Finally, provide a chart that identifies all of the specifications/grades/types/designations in your comparison market and U.S. market sales databases. After identifying in the first column the reporting code for the Quality field and in the second column the complete specification/grade/type/designation identification (e.g., "ASTM A1011 Designation CS Type B"), identify in subsequent columns the allowable range of carbon content, the minimum specified yield strength (in pounds per square inch), the minimum specified tensile strength (in pounds per square inch), and the minimum specified elongation percentage. For those values in this chart that are based on non-mandatory guidance provided in the specification (such as for the minimum yield strength for the ASTM A1011 Designation CS Type B products referenced above), place three asterisks next to the value in question (e.g., "30,000***"). If the specification does not identify a value (either required or as non-mandatory guidance) for carbon content range, minimum specified yield strength, minimum

specified tensile strength, and/or minimum specified elongation percentage for the specification/designation/grade/type in question, leave the cell of the chart blank for that item.  Finally, please present the chart sorted by Quality field reporting code.

**FIELD NUMBER 3.5:**      **Nominal Thickness**

    FIELD NAME:      THICKH

    DESCRIPTION:

| | |
|---|---|
| 1 = | < 0.05"; |
| 2 = | ≥ 0.05" but < 0.06" |
| 3 = | ≥ 0.06" but < 0.09" |
| 4 = | ≥ 0.09" but < 0.180" |
| 5 = | ≥ 0.180 but < 0.250" |
| 6 = | ≥ 0.250 but < 0.50" |
| 7 = | ≥ 0.50" but < 0.75" |
| 8 = | ≥ 0.75" |

Report the code based on the nominal thickness.  The nominal thickness is the thickness agreed upon between the customer and the supplier at the time of sale.  This may be a minimum thickness if the negative thickness tolerance is zero.

**FIELD NUMBER 3.6:**      **Nominal Width**

    FIELD NAME:      WIDTHH

    DESCRIPTION:

| | |
|---|---|
| 1 = | < 8.0"; |
| 2 = | ≥ 8.0" but < 24.0" |
| 3 = | ≥ 24.0"but < 40.0" |
| 4 = | ≥ 40.0"but < 72.0" |
| 5 = | ≥ 72.0"but < 96.0" |
| 6 = | ≥ 96.0" |

Report the code based on nominal width.

**FIELD NUMBER 3.7:**      **Form**

    FIELD NAME:      FORMH

    DESCRIPTION:      1 = Coil
                             3 = Not in coil (squares or rectangles)
                             4 = Not in coil (not squares or rectangles)

**FIELD NUMBER 3.8:**      **Pickled**

    FIELD NAME:      PICKLEDH

    DESCRIPTION:      1 = Pickled and/or Shot Blasted
                          2 = Neither pickled nor shot blasted

                          Describe the methods, if any, by which the surface of the steel was descaled after hot-rolling.  Also, identify the types of sales and production documents that would identify the methods of descaling used for merchandise associated with specific sale transactions.

**FIELD NUMBER 3.9:**      **Patterns in Relief**

    FIELD NAME:      PATTERNH

    DESCRIPTION:      1 = With patterns in relief;
                          2 = Not with patterns in relief.

                          Specify whether or not the subject product was supplied with patterns in relief (for example, grooves, ribs, checkers, tears, buttons, lozenges, diamonds).  In your narrative response, describe the types of patterns that are applicable for your reported sales.

---

**Fields 4 through 7**

Report the information requested concerning the customer and the channel of distribution for the merchandise.  In the section A response, you have described the various channels through which you distribute the merchandise.  The response to field 7 should correspond to the description you have provided in your response to section A.

---

**FIELD NUMBER 4.0:**      **Customer Code**

    FIELD NAME:      CUSCODH

    DESCRIPTION:      Report the name of the customer or the internal accounting code designating the customer, as used in your normal course of business.

    NARRATIVE:      Provide a list of customer names and codes as an attachment to your response.  If known, identify customers that export some or all of their purchases of the foreign like product.  Explain how you determined which sales were for consumption in the foreign market.

**FIELD NUMBER 4.1:**       **Consolidated Customer Code**

FIELD NAME:       CCUSCODH

DESCRIPTION:       Report only one name or code for each of your customers, even if more than one name or accounting code exists for that customer in your books and records. For example, if you use different codes for regional offices of the same customer, report the same code for this customer, regardless of the location of the office.

NARRATIVE:       Provide a list of customer names and codes as an attachment to your response, ensuring that each customer is assigned only one discrete code for this field.

**FIELD NUMBER 5.0:**       **Customer Relationship**

FIELD NAME:       CUSRELH

DESCRIPTION:       Report the code designating whether the customer is affiliated. As previously noted, the definition of affiliated parties is in Appendix I. For each customer you reported as an affiliate, please provide a detailed explanation of the nature of the affiliation.

1 = Unaffiliated Customers
2 = Affiliated Customers

**FIELD NUMBER 6.0:**       **Customer Category**

FIELD NAME:       CUSCATH

DESCRIPTION:       1 = Original Equipment Manufacturers
2 = Trading Companies
3 = Distributors
4 = Retailers
5 - n = Specify additional categories as required.

NARRATIVE:       Identify any additional categories and indicate the code used for each. Identify any customers that have been classified in more than one customer category and explain the circumstances requiring such treatment.

**FIELD NUMBER 7.0:**   **Channel of Distribution**

FIELD NAME:      CHANNELH

DESCRIPTION:     The channels of distribution designated in this field should
conform to those described in the response to question 3 in section
A of the questionnaire.

1 = Channel 1
2 = Channel 2
3 - n = Channel 3 - n.

NARRATIVE:       Identify any additional channels and indicate the code used for
each.  The codes for channel of distribution listed above are
examples only.  You need not use them.

---

**Fields 8 through 14**

Report the information requested concerning the terms of delivery and payment and the
dates of the specified events of each sale.  Please be sure to report dates in the specified
eight-digit format.  The Glossary of Terms at Appendix I describes the Department's criteria
for determining the date of sale.  The criteria used by the Department to determine the date
of sale may be different from the criteria you use in your accounting system; please contact
the official in charge if, after reviewing the Department's criteria, you are uncertain when a
sale has occurred.

---

**FIELD NUMBER 8.0:**   **Sale Invoice Date**

FIELD NAME:      SALINDTH

DESCRIPTION:     Positions 1 - 4 = Year
Positions 5 & 6 = Month
Positions 7 & 8 = Day

**FIELD NUMBER 9.0:**   **Date of Sale (if different than Sale Invoice Date)**

FIELD NAME:      SALEDATH

DESCRIPTION:     Include this field only if the date of sale is different from the sale
invoice date.

Positions 1 - 4 = Year
Positions 5 & 6 = Month
Positions 7 & 8 = Day

**FIELD NUMBER 10.0:**       **Sale Invoice Number**

FIELD NAME:       INVOICEH

DESCRIPTION:       Report the reference number assigned to the invoice in your accounting system.

NARRATIVE:       Describe the invoice numbering system used by each sales entity that originated a sale reported in this data file.  Is it simply a sequential number or is additional information included in the code, such as place of sale?  If additional information is contained in the code, provide a key describing each component of the code.

**FIELD NUMBER 11.0:**       **Date of Shipment**

FIELD NAME:       SHIPDATH

DESCRIPTION:       Report the date of shipment from the last facility under your control; *e.g.*, the factory or distribution warehouse to the customer.

Positions 1 - 4 = Year
Positions 5 & 6 = Month
Positions 7 & 8 = Day

**FIELD NUMBER 12.0:**       **Date of Receipt of Payment**

FIELD NAME:       PAYDATEH

DESCRIPTION:       Report the date your records indicate payment was received from the customer.

Positions 1 - 4 = Year
Positions 5 & 6 = Month
Positions 7 & 8 = Day

NARRATIVE:       Indicate the basis for determining the date of payment and the ledger from which this date was identified.  If you cannot collect the dates of payment in the time allowed for responding to this questionnaire, explain why and do not complete this field.  If you collect the information but a particular invoice is unpaid, leave this field blank for that invoice.

**FIELD NUMBER 13.0:**  **Terms of Delivery**

    FIELD NAME:  SALETERH

    DESCRIPTION:  1 = Delivered
                    2 = FOB (specify delivery point; *e.g.*, FOB railroad)
                    3 - n = Specify other delivery terms as required.

    NARRATIVE:  Describe the terms of delivery offered and indicate the code used for each.  If the terms vary by channel of distribution, explain how these are related.

                         The codes for delivery terms listed above are examples only.  You need not use them.

**FIELD NUMBER 14.0:**  **Terms of Payment**

    FIELD NAME:  PAYTERMH

    DESCRIPTION:  Report terms of payment granted the customer.

                         1 = 30 days after invoice.
                         2 = 60 days after invoice.
                         3- n = Specify other payment terms as required.

    NARRATIVE:  Describe each of the terms of payment you offer and indicate the code used for each.  If the terms vary by channel of distribution, explain how these are related.  If the payment terms you offer are tied to early payment discounts or to interest penalties for late payment, please explain.  Indicate whether the payment terms are stated or coded on each invoice or, otherwise, how customers agree to payment terms.  The codes for payment terms listed above are examples only.  You need not use them.

---

**Fields 15 through 20**

Report the information requested concerning the quantity sold and the price per unit paid in each sale transaction.  All **price adjustments** granted, including **discounts** and **rebates**, should be reported in these fields.  The gross unit price less price adjustments should equal the net amount of revenue received from the sale.  If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.  Refer to the Glossary of Terms at Appendix I for a more complete description of each of the price adjustments listed.

---

**FIELD NUMBER 15.0:**   **Quantity**

    FIELD NAME:    QTYH

    DESCRIPTION:    Report the sale quantity for this transaction.  In general, this quantity will be the quantity of the specific shipment or invoice line, net of returns where possible.  For sales that have not been fully shipped/invoiced at the time the computer data for this section is prepared, also report the quantity of the sale not yet shipped (*i.e.*, total quantity sold less the quantity shipped and invoiced to date - and reported in other records in this file).

        For example, assume the date of sale is the date of the customer's order.  In the last month of the POR a customer orders 100 tons to be shipped in 5 lots of 20 tons each once every 30 days.  At the time of preparation of your questionnaire response, 3 of the 5 shipments have been made and an invoice sent for each shipment to the customer.

        The file you submit to the Department should contain 4 records: one record for each shipment and invoice and a fourth record for the unshipped amount of 40 tons.  For the record containing the unshipped 40 tons, complete the adjustment fields based on estimates.

    NARRATIVE:    Explain how returns, if you permit them, affect your sales recorded in the general ledger and sales ledger.

**FIELD NUMBER 16.0:**   **Quantity Unit of Measure**

    FIELD NAME:    QTYUNITH

    DESCRIPTION:    Report all sales in this file in the same unit of measure.  Use an abbreviation or code to indicate the unit of measure.  For example,

        1 or MT = metric tons
        2 or KG = kilograms
        3 – n or specify as needed.

    NARRATIVE:    Provide a table of the units of measure and abbreviations or codes used.

        The codes for unit of measure listed above are examples only.  You need not use them.

Please use a single unit of measure for expressing all prices, expenses, and adjustments you report.  If you make sales or incur expenses or adjustments using more than one unit of measure, select the predominantly used unit of measure for sales of merchandise to express all reported data.  Additionally, in separate fields report the price, expense or adjustment as it appears in your records (*i.e.*, before the conversion to a single unit of measure), and the conversion factor applied to convert the data to a single unit of measure.

---

**Fields 17 through 51**

Report the sale price, discounts, rebates and all other revenues and expenses in the currencies in which they were earned or incurred and net of taxes rebated or not collected when the product is exported (*e.g.*, net of value added taxes (VAT)).

If a revenue or expense field is expressed in the same currency in all records in the file, simply note the currency name on the descriptive chart requested in Appendix II section B (Instructions for Submitting Computer Data - File Formats).  However, if a revenue or expense field is expressed in one currency in certain records and another currency in other records, create a companion field that designates the currency for each record with a code or abbreviation.

---

**FIELD NUMBER 17.0:**     **Gross Unit Price**

      FIELD NAME:      GRSUPRH

      DESCRIPTION:      Report the unit price as it appears on the invoice for sales shipped and invoiced in whole or in part.  To report portions of sales not shipped, provide the agreed unit sale price for the quantity that will be shipped to complete the order.  This value should be the gross unit price.  Discounts and rebates should be reported separately in fields numbered 19.n and 20.n, respectively.

**FIELD NUMBER 18.1-n:**     **Billing Adjustments**

      FIELD NAME:      BILLADJH

      DESCRIPTION:      Report any price adjustments made for reasons other than discounts or rebates.  State whether these billing adjustments are reflected in your gross unit price.  Report a decrease in price as a negative figure and an increase in price as a positive figure.  Report zero in this field if no adjustments were made to the price.  Create a separate field for each type of billing adjustment (*e.g.*, corrections of invoicing errors, post-invoicing price adjustments).

NARRATIVE: Describe the nature of each type of billing adjustment that is recognized in your sales records. Describe the document flow employed to process the price changes.

## FIELD NUMBER 19.1: Early Payment Discounts

FIELD NAME: EARLPYH

DESCRIPTION: Report the unit value of any discount granted to the customer for early payment.

NARRATIVE: Explain your policy and practice for granting early payment discounts. Describe the basis for eligibility for such discount. If discounts vary by channel of distribution (field 7.0) or by customer category (field 6.0), provide an explanation of the discounts given to each channel or category. Explain how you calculated the per-unit discount. Where available, provide sample documentation, including sample agreements, for this type of discount.

## FIELD NUMBER 19.2: Quantity Discounts

FIELD NAME: QTYDISH

DESCRIPTION: Report the unit value of each type of discount granted to the customer due to the quantity of the purchase.

NARRATIVE: Explain your policy and practice for granting quantity discounts. Describe the basis for eligibility for such discounts. If discounts vary by channel of distribution (field 7.0) or by customer category (field 6.0), provide an explanation of the discount given to each channel and category. Explain how you calculated the per-unit discount. Provide your quantity discount schedule or other documentation establishing the discount program.

## FIELD NUMBER 19.3-n: Other Discounts

FIELD NAME: OTHDIS(1-n)H

DESCRIPTION: Report the unit value of other discounts granted to the customer. Create a separate field for reporting each discount granted.

NARRATIVE: Explain your policy and practice for granting each additional discount. Describe each type of discount granted and the basis for eligibility for such discount. If discounts vary by channel of distribution (field 7.0) or by customer category (field 6.0), provide

an explanation of the discounts given to each category.  Explain how you calculated each additional per-unit discount.  Where available, provide sample documentation, including sample agreements, for each type of discount.

**FIELD NUMBER 20.1-n:**   **Rebates**

FIELD NAME:   REBATE(1-n)H

DESCRIPTION:   Report the unit value of each rebate given to the customer.  Create a separate field for reporting each rebate granted.  Rebates should be reported with the sales to which they apply.

NARRATIVE:   Explain your policy and practice for granting rebates.  Describe the terms and conditions of each rebate program and when the terms and conditions are established in the sales process.  If rebates vary by customer category (field 6.0) or channel of distribution (field 7), provide an explanation of the rebates given to each.  For rebates that have not yet been paid, describe how you computed the amount to be rebated.  Include your worksheets as an attachment to the response.  Where available, provide documentation, including sample agreements, for each type of rebate.

**FIELD NUMBER 21.0**   **Level of Trade**

FIELD NAME:   LOTH

DESCRIPTION:   Report the **level of trade**. Use an abbreviation or code to indicate the level of trade.

NARRATIVE:   Provide a key to any abbreviation or codes used.

**FIELD NUMBER 22.0**   This field is currently not in use.

| **Fields 23 through 26 - Movement Expenses** |
|---|
| Report the information requested concerning the direct cost incurred to bring the merchandise from the original place of shipment to the customer's place of delivery if included in the price charged to your customer.  The Department normally considers the production facility as being the original place of shipment.  However, if you are a reseller unaffiliated with the producer of the merchandise, you should treat the original place from which you shipped the merchandise as the original place of shipment.  If you report something other than the production facility as the original place of shipment, please provide an explanation in your narrative response.

All the direct costs incurred to transport the merchandise should be reported in these fields. |

You may add fields, if needed.  For merchandise which was sold during the POR but which has not been shipped at the time of preparation of the response, report estimated charges and your basis for these estimates.

The fields listed below anticipate the types of transport expenses commonly incurred on domestic and, in the case of third-country sales, international shipments.  However, it is not uncommon for certain of these transport expenses to be combined in a single fee paid a transport company (*e.g.*, combined transport and transport insurance).  If expenses are combined, do not attempt to separate them but report them in a single field and explain in your narrative response.

**FIELD NUMBER 23.0:**     **Inland Freight - Plant to Distribution Warehouse**

    FIELD NAME:     INLFTWH

    DESCRIPTION:     Report the unit cost of inland freight from the factory to the distribution warehouse or other intermediate location.  Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (*e.g.*, weight, volume).  If you shipped the product directly from the factory to the customer, report the cost of transport in field 25.

    NARRATIVE:     Describe the forms of transport you used to deliver the merchandise to your distribution warehouse(s) or other intermediate location and any affiliations you had with the carriers during the POR.  If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped.  If it is not possible to specifically identify the cost of each shipment, describe how you calculated the freight cost per unit.  Include your worksheets as attachments to the narrative response.

        If you used your own vehicles to deliver the product, explain how you calculated the freight cost for each sale and provide the total expense incurred by type of expense (*e.g.*, fuel).  Include your worksheets as attachments to the narrative response.

**FIELD NUMBER 24.0:**     **Warehousing Expense**

    FIELD NAME:     WAREHSH

    DESCRIPTION:     Report the unit cost of **warehousing**.  The cost of warehousing reported in this field should include only expenses incurred at a

distribution warehouse not located at the factory that produced the merchandise, less any reimbursement received from the customer.

NARRATIVE:  Describe the distribution warehousing system you operate and provide a list of the warehouse locations used to distribute the foreign like product.  Describe any warehousing services provided to customers.  Provide a list of customer names and codes that receive warehousing services, including the name and location of the warehouse used.  Also, state whether the warehouse is operated by a separate entity that is affiliated with you and describe the nature of the affiliation.

Describe the manner in which you calculated the unit cost of warehousing and submit your worksheets as an attachment to the narrative response.  If the warehouse is owned by you or an affiliate, describe how you allocated the cost of the warehouse operations.

**FIELD NUMBER 25.0:**  **Inland Freight - Plant/Warehouse to Customer**

FIELD NAME:  INLFTCH

DESCRIPTION:  Report the unit cost of inland freight to the customer's place of delivery from the factory or the distribution warehouse (or other intermediate location).  Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (*e.g.*, weight, volume).

NARRATIVE:  Describe the forms of transport you used to deliver the merchandise to your customers and any affiliations you had with the carriers during the POR.  If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped.  If it is not possible to specifically identify the cost of each shipment please describe how you derived the freight cost per unit.  Include your worksheets as attachments to the narrative response.

If you used your own vehicles to deliver the product, provide the total expense incurred by type of expense (*e.g.*, fuel) and describe the method you used to allocate the expenses incurred to each sale. Include your worksheets as attachments to the narrative response.

**FIELD NUMBER 26.0:**       **Inland Insurance**

     FIELD NAME:     INSUREH

     DESCRIPTION:     Report the unit cost of inland insurance on shipments from the factory or distribution warehouse to the customer's place of delivery.

     NARRATIVE:     Describe how you calculated the unit cost of inland insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 27.0:**       **Destination**

     FIELD NAME:     DESTH

     DESCRIPTION:     Report the internal destination code or other code, such as a postal code, that specifies the customer's place of delivery.

     NARRATIVE:     Provide a key to the codes and destinations.

---

**Fields 28 through 37**

Report the information requested concerning the selling expenses listed. Include the expenses of any affiliated selling agents instead of the commissions paid to those agents. These expenses will be used to make adjustments for different **circumstances of sale**. Report only **direct expenses** in Fields 28 through 37. Refer to the definitions of **circumstances of sale** and direct and **indirect expenses** in the Glossary of Terms at Appendix I.

---

**FIELD NUMBER 28.0:**       **Commissions**

     FIELD NAME:     COMMH

     DESCRIPTION:     Report the unit cost of commissions paid to selling agents and other intermediaries. If more than one commission was paid, report each commission in a separate field. Do not report commissions paid to affiliated selling agents unless there is a compelling reason that you cannot report an affiliated agent's actual expenses.

     NARRATIVE:     Describe the terms under which commissions were paid and how commission rates were determined. Explain whether the amount of the commission varies depending on the party to whom it is paid and whether that party is affiliated with you. Include samples of each type of commission agreement used.

If you report payments to any affiliated selling agent in lieu of the agent's actual expenses, provide an explanation of why you are unable to report those actual expenses. Indicate whether the commissions were paid at **arm's length** by reference to commission payments to unaffiliated parties in the foreign market and other markets. Submit evidence demonstrating the arm's-length nature of the commissions.

**FIELD NUMBER 29.0:**   **Selling Agent**

   FIELD NAME:   SELAGENH

   DESCRIPTION:   Report the name or internal code designating the commissioned selling agent or intermediary. If more than one commission was paid, report the name or code of each selling agent in a separate field.

   NARRATIVE:   Provide a list of commissioned selling agents and intermediaries and an internal code for each, the applicable commission rates, and whether the agent is affiliated with you.

**FIELD NUMBER 30.0:**   **Selling Agent Relationship**

   FIELD NAME:   SELARELH

   DESCRIPTION:   Report the code designating affiliation.

   1 = Unaffiliated
   2 = Affiliated

**FIELD NUMBER 31.0:**   **Credit Expenses**

   FIELD NAME:   CREDITH

   DESCRIPTION:   Report the unit cost of credit computed at the actual cost of short-term debt incurred by your company in the foreign market. If you did not borrow short-term during the POR, use a published commercial short-term lending rate.

   This expense should be calculated and reported on a transaction-by-transaction basis using the number of days between date of shipment to the customer and date of payment. If you are unable to determine actual payment dates from your records, you may base the calculation on the average age of accounts receivable. If

payment has not yet been received for this sale, leave this field blank for the transaction.

NARRATIVE:    Provide the equation you have used to calculate credit expenses and a worksheet showing the calculation of your average short-term interest rate.  Explain the calculation and any other factors that affect net credit costs, such as compensating deposits to the extent that they were a precondition for acquiring the loan. Indicate the source of the short-term interest rates used in the calculation.

**FIELD NUMBER 32.0:      Late Payment Fee**

FIELD NAME:    LATEPAYH

DESCRIPTION:    Report the per unit fees collected on each sale for late payment of the invoice.

NARRATIVE:    Describe the conditions under which you charge customers such fees.  If the practice varies by channel of distribution or category of customer, explain why it varies and how.

**FIELD NUMBER 33.0:      Advertising Expenses**

FIELD NAME:    ADVERTH

DESCRIPTION:    Report the unit cost of advertising specifically for the foreign like product that you have paid on behalf of your customer.  This is the cost you incurred to advertise to your customer's customers. Report all advertising expenses incurred to advertise to your customers as part of indirect selling expenses (Field 38).

NARRATIVE:    Describe separately advertising programs directed at your customer's customer (*e.g.*, co-op advertising) and advertising programs directed at your customers.  Provide separate lists of the expenses incurred for each and provide worksheets demonstrating the allocation of the advertising to your customer's customers to each sale of the foreign like product.

**FIELD NUMBER 34.0:      Warranty Expense**

FIELD NAME:    WARRH

DESCRIPTION:    Report the unit cost of warranty expenses incurred during the POR. Warranty expenses should include only the direct expense less any

reimbursement received from the customer or unaffiliated parts suppliers. Report indirect warranty expenses as part of indirect selling expenses (field 38). If you produce different models or types of the merchandise under review, warranty cost should be based upon your experience by model. If this is impractical, express warranty cost on the most product specific basis possible.

NARRATIVE:  Describe both the warranty expenses incurred on sales of this merchandise and the reimbursement, if any, received or expected from the customer. Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the foreign like product. Describe the nature and terms of the warranty provided. Include a copy of each type of warranty agreement as an attachment to the response.

Include a schedule of direct and indirect warranty expenses incurred for the foreign like product for the three most recently completed fiscal years. In addition, calculate a cost per unit for each year.

**FIELD NUMBER 35.0:**  **Technical Service Expense**

FIELD NAME:  TECHSERH

DESCRIPTION:  Report the unit cost of **technical services**. Include only the direct expense less any reimbursement received from the customer. Report indirect technical service expenses as part of indirect selling expenses (field 38).

NARRATIVE:  Describe the technical services provided, including any service, repair, or consultation that directly relate to sales of the foreign like product. Describe any reimbursement received for these services. Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the foreign like product.

**FIELD NUMBER 36.0:**  **Royalties**

FIELD NAME:  ROYALH

DESCRIPTION:  Report the unit cost of any royalties you paid on the sale of the product. Create a separate field for each royalty paid.

NARRATIVE:  Describe each royalty paid to third parties as a result of production or sale. Include a description of all royalties paid in this section of

the narrative but include the unit cost of production royalties as a **cost of manufacture** (section D).  The description should include the key terms of the agreements, the names of the parties that granted the rights, and a list of products covered by the agreements.

**FIELD NUMBER 37.1-n:**   **Other Direct Selling Expenses**

FIELD NAME:   DIRSELH

DESCRIPTION:   Report the unit cost of other direct selling expenses you incurred on sales of the foreign like product which are not reported in other fields.  Report each additional direct selling expense in a separate field.  Include only the direct expenses incurred less any reimbursement received from the customer.  Report the indirect expenses incurred as part of indirect selling expenses (field 38).

NARRATIVE:   Describe each type of direct selling expense incurred and your basis for considering it directly related to sales of the foreign like product.  Include lists of the direct and indirect expenses incurred and provide worksheets demonstrating any allocation of the direct expense to each sale of the foreign like product.

---

| **Fields 38 and 39** |
| --- |
| Report the information requested concerning indirect selling expenses in field 38 and **inventory carrying cost** in field 39.  The Department will use these fields to calculate a **CEP offset** adjustment or a commission offset adjustment, where appropriate.  Refer to the Glossary of Terms at Appendix I for a more complete description of these items.<br><br>Indirect expenses include all sales overhead expenses (*e.g.*, salesmen's salaries and office rent) plus the indirect expenses excluded from the circumstance of sale adjustments in fields 28 through 37. |

---

**FIELD NUMBER 38.0:**   **Indirect Selling Expenses**

FIELD NAME:   INDIRSH

DESCRIPTION:   Report the unit cost of indirect selling expenses (*e.g.*, sales office rent and salesmen's salaries) incurred to sell the product in the foreign market.  Where indirect selling expenses have been incurred by the producer and an affiliated reseller, create separate fields for the expenses of each company.

NARRATIVE:   Describe the sales overhead expenses incurred.  Include a list of the overhead expenses incurred and provide worksheets

demonstrating the allocation of these expenses, as well as the indirect expenses excluded from the circumstance of sale adjustments reported in fields 28 through 37.  Where more than one company incurred indirect selling expenses submit separate worksheets for each.

**FIELD NUMBER 39.0:**   **Inventory Carrying Costs**

FIELD NAME:   INVCARH

DESCRIPTION:   Report the unit opportunity cost incurred from the time of final production to the time of sale in the foreign market, computed at the actual cost of short-term debt borrowed by your company in the foreign market.  If you are a reseller, reported the unit opportunity cost incurred from the time you purchased the merchandise to the time of sale, computed at the actual cost of short-term debt incurred by your company in the foreign market. If you did not borrow short-term during the POR, use a published commercial short-term lending rate.

Please calculate inventory carrying costs on as specific a basis as possible (*e.g.*, sale, model, product group, *etc.*).

NARRATIVE:   Describe how the products under review are stored prior to sale and provide the average length of time in inventory prior to sale to the first unaffiliated customer (or to the affiliated customer if you are reporting such sales).  The cost reported should be based on the period from the end of production to the date of shipment to the customer.  Indicate the source of the short-term interest rate used in the calculation.  Include your worksheets as attachments to the response.

**FIELD NUMBER 40.0:**   **Packing Cost**

FIELD NAME:   PACKH

DESCRIPTION:   Report the unit cost of packing the foreign like product for sale in the foreign market.  Include the cost of labor, materials and overhead.  If a product is produced at more than one plant, report the weighted average packing cost of all plants combined.

NARRATIVE:   Describe the packing types used in the foreign market.  For each type of packing, provide a worksheet that demonstrates the calculation of packing material, labor and overhead for a single unit.

The worksheets should include a list of packing materials, the average cost of each material, and how much of each material was used.  In addition, report the average labor hours by packing type and the average labor cost per hour including benefits.  Include a list of overhead expenses incurred in packing and demonstrate how these expenses were allocated to each packing type.

**FIELD NUMBER 41.0:**     **Manufacturer**

FIELD NAME:     MFRH

DESCRIPTION:     If you have sold the foreign like product of more than one manufacturer, identify the manufacturer in each record by the use of a code.  If the manufacturer is unknown, identify your supplier.

NARRATIVE:     If you are not the manufacturer, report the manufacturer of the merchandise in your narrative response and provide a key to the code.

**FIELD NUMBER 42.0:**     **Samples**

FIELD NAME:     SAMPLEH

DESCRIPTION:     If the transaction in question involved sample merchandise, please report the code "S" (sample).

NARRATIVE:     Explain the circumstances surrounding the sales of sample merchandise.  Describe how sales of sample merchandise differ from sales of merchandise that does not fall under this category.

| Fields 43 through 50 |
| --- |
| Please respond to the following items if you are reporting third-country sales. |

**FIELD NUMBER 43.0:**     **International Freight**

FIELD NAME:     INTNFRT

DESCRIPTION:     Report the unit cost of ocean freight or air freight expense incurred on shipments from the port of exit in the country of manufacture to the third-country port of entry.

NARRATIVE:     Indicate whether the ocean freight carrier is affiliated.  Supply any contracts or tariff rate agreements with carriers that apply to the merchandise under review.  Describe how you calculated the unit

cost of ocean freight and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 44.0:**       **Marine Insurance**

FIELD NAME:          MARNINT

DESCRIPTION:        Report the unit cost of marine insurance expense incurred on shipments from the port of exit in the country of manufacture to the third- country port of entry.

NARRATIVE:           Describe how you calculated the unit cost of marine insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 45.0:**       **Third-Country Inland Freight from Port to Warehouse**

FIELD NAME:          INLFPWT

DESCRIPTION:        Report the unit cost of any freight expense incurred on shipments from the third-country port of entry to the affiliated reseller's warehouse or other intermediate location.  If the sale is direct to an unaffiliated third-country customer, report the unit cost of freight from the port of entry to the unaffiliated customer.

NARRATIVE:           Describe how you calculated the unit cost of inland freight and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 46.0:**       **Third-Country Inland Freight from Warehouse to the Unaffiliated Customer**

FIELD NAME:          INLFWCT

DESCRIPTION:        Report the unit cost of freight expense incurred on shipments from the affiliated third-country reseller's warehouse or other intermediate location to the unaffiliated customer.

NARRATIVE:           Describe how you calculated the unit cost of third-country inland freight and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 47.0:**    **Third-Country Inland Insurance**

    FIELD NAME:    TCINLINT

    DESCRIPTION:    Report the unit cost of third-country inland insurance expense incurred on shipments within the third country.

    NARRATIVE:    Describe how you calculated the unit cost of third-country inland insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 48.0:**    **Third-Country Brokerage and Handling**

    FIELD NAME:    TCBRKHT

    DESCRIPTION:    Report the unit cost of any additional brokerage and handling expense incurred on shipments within the third country.

    NARRATIVE:    Describe how you calculated the unit cost of third-country brokerage and handling and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 49.0:**    **Third-Country Customs Duty**

    FIELD NAME:    TCDUTYT

    DESCRIPTION:    Report the unit amount of any third-country customs duty and customs fees paid on foreign like product.

    NARRATIVE:    Describe how you calculated the unit cost of third-country customs duties and customs fees and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 50.0:**    **Duty Drawback**

    FIELD NAME:    DTYDRAWT

    DESCRIPTION:    Report the unit amount of any duty drawback received upon exportation of the foreign like product from the country of manufacture to the third country.

    NARRATIVE:    Explain how the amount of duty drawback received is calculated and submit your worksheets as attachments to the narrative response.

| Other Revenues and Expenses |
| --- |
| The fields listed above have been designed to capture all revenues and expenses you have incurred in selling the foreign like product in the foreign market.  If there are additional revenues or expenses that are not reported above, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response. |

## SECTION C

### Sales to the United States

### I.    General Explanation

This section of the questionnaire provides instructions for reporting your sales of the **subject merchandise** in or to the United States.  Normally, we will compare the prices at which this merchandise is sold in the United States with the prices at which the **foreign like product** is sold in the foreign market in order to determine whether the subject merchandise was sold at less than **normal value** in the United States during the period of review (POR).

> *Note:  Please submit a copy of the computer program/spreadsheet/worksheet that you used to calculate the prices, expenses, and adjustments reported in your U.S. sales lists.  The documentation submitted should provide detail on any formulas used for the calculation of the figures provided in the sales lists, identify any factors used therein, and identify the price or unit basis to which the factors are applied.*

### II.   Summary of U.S. Sales File

Please complete the U.S. market sales database summary that appears in Appendix VII.

At the top of the spreadsheet is a place to indicate the date the spreadsheet was submitted to the Department.  You are responsible for ensuring that the spreadsheet is consistent with the accompanying narrative response and any accompanying databases submitted on electronic media.  Each time you revise your questionnaire response, such as in answer to a supplemental questionnaire, and your response requires a change in a spreadsheet, you must submit a revised spreadsheet with the date the revision is submitted to the Department.

Please submit the worksheet computer file in a standard spreadsheet format such as Excel.  You must include as well a printout of this spreadsheet that is identical in content to the computer file.

If you have any questions concerning completion and submission of this spreadsheet, please contact the official in charge by no later than fourteen calendar days after the issuance of this questionnaire (the issuance date of this questionnaire appears on the first page of the cover letter).

### III.  Computer File of U.S. Sales

In accordance with the instructions provided in this section, prepare a separate computer data file containing each sale made during the POR of the subject merchandise, including sales of further manufactured merchandise.  This file format is designed to accommodate **export price** (EP) and **constructed export price** (CEP) transactions.

Report each U.S. sale of merchandise entered for consumption during the POR, except:  (1) for EP sales, if you do not know the entry dates, report each transaction involving merchandise shipped during the POR; and (2) for CEP sales made after importation, report each transaction that has a **date of sale** within the POR.  Do not report canceled sales.  If you believe there is a reason to report your U.S. sales on a different basis, please contact the official in charge before doing so.

For sales of merchandise that has been shipped to the customer and invoiced by the time this response is prepared, each record in the computer data file should correspond to an invoice line item (*i.e.*, each unique product included on the invoice).  For sales of merchandise that have not yet been shipped and invoiced (in whole or in part) to the customer, a record should correspond to the unshipped portion of the sale.

Each computer record submitted should contain the information requested concerning the product sold, the terms of the sale, the selling expenses incurred, and other information.   The following portion of section C describes the information the Department requires.[1]

The chart which follows is a summary of the data fields for the U.S. sales computer file which are described in the reminder of this section of the questionnaire.  The chart lists the field number, description and name.  Please refer to Appendix II Instructions for Submitting Computer Data for instructions on preparing the electronic file.

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 0.0 | Sequential Number | SEQU |
| 1.0 | Complete Product Code | PRODCODU |
| 2.0 | Matching Control Number | CONNUMU |
| 3.1 thru 3.n | Product Characteristics | |
| 4.0 | Sale Type | SALEU |
| 5.0 | Consignment Identifier | CONSIGNU |
| 6.0 | Customer Code | CUSCODU |
| 6.1 | Consolidated Customer Code | CCUSCODU |
| 7.0 | Customer Category | CUSCATU |
| 8.0 | Channel of Distribution | CHANNELU |
| 9.0 | Sale Invoice Date | SALINDTU |
| 10.0 | Date of Sale | SALEDATU |
| 11.0 | Sale Invoice Number | INVOICEU |
| 12.0 | Date of Shipment | SHIPDATU |
| 13.0 | Date of Receipt of Payment | PAYDATEU |

---

[1] Refer also to the Instructions for Submitting Computer Data at Appendix II.

C-3

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 14.0 | Terms of Delivery | SALETERU |
| 15.0 | Terms of Payment | PAYTERMU |
| 16.0 | Quantity | QTYU |
| 17.0 | Quantity Unit of Measure | QTYUNITU |
| 18.0 | Gross Unit Price | GRSUPRU |
| 19.1-n | Billing Adjustments | BILLADJU |
| 20.1 | Early Payment Discounts | EARLPYU |
| 20.2 | Quantity Discounts | QTYDISU |
| 20.3-20.n | Other Discounts | OTHDIS1-n U |
| 21.1-21.n | Rebates | REBATEU |
| 22.0 | Level of Trade | LOTU |
| 23.0 | Inland Freight - Plant to Distribution Warehouse | DINLFTWU |
| 24.0 | Warehousing Expense | DWAREHU |
| 25.0 | Inland Freight - Plant/Warehouse to Port of Exit | DINLFTPU |
| 26.0 | Country of Manufacture Inland Insurance | INSUREU |
| 27.0 | Brokerage and Handling in the Country of Manufacture | DBROKU |
| 28.0 | Brokerage and Handling in the United States | USBROKU |
| 29.0 | International Freight | INTNFRU |
| 30.0 | Marine Insurance | MARNINU |
| 31.0 | U.S. Inland Freight from Port to Warehouse | INLFPWU |
| 32.0 | U.S. Warehousing Expense | USWAREHU |
| 33.0 | U.S. Inland Freight from Warehouse to the Unaffiliated Customer | INLFWCU |
| 34.0 | U.S. Inland Insurance | USINSURU |
| 35.0 | Other U.S. Transportation Expense | USOTHTRU |
| 36.0 | U.S. Customs Duty | USDUTYU |
| 37.0 | Entry Date | ENTRYDTU |
| 38.0 | Destination | DESTU |
| 39.0 | Duty Drawback | DTYDRAWU |
| 40.0 | Commissions | COMMU |
| 41.0 | Selling Agent | SELAGENU |
| 42.0 | Selling Agent Relationship | SELARELU |
| 43.0 | Credit Expenses | CREDITU |
| 44.0 | Late Payment Fee | LATEPAYU |
| 45.0 | Advertising Expenses | ADVERTU |
| 46.0 | Warranty Expense | WARRU |

| FIELD NUMBER | FIELD DESCRIPTION | FIELD NAME |
|---|---|---|
| 47.0 | Technical Service Expense | TECHSERU |
| 48.0 | Royalties | ROYALU |
| 49.1-n | Other Direct Selling Expenses | DIRSELU |
| 50.1 | Indirect Selling Expenses Incurred in the Country of Manufacture | DINDIRSU |
| 50.2 | Indirect Selling Expenses Incurred in the United States | INDIRSU |
| 51.1 | Inventory Carrying Costs Incurred in the Country of Manufacture | DINVCARU |
| 51.2 | Inventory Carrying Costs Incurred in the United States | INVCARU |
| 52.0 | Packing Cost | PACKU |
| 53.0 | U.S. Repacking Cost | REPACKU |
| 54.0 | Value Added Tax | TAXU |
| 55.0 | Further Manufacturing | FURMANU |
| 56.0 | Samples | SAMPLEU |
| 57.0 | Foreign Trade Zone | FTZU |
| 58.0 | Temporary Import Bond | TEMPIMPU |
| 59.0 | Manufacturer | MFRU |
| 60.0 | Entered Value | ENTVALUE |
| 61.0 | Importer | IMPORTER |

**IV.   U.S. Market Sales Reconciliation**

Please provide a complete package of documents and worksheets demonstrating how you identified the sales you reported to the Department and reconciling the reported sales to the total sales listed in your general ledger. Include a copy of all computer programs used to separate the reported sales from your total sales and to calculate expenses.

**V.   Reporting of Expenses**

For each expense data field reported in the sales database, using the chart of accounts, please identify the account(s) used to calculate such expense. In addition, for each reported field, provide all sub accounts to the account referenced.

This information can be provided in chart form. For example, for movement expenses, please report the expenses in the following manner:

| Field | Main Account | Sub Accounts |
|---|---|---|
| Port Charges (PORTCHGU) | Account 030 Handling | Account 031 Port XYZ Account 0312 XXX |

C-5

Each field used to report expenses should thus identify all accounts which were used to calculate such expense.

## VI.   Instructions for the Narrative Response and the Computer File of U.S. Sales

The following instructions combine the questionnaire with the computer data file format. "FIELD NUMBER" includes the number and descriptive name of the field in the computer data file. "FIELD NAME" includes the "short" or variable name for the submitted printouts of the data file. "DESCRIPTION" defines the data you should report in the field of the computer data file, and "NARRATIVE" describes the additional information we request you provide, not in the computer data file, but in a narrative response.

---

**Fields 1 through 3**

Report the information requested concerning the product sold. Fields 1 and 2 are reserved for the product code and a matching control number the Department will use in the calculation of the dumping margin. Fields numbered 3.1 to 3.n specify the product characteristics requested by the Department. You may add additional product characteristics. However, if you add characteristics not specified in the questionnaire, describe in the narrative response why you believe that the Department should use this information to define **identical** and **similar merchandise**. At this point, do not incorporate these additional product characteristics into your response to CONNUMU (Field Number 2.0).

If the product sold was further manufactured in the U.S., report the product code of the product sold in field 1, the control number of the product imported in field 2, and the technical characteristics of the product imported in field 3.1 to 3. n.

---

**FIELD NUMBER 0.0**:        **Sequential Number**

    FIELD NAME:        SEQU

    DESCRIPTION:        Assign a unique sequential number to each sales record. This sales record number should remain constant in all future submissions (*i.e.*, sales record line items should not be renumbered during the course of this segment). This field will assist you in reconciling our calculations with the data you submit in your response.

**FIELD NUMBER 1.0**:        **Complete Product Code**

    FIELD NAME:        PRODCODU

    DESCRIPTION:        Report the commercial product code assigned by your company in the normal course of business to the specific product sold in the United States.

If the product sold is further manufactured in the United States, report the product code of the product sold not the product imported.

NARRATIVE:   The product code should be described in response to question 7 b in section A of this questionnaire.

**FIELD NUMBER 2.0:**   **Matching Control Number**

FIELD NAME:   CONNUMU

DESCRIPTION:   Assign a control number to each unique product reported in the section C sales data file.  Identical products should be assigned the same control number in each record in every file in which the product is referenced (*e.g.*, products with identical physical characteristics reported in the foreign market sales file and the U.S. market sales file should have the same control number).

The product sold is further manufactured in the United States, report the control number of the product imported, not of the product sold.

The following fields should be included in the construction of the CONNUM:

**FIELD NUMBER 3.1:**   **Painted**

FIELD NAME:   PAINTU

DESCRIPTION:   30 = Painted (Polyvinylidene Fluoride (PVDF)), regardless of whether or not laminated
40 = Painted (Other than PVDF), regardless of whether or not laminated
80 = Laminated but not painted
90 = Neither painted, nor laminated

The classification of "painted" does not include pretreatments such as phosphatizing or chromatizing alone, nor does it include temporary oils or greases.

**FIELD NUMBER 3.2:**   **Minimum Specified Carbon Content**

FIELD NAME:   CARBONU

DESCRIPTION:   1 =      < 0.26 percent, or no minimum specified (*e.g.*, ASTM

A506 designation 4012, ASTM A1011 designation
SS grade 30 (205), *etc.*)

2 =  $\geq$ 0.26 percent but < 0.68 percent (*e.g.*, ASTM A506
designation 8630)

3 =  $\geq$ 0.68 percent but < 0.85 percent

4 =  $\geq$ 0.85 percent (*e.g.*, ASTM A506 designation E51100)

Report the code based on the minimum carbon content required for
the product.

**FIELD NUMBER 3.3:**       **Quality**

FIELD NAME:       QUALITYU

DESCRIPTION:       20 = Ultra High Strength Steel (UHSS) or Advanced High Strength Steel
(AHSS) that is not classifiable in another listed Quality
subcategory (*e.g.*, ASTM A1011 designation UHSS grade 90 (620)
Type 1)

30 = Pressure Vessel / Boiler Quality (*e.g.*, ASTM A299, ASTM
A841, ASTM A515, ASTM A 516, ASTM A285, ASTM
A537, ASTM A204, ASTM A387, ASTM  A302, ASTM
A533, JIS G3103, JIS G3115, JIS G3116, KS D3560, KS
D3540, EN 10028-2, EN 10207, *etc.*).

33 =  Atmospheric Corrosion Resistance/Weathering Quality (*e.g.*,
ASTM A242, ASTM A588, ASTM A606, ASTM A871, JIS
G3114, JIS G3125, KS D3529, EN 10025-5, *etc.*)

35 = High Strength Low Alloy Steel that is not classifiable in
another listed Quality subcategory ((*e.g.*, ASTM A572,
ASTM A1018 designation HSLAS grade 45 (310) Class 1,
*etc.*)

40 = Steels Designated with Properties for Line Pipe Specifications
(*e.g.*, API 5L, EN 10208-2, *etc.*)

50 = Structural Steel that is not classifiable in another listed
Quality subcategory (*e.g.*, ASTM A1018 designation SS
grade 30 (205), ASTM A506, *etc.*)

65 = Commercial Steel (*e.g.*, ASTM A1018 designation CS grade
1015, *etc.*)

80 = Drawing Steel (whether or not special killed) (*e.g.*, ASTM
A1018 designation DS Type A, ASTM A507, etc.)

Case 1:21-cv-00827-MAB   Document 21   Filed 07/09/21   Page 169 of 386
Barcode:3663557-01 A-588-874 REM - Admin Review 3/22/16 - 9/30/17

C-8

95 = Deep Drawing Steel  (*e.g.*, Deep Drawing Quality, Deep Drawing Quality Special Killed, Extra Deep Drawing Quality, Extra Deep Drawing Quality Special Killed, etc.), whether or not fully stabilized (interstitial-free) or special killed) (*e.g.*, ASTM A424 Type III)

Use additional number codes for each additional Quality you propose.  Provide a detailed narrative description of each additional Quality you propose, and explain what differentiates each of those from the ones which are listed above.

For products you report under code 40, report in field 2.3 and in the chart referenced in the narrative for the Minimum Specified Yield Strength field below the line pipe specification (*e.g.*, API 5L) and line pipe specification grade (*e.g.*, X42) by which the flat-rolled product is identified.  However, for each such product, identify in your narrative what if any hot-rolled steel specification grade/type/designation applies to the product in question.

**FIELD NUMBER 3.4:**         **Minimum Specified Yield Strength**

FIELD NAME:         STRENGTHU

DESCRIPTION:         1 = Minimum specified yield strength of < 35,000 psi
2 = Minimum specified yield strength of $\geq$ 35,000 psi but $\leq$ 50,000 psi
3 = Minimum specified yield strength of > 50,000 psi but $\leq$ 80,000 psi
4 = Minimum specified yield strength of > 80,000 psi

For example, under ASTM A1011, the minimum specified yield strength for "Designation SS grade 60" is 60,000 psi, and should be reported as code "3".

Where no minimum yield strength is required, but a typical minimum is identified within the specification from a standards organization such as ASTM, utilize that information to determine the proper code to report (*e.g.*, under ASTM A1011, the typical range of yield strengths for "Designation CS Type B" is identified as 30,000 psi to 50,000 psi, resulting in a "typical" minimum of 30,000 psi, which in turn falls under reporting code "1").

If no such requirements or guidance on minimum specified yield strength are identified in the specification for the product in question, explain in detail your rationale for using one of the above

reporting codes to report this field for the product (do not create additional reporting codes).

If no requirements or guidance on minimum specified yield strength are identified in the specification for the product in question, and if the best basis for determining a reasonable proxy for minimum yield strength is production experience, then your identification of the proper reporting code should be based upon the following: the lowest actual yield strength of the specification/designation/type/grade in question which were produced during the POI (rather than an average or sampling of actual measured yield strengths).

Finally, provide a chart that identifies all of the specifications/grades/types/designations in your comparison market and U.S. market sales databases. After identifying in the first column the reporting code for the Quality field and in the second column the complete specification/grade/type/designation identification (e.g., "ASTM A1011 Designation CS Type B"), identify in subsequent columns the allowable range of carbon content, the minimum specified yield strength (in pounds per square inch), the minimum specified tensile strength (in pounds per square inch), and the minimum specified elongation percentage. For those values in this chart that are based on non-mandatory guidance provided in the specification (such as for the minimum yield strength for the ASTM A1011 Designation CS Type B products referenced above), place three asterisks next to the value in question (e.g., "30,000***"). If the specification does not identify a value (either required or as non-mandatory guidance) for carbon content range, minimum specified yield strength, minimum specified tensile strength, and/or minimum specified elongation percentage for the specification/designation/grade/type in question, leave the cell of the chart blank for that item. Finally, please present the chart sorted by Quality field reporting code.

**FIELD NUMBER 3.5:**     **Nominal Thickness**

FIELD NAME:          THICKU

DESCRIPTION:      1 =    < 0.05";
                  2 =    ≥ 0.05" but < 0.06"
                  3 =    ≥ 0.06" but < 0.09"
                  4 =    ≥ 0.09" but < 0.180"
                  5 =    ≥ 0.180 but < 0.250"

6 =     $\geq$ 0.250 but < 0.50"
7 =     $\geq$ 0.50" but < 0.75"
8 =     $\geq$ 0.75"

Report the code based on the nominal thickness. The nominal thickness is the thickness agreed upon between the customer and the supplier at the time of sale. This may be a minimum thickness if the negative thickness tolerance is zero.

**FIELD NUMBER 3.6:**        **Nominal Width**

    FIELD NAME:        WIDTHU

    DESCRIPTION:     1 =     < 8.0";
                        2 =     $\geq$ 8.0" but < 24.0"
                        3 =     $\geq$ 24.0"but < 40.0"
                        4 =     $\geq$ 40.0"but < 72.0"
                        5 =     $\geq$ 72.0"but < 96.0"
                        6 =     $\geq$ 96.0"

Report the code based on nominal width.

**FIELD NUMBER 3.7:**        **Form**

    FIELD NAME:        FORMU

    DESCRIPTION:     1 = Coil
                        3 = Not in coil (squares or rectangles)
                        4 = Not in coil (not squares or rectangles)

**FIELD NUMBER 3.8:**        **Pickled**

    FIELD NAME:        PICKLEDU

    DESCRIPTION:     1 = Pickled and/or Shot Blasted
                        2 = Neither pickled nor shot blasted

Describe the methods, if any, by which the surface of the steel was descaled after hot-rolling. Also, identify the types of sales and production documents that would identify the methods of descaling used for merchandise associated with specific sale transactions.

**FIELD NUMBER 3.9:**      **Patterns in Relief**

    FIELD NAME:      PATTERNU

    DESCRIPTION:      1 = With patterns in relief;
                             2 = Not with patterns in relief.

                             Specify whether or not the subject product was supplied with patterns in relief (for example, grooves, ribs, checkers, tears, buttons, lozenges, diamonds). In your narrative response, describe the types of patterns that are applicable for your reported sales.

| Fields 4 through 8 |
| --- |
| Report the information requested concerning the sale type, customer and the channel of distribution for the merchandise. In the section A response, you have described the various channels through which you distribute the merchandise. The response to field 8 should correspond to the description you have provided in your response to section A. |

**FIELD NUMBER 4.0:**      **Sale Type**

    FIELD NAME:      SALEU

    DESCRIPTION:      Identify the sale as either "EP" (export price) or "CEP" (constructed export price).

**FIELD NUMBER 5.0**      **Consignment Identifier**

    FIELD NAME:      CONSIGNU

    DESCRIPTION:      Identify the sale as either "C" (consignment sale) or "NC" (non-consignment sale).

**FIELD NUMBER 6.0:**      **Customer Code**

    FIELD NAME:      CUSCODU

    DESCRIPTION:      Report the name of the customer or the internal accounting code designating the customer, as used in your normal course of business.

    NARRATIVE:      Provide a list of customer names and codes as an attachment to your narrative response.

**FIELD NUMBER 6.1:**    **Consolidated Customer Code**

    FIELD NAME:    CCUSCODU

    DESCRIPTION:    Report only one name or code for each of your customers, even if more than one name or accounting code exists for that customer in your books and records.  For example, if you use different codes for regional offices of the same customer, report the same code for this customer, regardless of the location of the office.

    NARRATIVE:    Provide a list of customer names and codes as an attachment to your response, ensuring that each customer is assigned only one discrete code for this field.

**FIELD NUMBER 7.0:**    **Customer Category**

    FIELD NAME:    CUSCATU

    DESCRIPTION:    1 = Original Equipment Manufacturers
2 = Trading Companies
3 = Distributors
4 = Retailers
5 - n = Specify additional categories as required.

    NARRATIVE:    Identify any additional categories and indicate the code used for each.  Identify any customers that have been classified in more than one customer category and explain the circumstances justifying such treatment.

**FIELD NUMBER 8.0:**    **Channel of Distribution**

    FIELD NAME:    CHANNELU

    DESCRIPTION:    The channels of distribution designated in this field should conform to those described in the response to question 3 in section A of the questionnaire.

    1 = Channel 1
2 = Channel 2
3 - n = Channel 3 - n

    NARRATIVE:    Identify any additional channels and indicate the codes used for each.  The codes for channel of distribution listed above are examples only.  You need not use them.

+-------------------------------------------------------------------------+
| **Fields 9 through 15**                                                 |
+-------------------------------------------------------------------------+
| Report the information requested concerning the terms of delivery and   |
| payment and the dates of the specified events of each sale.  Please be  |
| sure to report dates in the specified eight-digit format.  The Glossary |
| of Terms at Appendix I describes the Department's criteria for          |
| determining the date of sale.  The criteria used by the Department to   |
| determine the date of sale may be different from the criteria you use   |
| in your accounting system; please contact the official in charge if,    |
| after reviewing the Department's criteria, you are uncertain when a      |
| sale has occurred.                                                      |
+-------------------------------------------------------------------------+

**FIELD NUMBER 9.0:**       **Sale Invoice Date**

      FIELD NAME:        SALINDTU

      DESCRIPTION:       Positions 1 - 4 = Year
                                  Positions 5 & 6 = Month
                                  Positions 7 & 8 = Day

**FIELD NUMBER 10.0:**      **Date of Sale (if different than Sale Invoice Date)**

      FIELD NAME:        SALEDATU

      DESCRIPTION:       Include this field only if the date of sale is different from the sale invoice date.  The appropriate date to use as date of sale should be determined in consultation with the Official in Charge.

                                  Positions 1 - 4 = Year
                                  Positions 5 & 6 = Month
                                  Positions 7 & 8 = Day

**FIELD NUMBER 11.0:**      **Sale Invoice Number**

      FIELD NAME:        INVOICEU

      DESCRIPTION:       Report the reference number assigned to the invoice in your accounting system.

      NARRATIVE:         Describe the invoice numbering system used by each sales entity that originated a sale reported in this data file.  Is it simply a sequential number or is additional information included in the code, such as place of sale?  If additional information is contained in the code, provide a key describing each component of the code.

**FIELD NUMBER 12.0:**      **Date of Shipment**

     FIELD NAME:            SHIPDATU

     DESCRIPTION:          Report the date of shipment from the last facility under your control; *e.g.*, the factory or distribution warehouse to the customer.

                        Positions 1 - 4 = Year
                        Positions 5 & 6 = Month
                        Positions 7 & 8 = Day

**FIELD NUMBER 13.0:**      **Date of Receipt of Payment**

     FIELD NAME:            PAYDATEU

     DESCRIPTION:          Report the date your records indicate payment was received from the customer.

                        Positions 1 - 4 = Year
                        Positions 5 & 6 = Month
                        Positions 7 & 8 = Day

     NARRATIVE:            Indicate the basis for determining the date of payment and the ledger from which this date was identified.  If you cannot collect the dates of payment in the time allowed for responding to this questionnaire, explain why and do not complete this field.  If you collect the information but a particular invoice is unpaid, leave this field blank for that invoice.

**FIELD NUMBER 14.0:**      **Terms of Delivery**

     FIELD NAME:            SALETERU

     DESCRIPTION:          1 = Delivered
                        2 = FOB (specify delivery point; *e.g.*, FOB home market seaport)
                        3 - n = Specify other delivery terms as required.

     NARRATIVE:            Describe the terms of delivery offered and indicate the code used for each.  If the terms vary by channel of distribution, explain how these are related.

                        The codes for delivery terms listed above are examples only.  You need not use them.

**FIELD NUMBER 15.0:**      **Terms of Payment**

      FIELD NAME:          PAYTERMU

      DESCRIPTION:          Report terms of payment granted the customer.

                                 1 = 30 days after invoice.
                                 2 = 60 days after invoice.
                                 3- n = Specify other payment terms as required.

      NARRATIVE:          Describe each of the terms of payment you offer and indicate the code used for each.  If the terms vary by channel of distribution, explain how these are related.  If the payment terms you offer are tied to early payment discounts or to interest penalties for late payment, please explain.  Indicate whether the payment terms are stated or coded on each invoice or, otherwise, how customers agree to payment terms.

                                 The codes for payment terms listed above are examples only.  You need not use them.

---

**Fields 16 through 21**

Report the information requested concerning the quantity sold and the price per unit paid in each sale transaction.  All **price adjustments** granted, including **discounts** and **rebates**, should be reported in these fields.  The gross unit price less price adjustments should equal the net amount of revenue received from the sale.  If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.  Refer to the Glossary of Terms at Appendix I for a more complete description of each of the price adjustments listed.

---

**FIELD NUMBER 16.0:**      **Quantity**

      FIELD NAME:          QTYU

      DESCRIPTION:          Report the sale quantity for this transaction.  In general, this quantity will be the quantity of the specific shipment or invoice line, net of returns where possible.  For sales that have not been fully shipped/invoiced at the time the computer data for this section is prepared, report the quantity of the sale not yet shipped (total quantity sold less the quantity shipped and invoiced to date - and reported in this file in separate records).

                               For example, assume the date of sale is the date of the customer's order.  In the last month the POR a customer orders 100 tons to be shipped in 5 lots of 20 tons each once every 30 days.  At the time

of preparation of your questionnaire response, 3 of the 5 shipments have been made and an invoice sent for each shipment to the customer.

The file you submit to the Department should contain 4 records: one record for each shipment and invoice and a fourth record for the unshipped amount of 40 tons. For the record containing the unshipped 40 tons, complete the adjustment fields based on estimates.

NARRATIVE:      Explain how returns, if you permit them, affect your sales recorded in the general ledger and sales ledger.

**FIELD NUMBER 17.0:      Quantity Unit of Measure**

FIELD NAME:      QTYUNITU

DESCRIPTION:      Report all sales in this file in the same unit of measure. Use an abbreviation or code to indicate the unit of measure. For example,

1 or MT = metric tons
2 or KG = kilograms
3 – n or specify as needed.

NARRATIVE:      Provide a table of the units of measure and abbreviations or codes used.

The codes for unit of measure listed above are examples only. You need not use them.

Please use a single unit of measure for expressing all prices, expenses, and adjustments you report. If you make sales or incur expenses or adjustments using more than one unit of measure, select the predominantly used unit of measure for sales of merchandise to express all reported data. Additionally, in separate fields report the price, expense or adjustment as it appears in your records (*i.e.*, before the conversion to a single unit of measure), and the conversion factor applied to convert the data to a single unit of measure.

| Fields 18 through 58 |
|---|
| Report the sale price, discounts, rebates and all other revenues and expenses in the currencies in which they were earned or incurred. If a revenue or expense field is expressed in the same currency in all records in the file, simply note the currency name on the descriptive chart requested in Appendix II section B (Instructions for Submitting Computer Data - File Formats). However, if a revenue or expense field is expressed in one currency in |

certain records and another currency in other records, create a companion field that designates the currency for each record with a code or abbreviation.

**FIELD NUMBER 18.0:**    **Gross Unit Price**

FIELD NAME:    GRSUPRU

DESCRIPTION:    Report the unit price as it appears on the invoice for sales shipped and invoiced in whole or in part.  To report portions of sales not yet shipped, provide the agreed unit sale price for the quantity that will be shipped to complete the order.  This value should be the gross unit price.  Discounts and rebates should be reported separately in fields numbered 20.n and 21.n, respectively.

**FIELD NUMBER 19.1-n:**    **Billing Adjustments**

FIELD NAME:    BILLADJU

DESCRIPTION:    Report any price adjustments made for reasons other than discounts or rebates.  State whether these billing adjustments are reflected in your gross unit price.  Report a decrease in price as a negative figure and an increase in price as a positive figure. Report zero in this field if no adjustments were made to the price. Create a separate field for each type of billing adjustment (*e.g.*, corrections of invoicing errors, post-invoicing price adjustments).

NARRATIVE:    Describe the nature of each type of billing adjustment that is recognized in your sales records.  Describe the document flow employed to process the price changes.

**FIELD NUMBER 20.1:**    **Early Payment Discounts**

FIELD NAME:    EARLPYU

DESCRIPTION:    Report the unit value of any discount granted to the customer for early payment.

NARRATIVE:    Explain your policy and practice for granting early payment discounts.  Describe the basis for eligibility for such discount.  If discounts vary by channel of distribution (field 8) or by customer category (field 7), provide an explanation of the discounts given to each channel or category.  Explain how you calculated the per-unit discount.  Where available, provide sample documentation, including sample agreements, for this type of discount.

**FIELD NUMBER 20.2:**    **Quantity Discounts**

> FIELD NAME:    QTYDISU

> DESCRIPTION:    Report the unit value of each type of discount granted to the customer due to the quantity of the purchase.

> NARRATIVE:    Explain your policy and practice for granting quantity discounts. Describe the basis for eligibility for such discounts. If discounts vary by channel of distribution (field 8) or by customer category (field 7), provide an explanation of the discount given to each channel and category. Explain how you calculated the per-unit discount. Provide your quantity discount schedule or other documentation establishing the discount program.

**FIELD NUMBER 20.3-n:**    **Other Discounts**

> FIELD NAME:    OTHDIS(1-n)U

> DESCRIPTION:    Report the unit value of other discounts granted to the customer. Create a separate field for reporting each discount granted.

> NARRATIVE:    Explain your policy and practice for granting each additional discount. Describe each type of discount granted and the basis for eligibility for such discount. If discounts vary by channel of distribution (field 8) or by customer category (field 7), provide an explanation of the discounts given to each category. Explain how you calculated each additional per-unit discount. Where available, provide sample documentation, including sample agreements, for each type of discount.

**FIELD NUMBER 21.1-n:**    **Rebates**

> FIELD NAME:    REBATE(1-n)U

> DESCRIPTION:    Report the unit value of each rebate given to the customer. Create a separate field for reporting each rebate granted. Rebates should be reported with the sales to which they apply.

> NARRATIVE:    Explain your policy and practice for granting rebates. Describe the terms and conditions of each rebate program and when the terms and conditions are established in the sales process. If rebates vary by customer category (field 7) or channel of distribution (field 8), provide an explanation of the rebates given to each. For rebates

that have not yet been paid, describe how you computed the amount to be rebated.  Include your worksheets as an attachment to the response.  Where available, provide documentation, including sample agreements, for each type of rebate.

**FIELD NUMBER 22.0**       **Level of Trade**

　　　FIELD NAME:       LOTU

　　　DESCRIPTION:       Report the level of trade. Use an abbreviation or code to indicate the level of trade.

　　　NARRATIVE:       Provide a key to any abbreviation or codes used.  For CEP sales, the level of trade specified should be that of the sale to your affiliated importer, not the subsequent sale to the first unaffiliated customer.

---

**Fields 23 through 36 – Movement Expenses**

Report the information requested concerning the direct cost incurred to bring the merchandise from the original place of shipment to the customer's place of delivery if included in the price charged to your customer.  The Department normally considers the production facility as being the original place of shipment.  However, if you are a reseller unaffiliated with the producer of the merchandise, you should treat the original place from which you shipped the merchandise as the original place of shipment.  If you report something other than the production facility as the original place of shipment, please provide an explanation in your narrative response.

All the direct costs incurred to transport the merchandise should be reported in these fields.  You may add fields, if needed.  (Field 35 can be used for other U.S. transportation expenses not requested separately.)  For merchandise which was sold during the POR but which has not been shipped at the time of preparation of the response, report estimated charges and your basis for these estimates.

The fields listed below anticipate the types of transport expenses commonly incurred on international shipments.  However, it is not uncommon for certain of these transport expenses to be combined in a single fee paid a transport company (*e.g.*, combined ocean transport and U.S. internal transport to the customer's place of delivery).  If expenses are combined, do not attempt to separate them but report them in a single field and explain in your narrative response.

---

**FIELD NUMBER 23.0:**    **Inland Freight - Plant to Distribution Warehouse**

     FIELD NAME:    DINLFTWU

     DESCRIPTION:    Report the unit cost of inland freight from the factory to the distribution warehouse (or other intermediate location) in the country of manufacture.  Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (*e.g.*, weight, volume).  If you ship the merchandise from the factory to the port of exit, report the cost of inland freight in field 25.

     NARRATIVE:    Describe the forms of transport you used to deliver the merchandise to your distribution warehouse(s) or other intermediate location and any affiliations you had with the carriers during the POR.  If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped.  If it is not possible to specifically identify the cost of each shipment, describe how you calculated the freight cost per unit.  Include your worksheets as attachments to the narrative response.

                              If you used your own vehicles to deliver the product, explain how you calculated the freight cost for each sale and provide the total expense incurred by type of expense (*e.g.*, fuel).  Include your worksheets as attachments to the narrative response.

**FIELD NUMBER 24.0:**    **Warehousing Expense**

     FIELD NAME:    DWAREHU

     DESCRIPTION:    Report the unit cost of **warehousing** expenses incurred in the country of manufacture on sales to the United States.  The cost of warehousing reported in this field should include only expenses incurred at a distribution warehouse not located at the factory that produced the merchandise, less any reimbursement received from the customer.

     NARRATIVE:    Describe the distribution warehousing system you operate and provide a list of the warehouse locations used to distribute the merchandise.  Describe any warehousing services provided to customers.  Provide a list of customer names and codes that receive warehousing services, including the name and location of the warehouse used.  Also, state whether the warehouse is operated by

Filed By: Jun Jack Zhao, Filed Date: 1/19/18 12:50 PM, Submission Status: Approved

a separate entity that is affiliated with you and describe the nature of the affiliation.

Describe the manner in which you calculated the unit cost of warehousing and submit your worksheets as an attachment to the narrative response. If the warehouse is owned by you or an affiliate, describe how you allocated the cost of the warehouse operations.

**FIELD NUMBER 25.0:**      **Inland Freight - Plant/Warehouse to Port of Exportation**

FIELD NAME:      DINLFTPU

DESCRIPTION:      Report the unit cost of inland freight to the port of exportation in the country of manufacture from the factory or distribution warehouse (or other intermediate location). Where it is necessary to allocate because multiple items were included in a shipment, freight cost should be allocated on the basis incurred (*e.g.*, weight, volume).

NARRATIVE:      Describe the forms of transport you used to deliver the merchandise to port of exportation in the country of manufacture and any affiliations you had with the carriers during the POR. If you shipped by common carrier, please submit the specific freight charges incurred on each transaction and the method of allocation, when more than one type or size of merchandise was shipped. If it is not possible to specifically identify the cost of each shipment, please describe how you derived the freight cost per unit. Include your worksheets as attachments to the narrative response.

If you used your own vehicles to deliver the product, provide the total expense incurred by type of expense (*e.g.*, fuel) and describe the method you used to allocate the expenses incurred to each sale. Include your worksheets as attachments to the narrative response.

**FIELD NUMBER 26.0:**      **Country of Manufacture Inland Insurance**

FIELD NAME:      INSUREU

DESCRIPTION:      Report the unit cost of inland insurance on shipments from the factory or distribution warehouse (or other intermediate location) to the domestic port of exportation in the country of manufacture.

NARRATIVE: Describe how you calculated the unit cost of inland insurance incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 27.0:** **Brokerage and Handling Incurred in the Country of Manufacture**

FIELD NAME: DBROKU

DESCRIPTION: Report the unit cost of any brokerage and handling incurred in the country of manufacture on sales to the United States.

NARRATIVE: Describe how you calculated the unit cost of brokerage and handling incurred in the country of manufacture and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 28.0:** **Brokerage and Handling Incurred in the United States**

FIELD NAME: USBROKU

DESCRIPTION: Report the unit cost of any brokerage and handling incurred in the United States on sales to the United States.

NARRATIVE: Describe how you calculated the unit cost of brokerage and handling incurred in the United States and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 29.0:** **International Freight**

FIELD NAME: INTNFRU

DESCRIPTION: Report the unit cost of ocean freight or air freight incurred on shipments from the port of exit in the country of manufacture to the U.S. port of entry.

NARRATIVE: Indicate whether the ocean freight carrier is affiliated. Supply any contracts or tariff rate agreements with carriers that apply to the merchandise under review. Describe how you calculated the unit cost of ocean freight and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 30.0:**     **Marine Insurance**

     FIELD NAME:      MARNINU

     DESCRIPTION:      Report the unit cost of marine insurance incurred on shipments from the port of exit in the country of manufacture to the U.S. port of entry.

     NARRATIVE:      Describe how you calculated the unit cost of marine insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 31.0:**     **U.S. Inland Freight from Port to Warehouse**

     FIELD NAME:      INLFPWU

     DESCRIPTION:      For CEP sales, report the unit cost of any freight incurred on shipments from U.S. port of entry to the affiliated reseller's U.S. warehouse or other intermediate location. For EP sales, report the unit cost of freight from the port of entry to an intermediate location.

     NARRATIVE:      Describe how you calculated the unit cost of inland freight from the port to the warehouse and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 32.0:**     **U.S. Warehousing Expense**

     FIELD NAME:      USWAREHU

     DESCRIPTION:      Report the unit cost of warehousing expenses incurred in the United States. The cost of warehousing reported in this field should include only expenses incurred at a warehouse not located at the distribution facility that sold the merchandise. In the case of merchandise processed further in the United States, report only expenses incurred at a warehouse not located at the facility that processed the merchandise. Reduce the cost of warehousing by any reimbursement received from the customer. Warehousing expenses might be incurred if just-in-time delivery or inventory segregation are conditions of sale.

     NARRATIVE:      Describe the distribution warehousing system you operate and provide a list of the warehouse locations used to distribute the foreign like product. Describe any warehousing services provided to customers. Provide a list of customer names and codes that receive warehousing services, including the name and location of

the warehouse used.  Also, state whether the warehouse is operated by a separate entity that is affiliated with you and describe the nature of the affiliation.

Describe the manner in which you calculated the unit cost of warehousing and submit your worksheets as an attachment to the narrative response.  If the warehouse is owned by you or an affiliate, describe how you allocated the cost of the warehouse operations.

**FIELD NUMBER 33.0:**    **U.S. Inland Freight from Warehouse to the Unaffiliated Customer**

  FIELD NAME:    INLFWCU

  DESCRIPTION:    For CEP sales, report the unit cost of freight incurred on shipments from the affiliated U.S. reseller to the U.S. unaffiliated customer. For EP sales, report the unit cost of freight to the customer from the port of entry or an intermediate location.

  NARRATIVE:    Describe how you calculated the unit cost of freight from the warehouse or other intermediate location and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 34.0:**    **U.S. Inland Insurance**

  FIELD NAME:    USINSURU

  DESCRIPTION:    Report the unit cost of U.S. inland insurance incurred on shipments within the United States.

  NARRATIVE:    Describe how you calculated the unit cost of U.S. inland insurance and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 35.0:**    **Other U.S. Transportation Expense**

  FIELD NAME:    USOTHTRU

  DESCRIPTION:    Report the unit cost of any additional transportation expense incurred in the United States.

  NARRATIVE:    Describe the expense and how you calculated the unit cost and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 36.0:**     **U.S. Customs Duty**

    FIELD NAME:          USDUTYU

    DESCRIPTION:        Report the unit amount of any customs duty paid on the subject merchandise.  Include the unit cost of the U.S. customs processing fee and the U.S. harbor maintenance fee.

    NARRATIVE:          Describe how you calculated the unit cost of U.S. customs duties and customs fees and include your worksheets as attachments to the narrative response.

**FIELD NUMBER 37.0:**     **Entry Date**

    FIELD NAME:          ENTRYDTU
        Identify the date of entry as reported on U.S. customs documents.

**FIELD NUMBER 38.1:**     **Destination - ZIP**

    FIELD NAME:          DESTU

    DESCRIPTION:        Report the five-digit U.S. postal "ZIP" code of the customer's place of delivery.

**FIELD NUMBER 38.2**      **Destination - State**

    FIELD NAME:          STATEU

    DESCRIPTION:        Report the state in which the customer's place of delivery is located.

**FIELD NUMBER 39.0:**     **Duty Drawback**

    FIELD NAME:          DTYDRAWU

    DESCRIPTION:        Report the unit amount of any duty drawback received upon exportation of the subject merchandise to the United States.

    NARRATIVE:          Explain how the amount of duty drawback received is calculated and submit your worksheets as attachments to the narrative response.

| Fields 40 through 49 |
| --- |
| Report the information requested concerning the selling expenses listed.  Include the |

expenses of any affiliated selling agents instead of the commissions paid to those agents. These expenses will be used to make adjustments for different **circumstances of sale** or CEP deductions. Report only direct expenses in Fields 40-49. Refer to the definitions of circumstances of sale and **direct and indirect expenses** in the Glossary of Terms at Appendix I.

**FIELD NUMBER 40.0:**     **Commissions**

FIELD NAME:     COMMU

DESCRIPTION:     Report the unit cost of commissions paid to selling agents and other intermediaries. If more than one commission was paid, report each commission in a separate field. Do not report commissions paid to affiliated selling agents unless there is a compelling reason that you cannot report an affiliated agent's actual expenses.

NARRATIVE:     Describe the terms under which commissions were paid and how commission rates were determined. Explain whether the amount of the commission varies depending on the party to whom it is paid and whether that party is affiliated with you. Include samples of each type of commission agreement used.

If you report payments to any affiliated selling agent in lieu of the agent's actual expenses, provide an explanation of why you are unable to report those actual expenses. Indicate whether the commissions were paid at **arm's length** by reference to payments to unaffiliated parties in the United States, the foreign market and other markets. Submit evidence demonstrating the arm's-length nature of the commissions.

**FIELD NUMBER 41.0:**     **Selling Agent**

FIELD NAME:     SELAGENU

DESCRIPTION:     Report the name or internal code designating the commissioned selling agent or intermediary. If more than one commission was paid, report the name or code of each selling agent in a separate field.

NARRATIVE:     Provide a list of commissioned selling agents and intermediaries and an internal code for each, the applicable commission rates, and whether the agent is affiliated with you.

**FIELD NUMBER 42.0:**   **Selling Agent Relationship**

    FIELD NAME:   SELARELU

    DESCRIPTION:   Report the code designating affiliation.

        1 = Unaffiliated
        2 = Affiliated

**FIELD NUMBER 43.0:**   **Credit Expenses**

    FIELD NAME:   CREDITU

    DESCRIPTION:   Report the unit cost of credit computed at the actual cost of short-term debt incurred by your company.  It is preferable to use a rate paid on short-term borrowing in U.S. dollars.  If you have not borrowed in U.S. dollars, use a U.S. published commercial short-term lending rate.

        This expense should be calculated and reported on a transaction-by-transaction basis using the number of days between date of shipment to the customer and date of payment.  If you are unable to determine actual payment dates from your records, you may base the calculation on the average age of accounts receivable.  If payment has not yet been received for this sale, leave this field blank for the transaction.

    NARRATIVE:   Provide the equation you have used to calculate credit expenses and a worksheet showing the calculation of your average short-term interest rate.  Explain the calculation and any other factors that affect net credit costs, such as compensating deposits to the extent that they were a precondition for acquiring the loan. Indicate the source of the short-term interest rates used in the calculation.

**FIELD NUMBER 44.0:**   **Late Payment Fee**

    FIELD NAME:   LATEPAYU

    DESCRIPTION:   Report the per unit fees collected on each sale for late payment of the invoice.

    NARRATIVE:   Describe the conditions under which you charge customers such fees.  If the practice varies by channel of distribution or category of customer, explain why it varies and how.

**FIELD NUMBER 45.0:**      **Advertising Expenses**

    FIELD NAME:      ADVERTU

    DESCRIPTION:      Report the unit cost of advertising specifically for the subject merchandise that you have paid on behalf of your customer. This is the cost you incurred to advertise to your customer's customers. Report all advertising expenses incurred to advertise to your customers as part of indirect selling expenses (Field 50.2)

    NARRATIVE:      Describe separately advertising programs directed at your customer's customer (*e.g.*, co-op advertising) and advertising programs directed at your customers. Provide separate lists of the expenses incurred for each and provide worksheets demonstrating the allocation of the advertising to your customers to each sale of the subject merchandise.

**FIELD NUMBER 46.0:**      **Warranty Expense**

    FIELD NAME:      WARRU

    DESCRIPTION:      Report the unit cost of warranty expenses incurred during the POR. Warranty expenses should include only the direct expense less any reimbursement received from the customer or unaffiliated parts suppliers. Report indirect warranty expenses as part of indirect selling expenses (field 50.2). If you produce different models or types of the merchandise under review, warranty cost should be based upon your experience by model. If this is impractical, express warranty cost on the most product-specific basis possible.

    NARRATIVE:      Describe both the warranty expenses incurred on sales of this merchandise and the reimbursement, if any, received or expected from the customer. Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the foreign like product. Describe the nature and terms of the warranty provided. Include a copy of each type of warranty agreement as an attachment to the response.

                Include a schedule of direct and indirect warranty expenses incurred for the subject merchandise for the three most recently completed fiscal years. In addition, calculate a cost per unit for each year.

**FIELD NUMBER 47.0:**     **Technical Service Expense**

    FIELD NAME:     TECHSERU

    DESCRIPTION:     Report the unit cost of technical services.  Include only the direct expense less any reimbursement received from the customer.  Report indirect technical service expenses as part of indirect selling expenses (field 50.2).

    NARRATIVE:     Describe the technical services provided, including any service, repair, or consultation that directly relate to sales of the subject merchandise.  Describe any reimbursement received for these services.  Provide lists of the direct and indirect expenses incurred and worksheets demonstrating the allocation of the direct expense to each sale of the subject merchandise.

**FIELD NUMBER 48.0:**     **Royalties**

    FIELD NAME:     ROYALU

    DESCRIPTION:     Report the unit cost of any royalties you paid on the sale of the product.  Create a separate field for each royalty paid.

    NARRATIVE:     Describe each royalty paid to third parties as a result of production or sale.  Include a description of all royalties paid in this section of the narrative but include the unit cost of production royalties as a cost of manufacture (section D).  The description should include the key terms of the agreements, the names of the parties that granted the rights, and a list of products covered by the agreements.

**FIELD NUMBER 49.1-n:**     **Other Direct Selling Expenses**

    FIELD NAME:     DIRSELU

    DESCRIPTION:     Report the unit cost of other direct selling expenses you incurred on sales of the subject merchandise which are not reported in other fields.  Report each additional direct selling expense in a separate field.  Include only the direct expenses incurred less any reimbursement received from the customer.  Report the indirect expenses incurred as part of indirect selling expenses (field 50.2).

    NARRATIVE:     Describe each type of direct selling expense incurred and your basis for considering it directly related to the sales of the subject merchandise.  Include lists of the direct and indirect expenses

incurred and provide worksheets demonstrating any allocation of
the direct expenses to each sale of the subject merchandise.

| Fields 50 and 51 |
| --- |
| Report the information requested concerning indirect selling expenses included in fields 50.1 and 50.2 and **inventory carrying cost** in fields 51.1 and 51.2.  When you complete these fields, please do so for both types of U.S. sales, EP and CEP.  The Department will use these fields to calculate **CEP** or a commission offset adjustment, where appropriate.  Refer to the Glossary of Terms at Appendix I for a more complete description of these.<br><br>Report those indirect selling expenses and inventory carrying costs that are incurred in the country of manufacture of the subject merchandise in separate fields from those expenses incurred in the United States.  Indirect selling expenses include all sales overhead expenses (*e.g.*, salesmen's salaries and office rent) as well as the indirect expense categories excluded from the direct expenses recorded in fields 40 through 49. |

**FIELD NUMBER 50.1:**    **Indirect Selling Expenses Incurred in the Country of Manufacture**

    FIELD NAME:      DINDIRSU

    DESCRIPTION:    Report the unit cost of indirect selling expenses (*e.g.*, sales office rent, salesmen's salaries) incurred in the country of manufacture to sell the product to the United States.  Where indirect selling expenses have been incurred by the producer and an affiliated reseller, create separate fields for the expenses of each company.

    NARRATIVE:    Describe the sales overhead expenses incurred in the home market.  Include a list of the overhead expenses incurred and provide worksheets demonstrating the allocation of these expenses plus the indirect expenses excluded from the circumstance of sale adjustments in fields 40 through 49 to each sale of the subject merchandise.  Where more than one company incurred indirect selling expenses submit separate worksheets for each.

**FIELD NUMBER 50.2:**    **Indirect Selling Expenses Incurred in the United States**

    FIELD NAME:      INDIRSU

    DESCRIPTION:    Report the unit cost of indirect selling and administrative expenses (*e.g.*, sales office rent and salesmen's salaries) incurred in the United States.  Where indirect selling expenses have been incurred by more than one affiliated reseller, create separate fields for the expenses of each company.

NARRATIVE:     Describe the sales and administrative overhead expenses incurred in the United States.  Include a list of the overhead expenses incurred and provide worksheets demonstrating the allocation of these expenses plus the indirect expenses excluded from the circumstance of sale adjustments in fields 40 through 49 to each sale of the subject merchandise.  Where more than one company incurred indirect selling expenses, submit separate worksheets for each.

**FIELD NUMBER 51.1:**     **Inventory Carrying Costs Incurred in the Country of Exportation**

FIELD NAME:     DINVCARU

DESCRIPTION:     For CEP sales, report the unit opportunity cost incurred from the time of final production to the time of arrival in the United States, computed at the actual cost of short-term debt incurred by your company in the country of exportation.  If you are a reseller, report the unit opportunity cost incurred from the time you purchased the merchandise to the time of arrival in the United States computed at the actual cost of short-term debt incurred by your company in the country of exportation.  If you did not have short-term borrowings during the POR, use a published commercial short-term lending rate.

For EP sales, report the unit opportunity cost incurred from the time of final production (or time of purchase) in the country of manufacture to the time of shipment to the United States computed at the same rate of interest as the CEP adjustment described above.

Please calculate inventory carrying costs on as specific a basis as possible (*e.g.*, sale, model, product group, *etc.*).

NARRATIVE:     Describe how the products under review are stored prior to sale.  Provide the average length of time in inventory in the country of manufacture and provide separately the average length of time of shipment from the country of manufacture to the United States.  Indicate the source of the short-term interest rate used in the calculation.  Include your worksheets as attachments to the response.

**FIELD NUMBER 51.2:**        **Inventory Carrying Costs Incurred in the United States**

FIELD NAME:        INVCARU

DESCRIPTION:        For CEP sales, report the unit opportunity cost incurred from the time of arrival in the United States until the time of shipment from the warehouse or other intermediate location in the United States to the first unaffiliated customer.

        Compute the adjustment at the actual cost of U.S. dollar denominated short-term debt incurred by your company. If you have not borrowed in U.S. dollars, use a U.S. published commercial bank prime short-term lending rate.

        Please calculate inventory carrying costs on as specific a basis as possible (*e.g.*, sale, model, product group, *etc.*).

NARRATIVE:        Describe how the products under review are stored in the United States prior to sale and the average length of time in inventory in the United States. Indicate the source of the short-term interest rate used in the calculation. Include your worksheets as attachments to the response.

**FIELD NUMBER 52.0:**        **Packing Cost**

FIELD NAME:        PACKU

DESCRIPTION:        Report the unit cost of packing the subject merchandise for shipment to the United States. Include the cost of labor, materials and overhead. If a product is produced at more than one plant, report the weighted-average packing cost of all plants combined. Report any costs associated with repacking the merchandise in the U.S. separately under field 53.

NARRATIVE:        Describe the types of packing used to prepare the subject merchandise for shipment to the United States. For each type of packing, provide a worksheet that demonstrates the calculation of packing material, labor and overhead for a single unit.
The worksheets should include a list of packing materials, the average cost of each material, and how much of each material was used. In addition, report the average labor hours by packing type and the average labor cost per hour including benefits. Include a list of overhead expenses incurred in packing and demonstrate how these expenses were allocated to each packing type.

**FIELD NUMBER 53.0:**     **U.S. Repacking Cost**

    FIELD NAME:    REPACKU

    DESCRIPTION:    For CEP sales, report the unit cost of any repacking in the United States.  Include the cost of labor, materials and overhead.

    NARRATIVE:    Describe any repacking that occurs in the United States.  For each type of packing, provide a worksheet that demonstrates the calculation of packing material, labor and overhead for a single unit.

        The worksheets should include a list of packing materials, the average cost of each material, and how much of each material was used.  In addition, report the average labor hours by packing type and the average labor cost per hour including benefits.  Include also a list of overhead expenses incurred in packing and demonstrate how these expenses were allocated to each packing type.

**FIELD NUMBER 54.0:**     **Value Added Tax**

    FIELD NAME:    TAXU

    DESCRIPTION:    If you pay value-added taxes on your merchandise sold to the United States and those taxes are not rebated upon export, report them here.  If you paid no such taxes, you may omit this field and note in your narrative response that it does not apply.

    NARRATIVE:    Provide a complete description of the value-added taxes, including the tax rate and tax base.  Include copies of all relevant tax laws.

**FIELD NUMBER 55.0:**     **Further Manufacturing**

    FIELD NAME:    FURMANU

    DESCRIPTION:    If you are required to report the cost of further manufacture or assembly (**further manufacture**) performed in the United States, record the unit cost in this field.  This value is the total unit cost reported in the computer data file prepared in response to questionnaire section E - Cost of Further Manufacturing Performed in the United States.

C-34

If you have incurred further manufacturing cost in the United States but are not required to report the cost, record the code "FM" in this field for each sale of a further manufactured product. Enter a zero in this field for sales of products that have not been further manufactured.

NARRATIVE:   If you further manufacture subject merchandise in the United States, please contact the official in charge immediately. You may be required to respond to section E of this questionnaire. No additional narrative description is required for this field. Refer to section A question 8.

**FIELD NUMBER 56.0:     Samples**

FIELD NAME:     SAMPLEU

DESCRIPTION:   If the transaction in question involved sample merchandise, please report the code "S" (sample).

NARRATIVE:   Explain the circumstances surrounding the sales of sample merchandise. Describe how sales of sample merchandise differ from sales of merchandise that does not fall under this category.

**FIELD NUMBER 57.0:     Foreign Trade Zone**

FIELD NAME:     FTZU

DESCRIPTION:   Identify all sales of merchandise shipped into foreign trade zones in the United States by recording the code "FTZ" in this field. If you shipped the subject merchandise to an affiliate in an FTZ that further processed the merchandise into products not within the description of merchandise in Appendix III prior to entry into U.S. customs territory, separately identify these transactions with the code FTZA. If the merchandise entered U.S. customs territory without being further processed into products not within the description of the merchandise, enter the code FTZB.

For merchandise that was not shipped into foreign trade zones or was entered for consumption prior to admission to a foreign trade zone, enter a zero in this field. If none of your merchandise was shipped into a foreign trade zone, you may omit this field entirely and note in your narrative response that it does not apply.

NARRATIVE:   Explain the circumstances that pertained to FTZ transactions. State whether you, your U.S. affiliate, or an unaffiliated firm

C-35

entered (or may have entered) the merchandise into the Customs territory of the United States.

**FIELD NUMBER 58.0**          **Temporary Import Bond**

        FIELD NAME:          TEMPIMPU

        DESCRIPTION:          Identify all sales of merchandise that you knew were imported under temporary import bonds by recording the code TIB in this field.  If the subject merchandise entered into the United States under a temporary import bond and was processed further by an affiliate into products not within the description of merchandise (*see* Appendix V) prior to entry into U.S. customs territory, separately identify these transactions with the code TIBA.  If the merchandise entered U.S. customs territory without being further processed into products not within the description of the merchandise, enter the code TIBB.

                         For merchandise that was not shipped under a temporary import bond, enter a zero in this field.  If none of your merchandise was imported under a temporary import bond, you may omit this field entirely and note in your narrative response that it does not apply.

        NARRATIVE:          Explain the circumstances that pertained to sales of merchandise imported under temporary import bonds.  State whether you, your U.S. affiliate, or an unaffiliated firm entered (or may have entered) the merchandise into the Customs territory of the United States.

**FIELD NUMBER 59.0:**          **Manufacturer**

        FIELD NAME:          MFRU

        DESCRIPTION:          If you have sold the foreign like product of more than one manufacturer, identify the manufacturer in each record by the use of a code.  If the manufacturer is unknown, identify your supplier.

        NARRATIVE:          If you are not the manufacturer, report the manufacturer of the merchandise in your narrative response and provide a key to the code.

**FIELD NUMBER 60.0**          **Entered Value**

      FIELD NAME:          ENTVALUE

      DESCRIPTION:          For CEP sales made after importation, report the average unit entered value (U.S. Customs value) during the POR for the specific product (*e.g.*, model) of the sale.  For other sales, report the actual unit entered value (U.S. Customs value), if known.  Report the entered value for all CEP sales and for EP sales for which this information is known.


**FIELD NUMBER 61.0**          **Importer**

      FIELD NAME:          IMPORTER

      DESCRIPTION:          Report the U.S. importer of record.  If unknown, place the code UNK in this field.  For CEP sales made after importation, indicate the importer of the subject merchandise entered during the POR.

      NARRATIVE:          Provide a list of importers of record with any codes or abbreviations you used to identify them.  If you (or an affiliate) were the importer of record for any EP sale(s), please explain the circumstances.  If you or an affiliate were not the importer of record for any CEP sale(s), please explain the circumstances.  Also, if more than one affiliate was an importer of the subject merchandise during the POR, please explain the functions of each and the circumstances under which each imported the subject merchandise.

---

**Other Revenues and Expenses**.

The fields listed above have been designed to capture all revenues and expenses you have incurred in selling the subject merchandise in the United States market.  If there are additional revenues or expenses that are not reported above, such as export taxes incurred in the country of manufacture, create a field for each in the computer file, describe the revenue or expense in your narrative response, and include all calculation worksheets as attachments to your narrative response.

---

## SECTION D

### Cost of Production and
### Constructed Value

As noted in the cover letter to this questionnaire, the Department is requesting constructed value and cost of production information from respondent companies in all AD proceedings. Therefore, please submit a full response to Section D of this questionnaire.

## I.      General Explanation

This section of the antidumping questionnaire provides instructions for reporting the **cost of production** (COP) of the **foreign like product** and the **constructed value** (CV) of the **subject merchandise,** collectively referred to as the **merchandise under consideration (MUC)**. [16]

If you have questions concerning any part of the section D questionnaire, you are instructed to contact the official in charge.  Please note, however, that requests by your company to alter the reporting of the information requested in the section D questionnaire must be submitted in writing to the Department.

A.      Cost of Production

Cost of production is the weighted-average control number (CONNUM) specific cost[17] of the product(s) sold by your company in the comparison market (*i.e.*, the home or third country market).  The Department will compare the COP to the sale prices for that product in the comparison market to determine whether those prices can be used as the basis for normal value.  Unless otherwise instructed by the Department, you should report per-unit COP information for each CONNUM included in your home market or third country sales listing submitted in response to section B of this questionnaire.

B.      Constructed Value

Constructed value is the weighted-average CONNUM specific cost of the product sold by your company in the U.S. market, plus an amount for profit.  Because CV is a type of normal value, selling, general and administrative (SG&A) expenses and profit are computed as if the merchandise had been sold in your comparison market.  Unless

---

[16] Throughout the questionnaire, whenever we refer to the merchandise under consideration (MUC) we are referring generally to all products within the scope of the review that your company sold in any market.  When we use the term subject merchandise, we are referring to products sold to the United States.  When we use the term foreign like product, we are referring to products sold in your home market or exported to a country other than the United States. Note that we consider merchandise under consideration, products under review, and merchandise under review to be synonymous.  We have provided a description of the merchandise included in the review in Appendix III.

[17] There should be a single weighted-average cost for each CONNUM regardless of market destination as defined by the Department's product characteristics.

otherwise instructed by the Department, you should report per-unit CV information for
<u>each</u> CONNUM included in your U.S. market sales listing submitted in response to
section C of this questionnaire.

C.  <u>Reporting Period for Cost of Production and Constructed Value</u>

Calculate reported COP and CV figures based on the actual costs incurred by your
company during the period of review (POR), as recorded under your company's normal
accounting system.[18]  If you have any questions regarding the appropriate cost calculation
period for the merchandise under consideration, notify the Department in writing <u>before</u>
preparing your response to this section of the questionnaire.

D.  <u>Weighted-Average COP and CV</u>

Please report per-unit cost information (*i.e.*, a per-unit cost per CONNUM) for all
merchandise under consideration produced by your company corresponding to those
CONNUMs reported in your responses to Sections B and C of this questionnaire.  Ensure
that each CONNUM included in your comparison market or U.S. sales listing has a
corresponding CONNUM-specific cost reported in response to this section of the
questionnaire.  Calculate reported COP and CV figures on a weighted-average basis
using the CONNUM specific <u>production quantity</u>, regardless of market sold, as the
weighting factor.  Thus, each CONNUM should be assigned only one cost, regardless of
the market or markets in which the product(s) were sold.  If more than one unique
product produced at a domestic facility falls within the definition of a specific
CONNUM, determine first the weighted-average CONNUM specific costs at that
facility; then calculate the company-wide weighted-average CONNUM specific costs.  If
you have any questions regarding how to compute the weighted-average cost of the
merchandise under consideration, notify the Department in writing <u>before</u> preparing your
response to this section of the questionnaire.

E.  Submit electronic versions in Excel format of all worksheets provided in response to this
supplemental section D questionnaire.

## II.  **General Information**

The production process, financial accounting, and cost accounting information requested below
is necessary for the Department to better understand your company's operations, its products and
production processes, and its financial and cost accounting practices.  Therefore, you should
provide complete narrative responses to each of the items listed below.

---

[18] If your company's fiscal year ends within three months of the POR and you want to report COP and CV based on
your company's fiscal year, you must contact the official in charge within 14 days after receipt of the initial
questionnaire.  *See* 19 CFR 351.301(c)(2)(iv).

C.    <u>Products and Production Processes</u>

Provide a description of your company's production process for the merchandise under consideration.[19]  Your description should address each of the items 1 through 8 listed below.

1.  Provide a description of your company's production facilities and their address.  If production of the merchandise under consideration takes place at more than one facility, identify each facility and describe the general production activities that take place at each facility.  Identify all product categories manufactured at each facility, including products not under consideration.

2.  Provide a flowchart of the production process for the merchandise under consideration.  Supplement your flowchart with descriptions of the processing that takes place at each stage.

3.  List all co-products, by-products, and scrap that result from producing the merchandise under consideration.  Describe why your company considers these items to be co-products, by-products, or scrap.  State how each is accounted for in the normal books and records.

4.  State whether your finished goods internal product codes are used for production control, cost accounting, sales, and inventory records.  Provide a key to the finished goods internal product codes used in the production process, cost accounting, and inventory records.  Include an explanation of the full range of prefixes, suffixes, or other notations that identify special features.

5.  List **all** significant inputs used to produce the merchandise under consideration, including specific types of raw materials, labor, energy, subcontractor services, research and development, *etc*.

6.  For the three most significant direct material inputs used in producing the merchandise under consideration, provide monthly inventory movement schedules that show the quantity and value of the beginning inventory, purchases, consumption, other adjustments, and ending inventory for the POR.  Indicate the unit of measure for each input and include in the worksheet the average monthly per-unit cost.  In addition, provide the percentage each such input represents of the total cost of manufacturing of the merchandise under consideration.

7.  List the **major** inputs purchased from affiliated parties that are used to produce the

---

[19] If you have already provided a description of your company's production process in response to section A of this questionnaire, you may repeat that description or refer to the page numbers in that part of your response where the information is presented.  However, your response must address each of the items noted in parts II.A.1 through 8 of this section of the questionnaire.  If it does not, provide the description of your company's production process in this section of your response and supplement it accordingly with the requested information.

Case 1:21-cv-00827-MAB   Document 21   Filed 07/09/21   Page 201 of 386
Case 1:21-cv-00827   Document 21   Filed 07/09/21   Page 201 of 386

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

D-4

merchandise under consideration during the cost calculation period. A major input is an essential component of the finished merchandise which accounts for a significant percentage of the total cost of manufacturing incurred to produce one unit of the merchandise under consideration.[20] For each major input identified, complete the following chart (*i.e.,* complete a separate chart for each major input):

| Name of Major Input | Total Volume Purchased | Total Value Purchased | Average Price | Affiliated Supplier's COP | % Supplier-Specific Purchases Represent of Total Purchases of that Input ((b) Volume / (a) Volume)[21] | % Input Represents of COM (Consumption Value of Input / Total COM) [22] |
|---|---|---|---|---|---|---|
| Name(s) of Affiliated Supplier(s) | (b) | (b) | (e) | (f) | (g₁) | |
| Unaffiliated Supplier(s) | (c) | (c) | (d) | | | |
| Total | (a) | (a) | | | | (g₂) |

The letters below are descriptions of the corresponding letters contained in the chart:

    a. the total volume and value (as recorded under your company's normal accounting system) of the input purchased from all sources by your company during the cost calculation period;

    b. the total volume and value of the input purchased from each affiliated supplier (list and identify each affiliated supplier separately);

    c. the aggregate volume and value of the input purchased from unaffiliated parties during the same period;

    d. the average unit market value per unaffiliated supplier(s);
       **Note:** *If there are no such purchases but your affiliated supplier sells the identical input to unaffiliated customers in the market under consideration, in a separate schedule provide the average price paid for the input by the unaffiliated purchasers.*

    e. the average unit transfer price for each affiliated supplier;

    f. Provide the product specific per-unit cost of production[23] incurred by each affiliated supplier producing the major input (list and identify each affiliated supplier separately); and,

    g. complete the rest of the chart accordingly and provide the calculation of the

---

[20] In reporting CONNUM specific per unit COP and CV figures under section IV below, report the cost of affiliated purchases in accordance with the amounts as recorded in your normal accounting records.

[21] Base the percentage on the volume purchased from each affiliate to the total volume purchased from all parties (*i.e.*, affiliated and unaffiliated).

[22] Base the percentage on the values recorded in your normal accounting system. Use the consumption value and total COM of the merchandise under consideration into which the item in question was an input. State whether the item in question is an input for only certain models.

[23] The product specific per-unit cost of production should include movement costs incurred by the affiliated supplier for shipping the good to the respondent and a portion of the affiliate's SG&A. Include an amount for the affiliated supplier's interest expenses unless that affiliated supplier is included in the consolidated financial statements being used to report financial expenses for the producer in the COP buildup for the merchandise under consideration. Provide a worksheet showing the cost build-up. The cost build-up should be based on the affiliate's normal accounting system.

D-5

requested percentages.  Adjust figures accordingly for self-produced items.

8.  Provide a worksheet that identifies those inputs and other items (*e.g.*, fixed assets, services, *etc.*), that your company receives from affiliated parties (exclude major inputs already identified in Q.7 above).  For each item received from an affiliated party, provide the following:
    a.  the name of the affiliated party
    b.  state the nature of the affiliation;
    c.  the POR total quantity and transfer price of the transactions, and;
    d.  the percentage the item represents of the total MUC's COM.

9.  Provide a description of how the production control system tracks the production quantities of each finished product.  Explain what unit is used to record or track the quantity of the produced product.

10. Identify and describe all internal tax programs that assess taxes on purchases of inputs used to produce the merchandise under consideration.  Identify the tax rate associated with each internal tax.  Explain whether the tax is rebated or not collected on exports.  If it is collected and not rebated upon export, but it is recovered through some other means, explain how (*e.g.*, through home country sales, export sales, or some other means).  If you did not recover such internal taxes paid during the POR through either home market sales, export sales, or some other means, report the net amount incurred for each type of internal tax during the cost calculation period.

B.    Financial Accounting Systems and Policies

Describe your company's financial accounting practices and the system it uses to accumulate and summarize accounting data for purposes of preparing financial statements.  Your description should address each of the items listed below.

1.  State whether your company's financial accounting practices are in accordance with generally accepted accounting principles (GAAP) practiced in the country in which the merchandise under consideration is produced.  If not, explain all differences.

2.  Provide a flowchart illustrating your company's financial accounting books and record keeping system.  Provide a description of your company's financial accounting system (*e.g.*, Software used, accounting modules, subsidiary ledgers (e.g., raw materials purchases, inventories, sales, accounts receivable, *etc.*)).

3.  Explain your financial accounting practices regarding the following:

    a.  valuation methodologies for raw materials, work-in-process, finished goods inventories, and cost of goods sold;
    b.  explain whether there were any changes to the inventory valuation methodology, particularly for direct materials, during the POR (if so, describe such changes);

   c.  fixed asset valuation, revaluation, depreciation, and treatment of idled assets;

   d.  whether the depreciation methodology or useful lives of any assets have changed within two years of the beginning of the POR (provide a summary table of the useful lives of each class of assets);

   e.  inventory write-off and write-down methods for raw materials, work-in-process, and finished goods;

   f.  income and expense accounts requiring year-end and periodic provisions, accruals, and other adjustments;

   g.  capitalization of general and administrative expenses or interest expenses as part of inventory or fixed asset valuation;

   h.  plant closure, shut-down (including periods for maintenance and retooling), or restructuring costs (state whether you recognized any expenses during the cost calculation period because of shut-downs, closures, or restructuring during previous periods);

   i.  changes in accounting methods (*e.g.*, accounting principles or estimates) during the fiscal period(s) that include part of the POR and one preceding fiscal year; and,

   j.  the effects of inflation on financial statement information.

C.   <u>Cost Accounting Systems and Policies</u>

1.  Describe your company's normal cost accounting system.[24]

   a.  Explain whether your company uses a job order, process, operations, or other type of cost accounting system.

   b.  Identify the type of system (*e.g.*, SAP) and each of the individual modules used by your company. Explain how the modules interact with each other and with the financial accounting and production control systems.

   c.  Explain how the system records, classifies, aggregates, and allocates the costs to specific products in the normal course of business.

   d.  Explain how your normal cost accounting system accounts for each of the physical characteristics identified for this proceeding.

2.  Describe how the company's cost accounting system reconciles to the financial accounting system. In addition, address each of the items listed below.

   a.  Explain whether the amounts from the cost accounting system are changed when assigning values to products in finished goods inventory.

   b.  Identify all production costs included in the cost of goods sold for financial accounting purposes which are valued differently for cost accounting purposes.

   c.  If your company does not have a formal cost accounting system, provide a

---

[24] If you do not have a formal cost accounting system, describe the extent to which costs and production are tracked in your normal records for production and inventory purposes.

D-7

detailed explanation and example of how the fiscal year-end inventory values are determined.

3. List and describe all reports generated by your company's cost accounting and production control system. List and describe all reports prepared for reporting cost and production information to the Department.

4. Describe the level of product specificity over which your company's cost accounting system normally captures production costs. Explain how the product specific costs recorded in your normal accounting system compare to the weighted-average CONNUM specific costs reported for COP and CV.

5. Provide a list of the direct cost centers, and their cost center codes, included as part of your company's cost accounting system. Identify those cost centers through which the merchandise under consideration passes during production. Identify whether those cost center also process Non-MUC.

6. Explain how materials, labor, and other direct costs incurred at each cost center are recorded and charged to the merchandise produced. If direct costs are allocated to individual units of the merchandise at these cost centers, then state the basis for the allocation.

7. Provide a list of the indirect or other common cost centers, and their cost center codes, included as part of your company's cost accounting system. Describe the operations that take place in each of these indirect cost centers and how the costs of those operations are accumulated and recorded. Explain how the costs accumulated by each indirect or common cost centers are allocated to the direct cost centers listed and state the basis for the allocation.

8. If your company's cost accounting system is based on standard or budgeted costs, then provide the following information:[25]

    a. list each variance or budgeted cost allocation recorded under your company's cost accounting system. For each, identify, the level of product specificity for which the variance or budget allocation is measured and the types of costs included in the variance;
    b. the period for which your company computes and records each type of variance;
    c. the methods used to develop each variance used in your company's cost accounting system;
    d. a description of how the standard or budgeted costs (*e.g.*, input prices, usage,

---

[25] Please answer these questions even if your system calculates an "actual" cost at the end of an accounting period, but relies on standard or budgeted costs during the interim period. For example, some ERP systems can calculate both a standard and actual costs.

*etc.*) were calculated and the frequency with which your company revises its cost accounting standards or budgeted costs, including the dates on which the latest revisions were made for input price and the usage factors; and,

    e. Explain how the company normally allocates variances between cost of goods sold and finished goods inventory.

9.  Describe the method used under your company's cost accounting system to account for scrap generated at each stage of the production process.

    a. State whether the scrap material generated is reintroduced into the production cycle as raw materials, sold, or otherwise disposed of in the normal course of business.

    b. Explain how the offset for scrap recovery is valued, if at all, and how any reintroduced scrap is valued.

    c. Provide an inventory movement schedule that shows, by month, the quantities and values of scrap generated and consumed during the POR (i.e., beginning inventory, generated, re-consumed in the production process, sold, other adjustments, and ending inventory).

    d. Compare the values from the schedule to the offset taken in the cost buildups.

10.  Describe the method used under your company's cost accounting system to account for co-products and by-products that may result from producing the merchandise under consideration. Identify the point in the production process where co-products or by-products become individually identifiable. If the by-products are valued at a lesser amount in your normal records than for reporting, explain how the revised value is determined and what happens with the excess amount of cost.

11.  Describe the method used under your company's cost accounting system to allocate costs to non-prime products that may result from producing the merchandise under consideration. Identify the point in the production process where non-prime products become individually identifiable and whether they can be sold as MUC. If the reported per unit costs allocated to the non-prime products exceed that normally allocated to such products in your normal records, explain how the revised value was determined and why you deviated from your normal books and records. Provide the quantity and value of the prime products that were reclassified as non-prime during the POR.

12.  Describe how your company accounts for processing yields or losses throughout the production cycle. Indicate each stage in the production cycle where processing yields are measured. Provide a schedule showing the average actual yield experience during the cost calculation period for each stage of production.

D.    Startup Costs

If a startup operation has taken place at your company during the POR and you are claiming a startup adjustment for a new product or a new production facility, address each of the following:

1.         describe the new product or production facility and provide the total costs attributable to the new product or production facility (*i.e.*, the total construction or development costs prior to the startup phase of production; also, describe how those costs were treated in your company's normal accounting records);

2.         state the total costs associated with the startup phase of production and describe how those costs were treated in your company's normal accounting records;

3.         for a new facility, identify the date on which the new facility was completed;

4.         if the claimed startup adjustment is for an expansion of capacity to an existing facility, demonstrate that the expansion constituted such a major undertaking that it required the construction of a new facility and resulted in the depression of production levels due to technical factors associated with the new facility's initial production phase (as part of your analysis, provide the amount spent in expanding the facility compared to the historical cost of the existing facility);

5.         if the claimed startup adjustment is for retooling of an existing facility, demonstrate that the retooling involved the replacement of nearly all production machinery or the equivalent rebuilding of existing machinery (as part of your analysis, provide the amount spent in refurbishing or retooling the facility compared to the historical cost of the machinery and equipment used previously in the facility);

6.         if the claimed startup adjustment is for a new product, demonstrate that the new product required substantial additional investment or, in the case of an existing product, involved the complete revamping or redesign of the product (as part of your analysis, demonstrate that the "new" product is technically distinct from those already manufactured by the company and provide the amount spent to develop the product);

7.         provide all dates relevant to the startup period, including: the beginning and ending dates of any test manufacturing prior to the startup phase of production, the start date of the initial start-up period, and the date when commercial production levels were reached or the projected date for reaching commercial production levels;

8.         explain how the production levels were limited by technical factors associated with the initial phase of commercial production (as part of your analysis, describe the technical factors which limited production, demonstrate how these technical factors restricted the number of units processed by the company, and demonstrate how these technical factors are unique to the startup phase, not a result of chronic or normal production problems);

9.        explain how commercial production levels were determined; as part of your analysis, provide:  (1) the monthly production volumes and the number of units started into production each month during both the startup period and the cost calculation period (*i.e.*, the post startup period); (2) the production capacity of the old and new facility; (3) the planned production quantity for the new product; (4) quantitative historical data reflecting experiences in producing the same or similar products; and (5) an analysis showing that low production levels were not caused by factors unrelated to startup operations;

10.       include the claimed startup adjustment in a computer data field entitled STARTUP, which represents the difference between the normalized cost and the actual cost, on a CONNUM specific per-unit basis; and,

11.       provide worksheets documenting the calculation of your claimed startup adjustment (the calculations must demonstrate not only the claimed startup adjustment, but also how the unit production costs incurred during the startup period were substituted with the unit production costs incurred after the startup period).

## III.    <u>Response Methodology</u>

The CONNUM specific per-unit COP and CV figures that you provide in response to this section of the <u>questionnaire must reconcile to the actual costs reported in your company's normal cost accounting system and to the accounting records used by your company to prepare its financial statements</u>.  Therefore, be advised that you will be required to reconcile the summation of the per-unit COP and CV figures to the amounts recorded in your cost accounting system and to the cost of manufacturing recorded in your financial accounting system.

If your company normally uses a cost accounting system based on actual costs, use that system for purposes of computing your submitted COP and CV amounts.  Similarly, if your company normally uses a standard cost accounting system, use that system for purposes of computing COP and CV; in such case, however, ensure that you have allocated to the merchandise under consideration all variances resulting from differences between standard and actual production costs.

Therefore, the starting point for your response must be the costs as recorded in your normal books and records, see section 773(f) of the statute.  While it may be necessary to adjust those costs to comply with certain reporting requirements you must provide the reasons for each departure from your normal books and records.   If in preparing the COP and CV calculations you intend to depart from your company's normal accounting system and normal cost allocation methods, you must notify the Department in writing <u>before</u> you respond to this section of the questionnaire.

A.   <u>Description of Response Methodology</u>

Describe the method you used to compute your company's submitted COP and CV figures.

1.   Describe how you developed the reported CONNUM specific per-unit costs from your normal cost accounting system.

2.   Describe how you used your normal cost and financial accounting records to compute each of the following cost elements:

    a.   production quantity;[26]
    b.   direct materials;
    c.   internal taxes (including value added taxes (VAT)) and import duties on materials purchases.  State whether you were exempted from paying or were rebated these taxes and duties on imported raw materials used to produce the merchandise under consideration;
    d.   direct labor;
    e.   variable production overhead (provide a list of the cost categories that comprise your submitted variable overhead cost figures);
    f.   fixed production overhead (provide a list of the cost categories that comprise your submitted fixed overhead cost figures);
    g.   research and development costs;
    h.   general and administrative (G&A) expenses (provide a list of the cost categories that comprise your submitted G&A costs); and,
    i.   net interest expense (include a list of all interest income and expense items and other financing amounts used to compute net interest expense).

3.   If a physical characteristic identified by the Department is not tracked by the company's normal cost accounting system, calculate the appropriate cost differences for that physical characteristic using a reasonable method based on available company records (*e.g.*, production records, engineering statistics).  The starting point for any such calculation must be the product specific costs as recorded in your normal cost accounting system.

If there is a physical characteristic not tracked by the company, for which the company believes that there is an insignificant cost difference between products, identify the particular physical characteristic, quantify, and explain your reasons for not reporting a cost difference.

4.   List and describe all differences between costs computed under your company's normal cost and financial accounting systems and the costs submitted in response to

---

[26] State whether the reported quantity is based on theoretical weight or an "actual" weight.  Explain the calculation of the basis used.   State whether the quantities reported on the B & C sales files is consistent with the basis used for the cost file.

this section of the questionnaire.  Include in your description the reasons why it was necessary for you to depart from your company's normal accounting practices to compute the submitted COP and CV figures.

B.   <u>Reconciliations</u>

Provide the following worksheets that illustrate how the costs reported on the financial statements reconcile to the general ledger or trial balance, to the cost accounting system (*i.e.*, the source used to derive the reported costs), and to the reported costs.[27]  On the worksheets, identify the source documents for all major items shown and cross-reference the worksheets where appropriate (*i.e.*, link between worksheets).

If your company has a limited cost accounting system, reconcile the general ledger or trial balance to the books and records normally kept by the company which were used to derive the reported per-unit costs.  This section takes a "top down" approach (*e.g.*, financial statements to per-unit cost), starting with cost of sales from the financial statements and proceeding step-by-step down through cost of manufacturing for the reporting period to the summation of the reported per-unit costs **(See sample reconciliation provided below)**.

1.  Provide summary trial balances for the POR and fiscal year.  Provide a worksheet reconciling all items on the fiscal year income statement (*e.g.*, revenues, cost of sales, selling and administrative expenses, and non-operating expenses) in the audited financial statements to the total costs in the financial accounting system (*i.e.*, the summary trial balance).[28]  Describe and quantify each reconciling item.

2.  Provide a worksheet reconciling the financial accounting system fiscal year cost of sales (or equivalent) to the POR cost of sales (or equivalent).

3.  Provide a worksheet reconciling the POR cost of sales (or equivalent) to the total POR costs from the cost accounting system (*i.e.*, the source used to derive the reported costs).  Describe and quantify each reconciling item.

4.  Provide a worksheet reconciling the total POR costs from the cost accounting system (*i.e.*, the source used to derive the reported costs) to the total POR cost of manufacturing (COM).  The Department defines COM as the cost of materials, labor, variable overhead, and fixed overhead incurred to produce the finished goods during the POR.  Thus, the COM should exclude general and administrative expenses and financial costs.  Describe and quantify each reconciling item.

5.  Provide worksheets reconciling the total POR COM to the total of the per-unit

---

[27] Please note that the sequence of each of the below steps may vary depending on your system.
[28] This worksheet should cross reference each account on the summary trial balance to the corresponding summarized line item on the income statement.

manufacturing costs submitted to the Department (*i.e.*, multiply the reported per-unit COMs of all merchandise under consideration for the POR by their respective production quantities regardless of ultimate destination as listed on the COP/CV database, then sum the totals).  Identify and quantify the following reconciling items:

    a.  differences between the reporting methodology and the normal books and records;

    b.  cost of merchandise <u>not</u> under consideration (*i.e.*, multiply the per-unit COM of all merchandise <u>not</u> under consideration produced by the company during the POR by their respective production quantities regardless of ultimate destination, then sum the totals; <u>or</u> if per-unit costs are not tracked or calculated, then, sum the total of the costs that you have directly assigned to or allocated to the merchandise <u>not</u> under consideration);

    c.  if not provided in the data file, the cost of merchandise under consideration not sold in either the United States or comparison market (*i.e.*, multiply the per-unit COM of all merchandise under consideration not sold in either the U.S. or the comparison market for the POR by their respective production quantities, then sum the totals); and,

    d.  all other reconciling items.

| | | |
|---|---|---|
| **Case Number:  A-XXX-XXX** | | |
| **Company Name: ABC Company** | | **A-XXX-XXX** |
| **POR:  MM/DD/YY to MM/DD/YY** | | **Business Proprietary Information** |
| **Overall Cost Reconciliation** | | **Exhibit X** |
| | **Yen (000s)** | **References/Comments** |
| Cost of Goods Sold (COGS) per Audited Fin. Stmt. for the FY Ended MM/DD/YY | XXX,XXX | *Most closely matching POR* |
| Plus: Differences between Audited Fin. Stmt. & Fin. Accounting | X,XXX | *List each type separately .* |
| Less: Differences between Audited Fin. Stmt. & Fin. Accounting | X,XXX | *List each type separately.* |
| COGS per Financial Accounting for the FY Ended MM/DD/YY | XXX,XXX | *Tie to the trial balance.* |
| Less: COGS of Purchased and Resold Merchandise | X,XXX | *Tie to reported summary trial balances.* |
| Less: Beginning Finished Goods Inventory as of MM/DD/YY | X,XXX | *Tie to reported summary trial balances.* |
| Plus: Ending Finished Goods Inventory as of MM/DD/YY | X,XXX | *Tie to reported summary trial balances.* |
| Cost of Manufacturing (COM) Per Financial Accounting System | XXX,XXX | *Tie to reported summary trial balances.* |
| Less: COM of facilities Not Producing MUC | X,XXX | *Tie to reported summary trial balances.* |
| COM of Facilities Producing MUC | XXX,XXX | |
| Less: Portion of FY Ending MM/DD/YY COM not in POR | X,XXX | *Tie to reported summary trial balances.* |
| Add: COM of POR Months not in FY Ending MM/DD/YY | X,XXX | *Tie to reported summary trial balances.* |
| POR COM of Facilities Producing MUC | XXX,XXX | |
| Less: Packing Expenses Reported as Selling Exp. | X,XXX | *Tie to reported summary trial balances.* |
| Less: Merchandise Not Under Consideration | X,XXX | *List each category of Non-MUC separately.* |
| Plus: Other Differences Between Accounting and Reported Costs | X,XXX | *List each type of difference separately.* |
| Less: Other Differences Between Accounting and Reported Costs | X,XXX | *List each type of difference separately.* |
| POR COM of Merchandise Under Consideration | XXX,XXX | A |
| Extended TOTCOM per COP/CV File | XXX,XXX | B   *Tie to most recently submitted COP/CV File* |
| Difference | XXX | C   =A-B |
| Percent Difference | XX% | D   =C/B |

IV-14

Note:  The items and order of the reconciliation will vary by situation.  If your financial statements only show net
       revenue (e.g., no COGS is shown) include at the beginning of the reconciliation the calculation of operating
       costs and other adjustments to derive a cost of goods sold.

C.    CONNUM Specific Worksheets
      For two CONNUMs – (1) the CONNUM with the highest sales volume in the market
      used for comparison purposes, and (2) the CONNUM with the highest U.S. market sales
      volume -- provide the following worksheets that illustrate how your company calculated
      the reported CONNUM specific per-unit COP and CV figures from your normal books
      and records.

      1. If you produced the merchandise under consideration at more than one domestic
         facility during the POR, provide a worksheet that demonstrates the method you used
         to weight-average the production costs of each facility to compute the single
         weighted-average COM (and the individual fields included therein) for the
         CONNUMs.

      2. For the facility with the highest production quantity, for each of these two
         CONNUMs -- if that facility's CONNUM specific cost is itself a weighted-average
         cost of several unique products -- provide worksheets showing the calculation of that
         facility's weighted-average figures for the CONNUM.  Show on the worksheets all
         products produced at the facility that were weight-averaged together to obtain that
         facility's cost for the specified CONNUMs.  For each unique product shown on the
         worksheet, show the product's internal product code, production quantity, and
         corresponding value for each computer field.

      3. From question III.C.2, identify the unique product with the highest production
         volume in each set of worksheets reported for the CONNUM weight-averaging, or
         the individual product if there is only one in the CONNUM, and provide a complete
         cost buildup of that individual product's reported per-unit cost.  In addition to the cost
         buildup documents requested below, supplement your buildup with narratives and
         cross references.

         a. Provide worksheets that demonstrate how all the cost elements for the product
            were calculated (e.g., Quantity, Direct materials, Labor, Variable Overhead,
            Fixed Overhead).
         b. The worksheets must show how the amounts were calculated and how they
            trace back to source data from the accounting system.  If they are directly
            taken from your system, demonstrate how the unit amount was created within
            the system.  If your company relies on a standard cost accounting system, also
            show how you allocated cost variances to derive actual production costs.
         c. The worksheets must show the accumulation of costs at each stage of
            production, the yield losses, scrap recovery, and the production quantity.

    d.  The worksheets must show the allocations of costs to the individual products, as well as, the allocation of indirect costs to direct cost centers.

4.  In addition, for the total merchandise under consideration, provide monthly inventory movement schedules that show the quantity and value of the beginning inventory, purchases, self-produced, sold, other adjustments, and ending inventory, for the period covering both the POR and the most closely matching fiscal year.  Also, include in the worksheet the average monthly per-unit production cost.


D.    <u>Worksheets for General Expenses</u>

1.  Provide a worksheet that demonstrates how you computed your company's G&A expense ratio.  Include in your reported G&A expenses an amount for administrative services performed on your company's behalf by its parent company or other affiliated party.  Compute G&A expenses on an annual basis as a ratio of total company-wide G&A expenses divided by cost of goods sold (COGS).  In calculating your company's G&A ratio, use the full-year G&A expense and COGS reported in your company's audited fiscal year financial statements for the fiscal year that most closely corresponds to the POR.  Demonstrate how the G&A expenses and the COGS used in the ratio reconcile to your company's audited fiscal year financial statements.  To compute the per-unit amount of G&A expense, multiply the G&A expense ratio by the per-unit TOTCOM for each of the CONNUMs.

2.  Provide a worksheet that demonstrates how you computed your company's net interest expense ratio.  If your company is a member of a consolidated group of companies, calculate your financial expense based on the <u>consolidated</u> audited fiscal year financial statements of the highest consolidation level available.  In calculating your company's net interest ratio, use the full-year net interest expense and COGS reported in the consolidated audited fiscal year financial statements for the period that most closely corresponds to the POR.

In calculating net interest expense for COP and CV, include interest expense relating to both long- and short-term borrowings made by your company.  Reduce the amount of interest expense incurred by any interest income earned by your company on short-term investments of its working capital.  Demonstrate the short-term nature of the short-term interest.  Demonstrate how the interest income, interest expense, and COGS used in the ratio reconcile to your company's audited fiscal year financial statements.  To compute the per-unit amount of net interest expense, multiply the net interest expense ratio by the per-unit TOTCOM for each of the CONNUMs.

## IV.  Instructions for Submitting COP and CV Data File

In accordance with the instructions provided below, provide one computer data file reporting the costs incurred for the merchandise under consideration.[29]  The file should contain per-unit cost information for the products sold in the U.S. market and the comparison market.  **If you are reporting a single response for multiple affiliates involved with the production of the merchandise under consideration, per II.E on page G-8 of the General Instructions, provide separate computer data files for each affiliated producer of the MUC as well as a weighted-average file combining all affiliated producers.**

Instructions regarding the specific information required to complete each data field for the cost file are provided below.  "FIELD NUMBER" includes the number and descriptive name of the field in the computer data file.  "FIELD NAME" includes the "short" or variable name for the submitted hard copy printouts of the data file.  "DESCRIPTION" defines the data that you must report in the field of the computer data file.  Provide a table that shows for each computer field the unit of currency and the unit of measure.

| | |
|---|---|
| **FIELD NUMBER 1.0:** | **Matching Control Number** |
| FIELD NAME: | CONNUM |
| DESCRIPTION: | Report the unique CONNUM assigned to the products on the comparison market sales file from section B of this questionnaire and the U.S. market sales file from section C of this questionnaire.  Unless otherwise instructed by the Department, ensure that your cost computer file contains a separate record for each unique product CONNUM contained in your comparison market and U.S. market sales files. |
| **FIELD NUMBERS 2.1 – 2.n:** | **Product Characteristics** |
| FIELD NAME: | Various Names |
| DESCRIPTION: | Report each of the product characteristics as specified by the Department in fields 3.1 through 3.n of the section B and section C questionnaires in separate fields. |

---

[29] Refer to the Instructions for Submitting Computer Data at Appendix II for technical information regarding the computer media required by the Department.

**FIELD NUMBER 3.0:**          **Production Quantity**

      FIELD NAME:          PRODQTY

      DESCRIPTION:          For each CONNUM, report the quantity produced during the cost calculation period. If you report a zero or negative production quantity in this field for any CONNUM, provide a narrative explanation and an example of how you calculated the corresponding cost.

---

**Fields 4 through 8**

These fields should contain information regarding the specific cost elements incurred to produce the merchandise under consideration.  The COM includes materials and fabrication costs actually incurred by your company.  Calculate reported COP and CV figures on a weighted-average basis using the CONNUM specific production quantity, regardless of market sold, as the weighting factor.  Thus, each CONNUM should be assigned only one cost, regardless of the market or markets in which the product(s) were sold.  If more than one unique product produced at a domestic facility falls within the definition of a specific CONNUM, determine first the weighted-average CONNUM specific costs at that facility; then calculate the company-wide weighted-average CONNUM specific costs at all facilities. If you have any questions regarding how to compute the weighted-average cost of the merchandise under consideration, notify the Department in writing <u>before</u> preparing your response to this section of the questionnaire.

---

**FIELD NUMBER 4.0:**          **Direct Material Costs**

      FIELD NAME:          DIRMAT

      DESCRIPTION:          Report the yielded CONNUM specific per-unit direct material costs incurred to produce the merchandise under consideration.  Direct material costs should include transportation charges, import duties and other expenses normally associated with obtaining the materials that become an integral part of the finished product.  Exclude from your reported direct material costs the amount of any internal taxes imposed on the purchase of materials used to produce the merchandise under consideration.  *See* field 12.0 for instructions on reporting internal taxes.

**FIELD NUMBER 4.1:**          **Other Direct Material Costs**

      FIELD NAME:          OTHDIRMAT

      DESCRIPTION:          Report the yielded CONNUM specific per-unit other direct material costs incurred to produce the merchandise under

consideration.  Other direct materials may include coatings, attachments, etc.  Other direct material costs should include transportation charges, import duties and other expenses normally associated with obtaining the materials that become an integral part of the finished product.  Exclude from your reported direct material costs the amount of any internal taxes imposed on the purchase of materials used to produce the merchandise under consideration.  *See* field 12.0 for instructions on reporting internal taxes.

**FIELD NUMBER 5.0:**               **Direct Labor Costs**

      FIELD NAME:                    DIRLAB

      DESCRIPTION:               Report the yielded CONNUM specific per-unit direct labor costs incurred to produce the merchandise under consideration.  Direct labor includes the costs incurred for all production workers, inspection/testing workers, relief workers, and all other workers directly involved in producing the merchandise.  Direct labor consists of your workers' base pay, overtime pay, incentive wages, shift differentials, bonuses, and all other form of wages or benefits paid to them by your company (*e.g.*, vacation, holidays, sick pay, insurance, government mandated social programs).

**FIELD NUMBER 6.0:**               **Variable Overhead Costs**

      FIELD NAME:                    VOH

      DESCRIPTION:               Report the yielded CONNUM specific per-unit variable overhead costs incurred to produce the merchandise under consideration.  Variable overhead costs include those production costs that generally vary in total with changes in the volume of merchandise produced at a given level of operations.  Variable overhead costs may include the costs incurred for indirect materials, indirect labor, utilities, and other variable overhead costs.

**FIELD NUMBER 8.0:**          **Fixed Overhead Costs**

    FIELD NAME:          FOH

    DESCRIPTION:          Report the yielded CONNUM specific per-unit fixed overhead costs incurred to produce the merchandise under consideration.  Fixed overhead costs include those production costs that generally do not vary in total with changes in the volume of merchandise produced at a given level of operations.  Fixed overhead costs may include the costs incurred for building or equipment rental, depreciation, supervisory labor, plant property taxes, and factory administrative costs.  In addition, include in fixed overhead costs research and development (R&D) costs which relate specifically to the merchandise under consideration.

**FIELD NUMBER 9.0:**          **Total Cost of Manufacture**

    FIELD NAME:          TOTCOM

    DESCRIPTION:          Report the yielded CONNUM specific per-unit total COM incurred to produce the merchandise under consideration. Compute this amount as the sum of data fields 4.0 through 6.0, plus field 8.

---

**Fields 10 and 11**

These fields should contain information regarding G&A expenses and net interest expense incurred in connection with the general operations of the company.

---

**FIELD NUMBER 10.0:**          **General and Administrative Expenses**

    FIELD NAME:          GNA

    DESCRIPTION:          Report the per-unit G&A expenses incurred by your company.  G&A expenses are those period expenses which relate indirectly to the general operations of the company rather than directly to the production process.  G&A expenses include amounts incurred for general R&D activities, executive salaries and bonuses, and operations relating to your company's corporate headquarters.

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

FY-20

**FIELD NUMBER 11.0:**　　　　　　**Net Interest Expense**

　　　FIELD NAME:　　　　　　INTEX

　　　DESCRIPTION:　　　　　　Report the per-unit net interest expense incurred by your company.

| Field 12 |
| --- |
| This field should contain information regarding the net per-unit internal taxes incurred on all inputs. |

**FIELD NUMBER 12.0:**　　　　　　**Internal Taxes on Inputs**

　　　FIELD NAME:　　　　　　TAXES

　　　DESCRIPTION:　　　　　　Report the net per-unit amount incurred for all internal taxes on purchases of inputs which were not refunded or paid by the customer.

Case 1:21-cv-00827-MAB   Document 21   Filed 07/09/21   Page 218 of 386
Case 1:21-cv-00827-MAB   Document 21   Filed 07/09/21   Page 218 of 386
Barcode:3673557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

*Last Revised May 19, 2017*

## SECTION E

## Cost of Further Manufacture or Assembly
## Performed in the United States

I.      **General Explanation**

This section of the antidumping questionnaire provides instructions for reporting the costs incurred for **further manufacture or assembly** of the subject merchandise in the United States.

If you have questions concerning any part of the section E questionnaire, you are instructed to contact the official in charge. Please note, however, that requests by your company to alter the reporting of the information requested in the section E questionnaire must be submitted in writing to the Department.

A.     Cost of Further Manufacture or Assembly

Further manufacture or assembly costs include amounts incurred for direct materials, labor and overhead, plus amounts for general and administrative expenses, interest expenses, additional U.S. packing expenses, and all costs involved in moving the merchandise under consideration (MUC) from the U.S. port of entry to the further manufacturer. The summation of the U.S. further manufacturing costs that you report in response to this section of the questionnaire must be reported in data field 54.0 of your company's U.S. sales listing submitted in response to section C of this questionnaire.

B.     Reporting Period for Further Manufacturing Costs

The further manufacturing costs that you report should be calculated based on the actual costs incurred by your U.S. affiliate (the company) during the period of review (POR) or review (POR), as recorded under its normal accounting system. If you have any questions regarding the appropriate cost calculation period for the MUC, please notify the Department in writing <u>before</u> preparing your response to this section of the questionnaire.

C.     Weighted-Average Further Manufacturing Costs

If you further manufactured the subject merchandise at more than one U.S. facility, you must report the weighted-average of the further manufacturing costs from all such facilities. The further manufacturing costs that you report should be calculated on a weighted-average basis using as the weighting factor the model-specific production quantity for the product sold in the United States. If you have any questions regarding how to compute the weighted-average further manufacturing costs for the subject

merchandise, please notify the Department in writing <u>before</u> preparing your response to this section of the questionnaire.

## II.   <u>General Information</u>

The production process, financial accounting, and cost accounting information requested below is necessary for the Department to better understand your company's operations, its products and production processes, and its financial and cost accounting practices.  We therefore ask that you provide complete and detailed narrative responses to each item listed below.

A.   <u>Products and Production Process</u>

Provide a description of the further manufacturing processes performed on the subject merchandise shipped to the United States and sold to the first unaffiliated customer. Your description should address each of the items listed below.

1. Describe the U.S. production facilities used to further manufacture the subject merchandise and provide the address of each facility.  If further manufacturing operations take place at more than one facility, identify each facility and describe the production activities that take place at each facility.

2. Identify all MUC and Non-MUC products manufactured using the same production facilities used to further manufacture the subject merchandise.

3. Provide a flowchart that details the complete production process for all of the reported further manufactured end products sold in the U.S.  This should include descriptions of each stage of production and the locations of primary cost centers.  It must also explain whether: 1) the imported product stays essentially intact and is only enhanced; 2) the imported product is assembled with other components; 3) the imported product is split into more than one end product; or, 4) more than one imported product is combined together into one end product.

4. Provide a description of how the company keeps account of processing yields or losses throughout the further manufacturing production process.  Indicate each stage in the production process where processing yields are measured.

5. List the inputs used to further manufacture the subject merchandise, including specific types of raw materials, labor, electricity or other power supply, machinery and equipment, and subcontractor services.

6. Identify all inputs or services that were purchased from an affiliated party (*i.e.*, **affiliated person**).  For each input received from an affiliated party, provide the name of the affiliated party and state the nature of the affiliation.

7. For inputs received from affiliated parties and used to further manufacture the MUC

during the cost calculation period, provide the following information:

     a. the total POR volume and value purchased from each affiliated and unaffiliated party during the same period (also show the per-unit average from each);

     b. if the input was not purchased directly from an unaffiliated party, but the affiliated supplier sells the identical input to other unaffiliated purchasers, provide the total POR volume and value (and unit price paid) for the input sold to the unaffiliated purchaser.

B.     <u>Financial Accounting Systems and Policies</u>

Describe your company's financial accounting practices and the system it uses to accumulate and summarize accounting data for purposes of preparing financial statements.  Your description should address each of the items listed below.

1. State whether your company's financial accounting practices are in accordance with generally accepted accounting principles (GAAP) in the United States.

2. Provide a narrative and flowchart illustrating the company's basic financial accounting books and record keeping system.

3. Describe how data from the company's financial accounting system are summarized in its financial statements.

C.     <u>Cost Accounting</u>

Provide narrative responses to the following questions as they relate to each affiliate that performs further manufacturing of the subject merchandise.  This information will provide us with an understanding of the cost accounting system used by the company in its normal course of business.

1. State whether the company's cost accounting system accumulates costs for the subject merchandise based on the actual production costs incurred, on standard or budgeted costs.  Provide a narrative describing the company's cost accounting system and how it is used to classify, allocate, aggregate, and record the costs incurred to further manufacture the subject merchandise.  Your description should be provided in narrative form and should include a flow chart that (1) illustrates how the system records and reports costs for the merchandise throughout the production process, and (2) shows the various subsidiary cost ledgers maintained under the system and how they reconcile to the company's normal financial statement data.

2. Provide a list of all direct, indirect, and common cost centers and their corresponding cost center codes. Referencing II.A.3 above, briefly describe the operations that take place at each of these cost centers. For direct cost centers, describe how the production costs are accumulated and charged to the merchandise produced. For indirect and common cost centers, describe how the costs incurred are accumulated and allocated to the direct cost centers.

3. Describe the level of product specificity over which the company's cost accounting system normally captures production costs. Explain how the product-specific costs as recorded in the company's normal accounting system compare to the product-specific costs reported for further manufacturing.

4. If the company's cost accounting system is based on standard or budgeted costs, then provide the following information:

   a. the variances recorded under the company's cost accounting system and how they are used by management in the normal course of business (for each variance, identify the level of product specificity for which the variance is measured);

   b. the period for which the company computes and records each variance;

   c. the methods used to develop each variance used in the company's cost accounting system;

   d. the frequency with which the company revises its standard or budgeted costs, including the date on which the latest revision was made; and

   e. the disposition of favorable or unfavorable variances (including under- or over-applied overhead) resulting from production operations during each accounting period (*e.g.*, charge to cost of sales, prorate between cost of sales and inventory balances).

5. List and describe all production costs incurred by the company that are valued differently for cost accounting purposes than for financial accounting purposes.


III. <u>**Response Methodology**</u>

The per-unit further manufacturing cost figures that you provide in response to this section of the questionnaire must reconcile to the actual costs reported in the company's cost accounting system and to accounting records used by the company to prepare its financial statements. If the company normally uses a cost accounting system based on actual costs, you should use that

system for purposes of computing your submitted further manufacturing cost amounts. Similarly, if the company uses a standard cost accounting system, you should use that system for purposes of computing further manufacturing costs.  In such case, however, you must also ensure that you have allocated to the further manufacturing costs all variances resulting from differences between standard and actual production costs.

While it may be necessary to adjust those costs to comply with certain reporting requirements you must provide the reasons for each departure from your normal books and records.   If you do not intend to use the company's normal accounting system and cost allocation methods to compute further manufacturing cost for the subject merchandise, you must notify the Department in writing <u>before</u> preparing your response to this section of the questionnaire.

Submit electronic versions in Excel format of all worksheets provided in response to this supplemental section D questionnaire.

A.      <u>Description of Response Methodology</u>

Provide a narrative description of the methodology that you used to compute the company's submitted further manufacturing costs.  Your description should address items listed below.

1.  Describe how you used the company's normal cost and financial accounting records to compute the per-unit further manufacturing cost figures reported in response to this section of the questionnaire.  Include in your description a discussion of how you used the company's accounting system and actual cost and financial accounting data to compute each of the following cost elements relating to the submitted further manufacturing cost figures:

    a.   direct materials;
    b.   direct labor;
    c.   factory overhead (provide a list of the cost categories that comprise your submitted factory overhead cost figures);
    d.   yield loss;
    e.   research and development (R&D) costs;
    f.   general and administrative expenses (including a list of all miscellaneous income and expense items); and
    g.   net interest expense (including a list of all interest income and expense items and other financing amounts used to compute net interest expense).

2.  List and describe in detail all differences between costs computed under the company's normal cost and financial accounting systems and the costs submitted in response to this section of the questionnaire.  Include in your description the reasons why it was necessary for you to depart from the company's normal accounting practices compute the submitted further manufacture costs.

E-6

B.    Reconciliation

Provide summary trial balances for the POR and fiscal year.  Provide a worksheet
reconciling all items on the fiscal year income statement (*e.g.*, revenues, cost of sales,
selling and administrative expenses, and non-operating expenses) in the audited financial
statements to the total costs in the financial accounting system (*i.e.*, the summary trial
balance).[1]  Describe and quantify each reconciling item.

Provide a reconciliation demonstrating how the extended per-unit further manufacturing
costs reconcile to the actual costs recorded in the company's accounting system (e.g.,
summary trial balance) and to accounting records used by the company to prepare its
financial statements.  Explain all reconciling items.

C.    Worksheets

Provide the worksheets requested below that illustrate how your company calculated the
per-unit further manufacturing costs submitted in response to this section of the
questionnaire.

1.   For the further manufactured product with the highest U.S. market sales volume
     during the POR, provide worksheets that demonstrate how your company computed
     direct materials (other than the imported subject merchandise), direct labor, fixed and
     variable overhead costs, and yield loss for the submitted further manufacturing cost
     figure(s).  If your company relies on a standard cost accounting system, the
     worksheets that you prepare should show the buildup of the standard costs and how
     you allocated any cost variances in deriving actual production costs. If your company
     relies on an actual cost accounting system, the worksheets that you prepare should
     show how you accumulated costs at each stage and allocated the costs to individual
     products.  If the further manufactured products vary significantly, provide some
     additional examples for major types of products.

2.   Provide a worksheet that demonstrates how you computed your company's general
     and administrative (G&A) expense ratio.  The worksheet that you provide should
     demonstrate how the G&A expenses used for your ratio calculation reconcile to your
     company's financial statements.  Demonstrate that the allocation properly allocates
     G&A to all products.

3.   Provide a worksheet that demonstrates how you computed your company's net
     interest expense ratio.  The interest expense rate should be calculated from the highest
     level consolidated financial statements in which the company is reported.   The
     worksheet that you provide should demonstrate how the interest income and expense

---

[1] This worksheet should cross reference each account on the summary trial balance to the corresponding
summarized line item on the income statement.

E-7

figures used for your ratio calculation reconcile to your company's financial statements. Demonstrate that the allocation properly allocates interest expense to all products.

## IV.   Instructions for Submitting Further Manufacturing Cost Data File

In accordance with the instructions provided below, prepare a computer file reporting the costs incurred to further manufacture the subject merchandise in the United States. Instructions regarding the specific information required to complete each data field for the further manufacturing cost file are provided below. These instructions combine the questionnaire with the computer data file format. FIELD NUMBER includes the number and descriptive name of the field in the computer data file. FIELD NAME includes the short or variable name for the submitted hard copy printouts of the data file. DESCRIPTION defines the data that you must report in the field of the computer data file.

| Fields 1 through 2.1 |
|---|
| For each file record, report in these fields the product code for each further manufactured product and the matching control number for each unique model of the subject merchandise that was further manufactured in the United States. This information should allow the Department to match the detailed further manufacturing cost data to the total further manufacturing cost data provided in your response to section C of this questionnaire. |

**FIELD NUMBER 1.0:**       **Complete Product Code**

      FIELD NAME:        PRODCODU

      DESCRIPTION:      Report the commercial product code assigned by the company in the normal course of business to the specific further manufactured product sold in the United States.

**FIELD NUMBER 2.0:**       **Matching Control Number**

      FIELD NAME:        CONNUMU

      DESCRIPTION:      Report the unique control number assigned to the subject merchandise (as imported) from the U.S. sales files in your response to section C of this questionnaire. Unless otherwise instructed by the Department, you should ensure that your further manufacturing cost computer file contains a record for each unique product control number contained in the U.S. sales file which required further manufacturing in the United States.

**FIELD NUMBER 2.1:**  **Production Quantity**

    FIELD NAME:  PRODQTY

    DESCRIPTION:  Report the quantity produced of PRODCODU during the cost calculation period.

| Fields 2.5 through 2.9 |
|---|
| In certain circumstances, it may be necessary to use these fields to provide a separate identifying variable(s) which will link the sale of each product which is further manufactured in the U.S. to the product(s) as imported. For example, if the company imports multiple parts which are assembled into a single product sold in the U.S., this field would be used to report a code which will specifically identify these parts to the U.S. sale. If a single product is imported and then further manufactured into multiple U.S. products, the sale of each of these U.S. products must be linked to the single imported product. The variable(s) reported in this field should also appear in the company's U.S. sales database reported in response to section C of the questionnaire. |

**FIELD NUMBER 2.5:**  **Linking Variables**

    FIELD NAME:  LINKVAR

    DESCRIPTION:  Report the identifying variable which will link the further manufacturing cost record to the corresponding sale or sales in the U.S. sales file.

| Fields 3 through 6 |
|---|
| These fields should contain information regarding the specific cost elements incurred to further manufacture the subject merchandise in the United States. The further manufacturing costs include direct materials and fabrication costs actually incurred by the company. If the company performed further manufacturing operations for the subject merchandise at more than one facility, the amounts reported for COM should be based on the weighted-average manufacturing costs from all facilities. |

**FIELD NUMBER 3.0:**  **Direct Materials Cost**

    FIELD NAME:  FURMAT

    DESCRIPTION:  Report the costs incurred for direct materials used to further manufacture the subject merchandise, not the subject merchandise itself. This should include transportation charges and other expenses normally associated with obtaining the materials that become an integral part of the finished product sold in the United States. Direct materials costs include only the costs incurred for materials added in the United States and not the cost of the

imported subject merchandise.  However, in addition to the cost of all direct materials added in the United States, you should include in this field the costs incurred for all movement charges incurred to transport the subject merchandise from the port of entry to the company's U.S. further manufacturing facilities.

FIELD NUMBER 3.1:      Yield Loss

    FIELD NAME:      FURMANYLD

    DESCRIPTION:      Report the actual costs incurred for any yield loss in connection with the further manufacture of the subject merchandise in the United States.  (Note that you should compute the amount of any yield loss taking into account both the cost of the imported subject merchandise and the costs incurred for U.S. further manufacturing.)

**FIELD NUMBER 4.0:      Direct Labor Costs**

    FIELD NAME:      FURLAB

    DESCRIPTION:      Report the direct labor costs incurred to further manufacture the subject merchandise.

**FIELD NUMBER 5.0:      Factory Overhead Costs**

    FIELD NAME:      FURFOH

    DESCRIPTION:      Report the factory variable and fixed overhead costs incurred to further manufacture the subject merchandise.  Overhead costs may include costs incurred for indirect materials, indirect labor, and manufacturing utilities, as well as other costs.

**FIELD NUMBER 6.0:      Total Production Cost**

    FIELD NAME:      FURCOM

    DESCRIPTION:      Report the total production costs incurred to further manufacture the subject merchandise computed as the sum of data fields 3.0 through 5.0.

| Fields 7 and 8 |
| --- |
| These fields should contain information regarding general and administrative (G&A) expenses and net interest expense incurred in connection with the further manufacture of the subject merchandise in the United States. |

**FIELD NUMBER 7.0:   General and Administrative Expenses**

FIELD NAME:   FURGNA

DESCRIPTION:   Report the per-unit G&A expenses incurred by the company in connection with the U.S. further manufacture of the subject merchandise.  G&A expenses are those period expenses that relate to the general production operations of the company rather than directly to the production process for the subject merchandise.  You should also include in your reported G&A expenses an amount for administrative services performed on the company's behalf by its parent company or other affiliated party.

Calculate the G&A expenses as follows.
1. Compute the G&A expense ratio on an annual basis as a ratio of the company's total G&A expenses divided by its total cost of sales.  In calculating the company's G&A ratio, you should rely on full-year G&A expense and cost of sales figures reported in the company's audited financial statements for the year that most closely corresponds to the POR.
2. To derive the amount for G&A expenses, multiply the G&A expense ratio by the per-unit further manufacturing cost for the subject merchandise plus the COP (including G&A and interest) of the subject merchandise that was further processed.  The COP of the subject merchandise should be taken from the cost database submitted in Section D of the questionnaire.
3. For the G&A expense ratio to be applied on the same basis as it was calculated, adjust the cost of sales denominator of the G&A expense ratio to include the COP of the subject merchandise purchased by the company rather than the purchase price paid (i.e., eliminate the profit or loss element on purchases of subject merchandise).  The COP of the subject merchandise in the revised cost of sales denominator should represent the COP of the subject merchandise reported in the cost database submitted in Section D of the questionnaire.

**FIELD NUMBER 8.0:   Net Interest Expense**

FIELD NAME:   FURINT

DESCRIPTION:   Report the per-unit net interest expense incurred by the company in connection with the further manufacture of the subject merchandise.

Calculate the net interest expense as follows.

If your company's operating results are included in the same consolidated financial statements that were used to calculate the interest expense reported in the cost database in Section D of the questionnaire, then to derive the amount for interest expense multiply the interest expense ratio reported in Section D by the per-unit further manufacturing cost for the subject merchandise.

If your company's operating results are not included in the same consolidated financial statements that were used to calculate the interest expense reported in Section D:

1. Compute the interest expense ratio on an annual basis as a ratio of the company's net interest expense divided by its total cost of sales. If the company is a member of a consolidated group of companies, then you should base your interest expense ratio calculation on the <u>consolidated</u> financial statements of the highest consolidation level available that includes operating results of the company for the fiscal year that most closely corresponds to the POR

2. To derive the amount for interest expense, multiply the interest expense ratio by the per-unit further manufacturing cost for the subject merchandise plus the COP (including G&A and interest) of the subject merchandise that was further processed. The COP of the subject merchandise should be taken from the cost database submitted in Section D of the questionnaire.

3. For the interest expense ratio to be applied on the same basis as it was calculated, adjust the cost of sales denominator of the interest expense ratio to include the COP of the subject merchandise purchased by the company rather than the purchase price (i.e., eliminate the profit or loss element on purchases of subject merchandise). The COP of the subject merchandise in the revised cost of sales denominator should represent the COP of the subject merchandise reported in the cost database submitted in Section D of the questionnaire.

**FIELD NUMBER 9.0:**       **Total Further Manufacturing Costs**

FIELD NAME:       TOTFMG

DESCRIPTION:       Report the unit total further manufacturing costs incurred for the product sold in the U.S. market. You should compute this amount as the sum of data fields 3.0 through 9.0.

Filed By: Jun Jack Zhao, Filed Date: 1/19/18 12:50 PM, Submission Status: Approved

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

# APPENDIX I

# GLOSSARY OF TERMS

> This glossary is intended to provide parties with a basic understanding of many technical terms that appear in the antidumping questionnaire. These explanations are not regulations or rules with the force of law. As difficult or detailed questions arise, parties should seek clarification from the statute, regulations, and the Department, rather than attempting to derive precise guidance from these general explanations.

**Administrative Protective Order**

An administrative protective order is the legal mechanism that controls the limited disclosure of business proprietary information to representatives of interested parties. The Department authorizes the release of proprietary information under administrative protective order only when the representatives file a request in which they agree to the following four conditions: (a) to use the information only in the antidumping (AD) proceeding, (b) to secure the information and protect it from disclosure to any person not subject to an administrative protective order, (c) to report any violation of the terms of the protective order, and (d) to acknowledge that they may be subject to sanctions if they violate the terms of the order. (Section 777(c) of the Tariff Act of 1930, as amended (the Act).) *See also* **Proprietary Information** and **Proprietary Treatment**.

---

**Administrative Review**

Annual proceeding conducted by the Department to determine the amount of AD duties that Customs will assess on imports of the subject merchandise during the period of review or to determine if a suspension agreement has been violated. The Department also establishes new cash deposit rates for entered subject merchandise for each of the companies reviewed. *See* section 751 of the Act.

---

**Affiliated Persons**

The term affiliated persons (affiliates) includes: (1) members of a family; (2) an officer or director of an organization and that organization; (3) partners; (4) employers and employees; (5) any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and that organization; (6) two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and (7) any person who controls any other person and that other person. Control exists when a person is legally or operationally in a position to exercise restraint or direction over another person. A control relationship should also have the potential to affect decisions concerning the production, pricing, or cost of the merchandise under investigation or review. (Section 771(33) of the Act; sections 351.102(b) and 351.401(f) of the regulations.)

Examples of situations which may indicate control include (but are not limited to): (a) joint ventures and franchises; (b) lender/borrower situations; (c) a close relationship with a supplier, (sub) contractor, lender, distributor, exporter or reseller; and (d) a group of companies controlled by, for example, a family, a corporation, or the same investors. An example of affiliation by common control may be the affiliation between the owners of a joint venture when each owner is in a control position with that joint venture.

Section 351.102(b) of the Department's regulations states that the term person includes any interested party as well as any other individual, enterprise, or entity, as appropriate. In the Department's practice, the term person includes any company, individual, organization, partnership or group.

## Antidumping Law and Regulations

The United States antidumping laws are set forth in Title VII of the Tariff Act of 1930, as amended (the Act) (19 U.S.C. 1673 *et seq.*). The Department's regulations governing antidumping proceedings are set forth at 19 CFR Part 351, published in the *Federal Register* on May 19, 1997 (62 FR 27379-27424). For procedures governing Administrative Protective Orders and the treatment of proprietary information, please *see* 19 CFR Parts 351 and 354, published in the *Federal Register* on May 4, 1998 (63 FR 24391).

## Arm's-Length Transactions (between affiliates)

Generally, the Department may use transactions between affiliates as a basis for normal value, only if the transactions are made at arm's length. Arm's-length transactions are those in which the selling price between the affiliated parties is comparable to the selling prices in transactions involving persons who are not affiliated. The Department takes into account terms of sale, conditions of delivery, and other circumstances related to the sales in deciding if the selling prices are comparable. To determine whether sales to an affiliate should be included in the normal value calculation, the Department performs an arm's-length test. In this test, the Department compares the weighted-average price to each affiliate for each product to the weighted-average price of the same or a similar product to all unaffiliated customers. If the overall ratio calculated for an affiliate is between 98 percent and 102 percent, inclusive, of sales prices to all unaffiliated customers, sales to that affiliate may be considered in the **ordinary course of trade** and used in the normal value calculation. Sales not made at arm's length are not considered to be within the ordinary course of trade. *See also* **Ordinary Course of Trade**.

## Business Proprietary Information

Business proprietary information (BPI) is sensitive business data that would cause substantial harm to the submitting party if disclosed publicly. Examples of information that the Department normally treats as business proprietary, if requested and not already in the public domain, include

trade secrets concerning the production process, production and distribution costs, terms of sale, individual prices, and the names of customers and suppliers.

## Certification of Accuracy

Any person that submits factual information to the Department must include with the submission a certification of the completeness and accuracy of the factual information. Certifications must be made by a knowledgeable official responsible for presentation of the factual information and by the party's legal counsel or other representative, if any. A sample certification form is included as Appendix IV to the questionnaire. (Section 782 (b) of the Act; section 351.303(g) of the regulations.)

## Circumstances of Sale

In comparing normal value to export price or constructed export price, the Department makes adjustments to normal value for certain differences in expenses or prices that exist because the conditions under which the sales are made in the two markets differ. Besides particular adjustments named in the statute (*e.g.*, differences in quantities and levels of trade), the statute also allows the Department to adjust for other differences in circumstances of sale. This adjustment normally is based only on differences in direct selling expenses that the Department does not adjust for under more specific provisions. (Section 773(a)(6)(C)(iii) of the Act; section 351.410 of the regulations.) *See also* **Direct vs. Indirect Expenses**.

## Comparison Market

*See* **Foreign Market**

## Constructed Export Price

*See* **Export Price and Constructed Export Price**

## Constructed Export Price Offset

To the extent practicable, the Department attempts to base normal value on sales made at the same level of trade as the export price or constructed export price or adjust for the differences in levels of trade. Where this is not possible, the law provides for an adjustment to normal value to account for differences in level of trade when: (1) U.S. price is a constructed export price; (2) normal value is determined at a more advanced level of trade than the level of trade of the

constructed export price;[1] and (3) the data available do not provide an appropriate basis for determining whether differences in levels of trade affect price comparability and quantifying the amount of a level of trade adjustment.  This adjustment takes the form of a deduction from normal value of the amount of indirect selling expenses incurred in the foreign market.  The amount of this deduction may not exceed (*i.e.*, it is capped by) the amount of indirect selling expenses deducted in calculating constructed export price.  (Section 773(a)(7)(B) of the Act; 351.412(f) of the regulations.)  *See also* **Level of Trade** and **Level of Trade Adjustment**.

---

## Constructed Value

When there are no sales of the foreign like product in the foreign market suitable for matching to the subject merchandise (including, for example, when the Department disregards sales because they are below the cost of production), the Department uses constructed value as the basis for normal value.  The constructed value is the sum of:  (1) the cost of materials and fabrication of the subject merchandise, (2) selling, general, and administrative expenses and profit in the foreign market, and (3) the cost of packing for exportation to the United States.  (Section 773(e) of the Act; sections 351.405 and 351.407 of the regulations.)

---

## Contemporaneous Sales

In investigations, the Department normally compares average export prices (or constructed export prices) to average normal values.  The averages normally are based on sales made over the course of the period of review.

In administrative reviews of existing antidumping orders, on the other hand, the Department normally compares the export price (or constructed export price) of an individual U.S. sale to an average normal value for a contemporaneous month.

The preferred month is the month in which the particular U.S. sale was made.  If, during the preferred month, there are no sales in the foreign market of a foreign like product that is identical to the subject merchandise, the Department will then employ a six-month window for the selection of contemporaneous sales.  For each U.S. sale, the Department will calculate an average price for sales of identical merchandise in the most recent of the three months prior to the month of the U.S. sale.  If there are no such sales, the Department will use sales of identical merchandise in the earlier of the two months following the month of the U.S. sale.  If there are no sales of identical merchandise in any of these months, the Department will apply the same progression to sales of similar merchandise.  (Section 351.414 of the regulations.)

---

[1] More advanced refers to a more advanced stage of marketing, which generally means that the home market level of trade is more remote from the factory door than the constructed export price level of trade.  A more advanced, or remote, level of trade is typically characterized by more selling activities and greater selling expenses.

## Cost of Manufacture

The cost of manufacture is the sum of material, fabrication and other processing costs incurred to produce the products under investigation or review.  *See also* **Cost of Production**.

## Cost of Production

Cost of production means the cost of producing the foreign like product.  The cost of production is the sum of:  (1) material, fabrication, and other processing costs, (2) selling, general, and administrative expenses, and (3) the cost of containers and other packing expenses.  The Department may disregard foreign market sales in calculating normal value if they are made at prices which are less than the cost of production.  The Department will disregard all sales below cost if made:  (A) within an extended period of time (normally one year) in substantial quantities ( at least 20 percent of the volume of the product examined is sold below cost or the weighted-average unit price is below the weighted-average cost for the period examined); and (B) at prices that do not permit recovery of costs within a reasonable period of time (*i.e.*, a price is less than the weighted-average cost of production during the period examined).

## Credit Expense

Credit expense is a type of expense for which the Department frequently makes circumstances-of-sale adjustments.  It is the interest expense incurred (or interest revenue foregone) between shipment of merchandise to a customer and receipt of payment from the customer.  The Department normally imputes the expense by applying a firm's annual short-term borrowing rate in the currency of the transaction, prorated by the number of days between shipment and payment, to the unit price.  If actual payment dates are not kept in a way that makes them accessible, the calculation may be based on the average number of days that accounts receivable remain outstanding.  *See also* **Imputed Expenses**.

Note that credit expenses are not the same as bank charges or fees.  While credit expenses represent the imputed costs of extending different credit periods on different sales, bank charges and fees are actual expenses incurred by a company, recorded on its books, and typically should be reported as a direct selling expense.

## Date of Sale

Because the Department attempts to compare sales made at the same time, establishing the date of sale is an important part of the dumping analysis.  The Department will normally use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business.  However, the Department may use a date other than the date of invoice (*e.g.*, the date of contract in the case of a long-term contract) if satisfied that a different date better reflects the

I-6

date on which the exporter or producer establishes the material terms of sale (*e.g.*, price, quantity). (Section 351.401(i) of the regulations.) If, for any specific sale, the date selected is after the shipment date for that sale, the Department will use shipment date as the date of sale instead, but only for the sale in question.

## Difference in Merchandise Adjustments

When normal value is based on sales in the foreign market of a product which is similar, but not identical, to the product sold in the United States, the Department may adjust normal value to account for differences in the variable costs of producing the two products. Generally, the adjustment is limited to differences in the costs of materials, labor and variable production costs that are attributable to physical differences in the merchandise. The Department will not adjust for differences in fixed overhead or administrative expenses or profit. (Section 351.411 of the regulations.)

## Direct vs. Indirect Expenses

In calculating export price, constructed export price, and normal value, the Department treats selling expenses differently depending on whether they are direct expenses or indirect expenses. For instance, circumstances-of-sale adjustments normally involve only direct expenses, while the constructed export price offset involves indirect expenses.

Direct expenses generally must be (1) variable and (2) traceable in a company's financial records to sales of the merchandise under investigation or review.

1. Variable vs. fixed expenses: Direct expenses are typically variable expenses that are incurred as a direct and unavoidable consequence of the sale (*i.e.*, in the absence of the sale these expenses would not be incurred). Indirect expenses are fixed expenses that are incurred whether or not a sale is made.

   The same expense may be classified as fixed or variable depending on how the expense is incurred. For example, if an exporter pays an unaffiliated contractor to perform a service, this fee would normally be considered variable and treated as a direct expense (provided that condition 2, below, is also satisfied). However, if the exporter provides the service through a salaried employee, the fixed salary expense will be treated as an indirect expense.

2. Tying of the expense to sales of the merchandise under investigation or review: Selling expenses must be reasonably dependent upon sales of the merchandise under investigation or review to qualify as direct selling expenses. However, even if a fixed expense is allocable to the merchandise under investigation or review, the Department normally will treat it as an indirect expense.

Filed By: Jun Jack Zhao, Filed Date: 1/19/18 12:50 PM, Submission Status: Approved

Common examples of direct selling expenses include credit expenses, commissions, and the variable portions of guarantee, warranty, technical assistance, and servicing expenses. Common examples of indirect selling expenses include inventory carrying costs, salesmen's salaries, and product liability insurance. The fixed portion of expenses, such as salaries for employees who perform technical services or warranty repairs, are indirect expenses.

The Department also treats assumptions of expenses as direct expenses, provided they are attributable to a later sale of the merchandise. For example, the Department treats expenses incurred for advertising aimed at retailers as if they were direct selling expenses when the exporter is selling to wholesalers.

---

**Discounts**

*See* **Price Adjustments**

---

**Dumping**

Dumping occurs when imported merchandise is sold in, or for export to, the United States at less than the normal value of the merchandise, *i.e.*, a price that is less than the price at which identical or similar merchandise is sold in the foreign market, or less than the constructed value of the merchandise. The dumping margin is the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise. The weighted-average dumping margin is the sum of the dumping margins divided by the sum of the export prices and constructed export prices.

---

**Export Price and Constructed Export Price**

Export price and constructed export price refer to the two types of calculated prices for merchandise imported into the United States. The Department compares these prices to normal values to determine whether goods are dumped. Both export price and constructed export price are calculated from the price at which the subject merchandise is first sold to a person not affiliated with the foreign producer or exporter.

Generally, a U.S. sale is classified as an export price sale when the first sale to an unaffiliated person occurs *before* the goods are imported into the United States. In cases where the foreign manufacturer knows or has reason to believe that the merchandise is ultimately destined for the United States, the manufacturer's sale is usually the sale subject to investigation or review. If, on the other hand, the manufacturer sold the merchandise to a trader without knowledge of the trader's intention to export the merchandise to the United States, then the trader's first sale to an unaffiliated person is the sale subject to investigation or review.

Generally, a U.S. sale is classified as a constructed export price sale when the first sale to an unaffiliated person occurs *after* importation.  Constructed export price also applies if the first sale to the unaffiliated person is made by a person in the United States affiliated with the foreign exporter before importation.

The Department makes adjustments to the price to the first unaffiliated customer in calculating the export price or constructed export price.   For both export price and constructed export price the Department adds packing charges, if not already included in the price, rebated import duties, and, if applicable, certain countervailing duties.  Also for both, the Department deducts transportation costs and export taxes or duties.  No other adjustments are made in calculating export price.  However, in calculating the constructed export price, the Department also deducts selling commissions and other expenses incurred for selling activities in the United States performed in selling the subject merchandise to unaffiliated U.S. customers, the cost of any further manufacture or assembly performed in the United States, and profit.  These expenses and profits represent activities undertaken in the United States to support the U.S. resale to an unaffiliated customer.  Generally these activities are undertaken by the affiliated U.S. reseller.  However, the Department will also deduct any selling expenses incurred to support the U.S. resale that are paid by the producer or exporter on behalf of its affiliated U.S. reseller.  (Section 772 of the Act; section 351.402(b) of the regulations.)

**Exporter**

As a general matter, an exporter arranges for the sending or carrying abroad of merchandise.  Most commonly, the exporter of merchandise takes possession of the merchandise and actively participates in the transport of merchandise to an importer.  Should an intermediate party, who is not a reseller, be involved in export transactions, the Department will focus primarily on the actual involvement of the intermediate party in the sale and transportation of the merchandise to determine which party is the "exporter" for AD/CVD purposes.

**Facts Available**

The Department seeks to make its antidumping determinations on the basis of responses to its antidumping questionnaires.  However, for a variety of reasons, the data needed to make such determinations may be unavailable or unusable.  In such instances, the law requires the Department to make its determinations on the basis of "the facts otherwise available" (more commonly referred to as "the facts available").  More specifically, the Department must use the facts available if necessary information is not available on the record of an antidumping proceeding.  In addition, the Department must use the facts available where an interested party or any other person:  (1) withholds information requested by the Department; (2) fails to provide requested information by the requested date or in the form and manner requested; (3) significantly impedes an antidumping proceeding; or (4) provides information that cannot be verified.

In selecting the information to use as the facts available, the law authorizes the Department to make an inference that is adverse to an interested party if the Department finds that party failed to cooperate by not acting to the best of its ability to comply with a request for information.

Submitted information that does not meet all of the requirements may be used if: (1) the information is submitted within applicable deadlines; (2) the information can be verified; (3) the information is not so incomplete that it cannot serve as a reliable basis for a determination; (4) the party establishes that it acted to the best of its ability; and (5) the Department can use the information without undue difficulties. Finally, if an interested party promptly informs the Department of difficulties it is having in responding to a request for information, the Department will consider modifying its request to the extent necessary to avoid imposing an unreasonable burden on the party. (Sections 776 and 782(c)-(e) of the Act; section 351.308 of the regulations.)

## Foreign Like Product

The term foreign like product refers to merchandise that is sold in the foreign market and that is identical or similar to the subject merchandise. When used in the questionnaire, foreign like product means all merchandise that is sold in the foreign market and that fits within the description of merchandise provided in Appendix III to the questionnaire. (Section 771(16) of the Act.) *See also* **Identical Merchandise** and **Similar Merchandise**.

## Foreign Market

The foreign market is the home or third-country market from which the Department selects the prices used to establish normal values. *See also* **Viability**.

## Further Manufacturing Adjustment

In calculating constructed export price, the Department normally deducts from the price of the merchandise sold in the United States the cost of any further manufacture or assembly performed in the United States by, or for, the exporter or an affiliate. However, if the value of the further processing is more than the value of the subject merchandise as imported, the Department may instead use an alternative basis for the constructed export price. The Department normally will determine that the value added in the United States meets this requirement if the value of the further processing in the United States by the affiliated person is estimated to be at least 65 percent of the price charged to the first unaffiliated purchaser for the merchandise as it is sold in the United States. In such cases, if possible, the Department will use the price of identical or similar subject merchandise sold to an unaffiliated customer by the producer, exporter, or affiliated seller. If there is an insufficient quantity of such sales or it is not appropriate to use such sales, the Department may rely on any other reasonable basis. (Sections 772(d)(2) and 772(e) of the Act; sections 351.402 (b) and (c) of the regulations.)

## General and Administrative Expenses

General and administrative expenses (G&A) are those period expenses which relate indirectly to the general operations of the company rather than directly to the production process.  G&A expenses include, for example, amounts incurred for general research & development activities, executive salaries and bonuses, litigation expenses, and operations relating to the company's corporate headquarters.

## Home Market

The home market refers to the market for sales of the foreign like product in the country in which the merchandise under investigation or review is produced.  Home market sales are the preferred basis for normal value.  *See also* **Third-Country Market** and **Viability**.

## Identical Merchandise

The Department prefers to compare U.S. sales to foreign market sales of identical merchandise. The identical merchandise is merchandise that is produced by the same manufacturer in the same country as the subject merchandise, and which the Department determines is identical or virtually identical in all physical characteristics with the subject merchandise, as imported into the United States. *See also* **Similar Merchandise** and **Foreign Like Product**.

## Imputed Expenses

Imputed expenses generally are opportunity costs (rather than actual costs) that are not reflected in the financial records of the company being investigated, but which must be estimated and reported for purposes of an antidumping inquiry.  Common examples of imputed expenses include credit expenses and inventory carrying costs.

## Indirect Expenses

*See* **Direct vs. Indirect Expenses**

## Inventory Carrying Costs

Inventory carrying costs are the interest expenses incurred (or interest revenue foregone) between the time the merchandise leaves the production line at the factory (*i.e.*, when goods are transferred from the work-in-progress ledger to finished goods inventory) to the time the goods are shipped to the first unaffiliated customer.  The Department normally calculates these costs by

applying the firm's annual short-term borrowing rate in the currency of the country where the inventory is being held, prorated by the number of days between leaving the production line and shipment to the customer, to the unit cost. *See also* **Imputed Expenses**.

## Level of Trade

To the extent practicable, the Department calculates normal values based on sales made in the foreign market at the same level of trade as the constructed export price (CEP) or export price, or adjusts for the differences in levels of trade. In a CEP situation, economic activities occurring in the United States are not considered in determining the level of trade. The level of trade of the U.S. sale is that associated with the constructed export price.

In order to establish whether differences in levels of trade exist, the Department reviews distribution systems, including categories of customers, selling activities, and levels of selling expenses for each type of sale. Different levels of trade are typically characterized by purchasers at different stages in the chain of distribution and sellers performing qualitatively and/or quantitatively different selling activities. Different levels of trade necessarily involve differences in selling activities, although differences in selling activities alone are not sufficient to establish differences in levels of trade. Similarly, customer categories such as distributor, wholesaler, retailer, and end-user are often useful in identifying levels of trade, although they, too, are insufficient in themselves to establish differences in levels of trade. Rather, the Department evaluates differences in levels of trade based on a seller's entire marketing process. (Section 773(a)(1) and 773(a)(7)(A) of the Act; sections 351.412(a)-(c) of the Department's regulations.)

## Level of Trade Adjustment

When the Department bases normal value on sales in the foreign market at a level of trade that is different from that of the EP or CEP, the Department may adjust the normal value to account for differences in levels of trade between the two markets.

The Department makes these adjustments only when there is a difference in the levels of trade and that difference affects price comparability. The Department determines whether there is an effect on price comparability by determining whether there is a pattern of consistent price differences between sales at the different levels of trade in the foreign market. The Department normally calculates any adjustment for level of trade based on the percentage difference between an average of the prices at the different levels of trade in the foreign market, less any expenses adjusted for elsewhere in the normal value calculation. (Sections 773(a)(1) and (7) of the Act; sections 351.412(c), (d), and (e) of the regulations.)

IV-12

## Movement Expenses

Movement expenses are expenses directly attributable to bringing the merchandise from the original place of shipment to the place of delivery to the United States or in the foreign market. These expenses may include freight and freight insurance charges, brokerage and handling fees, export taxes, and warehousing expenses incurred after the merchandise leaves the original place of shipment.

Normally, the production facility is considered to be the original place of shipment. However, where export price, constructed export price, or normal value is based on a sale made by a reseller unaffiliated with the producer, the Department may treat the place from which the reseller shipped the merchandise as the original place of shipment. (Sections 772(c)(2)(A) and 773(a)(6)(B)(ii) of the Act; section 351.401(e) of the regulations.)

## Normal Value

Normal value is the adjusted price of the foreign like product in the home or third-country (foreign) market, or the constructed value of the subject merchandise. The Department compares the normal value to the export price or constructed export price to determine the margin of dumping, if any.

The Department initially seeks to calculate normal values based on price. If there are adequate sales in the home market (*see* **Viability**), the Department calculates normal value based on the price at which the foreign like product is first sold (generally, to unaffiliated parties) in that market; otherwise, if there are adequate sales in a third-country market, the Department calculates normal value based on the price at which the foreign like product is first sold (generally, to unaffiliated parties) in the third-country market. If there are no appropriate home or third-country market sales, the Department determines normal value by calculating the constructed value.

To ensure a fair comparison between normal value and export price or constructed export price, the Department makes adjustments to the price used to calculate the normal value. The Department adds U.S. packing charges and deducts any of the following expenses included in the foreign market price: packing charges, transportation costs, and any internal tax[2] that was rebated or not collected on the subject merchandise. The Department may make additional adjustments to account for differences in the conditions under which sales are made in the United States and the foreign market. Thus, the Department may increase or decrease the normal value to account for differences in quantities, physical characteristics of the merchandise, levels of trade, and other circumstances of sale. (Section 773(a) and 773(c) of the Act.)

---

[2] Any internal tax other than an export tax or duty, or other charge described in section 771(6)(C) of the Act.

**Ordinary Course of Trade**

In calculating normal value, the Department considers only those sales in the foreign market that are in the ordinary course of trade. Generally, sales are in the ordinary course of trade if made under conditions and practices that, for a reasonable period of time prior to the date of sale of the subject merchandise, have been normal for sales of the foreign like product. (Section 771(15) of the Act; section 351.102(b) of the regulations.) *See also* **Arms-Length Transactions**.

**Price Adjustments**

A price adjustment is any change in the price charged for subject merchandise or the foreign like product that is reflected in the purchaser's net outlay. Discounts and rebates are examples of price adjustments.

A discount is a reduction to the gross price that a buyer is charged for goods. Although the discount need not be stated on the invoice, the buyer remits to the seller only the face amount of the invoice, less discounts. Common types of discounts include early payment discounts, quantity discounts, and loyalty discounts.

Similar to discounts, rebates are reductions in the gross price that a buyer is charged for goods. Unlike discounts, rebates do not result in a reduction in the remittance from the buyer to the seller for the particular merchandise with which the rebate is associated. Rather, a rebate is a refund of monies paid, a credit against monies due on future purchases, or the conveyance of some other item of value by the seller to the buyer after the buyer has paid for the merchandise. When the seller establishes the terms and conditions under which the rebate will be granted at or before the time of sale, the Department reduces the gross selling price by the amount of the rebate. (Section 351.102(b) of the regulations.) *See also* **Direct vs. Indirect Expenses**.

**Proprietary Information**

*See* **Business Proprietary Information**

**Proprietary Treatment**

If a party requests business proprietary treatment of information claimed to be business proprietary information, and if the Department agrees that the information is proprietary, the Department will protect the information from public disclosure. If the Department does not agree that the information is proprietary, it will return the information and not rely on it in the proceeding, unless the submitting party agrees that it may be made public. When requested, the Department will disclose business proprietary information only to United States International Trade Commission and United States Customs Service officials and, under limited administrative

protective orders, to the representatives of interested parties.  (Section 777(b) of the Act.)  *See also* **Administrative Protective Order**.

---

**Rebates**

*See* **Price Adjustments**

---

**Regulations**

*See* **Antidumping Law and Regulations**

---

**Sample Sales**

Sample sales will be excluded from the Department's calculations as "outside the ordinary course of trade."  In order to conclude sales qualify as "sample sales," the Department typically requires information demonstrating the sales were not for consideration (*i.e.*, the sales price net of movement expenses is not greater than zero) and not in commercial quantities.

---

**Selling Expenses**

Expenses incurred to sell or distribute the merchandise.  The expenses may be direct or indirect. *See also* **Direct vs. Indirect Expenses.**

---

**Similar Merchandise**

In deciding which sales of the foreign like product to compare to sales of the subject merchandise, the Department first seeks to compare sales of identical merchandise.  If there are no sales of the identical foreign like product, the Department will compare sales of the foreign like product similar to the subject merchandise.  The similar foreign like product is merchandise that is produced by the same manufacturer in the same country as the subject merchandise, and which, in order of preference,  is either (1) similar to the subject merchandise in component materials, use, and value, or (2) similar in use to, and reasonably comparable to, the subject merchandise.  (Section 771 (16) of the Act.)  *See also* **Identical Merchandise**, **Foreign Like Product**, and Appendix V.

---

**Subcontractor**

A person or business which contracts with the respondent to provide a process or service.  A specific type of subcontractor is a toller, who may provide processing related to the production of the merchandise under consideration.

---

**Subject Merchandise**

Subject merchandise is the merchandise under investigation or review, *i.e.*, the merchandise described in Appendix III to the questionnaire, and sold in, or to, the United States.  (Section 771(25) of the Act.)

---

**Technical Service Expenses**

Technical service expenses are typically incurred when a producer provides technical advice to customers which are industrial users of the product.  Generally, the Department considers travel expenses and contract services performed by unaffiliated technicians to be direct expenses.  The Department treats salaries paid to the seller's employees who provide technical services as indirect expenses.

---

**Third-Country Market**

When the Department cannot use home market sales as the basis for normal value, the preferred alternative method is the use of sales to a third-country market, *i.e.*, export sales of the foreign like product to a country other than the United States.  Generally, in selecting a third-country market to be used as the foreign market, the Department will choose one of the three third-country markets with the largest aggregate quantity of sales of the foreign like product.  In selecting which country, the Department will consider product similarity, the similarity of the third-country and U.S. markets, and whether the sales to the third country are representative. (Section 773(a)(1) of the Act; section 351.404 of the regulations.)  *See also* **Home Market** and **Viability**.

---

**Verification**

To establish the adequacy and accuracy of information submitted in response to questionnaires and other requests for information, the Department examines the records of the party that provided the information and interviews company personnel who prepared the questionnaire response and are familiar with the sources of the data in the response.  This process is called verification. The Department will verify information relied upon in making a final determination in an investigation, or in an administrative review when revocation of an antidumping order is properly requested.  The Department also will verify information submitted in an administrative

IV-16

review if an interested party so requests and no verification of the producer or exporter had been conducted during the two immediately preceding reviews of that producer or exporter, or if good cause for verification is shown.  (Section 782(i) of the Act; section 351.307 of the regulations.)

**Viability**

To calculate normal value based on sales in the home market, the Department must determine that the volume of sales is adequate in that market and that a particular market situation does not make their use inappropriate.  To calculate normal value based on sales in a third-country market, the Department must make the same determinations with respect to sales to the third country, and in addition the sales must be representative.  These determinations establish whether a market is viable.

The Department normally finds sales to be adequate if the quantity of the foreign like product sold is 5 percent or more of the quantity sold to the United States.  In unusual situations, the Department may find that sales below the 5-percent threshold are adequate, or that sales above the threshold are not.  Also in unusual situations, the Department may apply the 5-percent test on the basis of value, rather than quantity.  The terms particular market situation and representative are undefined in the statute or the regulations.  A particular market situation might exist, for example, where there was a single sale in the foreign market that constituted 5 percent or more of the quantity sold to the United States, or where government control of pricing is such that prices cannot be competitively set.  (Section 773(a)(1) of the Act; section 351.404(b)(2) of the Department's regulations.)

**Warehousing Expenses**

*See* **Movement Expenses**

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

# APPENDIX II

## INSTRUCTIONS FOR SUBMITTING
## COMPUTER DATABASES AND WORKSHEETS

A.   Description of Computer File Contents

Each file submitted should be assigned a unique eight character name.  We suggest that the first four positions be used to identify the respondent's name, the next two positions the type of file (*e.g.*, HM = home market sales; US = United States sales; CP = cost), and the last two positions a sequential file number.

For example, the first file of export sales to the United States would be named "FIRMUS01."  If that data file is amended and resubmitted during the course of the proceeding, the second submission would be named "FIRMUS02," and the third submission "FIRMUS03."

Within each file, all information pertaining to a specific sales transaction or to the cost of production for a unique product should be included in one record (row).  Each record should contain the fields (variables) defined in the suggested file formats included in section B (Foreign Market Sales), section C (United States Sales), section D (Cost of Production and Constructed Value) and section E (U.S. Further Manufacturing) of the questionnaire.

In preparing the files, left justify character fields (columns) and right justify numeric fields.  If some of the fields in the suggested file formats are not needed, exclude them from the file.  Explain in the narrative portion of your response why the information in those fields is not applicable.

For each transaction, provide information for all fields/columns.  If any revenue or expense information is not applicable (*e.g.*, no discount on a particular sale), place a zero in the cell.  If date information is not known or is unavailable for a transaction (*e.g.*, payment date), leave that particular cell blank.

Because the suggested file formats can be modified to add or delete fields, we have not specified record length or field position in the file formats.  The Department, however, does require that each file have a fixed record length and a uniform structure.  Every record within a file must be of the same length and must be formatted exactly like every other record in the file.  This requires that each field within a record have a fixed width and that the fields be consistent from record to record.

All values within each field must have the same format, either all values as numeric or all values as character.  In other words, do not mix character and numeric formats within the same field.  Fields with mixed formats will cause errors.  This is important for all data files, especially for data submitted in Excel spreadsheet format.

Report numerical data in a numerical format that allows calculations (*e.g.*, 10, not 10 MT).  Units should be reported in fields separate from numerical values.

When preparing the completed files for submission, sort each file first by product control number (CONNUM), and then, for sales files only, by date of sale (SALEDT).  Packed decimals should be avoided.  If you anticipate the need of packed decimals, approval should be obtained from the official in charge.

The Department uses PC SAS software for calculation purposes.  Other suitable formats are Access, dBase, Excel and ASCII text.  If you have questions about the software used for submission, contact the official in charge of the case.

For Excel spreadsheet and ASCII text files, use the first row to enter the field names as defined in the questionnaire.  Each subsequent row should contain data values.  Each row of data values should represent only one transaction (sale, cost record, etc.).  In Excel spreadsheet files, there should be no hidden rows or columns in the file.  Do not protect columns or rows.

For Excel spreadsheet files, report date variables as Excel date values (*e.g.*, the integer value 1 represents January 1, 1900; the integer value 39965 represents June 1, 2009).  Format the date value with the Excel MM/DD/YYYY date format (*e.g.*, 06/01/2009).  If there is no date to report, leave the field blank.

For SAS dataset files, report date variables as SAS date values (*e.g.*, the integer value 1 represents January 1, 1960; the integer value 18049 represents June 1, 2009).  Format the date value with the SAS MM/DD/YYYY date format (*e.g.*, 06/01/2009).  If there is no date to report, leave the field blank.

B.    Documentation of File Formats

Provide a record layout for each submitted file which identifies the file name and structure and shows the name, position, and characteristics of all fields in the file.

As noted under the general filing instructions included at the beginning of this questionnaire, for each database submitted in an antidumping proceeding, you must also complete Appendix VII, which is a template providing a standard format for reporting the units of measurement, currencies, and conversion factors.  Please complete a separate template for each database submitted (home market sales, U.S. sales, cost, *etc.*) and be sure to provide the requested data for each numerical field in the database.

C.    Filing Instructions

Except as described above under the section Manual Filing, all database files, including Microsoft Excel spreadsheets, that are less than 20 MB in size must be filed electronically using ACCESS.  Instructions for using ACCESS can be found above and at http://access.trade.gov.  Please refer to the Handbook on Electronic Filing Procedures in the Help section of the website.

For manual filings (when applicable), separately pack and label the electronic media containing the databases or spreadsheets (see section below for labeling and other instructions). Deliver the package to the manual filing address listed in the general instructions of this questionnaire. (Note that databases over 20 MB <u>must</u> be filed manually.)

D.      Special Instructions for Manual Filing

For manual filings (when applicable), you may submit your databases or spreadsheets on either a CD or DVD. Compressed databases are acceptable, but decompression instructions and software must accompany any compressed data submission.

Clearly label the CD or DVD with the following information:

        a. Case name, case number, and submission date
        b. Name of respondent
        c. Proceeding and time period (for example, REV-POR 1/2001-12/2001 or AR#2-POR 3/2001-2/2002)
        d. Name of official in charge
        e. File formats and software used to create the databases or worksheets
        f. File names, number of observations, and record lengths
        g. ACCESS bar code number

E.      Bracketing of Databases

1.      Database files containing business proprietary information will be considered business proprietary in their entirety. Brackets are not required for such electronic database files, but where possible, use headers and footers to indicate that the database contains business proprietary information. You must also submit a public version of the business proprietary database. The public version must contain brackets around the redacted or ranged business proprietary information, be properly labeled as a public version and submitted as a PDF file.

2.      All databases must be releasable in their entirety under the terms of an administrative protective order. (During a review, the Department may not release customer names or any information that would lead to their identity. If your standard customer code plainly identifies the customer, immediately contact the official in charge to obtain authorization for the use of a substitute code.)

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

**APPENDIX III**

**DESCRIPTION OF PRODUCTS UNDER REVIEW**

The merchandise under review is _____.  The merchandise under review is currently classifiable under item(s) _____ of the <u>Harmonized Tariff Schedule of the United States</u> (HTSUS).  Although the HTSUS classification is provided for convenience and customs purposes, the written description of the merchandise under review is dispositive.

## APPENDIX IV

## CERTIFICATIONS OF FACTUAL ACCURACY AND CERTIFICATE OF SERVICE

### CERTIFICATIONS OF FACTUAL ACCURACY

### FOR PROCEEDINGS INITIATED ON OR AFTER AUGUST 16, 2013

**§ 351.303 Filing, document identification, format, translation, service, and certification of documents.**
* * * * *

(g) *Certifications.*  Each submission containing factual information must include the following certification from the person identified in paragraph (g)(1) of this section and, in addition, if the person has legal counsel or another representative, the certification in paragraph (g)(2) of this section.  The certifying party must maintain the original signed certification for a period of five years from the date of filing the submission to which the certification pertains.  The original signed certification must be available for inspection by U.S. Department of Commerce officials. Copies of the certifications must be included in the submission filed at the Department.

(1) For the person(s) officially responsible for presentation of the factual information:

**(i)      COMPANY CERTIFICATION:***

I, **(PRINTED NAME AND TITLE)**, currently employed by **(COMPANY NAME)**, certify that I prepared or otherwise supervised the preparation of the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }:  {THE (ANTIDUMPING OR COUNTERVAILING) DUTY INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**.  I certify that the public information and any business proprietary information of **(CERTIFIER'S COMPANY NAME)** contained in this submission is accurate and complete to the best of my knowledge.  I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce.  I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature: _____**
**Date: _____**

\* For multiple person certifications, all persons should be listed in the first sentence of the certification and all persons should sign and date the certification.  In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.,* "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

**(ii)     GOVERNMENT CERTIFICATION:**\*\*

I, **(PRINTED NAME AND TITLE)**, currently employed by the government of **(COUNTRY)**, certify that I prepared or otherwise supervised the preparation of the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {THE (ANTIDUMPING OR COUNTERVAILING) DUTY INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**.  I certify that the public information and any business proprietary information of the government of **(COUNTRY)** contained in this submission is accurate and complete to the best of my knowledge.  I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature: _____**
**Date: _____**

\*\* For multiple person certifications, all persons should be listed in the first sentence of the certification and all persons should sign and date the certification.  In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.,* "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

IV-3

(2) For the legal counsel or other representative:

**REPRESENTATIVE CERTIFICATION:\*\*\***

I, **(PRINTED NAME)**, with **(LAW FIRM or OTHER FIRM)**, **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL TO} or {REPRESENTATIVE OF})** **(COMPANY NAME, OR GOVERNMENT OF COUNTRY, OR NAME OF ANOTHER PARTY)**, certify that I have read the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }:  {THE (ANTIDUMPING OR COUNTERVAILING DUTY) INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**.  In my capacity as **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL} or {ADVISER, PREPARER, OR REVIEWER})** of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge.  I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature:** _____
**Date:** _____

\*\*\* For multiple representative certifications, all representatives and their firms should be listed in the first sentence of the certification and all representatives should sign and date the certification.  In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.*, "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

IV-4

## CERTIFICATE OF SERVICE

I, _____, hereby certify that a copy of the

  (name of certifying official)

foregoing submission on behalf of _____,

                      (company name)

dated _____, was served by first class mail or by hand delivery (circle the method

used) on the following parties:

(Business Proprietary Version)

<u>On Behalf of</u>

Name and address

(Public Version)

<u>On Behalf of</u>

Name and address

_____

(Signature of Certifying Official)

# APPENDIX V

## CASE-SPECIFIC QUESTIONS AND MODIFICATIONS,
## INCLUDING MATCHING CRITERIA

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

# APPENDIX VI

## ARM'S-LENGTH SALES TO AFFILIATED PARTIES

In order to report sales to an affiliated comparison market customer (affiliate) rather than resales to unaffiliated customers by that affiliated comparison market customer, a respondent must demonstrate that the sales to the affiliated comparison market customer are at arm's length. This appendix describes the basis for this analysis, and provides guidance as to how a respondent could go about demonstrating that sales to an affiliated comparison market customer are at arm's length.

<u>Overview</u>

In accordance with section 351.403(c) of the Department's regulations, we include home market or third-country affiliated party sales in our analysis only if the respondent's sales are made at "arm's length." To be at "arms-length" the prices of the affiliated-party transactions must be comparable to the prices at which the respondent sold identical merchandise to unaffiliated parties. In determining whether affiliated party transactions are made at arm's-length prices, we generally compare the respondent's reported prices to affiliated parties with the respondent's prices to unaffiliated parties at the same level of trade. In making such a comparison, the Department has established a ratio in which sales by the exporter or producer to an affiliate be included in the normal value calculation. For affiliated party sales to be considered in the normal value calculation, prices to an affiliate must be between 98 percent and 102 percent, inclusive, of prices to unaffiliated customers. If affiliated party prices are, on average, less than 98 percent or more than 102 percent of unaffiliated party prices, then we reject them. In establishing the 98/102 percent band, the Department aims to prevent distortion of normal value based on sales between affiliates which could be unreasonably high or low-priced. Instead, the ratio is set up to capture only those sales between affiliates which are made in the ordinary course of trade.[1]

<u>Transactions Covered</u>

For investigations, the databases used for the arm's length test are limited to all sale observations with sale dates that fall within the POI. For administrative reviews, the databases used for the arm's-length test are limited to sales observations with sale dates that fall within the appropriate reporting period for the comparison market.

For both investigations and administrative reviews, the databases are also limited to those transactions involving merchandise described in Appendix III of the questionnaire.

---

[1] *See Antidumping Proceedings: Affiliated Party Sales in the Ordinary Course of Trade*, 67 FR 69187 (November 15, 2002).

<u>Net Price Calculations</u>

The Department's arm's-length test adjusts gross unit prices for relevant adjustments (*e.g.*, for appropriate discounts and rebates, movement expenses, imputed credit expenses, other direct selling expenses, commissions, packing, *etc.*), and, for each affiliated party comparison market customer, compares the net prices, by CONNUM, of sales to the affiliated party to the net prices of sales to all unaffiliated parties.

In instances where certain CONNUMs were sold to an affiliated comparison market customer but not to unaffiliated comparison market customers, the comparisons are made to the most similar product sold to unaffiliated comparison market customers, with appropriate adjustments made for differences in merchandise (the appropriate variable and total cost data for each comparison market CONNUM are therefore used for this calculation).  The determination of what constitutes the most similar merchandise is based upon the hierarchy of the product characteristics, and of the subcategories within each characteristic, identified in Section B of the questionnaire.

Comparisons are not allowed across levels of trade, or of prime merchandise to non-prime merchandise, or across manufacturers (MFRH), or, in instances where the respondent is not required to respond to Section D of the questionnaire, for CONNUMs sold to an affiliated comparison market customer but not to unaffiliated comparison market customers.  In such instances where comparisons are not allowed, the sales to the affiliated comparison market customers are ignored for purposes of the results of the arm's length test.

As noted above, for affiliated party sales to be considered in the normal value calculation, prices to an affiliate must on average be between 98 percent and 102 percent, inclusive, of prices to unaffiliated customers.

<u>Arm's-Length Test Programming</u>

The arm's-length test programming language currently used by the Department is referenced below.  To demonstrate that sales to an affiliate were at arm's length, you should utilize the methodology reflected in this programming, in conjunction with your appropriate databases and following the guidance above with respect to appropriate sales observations, adjustments, *etc*. (CMSALES would be the file of all comparison market POR sales of merchandise described in Appendix III of the questionnaire, and &CMAFFL &CMLOT &CMMANF &CMPRIME &CMCUST are references to CUSRELH, LOTH, MFRH, PRIMEH (for those cases in which PRIMEH is included in Section B of the Department's questionnaire), and CUSCODH, respectively):

The arm's-length test programming language currently used by the Department can be accessed at http://enforcement.trade.gov/sas/programs/amcp.html  Click on the "Macros Program" hyperlink and go to section "CM-3:  ARM'S LENGTH TEST OF AFFILIATED PARTY SALES."

Barcode:3663557-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

# APPENDIX VII

# DATABASE SUMMARIES

# ATTACHMENT 4

**Confirmation of Electronic Submission**

**Case & Segment Info:**

| | |
|---|---|
| Bar Code: | **3673940** |
| Case Number | A-588-874 |
| Case Title | Hot-Rolled Steel Flat Products From Japan |
| Case Segment | REV - Admin Review |
| Segment Begin Date | 3/22/2016 |
| Segment End Date | 9/30/2017 |

**Document Info:**

| | |
|---|---|
| Security Classification | Public Version |
| BPI Document Submission Barcode | 3673929 |
| Document Type | Response |
| Filed On Behalf Of (collective entity) | Tokyo Steel |
| Manual Submission | No |
| Document Title - Document (Page Count) | Tokyo Steel Section A Response (PV).pdf - Tokyo Steel Section A Response (PV).pdf (32)<br>Ex A-1 - A-20 (PV).pdf - Ex A-1 - A-20 (PV).pdf (220)<br>Ex A-21 (PV).pdf - Ex A-21 (PV).pdf (14) |
| Comments | |

**Submitter Info:**

| | |
|---|---|
| Filed By | dporter@curtis.com |
| Firm/Organization Name | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Filed Date-Time Stamp | 2/20/2018 10:20:12 AM |

**NOTE:**

**E-File Similar Submission: Use this feature to generate a new barcode for a new submission.**

**Add More Files: Use this feature to retain the same barcode for all parts of the submission.**



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

| Almaty | Houston | | |
|--------|---------|--|--|
| Ashgabat | London | 1717 Pennsylvania Avenue, N.W. | |
| Astana | Mexico City | Washington, D.C. 20006 | |
| Beijing | Milan | | |
| Buenos Aires | Muscat | | |
| Dubai | New York | | |
| Frankfurt | Paris | | |
| Geneva | Rome | | |

**Telephone +1 202 452 7373**
**Facsimile +1 202 452 7333**
www.curtis.com

**Daniel L. Porter**
Tel: +1 202 452 7340
Fax: +1 202 452 7333
E-Mail: dporter@curtis.com

February 20, 2018

<u>**Public Version**</u>

Case No.: A-588-874

Total No. of Pages: 266

First Administrative Review (3/22/2016 – 09/30/2017)

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations Office VII.

This document contains Tokyo Steel's **BUSINESS PROPRIETARY INFORMATION** on pages 6, 10-11, 13-16, 18, and 24 and in Exhibits A-1 to A-12 and A-14 to A-18. This information has been ranged, rounded or deleted in the public version of this submission.

The proprietary version of this submission may be released under APO.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Attn: Jack Zhao and Thomas Gilgunn

Re:  Section A Response of Tokyo Steel Manufacturing Co., Ltd.
    <u>*Certain Hot-Rolled Steel Flat Products from Japan*</u>

Dear Secretary Pritzker:

On behalf of Tokyo Steel Manufacturing Co., Ltd. ("Tokyo Steel"), we hereby submit

Tokyo Steel's response to Section A of the Department's questionnaire in the above-referenced

review. This response is timely filed pursuant to the Department's letter of February 5, 2018.[1]

---

[1] The Department's February 5, 2018 letter specified a due date of February 19, 2018. However, February 19, 2018 is a federal government holiday; thus, the deadline rolls to February 20, 2018.

CURTIS

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

### Request for Proprietary Treatment

Pursuant to 19 U.S.C. § 1677f(b)(1) and 19 C.F.R. § 351.304, Tokyo Steel requests

business proprietary treatment for the bracketed information contained in this submission.

Disclosure of this information would cause substantial harm to the competitive interests of

Tokyo Steel. The specific pages and exhibits in which business proprietary information appears

are listed on the first page of this letter. The specific types of information for which proprietary

treatment is sought are detailed below:

**Quantity and Value of Sales**
Exhibit A-1.

The bracketed information in these materials includes specific information regarding the quantity
and value of Tokyo Steel's sales in the U.S. and home market. This information is not publicly
available and it provides specific sales information which, if revealed, could harm Tokyo Steel's
competitive position. This information is properly categorized as business proprietary
information pursuant to 19 C.F.R § 351.105(c)(11).

**Corporate Structure and Affiliations**
Page 6,18, and 24 and Exhibits A-2 to A-6, and A-14

The information in these pages reveals information concerning the ownership structure of the
Tokyo Steel companies as well as companies that have certain common shareholders with Tokyo
Steel companies. The information identified as confidential is not publicly available and, if
revealed, could harm Tokyo Steel's competitive position. This information is properly
categorized as business proprietary information pursuant to 19 C.F.R § 351.105(c)(11).

**Affiliated Party Financial Documents**
Exhibit A-14

This exhibit contains confidential financial statements of an affiliated party. This information is
not publicly available and would cause harm to the affiliated party's competitive position if
released. This information is properly categorized as business proprietary information pursuant
to 19 C.F.R § 351.105(c)(11).

**Financial Information**
Exhibit A-15 and A-16

These exhibits include confidential financial information found on trial balances, profit and loss
statements, and other internal accounting documents. The release of this information could
provide specific business information to a Tokyo Steel competitor, to the detriment of Tokyo
Steel's competitive position. This information is properly categorized as business proprietary
information pursuant to 19 C.F.R § 351.105(c)(11).

**Sales Process and Sample Sales Documentation**
Pages 10,11, 13-16, and 24 and Exhibits A-7 to A-11.

This section describes confidential details about Tokyo Steel's sales processes, including price information and internal business practices that are not public.  The bracketed information in these pages also identifies specific Tokyo Steel customers by name and contains detailed, proprietary shipment, order, and payment information.  Certain aspects of Tokyo Steel's accounting system are not publicly available.  In addition, the bracketed information provides detailed internal customer account and other internal sales channel information.  The release of this information could provide specific business information to a Tokyo Steel competitor that could be replicated, to the detriment of Tokyo Steel's competitive position.  This information is properly categorized as business proprietary information pursuant to 19 C.F.R § 351.105(c)(11).

**Production Information**
Exhibit A-18

This exhibit includes confidential production information. The release of this information could provide specific business information to a Tokyo Steel competitor, to the detriment of Tokyo Steel's competitive position.  This information is properly categorized as business proprietary information pursuant to 19 C.F.R § 351.105(c)(11).

**Account Numbers & Accounting Flow Chart**
Exhibits A-12 and A-17

The bracketed information in these materials consists of detailed internal financial, sales, and cost data.  This information is not publicly available, as it provides significant insight into Tokyo Steel's internal operations.  The bracketed information also includes account numbers drawn from Tokyo Steel's internal chart of accounts.  These numbers are confidential in that they reveal management direction and level of management interest in specific accounts and within classes of accounts.  The release of this information would provide competitors with valuable insight into the direction of Tokyo Steel's business operations, to Tokyo Steel's commercial detriment.  This information is properly categorized as business proprietary information pursuant to 19 C.F.R § 351.105(c)(11).

<u>**Consent to APO Release and Service**</u>

Tokyo Steel consents to the release of the proprietary version of this submission under administrative protective order ("APO").  We have received from the Department an APO service list indicating which counsel have been granted an APO for this proceeding.

Accordingly, pursuant to 19 C.F.R. § 351.303, this submission is being served on all such counsel, as indicated on the attached service list.



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

February 20, 2018
Page 4

In accordance with the Department's regulations, Tokyo Steel electronically submits its response to the Department's questionnaire.  If the Department has any questions regarding this submission, please contact one of the undersigned.

Respectfully submitted,

 /s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Amber Jeffcoat, Trade Advisor
Taishu Pitt, Trade Policy Specialist

*Counsel for Tokyo Steel*

# COMPANY CERTIFICATION

I, Kiyoshi Imamura, currently employed as Managing Director by **Tokyo Steel Manufacturing Co. Ltd**. (**"Tokyo Steel"**) hereby certify that I prepared or otherwise supervised the preparation of the attached submission entitled: **Tokyo Steel's Section A Response, dated February 20, 2018** for Commerce Department case number **A-588-874**, pursuant to the antidumping review of **Certain Hot-Rolled Steel Flat Products Japan.**

I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce.  I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.

I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce, and that I will retain the original for a five-year period commencing with the filing of this document.  The original will be available for inspection by U.S. Department of Commerce officials.


Signature: _____

Date: _____February 19, 2018_____

23144840v1

Certain Hot-Rolled Steel Flat Products from Japan       A-588-874
                                                          (03/22/16 – 09/30/17)

## CERTIFICATE OF ACCURACY AND COMPLETENESS

I, Daniel L. Porter, of Curtis, Mallet-Prevost, Colt & Mosle LLP, counsel to Tokyo Steel Co., Ltd., ("Tokyo Steel"), certify that I have read the attached: ***Tokyo Steel's Section A Response,*** dated February 20, 2018, pursuant to the AD administrative review for the period 03/22/16 – 09/30/17 of Certain Hot-Rolled Steel Flat Products from Japan, A-588-874. In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006

Dated: February 20, 2018

30110602v1

**Certain Hot-Rolled Steel Flat Products from Japan**

**A-588-874**
**(03/22/16 – 09/30/17)**

`

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission has been served this day, by hand delivery, upon the following persons:

| | |
|---|---|
| Richard L.A. Weiner<br>On behalf of Nippon Steel & Sumitomo Metal Corporation<br>**SIDLEY AUSTIN LLP**<br>1501 K Street, NW<br>Washington, DC 20005 | Joshua Morey<br>On behalf of ArcelorMittal USA LLC<br>**KELLEY DRYE & WARREN LLP**<br>3050 K Street, N.W., Suite 400<br>Washington, D.C. 20007 |
| Alan H. Price<br>On behalf of Nucor Corporation<br>**WILEY REIN LLP**<br>1776 K Street, N.W.<br>Washington, D.C. 20006 | Roger B. Schagrin<br>On behalf of SSAB Americas and Steel Dynamics, Inc.<br>**SCHAGRIN ASSOCIATES**<br>900 7th St N.W. Suite 500<br>Washington, D.C. 20001 |
| Stephen W. Brophy, Esq.<br>On behalf of Mitsui & Co., Ltd. and Mitsui & Co. (USA) Inc.<br>**BARNES, RICHARDSON & COLBURN, LLP**<br>1200 New Hampshire Avenue, NW<br>Suite 725-B<br>Washington, DC 20036 | Stephen A. Jones<br>On behalf of AK Steel Corporation<br>**KING & SPALDING LLP**<br>1700 Pennsylvania Ave., N.W.<br>Suite 200<br>Washington, D.C. 20006 |
| Robert H. Huey<br>On behalf of JFE Steel Corporation<br>**FOLEY & LARDNER LLP**<br>3000 K Street, N.W.<br>Suite 600<br>Washington, DC  20007 | |

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC  20006

Dated:  February 20, 2018

30110602v1

*PUBLIC VERSION*

Case No.:          A-588-874

No. Pages:         266

First Administrative Review (3/22/2016 – 09/30/2017)

This proceeding is conducted by Import Administration, AD/CVD Operations, Office VII.

This submission contains Tokyo Steel's **business proprietary information** in brackets on pages 6, 10-11, 13-16, 18, and 24 and in Exhibits A-1 to A-12 and A-14 to A-18. This information is ranged, rounded, or deleted in the public version of this submission.

This submission may be released under administrative protective order.

# TOKYO STEEL'S SECTION A RESPONSE

*Certain Hot-Rolled Steel Flat Products from Japan*

Daniel L. Porter
James P. Durling
Amber Jefffcoat, Trade Advisor
Taishu Pitt, Trade Policy Specialist

**Curtis Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
202-452-7373

**February 20, 2018**

**<u>Introduction</u>**

On behalf of Tokyo Steel Manufacturing Co., Ltd. ("Tokyo Steel") we hereby respond to Section A of the Department of Commerce's questionnaire issued in the antidumping review involving certain hot-rolled flat-rolled products from Japan. We provide answers to the Department's questions below. For ease of organization and reference, we repeat each of the Department's questions with the answer immediately following the question.

**ANSWER**:    The requested channels of distribution flowcharts are provided in **Exhibit A-7.**  We note that 100 percent of Tokyo Steel's sales of subject hot-rolled steel to the United States are manufactured to order.  Also, Tokyo Steel does not sell from inventory in either the U.S. or home market.    Accordingly, all production of hot-rolled steel is shipped to a customer immediately after production.

**U.S. Sales**

Tokyo Steel's U.S. sales during the review period were made through [

].  For all sales made to this unaffiliated Japanese trading company, the unaffiliated Japanese company [

]

**Home market sales**

Tokyo Steel's home market (Japan) sales during the review period were made through three channels of distribution:  1. to a trading company, who then sells the merchandise to distributors or end users, 2. directly to distributors, and 3. directly to end-users.  Because merchandise is produced pursuant to an order, Tokyo Steel is aware of the ultimate destination of the merchandise sold to trading companies and distributors.  For [          ] sales in the Japan market, Tokyo Steel delivers the hot-rolled steel to a destination identified by the customer.

   b.   Provide a list of the categories of customers (e.g., distributor, wholesaler, retailer, end-user) that purchase through each channel of distribution.  In the case of **constructed export price** (CEP) transactions (i.e., sales to unaffiliated U.S. customers through an affiliated U.S. importer )[4], describe both your affiliated U.S. importer(s) and your importer's unaffiliated customers.

**ANSWER**:    Tokyo Steel describes the categories of its customers by channel of distribution in the U.S. and home market below.

---

[4] Please refer to the Glossary of Terms at Appendix I for a more exact definition.

PUBLIC VERSION

**U.S. Sales**

As indicated above, with respect to U.S. sales, there was [

]; namely, U.S. sales made to an unaffiliated Japanese [                    ].  And,

within this channel of distribution, Tokyo Steel had [                              ]

**Home market sales**

Tokyo Steel's home market sales during the review period were made through three

channels of distribution:  1. to a trading company who then sell the merchandise to distributors or

end users, 2. directly to distributors and 3. directly to end-users.  The customer category for

channel 1 is trading company, channel 2 is distributor, and channel 3 is end user.

> c.  Provide a complete list of all the selling activities performed and services offered in the U.S. market and the foreign market.  Selling activities or services might include inventory maintenance, technical advice, warranty services, freight and delivery arrangements, advertising, and any other sales support activities.  Please specify which services are provided by your company and which are provided by an affiliate.  Describe each activity or service in detail.  Identify the expense field in which the expenses associated with each selling activity will be captured in your response to sections B and C.
>
> Please prepare a chart showing all selling functions you performed for each channel of distribution in the home market and the U.S. market.  If you wish to distinguish between levels of function performance, you may.  For example, if technical consultation is done for two channels, but more is done in one channel than the other, you might wish to indicate this difference by assigning a code for each level of activity.  For each instance, however, you must provide a narrative explanation.
>
> You should also indicate functions where differences may exist but are not easily categorized as "more" or "less" performed between channels.  For example, if you pack the merchandise under review in bulk for sales in one channel but not in another channel, you should indicate this difference between channels.  In addition, in this chart, indicate who performs the selling functions (the foreign parent, the U.S. affiliate, or both).  If more than one sales unit performed the selling functions, please indicate all such sales units involved, and describe and rate the extent to which each performs the selling functions.  For purposes of this chart, when preparing the column(s) for CEP sales, use different columns for the sale to the U.S. affiliate and for the sale to the unaffiliated customer.
>
> A sample chart is included at the end of this section.  The items included in this sample chart are for illustrative purposes only, and are not intended to be exhaustive.  Your chart should include all the selling functions performed by your company and its U.S. affiliates for all your channels of trade, regardless of whether those functions are included in the sample chart.  Show the degree of involvement for each selling activity/function; i.e., indicate each selling activity/function with "None," "Low," "Medium," or "High" on the chart.

**ATTACHMENT 5**

Exhibit A-9

Sales Trace for U.S. Customers

**NOT CAPABLE OF SUMMARY**

**ATTACHMENT 6**

## Confirmation of Electronic Submission

**Case & Segment Info:**

| | |
|---|---|
| Bar Code: | **3680866** |
| Case Number | A-588-874 |
| Case Title | Hot-Rolled Steel Flat Products From Japan |
| Case Segment | REV - Admin Review |
| Segment Begin Date | 3/22/2016 |
| Segment End Date | 9/30/2017 |

**Document Info:**

| | |
|---|---|
| Security Classification | Public Version |
| BPI Document Submission Barcode | 3680846 |
| Document Type | Response |
| Filed On Behalf Of (collective entity) | Tokyo Steel |
| Manual Submission | No |
| Document Title - Document (Page Count) | Tokyo Steel's Section C Response (PV).pdf - Tokyo Steel's Section C Response (PV).pdf (56) Ex C-1 to C-13 (PV).pdf - Ex C-1 to C-13 (PV).pdf (127) |
| Comments | |

**Submitter Info:**

| | |
|---|---|
| Filed By | dporter@curtis.com |
| Firm/Organization Name | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Filed Date-Time Stamp | 3/8/2018 3:18:27 PM |

**NOTE:**

**E-File Similar Submission: Use this feature to generate a new barcode for a new submission.**

**Add More Files: Use this feature to retain the same barcode for all parts of the submission.**



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

| | | | |
|---|---|---|---|
| Almaty | Houston | | **Telephone  +1 202 452 7373** |
| Ashgabat | London | | **Facsimile  +1 202 452 7333** |
| Astana | Mexico City | 1717 Pennsylvania Avenue, N.W. | www.curtis.com |
| Beijing | Milan | Washington, D.C. 20006 | |
| Buenos Aires | Muscat | | |
| Dubai | New York | | **Daniel L. Porter** |
| Frankfurt | Paris | | Tel: +1 202 452 7340 |
| Geneva | Rome | | Fax: +1 202 452 7333 |
| | | | E-Mail: dporter@curtis.com |

March 8, 2018

<u>**Public Version**</u>

Case No.:  A-588-874

Total No. of Pages:  183

First Administrative Review (3/22/2016 – 09/30/2017)

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations Office VII.

This document contains Tokyo Steel's **BUSINESS PROPRIETARY INFORMATION** on pages 4-11, 15-18, 20-22, 30-31, 38-40, 46 and in Exhibits C-1, C-3 to C-8, and C-10 to C-13.  This information has been ranged, rounded or deleted in the public version of this submission.

The proprietary version of this submission may be released under APO.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn:  Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Attn:  Jack Zhao and Thomas Gilgunn

Re:     Section C Response of Tokyo Steel Manufacturing Co., Ltd.
        *Certain Hot-Rolled Steel Flat Products from Japan*

Dear Secretary Pritzker:

On behalf of Tokyo Steel Manufacturing Co., Ltd. ("Tokyo Steel"), we hereby submit

Tokyo Steel's response to Section C of the Department's questionnaire in the above-referenced

review.  This response is timely filed pursuant to the Department's letter of February 5, 2018.[1]

---

[1] See the Department's February 27, 2018 letter.

## CURTIS

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

March 8, 2018
Page 2

**Request for Proprietary Treatment**

Pursuant to 19 U.S.C. § 1677f(b)(1) and 19 C.F.R. § 351.304, Tokyo Steel requests

business proprietary treatment for the bracketed information contained in this submission.

Disclosure of this information would cause substantial harm to the competitive interests of

Tokyo Steel.  The specific pages and exhibits in which business proprietary information appears

are listed on the first page of this letter.  The specific types of information for which proprietary

treatment is sought are detailed below:

**Quantity and Value of Sales; Reconciliations**
Exhibit C-3

The bracketed information in these materials includes specific information regarding the quantity
and value of home market sales and reconciles these values to Tokyo Steel's trial balances and
accounting ledgers.  This information is not publicly available and it provides specific sales
information which, if revealed, could harm Tokyo Steel's competitive position.

**Product Codes and Production Information**
Pages 10-11, and 15-16; Exhibit C-4

The bracketed information in these materials consists of internal product and specifications.  This
information is not publicly available, as it provides significant insight into Tokyo Steel's internal
operations.  The release of this information would provide competitors with insight into the
direction of Tokyo Steel's business operations, to Tokyo Steel's commercial detriment.

**Account Numbers and Accounting Data**
Pages 6 and 40

The bracketed information in these materials consists of internal financial, sales, and cost data.
This information is not publicly available, as it provides significant insight into Tokyo Steel's
internal operations.  The release of this information would provide competitors with insight into
the direction of Tokyo Steel's business operations, to Tokyo Steel's commercial detriment.

**Internal Identification Codes**
Page 4,5,7,8, 20, and 46; Exhibit C-6

The bracketed information in these materials provides internal, proprietary codes used by
Tokyo Steel to identify products and code invoices. This information is proprietary because, if
revealed, it could provide insight into management direction and level of management interest in
specific products. This information is not otherwise publicly available and could be used by a
competitor to the commercial detriment of Tokyo Steel.

**Customer Names and Information**
Page 17, 21, and 31; Exhibit C-5



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

The bracketed information on these pages identifies Tokyo Steel's customers and trading companies. The full listing of Tokyo Steel's various suppliers and customers is not publicly available, nor is information about the specific sales terms. If revealed, this information could provide insight into Tokyo Steel's sales strategy to Tokyo Steel's commercial detriment.

**Sales Documentation and Internal Accounting Documents**
Exhibit C-7

The bracketed information on these pages provides information on Tokyo Steel's invoicing and accounting practicing. These pages include internal PDF prints of invoices, journal entries, and ledgers. These documents are not publicly available and provide specific sales information which, if revealed, could harm Tokyo Steel's competitive position.

**Terms of Sales & Payment**
Pages 9,18,22,38, and 39; Exhibit C-10

The bracketed information on these pages provides information on the shipment dates, terms of sale, and payment options offered by Tokyo Steel for U.S. sales. These terms are not publicly available and provide specific sales information which, if revealed, could harm Tokyo Steel's competitive position.

**Brokerage and Handling and Freight**
Page 30; Exhibit C-8

The bracketed information in these materials demonstrates the calculation of various freight expenses for the period, including information on net weights, rates per kilogram, and general ledger account numbers for freight related expenses. This information is not otherwise publicly available and, if revealed, could be used to the commercial detriment of Tokyo Steel.

**Indirect Selling Expenses**
Exhibit C-11

The bracketed information in these exhibits provides details on Tokyo Steel's indirect selling expenses, which are drawn from Tokyo Steel's internal accounting records. This information is not otherwise publicly available and, if revealed, could be used to the commercial detriment of Tokyo Steel.

**Inventory Carrying Costs**
Exhibit C-12

The bracketed information in these exhibits provides details on Tokyo Steel's inventory carrying expenses, including beginning and ending inventory values and days in inventory. This information is not otherwise publicly available and, if revealed, could be used to the commercial detriment of Tokyo Steel.

**Packing Costs**
Exhibit C-13

The bracketed information in these materials identifies the packing expense factors for the relevant period, including information on total packing costs. This information is not otherwise publicly available and, if revealed, could be used to the commercial detriment of Tokyo Steel.



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

March 8, 2018
Page 4

**Computer File**

Exhibit C-1

Tokyo Steel is also submitting a U.S. sales database, as requested by the Department. This file contains detailed information about Tokyo Steel's costs, including internal coding data and cost and selling expense data. The release of this information would cause substantial harm to Tokyo Steel's competitive position.

### Consent to APO Release and Service

Tokyo Steel consents to the release of the proprietary version of this submission under administrative protective order ("APO"). We have received from the Department an APO service list indicating which counsel have been granted an APO for this proceeding. Accordingly, pursuant to 19 C.F.R. § 351.303, this submission is being served on all such counsel, as indicated on the attached service list.

In accordance with the Department's regulations, Tokyo Steel electronically submits its response to the Department's questionnaire. If the Department has any questions regarding this submission, please contact one of the undersigned.

Respectfully submitted,

 /s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Amber Jeffcoat, Trade Advisor

*Counsel for Tokyo Steel*

## COMPANY CERTIFICATION

I, Takafumi Asai, currently employed as Director by **Tokyo Steel Manufacturing Co. Ltd. ("Tokyo Steel")** hereby certify that I prepared or otherwise supervised the preparation of the attached submission entitled: **Tokyo Steel's Section C Questionnaire Response, dated March 8, 2018** for Commerce Department case number **A-588-874,** pursuant to the antidumping review of **Certain Hot-Rolled Steel Flat Products Japan.**

I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.

I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce, and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Signature: _____

Date: _March  8  2018_____

23144840v1

Certain Hot-Rolled Steel Flat Products from Japan                    A-588-874
                                                                     (03/22/16 – 09/30/17)


### CERTIFICATE OF ACCURACY AND COMPLETENESS

I, Daniel L. Porter, of Curtis, Mallet-Prevost, Colt & Mosle LLP, counsel to Tokyo Steel

Co., Ltd., ("Tokyo Steel"), certify that I have read the attached:  ***Tokyo Steel's Section C***

***Questionnaire Response,*** dated March 8, 2018, pursuant to the AD administrative review for the

period 03/22/16 – 09/30/17 of Certain Hot-Rolled Steel Flat Products from Japan, A-588-874.  In

my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the

information contained in this submission is accurate and complete to the best of my knowledge. I

am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal

sanctions on individuals who knowingly and willfully make material false statements to the U.S.

Government.  In addition, I am aware that, even if this submission may be withdrawn from the

record of the AD/CVD proceeding, the Department may preserve this submission, including a

business proprietary submission, for purposes of determining the accuracy of this certification. I

certify that I am filing a copy of this signed certification with this submission to the U.S.

Department of Commerce and that I will retain the original for a five-year period commencing

with the filing of this document. The original will be available for inspection by U.S. Department

of Commerce officials.


Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC  20006

Dated:  March 8, 2018


30110602v1

Certain Hot-Rolled Steel Flat Products from Japan          A-588-874
                                                           (03/22/16 – 09/30/17)

`

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission has been served this day, by hand delivery, upon the following persons:

| | |
|---|---|
| Richard L.A. Weiner<br>On behalf of Nippon Steel & Sumitomo Metal Corporation<br>**SIDLEY AUSTIN LLP**<br>1501 K Street, NW<br>Washington, DC 20005 | Joshua Morey<br>On behalf of ArcelorMittal USA LLC<br>**KELLEY DRYE & WARREN LLP**<br>3050 K Street, N.W., Suite 400<br>Washington, D.C. 20007 |
| Alan H. Price<br>On behalf of Nucor Corporation<br>**WILEY REIN LLP**<br>1776 K Street, N.W.<br>Washington, D.C. 20006 | Roger B. Schagrin<br>On behalf of SSAB Americas and Steel Dynamics, Inc.<br>**SCHAGRIN ASSOCIATES**<br>900 7th St N.W. Suite 500<br>Washington, D.C. 20001 |
| Stephen W. Brophy, Esq.<br>On behalf of Mitsui & Co., Ltd. and Mitsui & Co. (USA) Inc.<br>**BARNES, RICHARDSON & COLBURN, LLP**<br>1200 New Hampshire Avenue, NW<br>Suite 725-B<br>Washington, DC 20036 | Stephen A. Jones<br>On behalf of AK Steel Corporation<br>**KING & SPALDING LLP**<br>1700 Pennsylvania Ave., N.W.<br>Suite 200<br>Washington, D.C. 20006 |
| Robert H. Huey<br>On behalf of JFE Steel Corporation<br>**FOLEY & LARDNER LLP**<br>3000 K Street, N.W.<br>Suite 600<br>Washington, DC  20007 | |

_Daniel L. Porter_ (signature)

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC  20006

Dated:  March 8, 2018

30110602v1

<u>**PUBLIC VERSION**</u>

Case No.:         A- 588-874

No. Pages:         183

First Administrative Review (3/22/2016 – 09/30/2017)

This proceeding is conducted by Enforcement and Compliance, AD/CVD Operations, Office VII.

This submission contains Tokyo Steel's **business proprietary information** in brackets on pages 4-11, 15-18, 20-22, 30-31, 38-40, 46 and in Exhibits C-1, C-3 to C-8, and C-10 to C-13. This information is ranged, rounded, or deleted in the public version of this submission.

This submission may be released under administrative protective order.

# Tokyo Steel's Section C Response

## *CERTAIN HOT-ROLLED STEEL FLAT PRODUCTS*

Daniel L. Porter
James P. Durling
Amber Jeffcoat (Trade Advisor)

**Curtis Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
202-452-7373

**March 8, 2018**

## Introduction

On behalf of Tokyo Steel Manufacturing Co., Ltd. ("Tokyo Steel") we hereby respond to **Section C** of the Department of Commerce's questionnaire issued in the antidumping review involving certain hot-rolled flat-rolled products from Japan.

We provide answers to the Department's questions below. For ease in organization and reference, we repeat each of the Department's questions with the answer immediately following the question.

**PUBLIC VERSION**

| | |
|---|---|
| DESCRIPTION: | Identify the sale as either "C" (consignment sale) or "NC" (non-consignment sale). |

**ANSWER**:   Tokyo Steel did not sell on consignment.  This field has been deleted from the database.

| | |
|---|---|
| **FIELD NUMBER 6.0:** | **Customer Code** |
| FIELD NAME: | CUSCODU |
| DESCRIPTION: | Report the name of the customer or the internal accounting code designating the customer, as used in your normal course of business. |
| NARRATIVE: | Provide a list of customer names and codes as an attachment to your narrative response. |

**ANSWER**:   Tokyo Steel has reported this field as requested.  Tokyo Steel had the following U.S. customer(s) during the POR:

[                                         ]

We have also reported in field CUSCOD2U [          ] customer.  See **Exhibit C-5**.

| | |
|---|---|
| **FIELD NUMBER 6.1:** | **Consolidated Customer Code** |
| FIELD NAME: | CCUSCODU |
| DESCRIPTION: | Report only one name or code for each of your customers, even if more than one name or accounting code exists for that customer in your books and records.  For example, if you use different codes for regional offices of the same customer, report the same code for this customer, regardless of the location of the office. |
| NARRATIVE: | Provide a list of customer names and codes as an attachment to your response, ensuring that each customer is assigned only one discrete code for this field. |

**ANSWER**:   Tokyo Steel does not utilize a consolidated customer code for U.S. customers.  This field has been deleted from the database.

| | |
|---|---|
| **FIELD NUMBER 7.0:** | **Customer Category** |
| FIELD NAME: | CUSCATU |
| DESCRIPTION: | 1 = Original Equipment Manufacturers |
| | 2 = Trading Companies |
| | 3 = Distributors |

- 17 -

Exhibit C-5

Customer Codes

PUBLIC VERSION

Exhibit C-5 Customer Codes

| Trading Company | | End Customer | |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

# ATTACHMENT 7

Exhibit C-1

US Sales Database

CERTAIN HOT-ROLLED STEEL FLAT PRODUCTS FROM JAPAN - Tokyo Steel

08:54 Thursday, March 8, 2018   61

REVIEW MARCH 22, 2016 - SEPTEMBER 30, 2017
SECTION C DATABASE
SAMPLE LISTING OF US MARKET SALES

| Obs | SEQU | PRODCODU1 | PRODCODU2 | PRODCODU3 | OVERRUNU | PRIMEU | SPECGRADEU | THK_MM | WID_MM | CONNUMU | PAINTU | CARBONU | QUALITYU | STRENGTHU | THICKU | WIDTHU | FORMU | PICKLEDU | PATTERNU | SALEU | CUSCODU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | . | | | | | | | . | . | | | | | | | | | | | | |
| 2 | . | | | | | | | . | . | | | | | | | | | | | | |
| 3 | . | | | | | | | . | . | | | | | | | | | | | | |
| 4 | . | | | | | | | . | . | | | | | | | | | | | | |
| 5 | . | | | | | | | . | . | | | | | | | | | | | | |
| 6 | . | | | | | | | . | . | | | | | | | | | | | | |
| 7 | . | | | | | | | . | . | | | | | | | | | | | | |
| 8 | . | | | | | | | . | . | | | | | | | | | | | | |
| 9 | . | | | | | | | . | . | | | | | | | | | | | | |
| 10 | . | | | | | | | . | . | | | | | | | | | | | | |
| 11 | . | | | | | | | . | . | | | | | | | | | | | | |
| 12 | . | | | | | | | . | . | | | | | | | | | | | | |
| 13 | . | | | | | | | . | . | | | | | | | | | | | | |

| Obs | CUSCODU3 | CUSRELU | CUSCATU | CHANNELU | SALINDTU | SALEDATU | INVOICEU | INVOICEU2 | ORDNUMU | ORDDATEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU1 | QTYU2 | QTYUNITU1 | QTYUNITU2 | GRSUPRU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | . | | | . | . | | | | . | . | | . | | 17.2743 | 17274.34 | | | 375.096 |
| 2 | | . | | | . | . | | | | . | . | | . | | 17.2471 | 17247.05 | | | 375.096 |
| 3 | | . | | | . | . | | | | . | . | | . | | 16.9196 | 16919.58 | | | 356.903 |
| 4 | | . | | | . | . | | | | . | . | | . | | 17.0742 | 17074.22 | | | 356.903 |
| 5 | | . | | | . | . | | | | . | . | | . | | 16.9469 | 16946.87 | | | 356.903 |
| 6 | | . | | | . | . | | | | . | . | | . | | 10.7703 | 10770.31 | | | 356.903 |
| 7 | | . | | | . | . | | | | . | . | | . | | 14.6727 | 14672.73 | | | 356.903 |
| 8 | | . | | | . | . | | | | . | . | | . | | 17.4199 | 17419.89 | | | 356.903 |
| 9 | | . | | | . | . | | | | . | . | | . | | 17.1743 | 17174.28 | | | 356.903 |
| 10 | | . | | | . | . | | | | . | . | | . | | 17.0924 | 17092.41 | | | 356.903 |
| 11 | | . | | | . | . | | | | . | . | | . | | 19.1028 | 19102.75 | | | 356.903 |
| 12 | | . | | | . | . | | | | . | . | | . | | 19.0755 | 19075.46 | | | 356.903 |
| 13 | | . | | | . | . | | | | . | . | | . | | 18.0930 | 18093.03 | | | 375.096 |

| Obs | GRSUPRU2 | GRSUPRU1JPY | BILLADJUUSD | BILLADJUJPY | LOTU | DBROKU | vessel_name | INTNFRU | DESTU | STATEU | DEPOSIT_DATE | DIRSELU | DINVCARU | CREDITU | DINDIRSU | PACKU | PLANT | MFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 0.37510 | 46246.10 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 46.9692 | 0.54955 | 0.84700 | 3.71709 | 8.55270 | | |
| 2 | 0.37510 | 46246.10 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 46.9692 | 0.54955 | 0.84700 | 3.71709 | 8.55270 | | |
| 3 | 0.35690 | 44003.46 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6915 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 4 | 0.35690 | 44003.47 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6915 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 5 | 0.35690 | 44003.47 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6915 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 6 | 0.35690 | 44003.46 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6915 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 7 | 0.35690 | 44003.46 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6915 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 8 | 0.35690 | 44003.49 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6916 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 9 | 0.35690 | 44003.47 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6916 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 10 | 0.35690 | 44003.50 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6916 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 11 | 0.35690 | 44003.51 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6916 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 12 | 0.35690 | 44003.50 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6916 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 13 | 0.37510 | 46246.09 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 46.9692 | 0.54955 | 0.84700 | 3.71709 | 8.55270 | | |

**PUBLIC VERSION - BPI DATA RANGED**

CERTAIN HOT-ROLLED STEEL FLAT PRODUCTS FROM JAPAN - TOKYO STEEL CO
REVIEW MARCH 22, 2016 - SEPTEMBER 30, 2017
SECTION C DATABASE
SAMPLE LISTING OF US MARKET SALES

| Obs | SEQU | PRODCODU1 | PRODCODU2 | PRODCODU3 | OVERRUNU | PRIMEU | SPECGRADEU | THK_MM | WID_MM | CONNUMU | PAINTU | CARBONU | QUALITYU | STRENGTHU | THICKU | WIDTHU | FORMU | PICKLEDU | PATTERNU | SALEU | CUSCODU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | . | | | | | | | . | . | | | | | | | | | | | | |
| 15 | . | | | | | | | . | . | | | | | | | | | | | | |
| 16 | . | | | | | | | . | . | | | | | | | | | | | | |
| 17 | . | | | | | | | . | . | | | | | | | | | | | | |
| 18 | . | | | | | | | . | . | | | | | | | | | | | | |
| 19 | . | | | | | | | . | . | | | | | | | | | | | | |
| 20 | . | | | | | | | . | . | | | | | | | | | | | | |
| 21 | . | | | | | | | . | . | | | | | | | | | | | | |
| 22 | . | | | | | | | . | . | | | | | | | | | | | | |
| 23 | . | | | | | | | . | . | | | | | | | | | | | | |
| 24 | . | | | | | | | . | . | | | | | | | | | | | | |
| 25 | . | | | | | | | . | . | | | | | | | | | | | | |
| 26 | . | | | | | | | . | . | | | | | | | | | | | | |

| Obs | CUSCODU3 | CUSRELU | CUSCATU | CHANNELU | SALINDTU | SALEDATU | INVOICEU | INVOICEU2 | ORDNUMU | ORDDATEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU1 | QTYU2 | QTYUNITU1 | QTYUNITU2 | GRSUPRU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | | . | | . | . | | | | . | . | | . | | | 17.9566 | 17956.59 | | | 375.096 |
| 15 | | . | | . | . | | | | . | . | | . | | | 17.5563 | 17556.34 | | | 375.096 |
| 16 | | . | | . | . | | | | . | . | | . | | | 17.8929 | 17892.91 | | | 375.096 |
| 17 | | . | | . | . | | | | . | . | | . | | | 17.9384 | 17938.39 | | | 375.096 |
| 18 | | . | | . | . | | | | . | . | | . | | | 17.3562 | 17356.21 | | | 375.096 |
| 19 | | . | | . | . | | | | . | . | | . | | | 18.1385 | 18138.52 | | | 356.903 |
| 20 | | . | | . | . | | | | . | . | | . | | | 17.5018 | 17501.76 | | | 356.903 |
| 21 | | . | | . | . | | | | . | . | | . | | | 16.9560 | 16955.97 | | | 356.903 |
| 22 | | . | | . | . | | | | . | . | | . | | | 18.7480 | 18747.99 | | | 356.903 |
| 23 | | . | | . | . | | | | . | . | | . | | | 18.7935 | 18793.47 | | | 356.903 |
| 24 | | . | | . | . | | | | . | . | | . | | | 18.9299 | 18929.92 | | | 356.903 |
| 25 | | . | | . | . | | | | . | . | | . | | | 17.1288 | 17128.80 | | | 356.903 |
| 26 | | . | | . | . | | | | . | . | | . | | | 9.4604 | 9460.41 | | | 420.351 |

| Obs | GRSUPRU2 | GRSUPRU1JPY | BILLADJUUSD | BILLADJUJPY | LOTU | DBROKU | vessel_name | INTNFRU | DESTU | STATEU | DEPOSIT_DATE | DIRSELU | DINVCARU | CREDITU | DINDIRSU | PACKU | PLANT | MFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 0.37510 | 46246.10 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 46.9692 | 0.54955 | 0.84700 | 3.71709 | 8.55270 | | |
| 15 | 0.37510 | 46246.09 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 46.9692 | 0.54955 | 0.84700 | 3.71709 | 8.55270 | | |
| 16 | 0.37510 | 46246.08 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 46.9692 | 0.54955 | 0.84700 | 3.71709 | 8.55270 | | |
| 17 | 0.37510 | 46246.06 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 46.9692 | 0.54955 | 0.84700 | 3.71709 | 8.55270 | | |
| 18 | 0.37510 | 46246.09 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 46.9692 | 0.54955 | 0.84700 | 3.71709 | 8.55270 | | |
| 19 | 0.35690 | 44003.49 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6916 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 20 | 0.35690 | 44003.46 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6915 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 21 | 0.35690 | 44003.45 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6915 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 22 | 0.35690 | 44003.50 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6916 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 23 | 0.35690 | 44003.48 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6915 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 24 | 0.35690 | 44003.47 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6915 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 25 | 0.35690 | 44003.49 | 0.00000 | 0 | . | 384.877 | | 0 | | | . | 44.6916 | 0.52290 | 0.80592 | 3.53680 | 8.55270 | | |
| 26 | 0.42035 | 56936.96 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |

**PUBLIC VERSION - BPI DATA RANGED**

Case 1:21-cv-00827-MWB Document 21 Filed 06/04/21 Page 291 of 863

CERTAIN HOT-ROLLED STEEL FLAT PRODUCTS FROM JAPAN - Tokyo Steel        08:54 Thursday, March 8, 2018   63
REVIEW MARCH 22, 2016 - SEPTEMBER 30, 2017
SECTION C DATABASE
SAMPLE LISTING OF US MARKET SALES

| Obs | SEQU | PRODCODU1 | PRODCODU2 | PRODCODU3 | OVERRUNU | PRIMEU | SPECGRADEU | THK_MM | WID_MM | CONNUMU | PAINTU | CARBONU | QUALITYU | STRENGTHU | THICKU | WIDTHU | FORMU | PICKLEDU | PATTERNU | SALEU | CUSCODU1 |
|-----|------|-----------|-----------|-----------|----------|--------|------------|--------|--------|---------|--------|---------|----------|-----------|--------|--------|-------|----------|----------|-------|----------|
| 27 | . | | | | | | | . | . | | | | | | | | | | | | |
| 28 | . | | | | | | | . | . | | | | | | | | | | | | |
| 29 | . | | | | | | | . | . | | | | | | | | | | | | |
| 30 | . | | | | | | | . | . | | | | | | | | | | | | |
| 31 | . | | | | | | | . | . | | | | | | | | | | | | |
| 32 | . | | | | | | | . | . | | | | | | | | | | | | |
| 33 | . | | | | | | | . | . | | | | | | | | | | | | |
| 34 | . | | | | | | | . | . | | | | | | | | | | | | |
| 35 | . | | | | | | | . | . | | | | | | | | | | | | |
| 36 | . | | | | | | | . | . | | | | | | | | | | | | |
| 37 | . | | | | | | | . | . | | | | | | | | | | | | |
| 38 | . | | | | | | | . | . | | | | | | | | | | | | |
| 39 | . | | | | | | | . | . | | | | | | | | | | | | |

| Obs | CUSCODU3 | CUSRELU | CUSCATU | CHANNELU | SALINDTU | SALEDATU | INVOICEU | INVOICEU2 | ORDNUMU | ORDDATEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU1 | QTYU2 | QTYUNITU1 | QTYUNITU2 | GRSUPRU1 |
|-----|----------|---------|---------|----------|----------|----------|----------|-----------|---------|----------|----------|----------|----------|----------|-------|-------|-----------|-----------|----------|
| 27 | . | | | . | . | | | | . | . | | . | | | 9.5514 | 9551.38 | | | 420.351 |
| 28 | . | | | . | . | | | | . | . | | . | | | 9.6423 | 9642.34 | | | 420.351 |
| 29 | . | | | . | . | | | | . | . | | . | | | 9.2421 | 9242.09 | | | 420.351 |
| 30 | . | | | . | . | | | | . | . | | . | | | 9.5514 | 9551.38 | | | 420.351 |
| 31 | . | | | . | . | | | | . | . | | . | | | 9.5423 | 9542.28 | | | 420.351 |
| 32 | . | | | . | . | | | | . | . | | . | | | 9.2876 | 9287.58 | | | 420.351 |
| 33 | . | | | . | . | | | | . | . | | . | | | 9.3694 | 9369.44 | | | 420.351 |
| 34 | . | | | . | . | | | | . | . | | . | | | 9.4968 | 9496.80 | | | 420.351 |
| 35 | . | | | . | . | | | | . | . | | . | | | 9.4149 | 9414.93 | | | 420.351 |
| 36 | . | | | . | . | | | | . | . | | . | | | 9.5150 | 9514.99 | | | 420.351 |
| 37 | . | | | . | . | | | | . | . | | . | | | 9.5423 | 9542.28 | | | 420.351 |
| 38 | . | | | . | . | | | | . | . | | . | | | 9.4695 | 9469.51 | | | 420.351 |
| 39 | . | | | . | . | | | | . | . | | . | | | 9.3694 | 9369.44 | | | 420.351 |

| Obs | GRSUPRU2 | GRSUPRU1JPY | BILLADJUUSD | BILLADJUJPY | LOTU | DBROKU | vessel_name | INTNFRU | DESTU | STATEU | DEPOSIT_DATE | DIRSELU | DINVCARU | CREDITU | DINDIRSU | PACKU | PLANT | MFRU |
|-----|----------|-------------|-------------|-------------|------|--------|-------------|---------|-------|--------|--------------|---------|----------|---------|----------|-------|-------|------|
| 27 | 0.42035 | 56936.93 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 28 | 0.42035 | 56936.90 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 29 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 30 | 0.42035 | 56936.93 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 31 | 0.42035 | 56936.92 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 32 | 0.42035 | 56936.93 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 33 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98570 | 4.16555 | 8.55270 | | |
| 34 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 35 | 0.42035 | 56936.93 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 36 | 0.42035 | 56936.90 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 37 | 0.42035 | 56936.92 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 38 | 0.42035 | 56936.97 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 39 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |

**PUBLIC VERSION - BPI DATA RANGED**

| Obs | SEQU | PRODCODU1 | PRODCODU2 | PRODCODU3 | OVERRUNU | PRIMEU | SPECGRADEU | THK_MM | WID_MM | CONNUMU | PAINTU | CARBONU | QUALITYU | STRENGTHU | THICKU | WIDTHU | FORMU | PICKLEDU | PATTERNU | SALEU | CUSCODU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | . | | | | | | | . | . | | | | | | | | | | | | |
| 41 | . | | | | | | | . | . | | | | | | | | | | | | |
| 42 | . | | | | | | | . | . | | | | | | | | | | | | |
| 43 | . | | | | | | | . | . | | | | | | | | | | | | |
| 44 | . | | | | | | | . | . | | | | | | | | | | | | |
| 45 | . | | | | | | | . | . | | | | | | | | | | | | |
| 46 | . | | | | | | | . | . | | | | | | | | | | | | |
| 47 | . | | | | | | | . | . | | | | | | | | | | | | |
| 48 | . | | | | | | | . | . | | | | | | | | | | | | |
| 49 | . | | | | | | | . | . | | | | | | | | | | | | |
| 50 | . | | | | | | | . | . | | | | | | | | | | | | |
| 51 | . | | | | | | | . | . | | | | | | | | | | | | |
| 52 | . | | | | | | | . | . | | | | | | | | | | | | |

| Obs | CUSCODU3 | CUSRELU | CUSCATU | CHANNELU | SALINDTU | SALEDATU | INVOICEU | INVOICEU2 | ORDNUMU | ORDDATEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU1 | QTYU2 | QTYUNITU1 | QTYUNITU2 | GRSUPRU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | | . | | . | . | | | | . | . | . | | | 9.5514 | 9551.38 | | | 420.351 |
| 41 | | . | | . | . | | | | . | . | . | | | 9.1238 | 9123.84 | | | 420.351 |
| 42 | | . | | . | . | | | | . | . | . | | | 9.4604 | 9460.41 | | | 420.351 |
| 43 | | . | | . | . | | | | . | . | . | | | 9.4331 | 9433.12 | | | 420.351 |
| 44 | | . | | . | . | | | | . | . | . | | | 9.5605 | 9560.47 | | | 420.351 |
| 45 | | . | | . | . | | | | . | . | . | | | 9.5787 | 9578.66 | | | 420.351 |
| 46 | | . | | . | . | | | | . | . | . | | | 9.5150 | 9514.99 | | | 420.351 |
| 47 | | . | | . | . | | | | . | . | . | | | 9.4968 | 9496.80 | | | 420.351 |
| 48 | | . | | . | . | | | | . | . | . | | | 9.5059 | 9505.89 | | | 420.351 |
| 49 | | . | | . | . | | | | . | . | . | | | 9.4968 | 9496.80 | | | 420.351 |
| 50 | | . | | . | . | | | | . | . | . | | | 9.0056 | 9005.58 | | | 420.351 |
| 51 | | . | | . | . | | | | . | . | . | | | 9.0875 | 9087.45 | | | 420.351 |
| 52 | | . | | . | . | | | | . | . | . | | | 9.5514 | 9551.38 | | | 420.351 |

| Obs | GRSUPRU2 | GRSUPRU1JPY | BILLADJUUSD | BILLADJUJPY | LOTU | DBROKU | vessel_name | INTNFRU | DESTU | STATEU | DEPOSIT_DATE | DIRSELU | DINVCARU | CREDITU | DINDIRSU | PACKU | PLANT | MFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 0.42035 | 56936.93 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 41 | 0.42035 | 56936.90 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16556 | 8.55270 | | |
| 42 | 0.42035 | 56936.96 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 43 | 0.42035 | 56936.94 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 44 | 0.42035 | 56936.94 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 45 | 0.42035 | 56936.95 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98569 | 4.16556 | 8.55270 | | |
| 46 | 0.42035 | 56936.90 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98569 | 4.16556 | 8.55270 | | |
| 47 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 48 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 49 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 50 | 0.42035 | 56936.91 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 51 | 0.42035 | 56936.98 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 52 | 0.42035 | 56936.93 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |

**PUBLIC VERSION - BPI DATA RANGED**

| Obs | SEQU | PRODCODU1 | PRODCODU2 | PRODCODU3 | OVERRUNU | PRIMEU | SPECGRADEU | THK_MM | WID_MM | CONNUMU | PAINTU | CARBONU | QUALITYU | STRENGTHU | THICKU | WIDTHU | FORMU | PICKLEDU | PATTERNU | SALEU | CUSCODU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53 | . | | | | | | | . | . | | | | | | | | | | | | |
| 54 | . | | | | | | | . | . | | | | | | | | | | | | |
| 55 | . | | | | | | | . | . | | | | | | | | | | | | |
| 56 | . | | | | | | | . | . | | | | | | | | | | | | |
| 57 | . | | | | | | | . | . | | | | | | | | | | | | |
| 58 | . | | | | | | | . | . | | | | | | | | | | | | |
| 59 | . | | | | | | | . | . | | | | | | | | | | | | |
| 60 | . | | | | | | | . | . | | | | | | | | | | | | |
| 61 | . | | | | | | | . | . | | | | | | | | | | | | |
| 62 | . | | | | | | | . | . | | | | | | | | | | | | |
| 63 | . | | | | | | | . | . | | | | | | | | | | | | |
| 64 | . | | | | | | | . | . | | | | | | | | | | | | |
| 65 | . | | | | | | | . | . | | | | | | | | | | | | |

| Obs | CUSCODU3 | CUSRELU | CUSCATU | CHANNELU | SALINDTU | SALEDATU | INVOICEU | INVOICEU2 | ORDNUMU | ORDDATEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU1 | QTYU2 | QTYUNITU1 | QTYUNITU2 | GRSUPRU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53 | | . | | | . | . | | | | . | . | . | | | 9.5059 | 9505.89 | | | 420.351 |
| 54 | | . | | | . | . | | | | . | . | . | | | 9.5423 | 9542.28 | | | 420.351 |
| 55 | | . | | | . | . | | | | . | . | . | | | 9.3694 | 9369.44 | | | 420.351 |
| 56 | | . | | | . | . | | | | . | . | . | | | 9.3240 | 9323.96 | | | 420.351 |
| 57 | | . | | | . | . | | | | . | . | . | | | 8.4416 | 8441.60 | | | 420.351 |
| 58 | | . | | | . | . | | | | . | . | . | | | 9.5059 | 9505.89 | | | 420.351 |
| 59 | | . | | | . | . | | | | . | . | . | | | 9.6060 | 9605.95 | | | 420.351 |
| 60 | | . | | | . | . | | | | . | . | . | | | 9.4968 | 9496.80 | | | 420.351 |
| 61 | | . | | | . | . | | | | . | . | . | | | 7.0862 | 7086.21 | | | 420.350 |
| 62 | | . | | | . | . | | | | . | . | . | | | 9.5241 | 9524.09 | | | 420.351 |
| 63 | | . | | | . | . | | | | . | . | . | | | 9.3422 | 9342.15 | | | 420.351 |
| 64 | | . | | | . | . | | | | . | . | . | | | 9.2421 | 9242.09 | | | 420.351 |
| 65 | | . | | | . | . | | | | . | . | . | | | 9.1966 | 9196.61 | | | 420.351 |

| Obs | GRSUPRU2 | GRSUPRU1JPY | BILLADJUUSD | BILLADJUJPY | LOTU | DBROKU | vessel_name | INTNFRU | DESTU | STATEU | DEPOSIT_DATE | DIRSELU | DINVCARU | CREDITU | DINDIRSU | PACKU | PLANT | MFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 53 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 54 | 0.42035 | 56936.92 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 55 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 56 | 0.42035 | 56936.96 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 57 | 0.42035 | 56936.98 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 58 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 59 | 0.42035 | 56936.98 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 60 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 61 | 0.42035 | 56936.92 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 62 | 0.42035 | 56936.91 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 63 | 0.42035 | 56936.97 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 64 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 65 | 0.42035 | 56936.96 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |

**PUBLIC VERSION - BPI DATA RANGED**

Case 1:21-cv-00827-WMB   Document 21   Filed 06/04/21   Page 298 of 863

ANTIDUMPING HOT-ROLLED STEEL FLAT PRODUCTS FROM JAPAN - TOKYO STEEL
REVIEW MARCH 22, 2016 - SEPTEMBER 30, 2017
SECTION C DATABASE
SAMPLE LISTING OF US MARKET SALES

08:54 Thursday, March 8, 2018  66

| Obs | SEQU | PRODCODU1 | PRODCODU2 | PRODCODU3 | OVERRUNU | PRIMEU | SPECGRADEU | THK_MM | WID_MM | CONNUMU | PAINTU | CARBONU | QUALITYU | STRENGTHU | THICKU | WIDTHU | FORMU | PICKLEDU | PATTERNU | SALEU | CUSCODU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 66 | . | | | | | | | . | . | | | | | | | | | | | | |
| 67 | . | | | | | | | . | . | | | | | | | | | | | | |
| 68 | . | | | | | | | . | . | | | | | | | | | | | | |
| 69 | . | | | | | | | . | . | | | | | | | | | | | | |
| 70 | . | | | | | | | . | . | | | | | | | | | | | | |
| 71 | . | | | | | | | . | . | | | | | | | | | | | | |
| 72 | . | | | | | | | . | . | | | | | | | | | | | | |
| 73 | . | | | | | | | . | . | | | | | | | | | | | | |
| 74 | . | | | | | | | . | . | | | | | | | | | | | | |
| 75 | . | | | | | | | . | . | | | | | | | | | | | | |
| 76 | . | | | | | | | . | . | | | | | | | | | | | | |
| 77 | . | | | | | | | . | . | | | | | | | | | | | | |
| 78 | . | | | | | | | . | . | | | | | | | | | | | | |

| Obs | CUSCODU3 | CUSRELU | CUSCATU | CHANNELU | SALINDTU | SALEDATU | INVOICEU | INVOICEU2 | ORDNUMU | ORDDATEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU1 | QTYU2 | QTYUNITU1 | QTYUNITU2 | GRSUPRU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 66 | | . | | . | . | | | | . | . | | . | | | 9.2694 | 9269.38 | | | 420.351 |
| 67 | | . | | . | . | | | | . | . | | . | | | 9.5332 | 9533.18 | | | 420.351 |
| 68 | | . | | . | . | | | | . | . | | . | | | 9.4968 | 9496.80 | | | 420.351 |
| 69 | | . | | . | . | | | | . | . | | . | | | 9.5241 | 9524.09 | | | 420.351 |
| 70 | | . | | . | . | | | | . | . | | . | | | 9.5696 | 9569.57 | | | 420.351 |
| 71 | | . | | . | . | | | | . | . | | . | | | 9.6332 | 9633.24 | | | 420.351 |
| 72 | | . | | . | . | | | | . | . | | . | | | 9.2512 | 9251.19 | | | 420.351 |
| 73 | | . | | . | . | | | | . | . | | . | | | 9.5878 | 9587.76 | | | 420.351 |
| 74 | | . | | . | . | | | | . | . | | . | | | 9.1693 | 9169.32 | | | 420.351 |
| 75 | | . | | . | . | | | | . | . | | . | | | 19.3666 | 19366.55 | | | 472.656 |
| 76 | | . | | . | . | | | | . | . | | . | | | 19.3847 | 19384.74 | | | 472.656 |
| 77 | | . | | . | . | | | | . | . | | . | | | 19.3756 | 19375.65 | | | 472.657 |
| 78 | | . | | . | . | | | | . | . | | . | | | 15.7643 | 15764.32 | | | 472.656 |

| Obs | GRSUPRU2 | GRSUPRU1JPY | BILLADJUUSD | BILLADJUJPY | LOTU | DBROKU | vessel_name | INTNFRU | DESTU | STATEU | DEPOSIT_DATE | DIRSELU | DINVCARU | CREDITU | DINDIRSU | PACKU | PLANT | MFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 66 | 0.42035 | 56936.91 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 67 | 0.42035 | 56936.92 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 68 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 69 | 0.42035 | 56936.91 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 70 | 0.42035 | 56936.95 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98570 | 4.16556 | 8.55270 | | |
| 71 | 0.42035 | 56936.89 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 72 | 0.42035 | 56936.90 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1746 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 73 | 0.42035 | 56936.96 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 74 | 0.42035 | 56936.94 | 0.00000 | 0 | . | 596.104 | | 0 | | | . | 37.1747 | 0.61586 | 0.98569 | 4.16555 | 8.55270 | | |
| 75 | 0.47266 | 63952.79 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68389 | 8.55270 | | |
| 76 | 0.47266 | 63952.82 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68388 | 8.55270 | | |
| 77 | 0.47266 | 63952.81 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68388 | 8.55270 | | |
| 78 | 0.47266 | 63952.78 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68388 | 8.55270 | | |

CERTAIN HOT-ROLLED STEEL FLAT PRODUCTS FROM JAPAN — TOKYO STEEL
REVIEW MARCH 22, 2016 - SEPTEMBER 30, 2017

SECTION C DATABASE
SAMPLE LISTING OF US MARKET SALES

| Obs | SEQU | PRODCODU1 | PRODCODU2 | PRODCODU3 | OVERRUNU | PRIMEU | SPECGRADEU | THK_MM | WID_MM | CONNUMU | PAINTU | CARBONU | QUALITYU | STRENGTHU | THICKU | WIDTHU | FORMU | PICKLEDU | PATTERNU | SALEU | CUSCODU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 79 | . | | | | | | | . | . | | | | | | | | | | | | |
| 80 | . | | | | | | | . | . | | | | | | | | | | | | |
| 81 | . | | | | | | | . | . | | | | | | | | | | | | |
| 82 | . | | | | | | | . | . | | | | | | | | | | | | |
| 83 | . | | | | | | | . | . | | | | | | | | | | | | |
| 84 | . | | | | | | | . | . | | | | | | | | | | | | |
| 85 | . | | | | | | | . | . | | | | | | | | | | | | |
| 86 | . | | | | | | | . | . | | | | | | | | | | | | |
| 87 | . | | | | | | | . | . | | | | | | | | | | | | |
| 88 | . | | | | | | | . | . | | | | | | | | | | | | |
| 89 | . | | | | | | | . | . | | | | | | | | | | | | |
| 90 | . | | | | | | | . | . | | | | | | | | | | | | |
| 91 | . | | | | | | | . | . | | | | | | | | | | | | |

| Obs | CUSCODU3 | CUSRELU | CUSCATU | CHANNELU | SALINDTU | SALEDATU | INVOICEU | INVOICEU2 | ORDNUMU | ORDDATEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU1 | QTYU2 | QTYUNITU1 | QTYUNITU2 | GRSUPRU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 79 | . | | | | . | . | | | | . | . | . | | | 9.6787 | 9678.73 | | | 472.656 |
| 80 | . | | | | . | . | | | | . | . | . | | | 9.5332 | 9533.18 | | | 472.656 |
| 81 | . | | | | . | . | | | | . | . | . | | | 9.5423 | 9542.28 | | | 472.656 |
| 82 | . | | | | . | . | | | | . | . | . | | | 9.5332 | 9533.18 | | | 472.656 |
| 83 | . | | | | . | . | | | | . | . | . | | | 9.5150 | 9514.99 | | | 472.656 |
| 84 | . | | | | . | . | | | | . | . | . | | | 9.5514 | 9551.38 | | | 472.657 |
| 85 | . | | | | . | . | | | | . | . | . | | | 13.8086 | 13808.56 | | | 499.946 |
| 86 | . | | | | . | . | | | | . | . | . | | | 14.0269 | 14026.88 | | | 499.946 |
| 87 | . | | | | . | . | | | | . | . | . | | | 13.8177 | 13817.66 | | | 499.946 |
| 88 | . | | | | . | . | | | | . | . | . | | | 14.2725 | 14272.48 | | | 499.946 |
| 89 | . | | | | . | . | | | | . | . | . | | | 14.2634 | 14263.39 | | | 499.946 |
| 90 | . | | | | . | . | | | | . | . | . | | | 14.2634 | 14263.39 | | | 499.946 |
| 91 | . | | | | . | . | | | | . | . | . | | | 14.3180 | 14317.97 | | | 499.946 |

| Obs | GRSUPRU2 | GRSUPRU1JPY | BILLADJUUSD | BILLADJUJPY | LOTU | DBROKU | vessel_name | INTNFRU | DESTU | STATEU | DEPOSIT_DATE | DIRSELU | DINVCARU | CREDITU | DINDIRSU | PACKU | PLANT | MFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 79 | 0.47266 | 63952.83 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68388 | 8.55270 | | |
| 80 | 0.47266 | 63952.83 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68388 | 8.55270 | | |
| 81 | 0.47266 | 63952.75 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68388 | 8.55270 | | |
| 82 | 0.47266 | 63952.83 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68388 | 8.55270 | | |
| 83 | 0.47266 | 63952.78 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68388 | 8.55270 | | |
| 84 | 0.47266 | 63952.78 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 24.1253 | 0.69249 | 0.61575 | 4.68389 | 8.55270 | | |
| 85 | 0.49995 | 67645.43 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95431 | 8.55270 | | |
| 86 | 0.49995 | 67645.42 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 87 | 0.49995 | 67645.41 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 88 | 0.49995 | 67645.41 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 89 | 0.49995 | 67645.43 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95431 | 8.55270 | | |
| 90 | 0.49995 | 67645.43 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95431 | 8.55270 | | |
| 91 | 0.49995 | 67645.43 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |

**PUBLIC VERSION - BPI DATA RANGED**

CERTAIN HOT-ROLLED STEEL FLAT PRODUCTS FROM JAPAN - TOKYO STEEL CO
REVIEW MARCH 22, 2016 - SEPTEMBER 30, 2017
SECTION C DATABASE
SAMPLE LISTING OF US MARKET SALES

| Obs | SEQU | PRODCODU1 | PRODCODU2 | PRODCODU3 | OVERRUNU | PRIMEU | SPECGRADEU | THK_MM | WID_MM | CONNUMU | PAINTU | CARBONU | QUALITYU | STRENGTHU | THICKU | WIDTHU | FORMU | PICKLEDU | PATTERNU | SALEU | CUSCODU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 92 | . | | | | | | | . | . | | | | | | | | | | | | |
| 93 | . | | | | | | | . | . | | | | | | | | | | | | |
| 94 | . | | | | | | | . | . | | | | | | | | | | | | |
| 95 | . | | | | | | | . | . | | | | | | | | | | | | |
| 96 | . | | | | | | | . | . | | | | | | | | | | | | |
| 97 | . | | | | | | | . | . | | | | | | | | | | | | |
| 98 | . | | | | | | | . | . | | | | | | | | | | | | |
| 99 | . | | | | | | | . | . | | | | | | | | | | | | |
| 100 | . | | | | | | | . | . | | | | | | | | | | | | |

| Obs | CUSCODU3 | CUSRELU | CUSCATU | CHANNELU | SALINDTU | SALEDATU | INVOICEU | INVOICEU2 | ORDNUMU | ORDDATEU | SHIPDATU | PAYDATEU | SALETERU | PAYTERMU | QTYU1 | QTYU2 | QTYUNITU1 | QTYUNITU2 | GRSUPRU1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 92 | | . | | . | . | | | | | . | . | . | | | 17.8565 | 17856.52 | | | 499.946 |
| 93 | | . | | . | . | | | | | . | . | . | | | 19.5030 | 19503.00 | | | 499.946 |
| 94 | | . | | . | . | | | | | . | . | . | | | 19.5394 | 19539.38 | | | 499.946 |
| 95 | | . | | . | . | | | | | . | . | . | | | 19.4848 | 19484.81 | | | 499.946 |
| 96 | | . | | . | . | | | | | . | . | . | | | 19.5394 | 19539.38 | | | 499.946 |
| 97 | | . | | . | . | | | | | . | . | . | | | 14.1997 | 14199.71 | | | 499.946 |
| 98 | | . | | . | . | | | | | . | . | . | | | 13.9814 | 13981.39 | | | 499.946 |
| 99 | | . | | . | . | | | | | . | . | . | | | 14.1906 | 14190.61 | | | 499.946 |
| 100 | | . | | . | . | | | | | . | . | . | | | 17.9020 | 17902.01 | | | 499.946 |

| Obs | GRSUPRU2 | GRSUPRU1JPY | BILLADJUUSD | BILLADJUJPY | LOTU | DBROKU | vessel_name | INTNFRU | DESTU | STATEU | DEPOSIT_DATE | DIRSELU | DINVCARU | CREDITU | DINDIRSU | PACKU | PLANT | MFRU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 92 | 0.49995 | 67645.42 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 93 | 0.49995 | 67645.39 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 94 | 0.49995 | 67645.43 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 95 | 0.49995 | 67645.43 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 96 | 0.49995 | 67645.43 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 97 | 0.49995 | 67645.39 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 98 | 0.49995 | 67645.40 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 99 | 0.49995 | 67645.41 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |
| 100 | 0.49995 | 67645.44 | 0.00000 | 0 | . | 487.294 | | 0 | | | . | 25.5183 | 0.75689 | 0.65130 | 4.95432 | 8.55270 | | |

**PUBLIC VERSION - BPI DATA RANGED**

# ATTACHMENT 8

**Confirmation of Electronic Submission**

**Case & Segment Info:**

| | |
|---|---|
| Bar Code: | **3737788** |
| Case Number | A-588-874 |
| Case Title | Hot-Rolled Steel Flat Products From Japan |
| Case Segment | REV - Admin Review |
| Segment Begin Date | 3/22/2016 |
| Segment End Date | 9/30/2017 |

**Document Info:**

| | |
|---|---|
| Security Classification | Public Version |
| BPI Document Submission Barcode | 3737664 |
| Document Type | Response |
| Filed On Behalf Of (collective entity) | Tokyo Steel |
| Manual Submission | No |
| Document Title - Document (Page Count) | Tokyo Steel 1supp A-C Response (PV).pdf - Tokyo Steel 1supp A-C Response (PV).pdf (23) Ex SA-1 - SD-2 (PV).pdf - Ex SA-1 - SD-2 (PV).pdf (158) |
| Comments | |

**Submitter Info:**

| | |
|---|---|
| Filed By | dporter@curtis.com |
| Firm/Organization Name | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Filed Date-Time Stamp | 8/1/2018 3:46:30 PM |

**NOTE:**

**E-File Similar Submission: Use this feature to generate a new barcode for a new submission.**

**Add More Files: Use this feature to retain the same barcode for all parts of the submission.**

## www.TRADE.gov

Website Feedback | USA.gov | FOIA | Privacy Policy | EEO Policy | Disclaimer | Information Quality Guidelines

The International Trade Administration, U.S. Department of Commerce, manages this global trade site to provide access to ITA information on promoting trade and investment, strengthening the competitiveness of U.S. industry, and ensuring fair trade and compliance with trade laws and agreements. External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein. This site contains PDF documents. A PDF reader is available from Adobe Systems Incorporated.



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

| | | | |
|---|---|---|---|
| Almaty | Houston | | **Telephone  +1 202 452 7373** |
| Ashgabat | London | | **Facsimile  +1 202 452 7333** |
| Astana | Mexico City | 1717 Pennsylvania Avenue, N.W. | www.curtis.com |
| Beijing | Milan | Washington, D.C. 20006 | |
| Buenos Aires | Muscat | | |
| Dubai | New York | | **Daniel L. Porter** |
| Frankfurt | Paris | | Tel: +1 202 452 7340 |
| Geneva | Rome | | Fax: +1 202 452 7333 |
| | | | E-Mail: dporter@curtis.com |

August 1, 2018

<u>**PUBLIC VERSION**</u>

Case No.:  A-588-874

Total No. of Pages:   181

First Administrative Review (3/22/2016 – 09/30/2017)

This proceeding is conducted by Enforcement & Compliance, AD/CVD Operations Office VII.

This document contains Tokyo Steel's **BUSINESS PROPRIETARY INFORMATION** on pages 1-4 and 6-13 and in Exhibits SA-1 to SA-7, SB-1, SB-3 to SB-13, SB-15, SB-17, SB-18, SC-1, SC-3, SC-5 to SC-8, SD-1 and SD-2.  This information has been ranged, rounded or deleted in the public version of this submission.

The proprietary version of this submission may be released under APO.

The Honorable Wilbur Ross
Secretary of Commerce
U.S. Department of Commerce
Attn:  Enforcement and Compliance
APO/Dockets Unit, Room 18022
14th Street & Constitution Avenue, N.W.
Washington, D.C. 20230

Attn:  Jack Zhao and Thomas Gilgunn

Re:    **Tokyo Steel's First Supplemental Section A-C Questionnaire Response**
       <u>*Certain Hot-Rolled Steel Flat Products from Japan*</u>

Dear Secretary Pritzker:

On behalf of Tokyo Steel Manufacturing Co., Ltd. ("Tokyo Steel"), we hereby submit

Tokyo Steel's response to the Department's supplemental section A-C questionnaire in the



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

above-referenced review.  This response is timely filed pursuant to the Department's letter of

July 23, 2018.[1]

### Request for Proprietary Treatment

Pursuant to 19 U.S.C. § 1677f(b)(1) and 19 C.F.R. § 351.304, Tokyo Steel requests

business proprietary treatment for the bracketed information contained in this submission.

Disclosure of this information would cause substantial harm to the competitive interests of

Tokyo Steel.  The specific pages and exhibits in which business proprietary information appears

are listed on the first page of this letter.  The specific types of information for which proprietary

treatment is sought are detailed below:

**Quantity and Value of Sales; Reconciliations**
Exhibits: SA-1, SB-3, SC-3, and SD-2

The bracketed information in these materials includes specific information regarding the quantity
and value of home market sales, US sales, and costs of production and reconciles these values to
Tokyo Steel's trial balances and accounting ledgers.  This information is not publicly available
and it provides specific sales information which, if revealed, could harm Tokyo Steel's
competitive position.

**Terms of Sales, Delivery & Payment**
Pages: 1 and 2
Exhibits: SB-5 – SB-7, SB-11, and SC-5

The bracketed information on these pages provides information on the terms of sale, sales
channels and payment options offered by Tokyo Steel for U.S. sales.  It also includes customer
specific early payment and sales promotion discount information.  This information is not
publicly available and provide specific sales information which, if revealed, could harm Tokyo
Steel's competitive position.

---

[1] *See* Letter from Thomas Gilgunn dated July 23, 2018 letter (granting extension to file Supplemental Section A-C
until August 1, 2018).



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

**Customer Codes and Names**
Pages: 4, 8, 10, and 11

The bracketed information in these materials Tokyo Steel's customer codes and names.  This information is not otherwise publicly available and could be used by a competitor to the commercial detriment of Tokyo Steel.

**Internal Identification Codes, Product Codes, Product Specifications**
Page: 13
Exhibits: SB-4, SB-8, and SB-15

The bracketed information in these materials provides internal, proprietary codes used by Tokyo Steel to identify products and code invoices. This information is proprietary because, if revealed, it could provide insight into management direction and level of management interest in specific products and what products are produced. This information is not otherwise publicly available and could be used by a competitor to the commercial detriment of Tokyo Steel.

**Sales Documentation and Internal Accounting Documents**
Page: 3
Exhibits: SA-2 – SA-6, and SC-7

The bracketed information on these pages provides information on Tokyo Steel's invoicing and accounting practicing.  These pages include internal PDF prints of invoices, journal entries, and ledgers, or numbers stated in the narrative from such documents.  These documents are not publicly available and provide specific sales information which, if revealed, could harm Tokyo Steel's competitive position.

**Price Lists**
Exhibit: SA-7

The bracketed information in these materials provides insight into Tokyo Steel's pricing practices.  This information details internal price lists and if revealed, would provide insight into Tokyo Steel's pricing strategy to Tokyo Steel's commercial detriment.

**Freight & Insurance**
Pages: 6-8, and 12
Exhibits: SB-9, SD-10, SB-13, SB-17, and SC-6

The bracketed information in these materials contains standard freight rates.  In addition, it demonstrates the calculation of various freight expenses for the period, including information on net weights, rates per kilogram, and general ledger account numbers for freight related expenses.



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

August 1, 2018
Page 4

This information is not otherwise publicly available and, if revealed, could be used to the commercial detriment of Tokyo Steel.

**Indirect Selling Expenses**
Pages: 8 and 9
Exhibit: SB-12

The bracketed information in these exhibits provides details on Tokyo Steel's indirect selling expenses, which are drawn from Tokyo Steel's internal accounting records. This information is not otherwise available.

**Inventory Ledgers**
Exhibits: SB-18 and SC-8

The bracketed information in these exhibits includes PDF prints of Tokyo Steel's inventory ledgers, including expenses and beginning and ending inventory values. This information is not otherwise publicly available and, if revealed, could be used to the commercial detriment of Tokyo Steel.

**Computer File**
Exhibits: SB-1, SC-1, and SD-1

Tokyo Steel is also submitting a home market sales database, a US sales database, and cost databases. These files contain detailed information about Tokyo Steel's costs, including internal coding data and cost and selling expense data. The release of this information would cause substantial harm to Tokyo Steel's competitive position.

## Consent to APO Release and Service

Tokyo Steel consents to the release of the proprietary version of this submission under

administrative protective order ("APO"). We have received from the Department an APO

service list indicating which counsel have been granted an APO for this proceeding.

Accordingly, pursuant to 19 C.F.R. § 351.303, this submission is being served on all such

counsel, as indicated on the attached service list.



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

August 1, 2018
Page 5

    In accordance with the Department's regulations, Tokyo Steel electronically submits its response to the Department's questionnaire.  If the Department has any questions regarding this submission, please contact one of the undersigned.

                          Respectfully submitted,

                           /s/ Daniel L. Porter

                          Daniel L. Porter
                          James P. Durling
                          Amber Jeffcoat, Trade Advisor
                          Jessica Wang, Trade Advisor
                          Dan Anderson, Quantitative Analyst

                          *Counsel for Tokyo Steel*

## **COMPANY CERTIFICATION**

I, Kiyoshi Imamura, currently employed as Managing Director by Tokyo Steel
Manufacturing Co. Ltd. ("Tokyo Steel") hereby certify that I prepared or otherwise
supervised the preparation of the attached submission entitled: **Tokyo Steel's First
Supplemental Section A-C Questionnaire Response,** *dated August 1, 2018,* for
Commerce Department case number **A-588-874,** pursuant to the antidumping review of
**Certain Hot-Rolled Steel Flat Products Japan.**

I certify that the information contained in this submission is accurate and complete
to the best of my knowledge. I am aware that the information contained in this
submission may be subject to verification or corroboration (as appropriate) by the U.S.
Department of Commerce. I am also aware that U.S. law (including, but not limited to,
18 U.S.C. §1001) imposes criminal sanctions on individuals who knowingly and willfully
make material false statements to the U.S. Government. In addition, I am aware that,
even if this submission may be withdrawn from the record of the AD/CVD proceeding,
the Department may preserve this submission, including a business proprietary
submission, for purposes of determining the accuracy of this certification.

I certify that I am filing a copy of this signed certification with this submission to
the U.S. Department of Commerce, and that I will retain the original for a five-year
period commencing with the filing of this document. The original will be available for
inspection by U.S. Department of Commerce officials.

Signature: _____

Date: _____August 1, 2018_____

32290809v1

Certain Hot-Rolled Steel Flat Products from Japan                    A-588-874
                                                                     (03/22/16 – 09/30/17)

## CERTIFICATE OF ACCURACY AND COMPLETENESS

I, Daniel L. Porter, of Curtis, Mallet-Prevost, Colt & Mosle LLP, counsel to Tokyo Steel Co., Ltd., ("Tokyo Steel"), certify that I have read the attached: *Tokyo Steel's First Supplemental Section A-C Questionnaire Response,* dated August 1, 2018, pursuant to the AD admin. review for the period 03/22/16 – 09/30/17 of Certain Hot-Rolled Steel Flat Products from Japan, A-588-874.   In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document. The original will be available for inspection by U.S. Department of Commerce officials.

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC  20006

Dated:  August 1, 2018

30110602v1

Certain Hot-Rolled Steel Flat Products from Japan          A-588-874
                                                          (03/22/16 – 09/30/17)

## PUBLIC CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing submission has been served this day, by hand delivery, upon the following persons:

| | |
|---|---|
| Richard L.A. Weiner<br>On behalf of Nippon Steel & Sumitomo Metal Corporation<br>**SIDLEY AUSTIN LLP**<br>1501 K Street, NW<br>Washington, DC 20005 | Joshua Morey<br>On behalf of ArcelorMittal USA LLC<br>**KELLEY DRYE & WARREN LLP**<br>3050 K Street, N.W., Suite 400<br>Washington, D.C. 20007 |
| Alan H. Price<br>On behalf of Nucor Corporation<br>**WILEY REIN LLP**<br>1776 K Street, N.W.<br>Washington, D.C. 20006 | Roger B. Schagrin<br>On behalf of SSAB Americas and Steel Dynamics, Inc.<br>**SCHAGRIN ASSOCIATES**<br>900 7th St N.W. Suite 500<br>Washington, D.C. 20001 |
| Matthew T. McGrath, Esq.<br>On behalf of Mitsui & Co., Ltd. and Mitsui & Co. (USA) Inc.<br>**BARNES, RICHARDSON & COLBURN, LLP**<br>1200 New Hampshire Avenue, NW<br>Suite 725-B<br>Washington, DC 20036 | Stephen A. Jones<br>On behalf of AK Steel Corporation<br>**KING & SPALDING LLP**<br>1700 Pennsylvania Ave., N.W.<br>Suite 200<br>Washington, D.C. 20006 |
| Robert H. Huey<br>On behalf of JFE Steel Corporation<br>**FOLEY & LARDNER LLP**<br>3000 K Street, N.W.<br>Suite 600<br>Washington, DC  20007 | Thomas M. Beline, Esq.<br>On behalf of United States Steel Corporation<br>**CASSIDY LEVY KENT (USA) LLP (LEAD FIRM)**<br>900 19th Street, NW<br>Suite 400<br>Washington, DC 20006 |

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, DC  20006

Dated:  August 1, 2018

30110602v1

<u>**PUBLIC VERSION**</u>

Case No.:          A-588-874

No. Pages:         181

Status:            Administrative Review
                   (3/22//2016 – 9/30/2017)

This proceeding is conducted by Enforcement and
Compliance, AD/CVD Operations, Office VII.

This submission contains business proprietary
information in brackets on pages 1-4 and 6-13 and in
Exhibits SA-1 to SA-7, SB-1, SB-3 to SB-13, SB-15,
SB-17, SB-18, SC-1, SC-3, SC-5 to SC-8, SD-1 and
SD-2.  Such information is ranged, rounded, or
deleted in the public version of this submission.

This submission may be released under
administrative protective order.

# TOKYO STEEL'S FIRST SUPPLEMENTAL SECTION A-C QUESTIONNAIRE RESPONSE

*Certain Hot Rolled Steel Flat Products from Japan*

Daniel L. Porter
James P. Durling
Anya Naschak (Senior Trade Advisor)
Jessica Wang (Trade Advisor)
Amber Jeffcoat (Trade Advisor)
Daniel Anderson (Trade Advisor

**Curtis Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
202-452-7373

**August 1, 2018**

PUBLIC VERSION

**ANSWER**:   Just to clarify, the amount that [        ], the Japanese trading company

paid Tokyo Steel changed as a result of the change to international freight.  This is discussed in

question 13 above.

No, [                      ] did not play a role in the shipment of any sales to the U.S.

market.

15. Include in the U.S. sales database the U.S. postal "ZIP" code in field DESTU and the
    corresponding U.S. state in the field STATEU of the place of delivery of the ultimate
    customer as identified in Exhibit C-5.

**ANSWER**:   [                              ] is Tokyo Steel's ultimate customer.  The

end customer identified in Exhibit C-5 is [          ] customer.  Because Tokyo Steel sells

merchandise that is made to order, Tokyo Steel is aware of [          ]'s customer at the time

[        ] places the order.  As such, Tokyo Steel is able to provide this information for [          ]

customer.  We have added a field to the US database called STATECC and ZIPCC to report the

state and zip code for Tokyo Steel's customer's customer.

16. You use at least [

            ]. What is the official name of your U.S. customer and all its affiliated
    companies that you deal with?  Explain how they are related to each other and your
    interactions with them.

**ANSWER**:   [                      ] is the parent company of [                  ], whose full

name is "[                      ].".  [                  ] is a shortened form, or another name

for, [                  ].  Tokyo Steel interacts with [                  ].  This customer is not a

U.S. customer, it is an unaffiliated trading company located in Japan to whom Tokyo Steel

makes all sales destined to the US market.

17. Were any U.S. sales [              ]?  If so, please explain and make any necessary
    changes to your response with regard to the pickled product characteristic (PICKLEDU).

# ATTACHMENT 9


protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

This notice is issued and published in accordance with section 751 of the Act and 19 CFR 351.213(d)(4).

Dated: June 24, 2019.

**James Maeder,**

*Acting Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations.*

[FR Doc. 2019–13860 Filed 6–27–19; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

### United States Travel and Tourism Advisory Board: Meeting of the United States Travel and Tourism Advisory Board

**AGENCY:** International Trade Administration, U.S. Department of Commerce.

**ACTION:** Notice of an open meeting.

**SUMMARY:** The United States Travel and Tourism Advisory Board (Board or TTAB) will hold a meeting on Tuesday, July 16, 2019. The Board advises the Secretary of Commerce on matters relating to the U.S. travel and tourism industry. The purpose of the meeting is for Board members to discuss key issues related to the importance of international travel and tourism to the United States and for the Secretary of Commerce to provide information on the Administration's priorities in travel and tourism. The final agenda will be posted on the Department of Commerce website for the Board at *http://trade.gov/ttab* at least one week in advance of the meeting.

**DATES:** Tuesday, July 16, 2:00 p.m.–3:30 p.m. EDT. The deadline for members of the public to register, including requests to make comments during the meeting and for auxiliary aids, or to submit written comments for dissemination prior to the meeting, is 5:00 p.m. EDT on Tuesday, July 9, 2019.

**ADDRESSES:** The meeting will be held in Washington, DC. The exact location will be provided by email to registrants.

Requests to register (including to speak or for auxiliary aids) and any written comments should be submitted to: National Travel and Tourism Office, U.S. Department of Commerce, 1401 Constitution Ave. NW, Room 10003, Washington, DC 20230 or by email to *TTAB@trade.gov*. Members of the public are encouraged to submit registration

requests and written comments via email to ensure timely receipt.

**FOR FURTHER INFORMATION CONTACT:** Brian Beall, the United States Travel and Tourism Advisory Board, National Travel and Tourism Office, U.S. Department of Commerce, 1401 Constitution Ave. NW, Room 10003, Washington, DC 20230; telephone: 202–482–0140; email: *TTAB@trade.gov*.

**SUPPLEMENTARY INFORMATION:**

*Background:* The Board advises the Secretary of Commerce on matters relating to the U.S. travel and tourism industry.

*Public Participation:* The meeting will be open to the public and will be accessible to people with disabilities. Any member of the public requesting to join the meeting is asked to register in advance by the deadline identified under the **DATES** caption. Requests for auxiliary aids must be submitted by the registration deadline. Last minute requests will be accepted but may not be possible to fill. There will be fifteen (15) minutes allotted for oral comments from members of the public joining the meeting. To accommodate as many speakers as possible, the time for public comments may be limited to three (3) minutes per person. Members of the public wishing to reserve speaking time during the meeting must submit a request at the time of registration, as well as the name and address of the proposed speaker. If the number of registrants requesting to make statements is greater than can be reasonably accommodated during the meeting, the International Trade Administration may conduct a lottery to determine the speakers. Speakers are requested to submit a written copy of their prepared remarks by 5:00 p.m. EDT on Tuesday, July 9, 2019 for inclusion in the meeting records and for circulation to the members of the Board. In addition, any member of the public may submit pertinent written comments concerning the Board's affairs at any time before or after the meeting. Comments may be submitted to Brian Beall at the contact information indicated above. To be considered during the meeting, comments must be received no later than 5:00 p.m. EDT on Tuesday, July 9, 2019 to ensure transmission to the Board prior to the meeting. Comments received after that date and time will be distributed to the members but may not be considered during the meeting. Copies of Board

meeting minutes will be available within 90 days of the meeting.

**Brian Beall,**

*Deputy Director for Policy and Planning, National Travel and Tourism Office, Industry and Analysis, International Trade Administration, U.S. Department of Commerce.*

[FR Doc. 2019–13851 Filed 6–27–19; 8:45 am]

**BILLING CODE 3510–DR–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

[A–588–874]

### Certain Hot-Rolled Steel Flat Products From Japan: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016–2017

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that certain hot-rolled steel flat products from Japan were sold at less than normal value during the period of review (POR), March 22, 2016 through September 30, 2017.

**DATES:** Applicable June 28, 2019.

**FOR FURTHER INFORMATION CONTACT:** Jun Jack Zhao or Myrna Lobo, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–1396 or (202) 482–2371, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On November 14, 2018, Commerce published the *Preliminary Results* of this review in the **Federal Register**.[1] We invited interested parties to comment on the *Preliminary Results*. Between December 14 and December 21, 2019, Commerce received timely filed briefs and rebuttal briefs from the petitioners,[2] Nippon Steel & Sumitomo Metal Corporation (Nippon Steel) and Tokyo

---

[1] *See Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2016–2017;* 83 FR 56813 (November 14, 2018) (*Preliminary Results*) and accompanying Preliminary Decision Memorandum (PDM).

[2] The petitioners are AK Steel Corporation, ArcelorMittal USA LLC, Nucor Corporation, SSAB Enterprises, LLC, Steel Dynamics, Inc., and United States Steel Corporation (collectively, the petitioners).

Barcode:3855239-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

Steel Manufacturing Co., Ltd. (Tokyo Steel).[3]

Commerce exercised its discretion to toll all deadlines affected by the partial federal government closure from December 22, 2018 through the resumption of operations on January 29, 2019.[4] If the new deadline falls on a non-business day, in accordance with Commerce's practice, the deadline will become the next business day. On March 28 and May 22, 2019, we extended the deadline for the final results.[5] The revised deadline for the final results is now June 21, 2019.

These final results cover 20 producers and exporters of subject merchandise. Based on an analysis of the comments received, we have made changes to the weighted-average dumping margins determined for the respondents. The weighted-average dumping margins are listed in the "Final Results of Review" section, below. Commerce conducted this review in accordance with section 751(a) of the Tariff Act of 1930, as amended (the Act).

## Scope of the Order [6]

The merchandise covered by the order is certain hot-rolled steel flat products. For a complete description of the scope of the *Order, see* the Issues and Decision Memorandum.[7]

---

[3] *See* Petitioners' Letter, "*Certain Hot-Rolled Steel Flat Products from Japan:* Case Brief Nucor Corporation," dated December 14, 2019; *see also* Nippon Steel's Letter, "Certain Hot-Rolled Steel Flat Products from Japan: NSSMC's Case Brief," dated December 14, 2019; Tokyo Steel's Letter, "Case Brief of Tokyo Steel Manufacturing Co., Ltd: Certain Hot-Rolled Steel Flat Products from Japan," dated December 14, 2019; Petitioners' Letter, "*Certain Hot-Rolled Steel Flat Products from Japan:* Rebuttal Brief Nucor Corporation," dated December 21, 2019; Nippon Steel's Letter, "Certain Hot-Rolled Steel Flat Products from Japan: NSSMC's Rebuttal Brief," dated December 21, 2019; and Tokyo Steel's Letter, "Rebuttal Brief of Tokyo Steel Manufacturing Co., Ltd: Certain Hot-Rolled Steel Flat Products from Japan," dated December 21, 2019.

[4] *See* Memorandum to the Record from Gary Taverman, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive duties of the Assistant Secretary for Enforcement and Compliance, "Deadlines Affected by the Partial Shutdown of the Federal Government," dated January 28, 2019. All deadlines in this segment of the proceeding have been extended by 40 days.

[5] *See* Memoranda, "Certain Hot-Rolled Steel Products from Japan: Extension of Deadline for Final Results of Antidumping Duty Administrative Review; 2016–2017," dated March 28, and May 22, 2019.

[6] See Certain Hot-Rolled Steel Flat Products from Australia, Brazil, Japan, the Republic of Korea, the Netherlands, the Republic of Turkey, and the United Kingdom: Amended Final Affirmative Antidumping Determinations for Australia, the Republic of Korea, and the Republic of Turkey and Antidumping Duty Orders, 81 FR 67962 (October 3, 2016) (Order).

[7] *See* Memorandum, "Issues and Decision Memorandum for the Final Results of the

## Final Determination of No Shipments

In the *Preliminary Results,* Commerce preliminarily determined that Hitachi Metals, Ltd. (Hitachi), Honda Trading Canada, Inc. (Honda), and Panasonic Corporation (Panasonic) each had no shipments of subject merchandise during the POR. U.S. Customs and Border Protection (CBP) subsequently confirmed these companies had no shipments.[8] As no party has identified any record evidence which would call into question these preliminary findings with respect to Hitachi, Honda, or Panasonic, we continue to find that these companies made no shipments of subject merchandise during the POR. Accordingly, consistent with our practice, we intend to instruct CBP to liquidate any existing entries of subject merchandise produced by these three companies, but exported by other parties without their own rate, at the all-others rate.[9]

Mitsui & Co. Ltd. (Mitsui) also initially claimed no shipments during the POR.[10] Based on information received from CBP,[11] we stated in the *Preliminary Results* we would continue to include Mitsui with the companies under review and make a determination for the final results after soliciting more information and comments on Mitsui. On December 20, 2018, we placed U.S. entry documentation on the record and provided parties with an opportunity to comment. We also requested Mitsui to explain the apparent discrepancy between its claim of no shipments and the CBP information.[12] Mitsui responded by stating that the documents provided to Commerce by CBP were consistent with the entry documentation which it had now retrieved by Mitsui & Co., (USA), Inc. (Mitsui USA),

---

Antidumping Duty Administrative Review: Certain Hot-Rolled Steel Flat Products from Japan; 2016–2017," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[8] *See* Memorandum, "No Shipment Inquiry with Respect to the Company Below During the Period 03/22/2016 through 09/30/2017," dated October 23, 2018 (Public Version).

[9] *See, e.g., Magnesium Metal from the Russian Federation: Preliminary Results of Antidumping Duty Administrative Review,* 75 FR 26922, 26923 (May 13, 2010), unchanged in *Magnesium Metal from the Russian Federation: Final Results of Antidumping Duty Administrative Review,* 75 FR 56989 (September 17, 2010).

[10] *See* Mitsui's Letter, "Antidumping Administrative Review of Certain Hot-Rolled Steel Flat Products: Mitsui No Shipment Notification," dated January 5, 2018.

[11] *See* Memorandum, "No Shipment Inquiry with Respect to the Company Below During the Period 03/22/2016 through 09/30/2017," dated October 23, 2018 (Proprietary Version).

[12] *See* Memorandum, "Placing U.S. Entry Documents on the Record," dated December 20, 2018.

indicating that during the POR there was, in fact, one shipment of subject merchandise by Mitsui of Japan, sold to and entered by a U.S. customer.[13] Mitsui added that it regretted its error, and that it was seeking to withdraw its certification.[14] No other interested parties filed comments. Therefore, for the final results, we find that Mitsui had shipments of subject merchandise to the United States during the POR.

## Analysis of Comments Received

We addressed all issues raised in the case and rebuttal briefs in the Issues and Decision Memorandum, which is hereby adopted with this notice. The issues are identified in Appendix I to this notice. The Issues and Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov* and is available to all parties in the Central Records Unit, Room B8024 of the main Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly on the internet at *http:// enforcement.trade.gov/frn/index.html.* The signed Issues and Decision Memorandum and the electronic version of the Issues and Decision Memorandum are identical in content.

## Changes Since the *Preliminary Results*

Based on our review and analysis of the comments received from parties, we made certain changes to the margin calculations for both Nippon Steel and Tokyo Steel. For a discussion of these changes, *see* the Issues and Decision Memorandum.

## Rate for Non-Examined Companies

The statute and Commerce's regulations do not address the establishment of a rate to be applied to companies not selected for individual examination when Commerce limits its examination in an administrative review pursuant to section 777A(c)(2) of the Act. Generally, Commerce looks to section 735(c)(5) of the Act, which provides instructions for calculating the all-others rate in a market economy investigation, for guidance when calculating the rate for companies which were not selected for individual

---

[13] *See* Mitsui's Letter, "Antidumping Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan: Mitsui Comment on U.S. Entry Documents Placed on the Record," dated December 27, 2018.

[14] *Id.*

examination in an administrative review. Under section 735(c)(5)(A) of the Act, the all-others rate is normally "an amount equal to the weighted-average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero or *de minimis* margins, and any

margins determined entirely {on the basis of facts available}."

For these final results, we calculated weighted-average dumping margins that are not zero, *de minimis*, or determined entirely on the basis of facts available for Nippon Steel and Tokyo Steel. Accordingly, Commerce has assigned to the companies not individually examined (*see* Appendix II, for a full list of these companies) a margin of 6.92

percent, which is the weighted-average of Nippon Steel's and Tokyo Steel's calculated weighted-average dumping margins for these final results.[15]

## Final Results of Review

Commerce determines that the following weighted-average dumping margins exist for the period March 22, 2016 through September 30, 2017:

| Exporter/producer | Weighted-average dumping margin (percent) | | |
| --- | --- | --- | --- |
| Nippon Steel & Sumitomo Metal Corporation [16] | 7.64 | | |
| Nisshin Steel Co., Ltd.[17] | 3/22/2016 to 3/12/2017 .............. 6.92 [18] | | 3/13/2017 to 9/30/2017. 7.64 [19] |
| Tokyo Steel Manufacturing Co., Ltd | 2.06 | | |
| Non-examined companies [20] | 6.92 | | |

## Disclosure

We intend to disclose the calculations performed for these final results of review within five days of the date of publication of this notice in the **Federal Register**, in accordance with 19 CFR 351.224(b).

## Assessment

Pursuant to section 751(a)(2)(C) of the Act and 19 CFR 351.212(b), Commerce shall determine, and CBP shall assess, antidumping duties on all appropriate entries of subject merchandise in accordance with the final results of this review. Commerce intends to issue assessment instructions to CBP 15 days after the date of publication of the final results of this review in the **Federal Register**.

Where the respondent reported reliable entered values, we calculated importer- (or customer-) specific *ad valorem* rates by aggregating the dumping margins calculated for all U.S. sales to each importer (or customer) and dividing this amount by the total entered value of the sales to each importer (or customer).[21] Where Commerce calculated a weighted-average dumping margin by dividing the

total amount of dumping for reviewed sales to that party by the total sales quantity associated with those transactions, Commerce will direct CBP to assess importer- (or customer-) specific assessment rates based on the resulting per-unit rates.[22] Where an importer- (or customer-) specific *ad valorem* or per-unit rate is greater than *de minimis* (*i.e.*, 0.50 percent), Commerce will instruct CBP to collect the appropriate duties at the time of liquidation.[23] Where an importer- (or customer-) specific *ad valorem* or per-unit rate is zero or *de minimis*, Commerce will instruct CBP to liquidate appropriate entries without regard to antidumping duties.[24]

For the companies which were not selected for individual review, we will assign an assessment rate based on the methodology described in the "Rates for Non-Examined Companies" section, above.

Consistent with Commerce's assessment practice, for entries of subject merchandise during the POR produced by Nippon Steel, Tokyo Steel, or the non-examined companies for which the producer did not know that its merchandise was destined for the

United States, we will instruct CBP to liquidate unreviewed entries at the all-others rate if there is no rate for the intermediate company(ies) involved in the transaction.[25]

## Cash Deposit Requirements

The following cash deposit requirements will be effective for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the publication date of the final results of this administrative review, as provided for by section 751(a)(2)(C) of the Act: (1) The cash deposit rates for the companies listed in these final results will be equal to the weighted-average dumping margins established in the final results of this review; (2) for merchandise exported by producers or exporters not covered in this review but covered in a prior segment of this proceeding, the cash deposit rate will continue to be the company-specific rate published for the most recently completed segment in which the company was reviewed; (3) if the exporter is not a firm covered in this review or the original less-than-fair-value (LTFV) investigation, but the

[15] This rate is based on the weighted-average of the margins calculated for those companies selected for individual review using the publicly-ranged U.S. quantities. Because we cannot apply our normal methodology of calculating a weighted-average margin due to requests to protect business proprietary information, we find this rate to be the best proxy of the actual weighted-average margin determined for the mandatory respondents Nippon Steel and Tokyo Steel. *See* Memorandum, "Calculation of the Review-Specific Average Rate for Non-Examined Companies," dated concurrently with this notice (Non-Examined Companies Rate Memorandum).

[16] We collapsed Nippon Steel & Sumikin Bussan Corporation with Nippon Steel & Sumitomo Metal Corporation in the underlying investigation. *See*

*Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Determination of Sales at Less than Fair Value and Postponement of Final Determination*, 81 FR 15222 (March 22, 2016) and accompanying PDM at 6–7.

[17] In the *Preliminary Results* we collapsed Nisshin Steel Co., Ltd. and Nippon Steel & Sumitomo Metal Corporation as of March 13, 2017. *See Preliminary Results* PDM at 9. No parties commented on this, thus, we made no changes to this determination for these final results.

[18] Entries of subject merchandise produced/exported by Nisshin Steel Co., Ltd. made prior to March 13, 2017 are subject to the non-examined companies' rate calculated in this administrative review. *See* Non-Examined Companies Rate Memorandum.

[19] Entries of subject merchandise produced/exported by Nisshin Steel Co., Ltd. made on/or after March 13, 2017 are subject to the AD rate assigned to Nippon Steel in this administrative review.

[20] *See* Appendix II, for a full list of these companies.

[21] *See* 19 CFR 351.212(b)(1).

[22] *Id.*

[23] *Id.*

[24] *See* 19 CFR 351.106(c)(2).

[25] For a full discussion of this practice, *see Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 68 FR 23954 (May 6, 2003).

Case 1:21-cv-00827-MAB   Document 21   Filed 06/04/21   Page 299 of 386
Barcode:3855239-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

**31028**      **Federal Register** / Vol. 84, No. 125 / Friday, June 28, 2019 / Notices

producer is, the cash deposit rate will be the rate established for the most recently completed segment of this proceeding for the producer of the subject merchandise; and (4) the cash deposit rate for all other producers or exporters will continue to be 5.58 percent,[26] the all-others rate established in the LTFV investigation. These cash deposit requirements, when imposed, shall remain in effect until further notice.

### Notification to Importers

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this POR. Failure to comply with this requirement could result in the presumption that reimbursement of antidumping duties occurred and the subsequent assessment of double antidumping duties.

### Administrative Protective Order

This notice also serves as a reminder to parties subject to administrative protective order (APO) of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

### Notification to Interested Parties

We are issuing and publishing these results in accordance with sections 751(a)(1) and 777(i)(1) of the Act and 19 CFR 351.213(h) and 351.221(b)(5) of Commerce's regulations.

Dated: June 21, 2019.

**Jeffrey I. Kessler,**

*Assistant Secretary for Enforcement and Compliance.*

### Appendix I

#### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Order
IV. Application of Partial Facts Available and Use of Adverse Inference
V. Final Determination of No Shipments
VI. Changes Since the Preliminary Results
VII. Discussion of the Issues

*Tokyo Steel-Specific Issues*

Comment 1: Whether Commerce Should Apply Total AFA to Tokyo Steel for Failing to Explain Its Original Cost Reporting Methodology
Comment 2: Correction of Error in Tokyo Steel's Margin Calculation

*Nippon Steel-Specific Issues*

Comment 3: Whether Commerce Should Continue to Apply Partial AFA to Certain Nippon Steel's Affiliated Downstream Resales in the Home Market
Comment 4: Whether Commerce Should Grant a Constructed Export Price Offset to Nippon Steel
Comment 5: Processing Expenses Incurred by Nippon Steel's Affiliated Trading Company in Japan
Comment 6: Nippon Steel's Failure to Submit Full Translations of Requested Financial Statement
Comment 7: Nippon Steel's Failure to Provide a Separate Section A Response for Nisshin Steel Co., Ltd
Comment 8: Nippon Steel Refused to Report All the HM Sales in the Window Period that Are Necessary for the Margin Calculations
Comment 9: Nippon Steel Did Not Report Nisshin's Sales and Costs for the Entire POR
Comment 10: Whether Nippon Steel Failed to Report All of its U.S. Sales
Comment 11: Nisshin's G&A Expenses Ratio Calculation
Comment 12: Whether Nippon Steel Failed to Provide a Usable Section E Response
Comment 13: Whether Nippon Steel Reported Incorrect "Mark-up" Rates
Comment 14: Whether Nippon Steel Failed to Provide the Required Information on the Affiliated Suppliers of Major Inputs
Comment 15: Whether Nippon Steel Failed to Provide Requested Information on Affiliate's Assets
Comment 16: Whether Commerce Should Revise Its Major Input Rule Adjustment to Steelscape LLC's Costs Based on Steelscape Washington LLC's Full Cost of Production
Comment 17: Whether Commerce Should Revise the Reported G&A Expense Ratio for Steelscape LLC
VIII. Recommendation

### Appendix II

#### List of Companies Not Individually Examined

Hanwa Co., Ltd.
JFE Steel Corporation [27]
JFE Shoji Trade America
Kanematsu Corporation
Kobe Steel, Ltd.
Mitsui & Co., Ltd.
Miyama Industry Co., Ltd.
Nippon Steel & Sumikin Logistics Co., Ltd.
Okaya & Co. Ltd.
Saint-Gobain KK

Shinsho Corporation
Sumitomo Corporation
Suzukaku Corporation
Toyota Tsusho Corporation Nagoya

[FR Doc. 2019–13863 Filed 6–27–19; 8:45 am]

**BILLING CODE 3510–DS–P**

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–201–830]**

### Carbon and Certain Alloy Steel Wire Rod From Mexico: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2016–2017

**AGENCY:** Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that carbon and certain alloy steel wire rod (wire rod) from Mexico was sold in the United States at less than normal value (NV) during the period of review (POR) October 1, 2016 through September 30, 2017.

**DATES:** Applicable June 28, 2019.

**FOR FURTHER INFORMATION CONTACT:** Jolanta Lawska, AD/CVD Operations, Office III, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington DC 20230; telephone: 202–482–8362.

**SUPPLEMENTARY INFORMATION:**

### Background

On November 14, 2018, Commerce published the *Preliminary Results* of this review in the **Federal Register**.[1] For a summary of events that occurred since the *Preliminary Results, see* the Issues and Decision Memorandum.[2] Commerce exercised its discretion to toll all deadlines affected by the partial federal government closure from December 22, 2018 through the resumption of operations on January 29, 2019.[3] On

---

[26] *See Certain Hot-Rolled Steel Flat Products from Japan: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances,* 81 FR 53409 (August 12, 2016).

[27] We collapsed JFE Shoji Trade Corporation with JFE Steel Corporation in the investigation. *See Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Determination of Sales at Less than Fair Value and Postponement of Final Determination,* 81 FR 15222 (March 22, 2016) and accompanying PDM at 8–9 unchanged in *Hot-Rolled Japan Final Determination.*

---

[1] *See Carbon and Certain Alloy Steel Wire Rod from Mexico: Preliminary Results of Antidumping Duty Administrative Review; 2016–2017,* 83 FR 56800 (November 14, 2018) (*Preliminary Results*) and accompanying Preliminary Decision Memorandum.

[2] *See* Memorandum, "Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review: Carbon and Certain Alloy Steel Wire Rod from Mexico; 2016–2017," dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[3] *See* Memorandum to the Record from Gary Taverman, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance, "Deadlines Affected by the Partial Shutdown of the Federal Government," dated

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-588-874
Administrative Review
POR:  3/22/2016 - 9/30/2017
**Public Document**
E&C/Office VII:  JZ/ML

June 21, 2019

**MEMORANDUM TO**:     Jeffrey I. Kessler
                       Assistant Secretary
                        for Enforcement and Compliance

**FROM**:              James Maeder
                       Acting Deputy Assistant Secretary
                        for Antidumping and Countervailing Duty Operations

**SUBJECT**:           Issues and Decision Memorandum for the Final Results of the
                       Antidumping Duty Administrative Review:  Certain Hot-Rolled
                       Steel Flat Products from Japan; 2016-2017

## I.     SUMMARY

The Department of Commerce (Commerce) has analyzed the comments of interested parties in
the 2016-2017 administrative review of the antidumping duty (AD) order on certain hot-rolled
steel flat products (hot-rolled steel) from Japan.  As a result of our analysis, we have made
changes to the *Preliminary Results*,[1] as discussed below.  We continue to find that Nippon Steel
& Sumitomo Metal Corporation (Nippon Steel) and Tokyo Steel Manufacturing Co., Ltd.
(Tokyo Steel) sold hot-rolled steel in the United States below normal value during the period of
review (POR), March 22, 2016 through September 30, 2017.

We recommend that you approve the positions described in the "Discussion of the Issues"
section of this memorandum.  Below is the complete list of the issues for which we received
comments from parties:

List of the Issues

Tokyo Steel-Specific Issues

Comment 1:  Whether Commerce Should Apply Total AFA to Tokyo Steel for Failing to
                     Explain Its Original Cost Reporting Methodology
Comment 2:  Correction of Error in Tokyo Steel's Margin Calculation

---

[1] *See Certain Hot-Rolled Steel Flat Products from Japan:  Preliminary Results of Antidumping Duty Administrative
Review and Preliminary Determination of No Shipments; 2016-2017*, 83 FR 56813 (November 14, 2018)
(*Preliminary Results*) and accompanying Preliminary Decision Memorandum (PDM).



Nippon Steel-Specific Issues

Comment 3:  Whether Commerce Should Continue to Apply Partial AFA to Certain Nippon
Steel's Affiliated Downstream Resales in the Home Market
Comment 4:  Whether Commerce Should Grant a Constructed Export Price Offset to Nippon
Steel
Comment 5:  Processing Expenses Incurred by Nippon Steel's Affiliated Trading Company in
Japan
Comment 6:  Nippon Steel's Failure to Submit Full Translations of Requested Financial
Statement
Comment 7:  Nippon Steel's Failure to Provide a Separate Section A Response for Nisshin Steel
Co., Ltd
Comment 8:  Nippon Steel Refused to Report All the HM Sales in the Window Period that Are
Necessary for the Margin Calculations
Comment 9:  Nippon Steel Did Not Report Nisshin's Sales and Costs for the Entire POR
Comment 10:  Whether Nippon Steel Failed to Report All of its U.S. Sales
Comment 11:  Nisshin's G&A Expenses Ratio Calculation
Comment 12:  Whether Nippon Steel Failed to Provide a Usable Section E Response
Comment 13:  Whether Nippon Steel Reported Incorrect "Mark-up" Rates
Comment 14:  Whether Nippon Steel Failed to Provide the Required Information on the
Affiliated Suppliers of Major Inputs
Comment 15:  Whether Nippon Steel Failed to Provide Requested Information on Affiliate's
Assets
Comment 16:  Whether Commerce Should Revise Its Major Input Rule Adjustment to Steelscape
LLC's Costs Based on Steelscape Washington LLC's Full Cost of Production
Comment 17:  Whether Commerce Should Revise the Reported G&A Expense Ratio for
Steelscape LLC

## II.    BACKGROUND

On November 14, 2018, Commerce published the *Preliminary Results* of the administrative
review of the AD order on hot-rolled steel from Japan for the POR March 22, 2016 through
September 30, 2017.[2]  In the *Preliminary Results*, we provided interested parties an opportunity
to comment on the results.[3]  Between December 14 and 21, 2018, the petitioners,[4] Nippon Steel,
and Tokyo Steel each filed case and rebuttal briefs.[5]

---

[2] *See Preliminary Results*.
[3] *Id.*
[4] The petitioners are AK Steel Corporation, ArcelorMittal USA LLC, Nucor Corporation, SSAB Enterprises, LLC,
Steel Dynamics, Inc., and United States Steel Corporation (collectively, "the petitioners" or "Petitioners").
[5] *See* Petitioners' Letter, "Certain Hot-Rolled Steel Flat Products from Japan:  Case Brief Nucor Corporation," dated
December 14, 2018 (Petitioners' Case Brief); *see also* Nippon Steel's Letter, "Certain Hot-Rolled Steel Flat
Products from Japan:  NSSMC's Case Brief," dated December 14, 2018 (Nippon Steel's Case Brief); Tokyo Steel's
Letter, "Case Brief of Tokyo Steel Manufacturing Co., Ltd.:  Certain Hot-Rolled Steel Products from Japan," dated
December 14, 2018 (Tokyo Steel's Case Brief); Petitioners' Letter, "Certain Hot-Rolled Steel Flat Products from
Japan:  Rebuttal Brief Nucor Corporation," dated December 21, 2018 (Petitioners' Rebuttal Brief); Nippon Steel's
Letter, "Certain Hot-Rolled Steel Flat Products from Japan:  NSSMC's Rebuttal Brief," dated December 21, 2018

2

On January 28, 2019, Commerce exercised its discretion to toll all deadlines affected by the partial federal government closure from December 22, 2018 through the resumption of operations on January 29, 2019.[6]  On March 27, and April 30, 2019, Commerce met with the petitioners and Tokyo Steel, respectively, to discuss the issues each raised in their respective case and rebuttal briefs.[7]  On March 28, 2019, Commerce extended the deadline for the final results of review until May 23, 2019.[8]  On May 22, 2019, Commerce extended the deadline for the final results of review until June 21, 2019.[9]

## III.   SCOPE OF THE ORDER

The products covered by this order are certain hot-rolled, flat-rolled steel products, with or without patterns in relief, and whether or not annealed, painted, varnished, or coated with plastics or other non-metallic substances.  The products covered do not include those that are clad, plated, or coated with metal.  The products covered include coils that have a width or other lateral measurement ("width") of 12.7 mm or greater, regardless of thickness, and regardless of form of coil (*e.g.*, in successively superimposed layers, spirally oscillating, etc.).  The products covered also include products not in coils (*e.g.*, in straight lengths) of a thickness of less than 4.75 mm and a width that is 12.7 mm or greater and that measures at least 10 times the thickness.  The products described above may be rectangular, square, circular, or other shape and include products of either rectangular or non-rectangular cross-section where such cross-section is achieve subsequent to the rolling process, *i.e.*, products which have been "worked after rolling" (*e.g.*, products which have been beveled or rounded at the edges).  For purposes of the width and thickness requirements referenced above:

(1)   where the nominal and actual measurements vary, a product is within the scope if application of either the nominal or actual measurement would place it within the scope based on the definitions set forth above unless the resulting measurement makes the product covered by the existing antidumping[10] or countervailing duty[11] orders on Certain Cut-To-Length Carbon-Quality Steel Plate Products From the Republic of Korea (A-580-836; C-580-837), and

---

(Nippon Steel's Rebuttal Brief); and Tokyo Steel's Letter, "Rebuttal Brief of Tokyo Steel Manufacturing Co., Ltd: Certain Hot-Rolled Steel Flat Products from Japan," dated December 21, 2018 (Tokyo Steel's Rebuttal Brief).

[6] *See* Memorandum to the Record from Gary Taverman, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance, "Deadlines Affected by the Partial Shutdown of the Federal Government," dated January 28, 2019.  All deadlines in this segment of the proceeding have been extended by 40 days.

[7] *See* Memoranda, "Administrative Review of Certain Hot-Rolled Steel Products from Japan:  Meeting with the Petitioners," dated March 27, 2019; and "Administrative Review of Certain Hot-Rolled Steel Products from Japan: Meeting with Counsel for Tokyo Steel Manufacturing Co., Ltd.," dated April 30, 2019.

[8] *See* Memorandum, "Certain Hot-Rolled Steel Products from Japan:  Extension of Deadline for Final Results of Antidumping Duty Administrative Review; 2016-2017," dated March 28, 2019.

[9] *See* Memorandum, "Certain Hot-Rolled Steel Products from Japan:  Extension of Deadline for Final Results of Antidumping Duty Administrative Review; 2016-2017," dated May 22, 2019.

[10] *See Notice of Amendment of Final Determinations of Sales at Less Than Fair Value and Antidumping Duty Orders:  Certain Cut-To-Length Carbon-Quality Steel Plate Products from France, India, Indonesia, Italy, Japan and the Republic of Korea*, 65 FR 6585 (February 10, 2000).

[11] *See Notice of Amended Final Determinations:  Certain Cut-to-Length Carbon-Quality Steel Plate from India and the Republic of Korea; and Notice of Countervailing Duty Orders:  Certain Cut-To-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, and the Republic of Korea*, 65 FR 6587 (February 10, 2000).

Barcode:3852503-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

(2)        where the width and thickness vary for a specific product (*e.g.*, the thickness of certain products with non-rectangular cross-section, the width of certain products with non-rectangular shape, etc.), the measurement at its greatest width or thickness applies.

Steel products included in the scope of this order are products in which:  (1) iron predominates, by weight, over each of the other contained elements; (2) the carbon content is 2 percent or less, by weight; and (3) none of the elements listed below exceeds the quantity, by weight, respectively indicated:

- 2.50 percent of manganese, or
- 3.30 percent of silicon, or
- 1.50 percent of copper, or
- 1.50 percent of aluminum, or
- 1.25 percent of chromium, or
- 0.30 percent of cobalt, or
- 0.40 percent of lead, or
- 2.00 percent of nickel, or
- 0.30 percent of tungsten, or
- 0.80 percent of molybdenum, or
- 0.10 percent of niobium, or
- 0.30 percent of vanadium, or
- 0.30 percent of zirconium.

Unless specifically excluded, products are included in this scope regardless of levels of boron and titanium.

For example, specifically included in this scope are vacuum degassed, fully stabilized (commonly referred to as interstitial-free (IF)) steels, high strength low alloy (HSLA) steels, the substrate for motor lamination steels, Advanced High Strength Steels (AHSS), and Ultra High Strength Steels (UHSS).  IF steels are recognized as low carbon steels with micro-alloying levels of elements such as titanium and/or niobium added to stabilize carbon and nitrogen elements. HSLA steels are recognized as steels with micro-alloying levels of elements such as chromium, copper, niobium, titanium, vanadium, and molybdenum.  The substrate for motor lamination steels contains micro-alloying levels of elements such as silicon and aluminum.  AHSS and UHSS are considered high tensile strength and high elongation steels, although AHSS and UHSS are covered whether or not they are high tensile strength or high elongation steels.

Subject merchandise includes hot-rolled steel that has been further processed in a third country, including but not limited to pickling, oiling, levelling, annealing, tempering, temper rolling, skin passing, painting, varnishing, trimming, cutting, punching, and/or slitting, or any other processing that would not otherwise remove the merchandise from the scope of the order if performed in the country of manufacture of the hot-rolled steel.

All products that meet the written physical description, and in which the chemistry quantities do not exceed any one of the noted element levels listed above, are within the scope of this order unless specifically excluded.  The following products are outside of and/or specifically excluded from the scope of this order:

- Universal mill plates (*i.e.*, hot-rolled, flat-rolled products not in coils that have been rolled on four faces or in a closed box pass, of a width exceeding 150 mm but not exceeding 1250 mm, of a thickness not less than 4.0 mm, and without patterns in relief);
- Products that have been cold-rolled (cold-reduced) after hot-rolling;[12]
- Ball bearing steels;[13]
- Tool steels;[14] and
- Silico-manganese steels;[15]

The products subject to this order are currently classified in the Harmonized Tariff Schedule of the United States (HTSUS) under item numbers:  7208.10.1500, 7208.10.3000, 7208.10.6000, 7208.25.3000, 7208.25.6000, 7208.26.0030, 7208.26.0060, 7208.27.0030, 7208.27.0060, 7208.36.0030, 7208.36.0060, 7208.37.0030, 7208.37.0060, 7208.38.0015, 7208.38.0030, 7208.38.0090, 7208.39.0015, 7208.39.0030, 7208.39.0090, 7208.40.6030, 7208.40.6060, 7208.53.0000, 7208.54.0000, 7208.90.0000, 7210.70.3000, 7211.14.0030, 7211.14.0090, 7211.19.1500, 7211.19.2000, 7211.19.3000, 7211.19.4500, 7211.19.6000, 7211.19.7530, 7211.19.7560, 7211.19.7590, 7225.11.0000, 7225.19.0000, 7225.30.3050, 7225.30.7000, 7225.40.7000, 7225.99.0090, 7226.11.1000, 7226.11.9030, 7226.11.9060, 7226.19.1000, 7226.19.9000, 7226.91.5000, 7226.91.7000, and 7226.91.8000.  The products subject to the order may also enter under the following HTSUS numbers:  7210.90.9000, 7211.90.0000, 7212.40.1000, 7212.40.5000, 7212.50.0000, 7214.91.0015, 7214.91.0060, 7214.91.0090, 7214.99.0060, 7214.99.0075, 7214.99.0090, 7215.90.5000, 7226.99.0180, and 7228.60.6000.

The HTSUS subheadings above are provided for convenience and U.S. Customs and Border Protection purposes only.  The written description of the scope of the order is dispositive.

---

[12] For purposes of this scope exclusion, rolling operations such as a skin pass, levelling, temper rolling or other minor rolling operations after the hot-rolling process for purposes of surface finish, flatness, shape control, or gauge control do not constitute cold-rolling sufficient to meet this exclusion.

[13] Ball bearing steels are defined as steels which contain, in addition to iron, each of the following elements by weight in the amount specified:  (i) not less than 0.95 nor more than 1.13 percent of carbon; (ii) not less than 0.22 nor more than 0.48 percent of manganese; (iii) none, or not more than 0.03 percent of sulfur; (iv) none, or not more than 0.03 percent of phosphorus; (v) not less than 0.18 nor more than 0.37 percent of silicon; (vi) not less than 1.25 nor more than 1.65 percent of chromium; (vii) none, or not more than 0.28 percent of nickel; (viii) none, or not more than 0.38 percent of copper; and (ix) none, or not more than 0.09 percent of molybdenum.

[14] Tool steels are defined as steels which contain the following combinations of elements in the quantity by weight respectively indicated:  (i) more than 1.2 percent carbon and more than 10.5 percent chromium; or (ii) not less than 0.3 percent carbon and 1.25 percent or more but less than 10.5 percent chromium; or (iii) not less than 0.85 percent carbon and 1 percent to 1.8 percent, inclusive, manganese; or (iv) 0.9 percent to 1.2 percent, inclusive, chromium and 0.9 percent to 1.4 percent, inclusive, molybdenum; or (v) not less than 0.5 percent carbon and not less than 3.5 percent molybdenum; or (vi) not less than 0.5 percent carbon and not less than 5.5 percent tungsten.

[15] Silico-manganese steel is defined as steels containing by weight:  (i) not more than 0.7 percent of carbon; (ii) 0.5 percent or more but not more than 1.9 percent of manganese, and (iii) 0.6 percent or more but not more than 2.3 percent of silicon.

Barcode:3852503-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

## IV.   APPLICATION OF PARTIAL FACTS AVAILABLE AND USE OF ADVERSE INFERENCE

### A)   *Application of Facts Available*

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Tariff Act of 1930, as amended (the Act), provide that, if necessary information is not available on the record, or if an interested party:  (1) withholds information requested by Commerce; (2) fails to provide such information by the deadlines for submission of the information, or in the form and manner requested, subject to subsections (c)(1) and (e) of section 782 of the Act; (3) significantly impedes a proceeding; or (4) provides such information but the information cannot be verified as provided in section 782(i) of the Act, Commerce shall use, subject to section 782(d) of the Act, facts otherwise available in reaching the applicable determination.

Finally, where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party an opportunity to remedy or explain the deficiency.

As discussed in Comment 3 below, we find that necessary information is not available on the record because Nippon Steel withheld requested information that was necessary to calculate comparison market price and dumping margins.  Accordingly, pursuant to sections 776(a)(1) and (2)(A) of the Act, we are relying upon facts otherwise available with respect to Nippon Steel's unreported home market affiliates' downstream resales.

### B)   *Use of Adverse Inference*

Section 776(b) of the Act provides that, if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, Commerce may use an inference adverse to the interests of that party in selecting the facts otherwise available (*i.e.*, adverse facts available (AFA)).[16]  In doing so, and under section 776(b)(1)(B) of the Act, Commerce is not required to determine, or make any adjustments to, a weighted-average dumping margin based on any assumptions about information an interested party would have provided if the interested party had complied with the request for information. In addition, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act (SAA) explains that Commerce may employ an adverse inference "to ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[17]  Furthermore, affirmative evidence of bad faith on the part of a respondent is

---

[16] *See* 19 CFR 351.308(a); *see also Notice of Final Results of Antidumping Duty Administrative Review:  Stainless Steel Bar from India*, 70 FR 54023, 54025-26 (September 13, 2005); and *Notice of Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances:  Carbon and Certain Alloy Steel Wire Rod from Brazil*, 67 FR 55792, 55794-96 (August 30, 2002).

[17] *See* SAA, H.R. Doc. 103-316, Vol. 1 (1994) at 870; *see also Certain Polyester Staple Fiber from Korea:  Final Results of the 2005-2006 Antidumping Duty Administrative Review*, 72 FR 69663, 69664 (December 10, 2007).

Filed By: Jun Jack Zhao, Filed Date: 6/24/19 12:37 PM, Submission Status: Approved

not required before Commerce may make an adverse inference.[18]  It is Commerce's practice to
consider, in employing adverse inferences, the extent to which a party may benefit from its own
lack of cooperation.[19]

Nippon Steel's Unreported Home Market Affiliates' Downstream Resales

As discussed in detail in Comment 3 below, we find that Nippon Steel failed to cooperate by not
acting to the best of its ability to comply with the request for information regarding the reporting
of its affiliated companies' home market resales, which prevents Commerce from having home
market sales prices and, therefore, from calculating an accurate dumping margin.

Accordingly, Commerce finds that Nippon Steel failed to cooperate to the best of its ability to
comply with a request for information by Commerce.  Based on the above, in accordance with
section 776(b) of the Act and 19 CFR 351.308(a), as we don't have the home market prices for
these unreported affiliates' downstream resales, Commerce finds it is appropriate to use an
adverse inference when selecting from among the facts otherwise available in assigning the
highest unaffiliated home market price to the unreported downstream sales at issue.

## V.    FINAL DETERMINATION OF NO SHIPMENTS

Hitachi Metals, Ltd. (Hitachi), Honda Trading Canada, Inc. (Honda), and Panasonic Corporation
(Panasonic) each claimed no shipments during the POR.  U.S. Customs and Border Protection
(CBP) confirmed these companies had no shipments.[20]  Therefore, in the *Preliminary Results*, we
noted we would issue appropriate instructions to CBP based on final results of the review.[21]  We
received no comments from parties with respect to these companies.  Therefore, for the final
results we continue to find Hitachi, Honda, and Panasonic had no shipments of subject
merchandise to the United States during the POR.

**Mitsui**

Mitsui & Co. Ltd. (Mitsui) also initially claimed no shipments during the POR.[22]  Based on
information received from CBP,[23] we stated in the *Preliminary Results* that we would continue to
include Mitsui with the companies under review and make a determination for the final results

---

[18] *See, e.g.*, *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (*Nippon Steel*); *Notice of Final Determination of Sales at Less Than Fair Value:  Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); and *Preamble*, 62 FR at 27340.

[19] *See, e.g.*, *Steel Threaded Rod from Thailand:  Preliminary Determination of Sales at Less Than Fair Value and Affirmative Preliminary Determination of Critical Circumstances*, 78 FR 79670 (December 31, 2013), and accompanying PDM at 4, unchanged in *Steel Threaded Rod from Thailand:  Final Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 79 FR 14476 (March 14, 2014).

[20] *See* Memorandum, "No Shipment Inquiry with Respect to the Company Below During the Period 03/22/2016 through 09/30/2017," dated October 23, 2018 (Public Version).

[21] *See Preliminary Results* PDM at 7.

[22] *See* Mitsui's Letter, "Antidumping Administrative Review of Certain Hot-Rolled Steel Flat Products:  Mitsui No Shipment Notification," dated January 5, 2018.

[23] *See* Memorandum, "No Shipment Inquiry with Respect to the Company Below During the Period 03/22/2016 through 09/30/2017," dated October 23, 2018 (Business Proprietary Version).

after soliciting more information and comments.  On December 20, 2018, we placed U.S. entry documentation on the record providing parties with an opportunity to comment.  We also requested Mitsui to explain the apparent discrepancy between its claim of no shipments and the CBP information.[24]  Mitsui responded by stating that the documents provided to Commerce by CBP were consistent with the entry documentation which it had now retrieved from Mitsui & Co., (USA), Inc. (Mitsui USA), indicating that during the POR there was, in fact, one shipment of subject merchandise by Mitsui of Japan, sold to and entered by a U.S. customer.[25]  Mitsui explained that the error resulted from the fact that, in their established business pattern, Mitsui USA had been the only prior importer of such sales made by its parent company in Japan (*i.e.*, Mitsui), and that there were no such sales like those of past experience during the POR.  Mitsui added that the two affiliated companies missed this unrelated third-party party sale, resulting in the erroneous no shipment certification.  Mitsui added that it regretted its error, and that it was seeking to withdraw its certification.[26]  No other interested parties filed comments.  Therefore, for the final results, we find that Mitsui had shipments of subject merchandise to the United States during the POR.  Accordingly, the rate applicable to Mitsui is the rate assigned to the companies not individually examined in this review.

## VI.   CHANGES SINCE THE PRELIMINARY RESULTS

Based on our analysis of comments received from parties, we made certain changes to Nippon Steel's and Tokyo Steel's calculations.[27]

## VII.   DISCUSSION OF THE ISSUES

### Tokyo Steel-Specific Issues

**Comment 1:   Whether Commerce Should Apply Total AFA to Tokyo Steel for Failing to Explain Its Original Cost Reporting Methodology**

*Petitioners' Case Brief:*
- Commerce should apply total AFA to Tokyo Steel for failing to provide an explanation of its original cost reporting methodology in a timely manner.
- Tokyo Steel's section D response was not a serious attempt to provide a legitimate response or to act to the best of its ability.
- The original section D response failed to explain how Tokyo Steel used its normal books and records to determine the reported control number- (CONNUM-) specific costs or how the reported costs accounted for differences in certain CONNUM characteristics.

---

[24] *See* Memorandum, "Placing U.S. Entry Documents on the Record," dated December 20, 2018.
[25] *See* Mitsui's Letter, "Antidumping Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan: Mitsui Comment on U.S. Entry Documents Placed on the Record," dated December 27, 2018.
[26] *Id.*
[27] *See* Memoranda, "Final Results Margin Calculation for Nippon Steel & Sumitomo Metal Corporation" (Nippon Steel Final Analysis Memorandum); and "Final Results Margin Calculation for Tokyo Steel Manufacturing Co., Ltd." (Tokyo Steel Final Analysis Memorandum) dated concurrently with this memorandum.

- Tokyo Steel side-stepped the section D questions on how it derived CONNUM-specific costs for the highest selling U.S. and home-market CONNUMs while the substantive methodology questions were simply answered by deferring to exhibits.
- Tokyo Steel submitted numerous irrelevant and untranslated pages in its original section D response; not a single exhibit shows the allocation methodologies of any costs to particular products or CONNUMs.
- Tokyo Steel's original section D submission and cost database prove that Tokyo Steel took its books and records, which did not account for the most important product characteristics, and simply reallocated monthly costs to CONNUMs based on monthly sales totals.
- Commerce's supplemental questionnaire never asked for a remedy to the section D response deficiencies but rather an explanation of the deficiencies.  Moreover, Commerce warned Tokyo Steel that its response must comply with Commerce's factual information regulations.
- In response to the supplemental questionnaire, Tokyo Steel failed to explain the actual methodology in its original questionnaire response and used a new reporting methodology without reference to its original response.
- Commerce should not accept Tokyo Steel's claim that the revision to its originally reported costs was the result of the correction of inadvertent errors.
- The comparison of Tokyo Steel's original and most recent cost databases conclusively demonstrates that Tokyo Steel drastically revised its CONNUMs and CONNUM-specific costs for every single cost reporting field despite Tokyo Steel's claim that it used the same reporting methodology.
- There are too many changes to Tokyo Steel's cost data file for the changes to be the result of inadvertent errors and Tokyo Steel's original response demonstrates that nothing was accidentally reported.
- Tokyo Steel's reporting tactic directly violates Commerce's new factual information regulations and deadlines and constitutes a failure to provide requested information in a timely manner.
- Tokyo Steel's actions were intentional and deliberate.  As such, Commerce should find that Tokyo Steel's explanation for its changes in its reported costs is not satisfactory under section 782(d) and disregard Tokyo's original questionnaire response.

*Tokyo Steel's Rebuttal Brief:*
- Commerce should disregard the petitioners' request for the application of total adverse facts available because the request has no legal or factual basis in this administrative review.
- In accordance with the statute, Tokyo Steel has been fully cooperative in this review, fully complying with Commerce's requests for information.
- Tokyo Steel addressed all of Commerce's questions and requests for additional explanation in its first supplemental section D questionnaire and, importantly, Tokyo Steel utilized this first opportunity to address and revise some of the inadvertent errors made in its original Section D response.

- The Federal Circuit noted in *Nippon Steel*[28] that the "best of its ability" standard does not require perfection from respondents and it is unavoidable in antidumping proceedings that mistakes occur.
- Commerce accepted Tokyo Steel's supplemental response and issued a second supplemental section D questionnaire asking for a few additional revisions and clarifications. Tokyo Steel timely filed its response with Commerce and no further questionnaires were issued by Commerce.
- Petitioners did not file any further comments on Tokyo Steel's cost reporting methodology or section D responses in the more than three months that passed after Tokyo Steel's first supplemental response in early July 2018 until two weeks before Commerce's *Preliminary Results*.
- Petitioners repeat the same arguments in its case brief that it made in its pre-preliminary comments which were implicitly rejected by Commerce in the *Preliminary Results*.
- Petitioners mischaracterize the impact of the errors made in Tokyo Steel's Original Section D response by claiming that the revised cost database is drastically different from the original cost database. There are numerous CONNUMs in the cost database and many had changes but that is the nature of adjustments to costs that pass through to most or even all of the CONNUMs.
- The majority of the CONNUMs in the cost database do not have any impact on the margin calculation.
- The small difference between the percentage of home market sales passing the cost test based on the original cost database and the percentage of home market sales passing the cost test based on the most recently submitted revised cost database demonstrates that the revised cost database may have had many changes, but the net effect of those changes was very modest.
- If Commerce now accepted the petitioners' request to apply total AFA to Tokyo Steel, it would be contrary to Commerce's practice to accept changes submitted in response to Commerce's questionnaires, so long as the changes were timely submitted, fully explained, and responsive to Commerce's requests.
- Since July of 2016, Commerce has received ten requests from the petitioners to apply total AFA to a respondent's information in flat-rolled steel products alone. Commerce did not apply total AFA in any of those cases where the respondent had submitted extensive information that duly responded to all Commerce's requests.
- In *CTL Plate from Korea*,[29] Commerce rejected the petitioners' similar request for total AFA and instead relied on the respondent's timely reported information in reaching its Final Determination.

**Commerce's Position***:* We continue to find that AFA is not warranted with respect to Tokyo Steel. Contrary to the petitioners' claim, we find that Tokyo Steel acted to the best of its ability in timely complying to all of Commerce's requests. Moreover, we find that Tokyo Steel's submission of its revised cost database was compliant with Commerce's factual information

---

[28] *See* Tokyo Steel's Rebuttal Brief at 5 (citing *Nippon Steel*, 337 F.3d at 1382).
[29] *See* Tokyo Steel's Rebuttal Brief at 10 (citing *Carbon and Alloy Steel Cut-to-Length Plate from Korea: Final Determination of Sales at Less Than Fair Value and Final Negative Critical Circumstances Determination*, 82 FR 16369 (April 4, 2017) (*CTL Plate from Korea*) and accompanying IDM at 13-16).

regulations[30] because the revised cost database was submitted by Tokyo Steel in response to Commerce's SDQ.[31]

In its original DQR, Tokyo Steel reported that it does not track costs associated with the physical characteristics of "quality," "strength," "thickness," and "width" in the normal course of business.[32]  However, Tokyo Steel explained that it could distinguish quality and strength among products produced based on the finished products' standard specifications and grades.[33]  Tokyo Steel stated that differentiation between products for quality and strength is established at the steelmaking stage, based on the inputs in each charge.[34]  As such, differences in costs occur among products of differing qualities and strength due to the mix of alloys that are consumed for each charge to make a slab from the furnace.[35]  Tokyo Steel stated that differences in thickness and width are specific to the final coil or sheet and can be differentiated based on the rolling time of the individual coil.[36]  Tokyo Steel explained that the company developed a cost allocation methodology to utilize the steel input mix of each slab and the rolling times of the finished products to differentiate the costs between the reported scope merchandise.[37]  Tokyo Steel provided a description of how the company developed the reported CONNUM-specific costs and cost calculation worksheets for the highest selling CONNUMs in the U.S. and home markets.[38]  In addition, Tokyo Steel provided copies of production reports as support of the classification of finished products to CONNUMs as well as identifying the originating steel slab for purposes of distinguishing quality and strength among finished products.[39]  Tokyo Steel also provided copies of its monthly inventory records.[40]  Tokyo Steel submitted certain translations of the copies of the production reports and inventory records and an index of certain translated words.[41]

The petitioners filed deficiency comments on Tokyo Steel's DQR requesting that Commerce consider Tokyo Steel's response a failure to provide requested information in a timely manner and a failure to act to the best of its ability.[42]  The petitioners based its request on the assertion that Tokyo Steel failed to explain how it derived the reported CONNUM-specific costs.[43]  The

---

[30] *See* 19 CFR 351.302 for Commerce's factual information regulations.

[31] *See* Letter to Tokyo Steel dated June 19, 2018 (SDQ); *see also* Tokyo Steel's July 5, 2018 supplemental section D questionnaire response (Tokyo Steel's July 5, 2018 SDQR) at Exhibit SD1-1.

[32] Quality, strength, thickness, and width were defined as physical characteristics in the original questionnaire issued by Commerce on January 19, 2018 (*see* B-8 thru B-11 and C-7 thru C-9); *see also* Tokyo Steel's March 19, 2018 section D questionnaire response (Tokyo Steel's March 19, 2018 DQR) at D-19.

[33] *See* Tokyo Steel's March 19, 2018 DQR at D-29

[34] *Id.*

[35] *Id.* at D-31.

[36] *Id.* at D-29.

[37] *Id.* at D-31.

[38] *Id.* at D-28 thru D-34 (Tokyo Steel's description of its cost reporting methodology) and Exhibits D-18 and D-19 (cost calculation worksheets).

[39] *Id.* at D-22 to D-23 and Exhibits D-14 and D-15.

[40] *Id.* at Exhibit D-13.

[41] *Id.* at Exhibits D-13, D-14, and D-15.

[42] *See* Petitioner's Letter, "Deficiency Comments on Tokyo's Sections B-D Questionnaire Responses," dated April 17, 2018 at 2.

[43] *Id.* at 10-17.

petitioners stated that if Commerce continued with the proceeding, Commerce should request that Tokyo Steel explain how it derived the costs reported in the cost database.[44]

In the first SDQ, Commerce requested that Tokyo Steel describe in further detail how the company departed from its normal books and records to account for cost differences associated with the quality, strength, thickness, and width physical characteristics.[45]  Commerce also requested that Tokyo Steel revise its reconciliation of the POR total cost of manufacturing (TCOM) to the summation of Tokyo Steel's extended per-unit costs in its cost database.[46]  In addition, Commerce requested that Tokyo Steel provide more detailed descriptions of the cost calculation worksheets for the highest selling CONNUMs in the U.S. and home markets.[47]  Commerce requested that Tokyo Steel provide complete translations of all previously submitted copies of production reports and inventory records with certain words translated rather than providing an index of certain words.[48]

The SDQ also advised Tokyo Steel of Commerce's factual information regulations.[49]  Specifically, Commerce stated,

> All responses to this supplemental questionnaire should be limited to the questions contained herein.  Additional information or revisions of previously requested information, not pertinent to this supplemental questionnaire, may result in their rejection, pursuant to 19 CFR 351.301.  If any of your responses to the above questions results in a change to your cost of production database provide a revised electronic cost database in SAS and Excel formats.[50]

Tokyo Steel timely filed its SDQR.[51]  In response to Commerce's request for further clarification of how Tokyo Steel accounted for cost differences associated with quality, strength, thickness, and width, Tokyo Steel provided a more detailed, step-by-step explanation of how the company differentiated costs among products.[52]  In that discussion, Tokyo Steel noted that as a result of providing detailed descriptions and analyses in response to Commerce's questions, Tokyo Steel discovered that the alloy cost allocations were inadvertently not incorporated in Tokyo Steel's originally reported cost database due to a programming error.[53]  Tokyo Steel stated that it corrected the error in the revised cost database.[54]  Tokyo Steel also revised the reconciliation of the POR TCOM to summation of Tokyo Steel's extended per-unit costs in its revised cost database.[55]  Tokyo Steel explained that while completing the revised reconciliation, it discovered

---

[44] *Id.* at 15 and 17.
[45] *See* SDQ at 3 and 4.
[46] *Id.* at 8.
[47] *Id.* at 3 thru 5.
[48] *Id.* at 6.
[49] *Id.* at 10.
[50] *Id.* at 10.
[51] *See* Tokyo Steel's July 5, 2018 SDQR at 1.
[52] *Id.* at 2-16.
[53] *Id.* at 3 and 12.
[54] *Id.* at 3 and 12.
[55] *Id.* at 45 and 46.

that the originally reported total POR cost of manufacturing did not account for the removal of
semi-finished products that were further processed at subsequent stages of production or
reprocessed at the skin-passing stage.[56]  Tokyo Steel also complied with Commerce's requests to
provide more detailed descriptions of the cost calculation worksheets for the highest selling
CONNUMs in the U.S. and home markets and complete translations of the production reports
and inventory ledgers.[57]

Sections 776(a)(1) and 776(a)(2)(A)-(D) of the Act provide that if necessary information is not
available on the record or if an interested party:  (A) withholds information that has been
requested by Commerce; (2) fails to provide information within the established deadlines or in
the form or manner requested, subject to section 782(c)(1) and section 782(e) of the Act; (3)
significantly impedes a proceeding; or (4) provides information but the information cannot be
verified, then Commerce shall use, subject to section 782(d) of the Act, facts otherwise available
in reaching the applicable determination.  Moreover, section 776(b) of the Act provides that, if
Commerce finds that an interested party failed to cooperate by not acting to the best of its ability
to comply with a request for information, Commerce may use an inference adverse to the
interests of that party in selecting the facts otherwise available.

Contrary to the petitioners' allegation, we do not find that the statutory requirements for the
application of AFA are met in this instance.  The petitioners assert that because Tokyo Steel
failed to provide an explanation of its cost reporting methodology in its section D submission
and subsequently failed to explain the changes to its originally reported costs in its supplemental
section D response, Commerce should disregard Tokyo Steel's cost submissions in accordance
with section 782(d) of the Act and, instead, rely on AFA for Tokyo Steel's costs in this
proceeding.  We disagree.  Here, Tokyo Steel's original section D response complied with the
criteria mandated by section 782(e) of the Act.[58]  The original DQR was submitted by the
established deadline and provided per-unit CONNUM-specific costs that Commerce could use
for the *Preliminary Results* without undue difficulties.[59]  Contrary to the petitioners' allegation,
the original DQR included a description of Tokyo Steel's reporting methodology.[60]  Tokyo
Steel's SDQR, also submitted timely, explicitly stated that as a result of a programming error,
Tokyo Steel's alloy cost allocations were inadvertently not incorporated into the originally
reported cost database.[61]  In addition, Tokyo Steel explained that the original cost database did
not account for the removal of certain semi-finished products.[62]  Because we find that Tokyo
Steel adequately explained the differences between its original and revised cost databases, we
disagree with the petitioners that Tokyo Steel's SDQR fails to meet the requirements of 782(d)
of the Act.  Moreover, we find in this case that Tokyo Steel's timely responses to Commerce's
supplemental questionnaires demonstrates that Tokyo Steel acted to the best of its ability in

---

[56] *Id*. at 14.
[57] *Id*. at 2-16 and Exhibits SD1-9 and SD1-12 thru SD1-14.
[58] *See* sections 782(e)(1), 782(e)(3), and 782(e)(5) of the Act, respectively.  Because no party requested verification,
Commerce did not conduct verification of Tokyo Steel's responses.  As such, Section 782(e)(2) is inapplicable here.
[59] *See* Tokyo Steel's March 19, 2018 DQR at Exhibit D-1.
[60] *Id*. at D-28 thru D-34.
[61] *See* Tokyo Steel's July 5, 2018 SDQR at 3.
[62] *Id*. at 45.

complying with Commerce's requests.[63]  As such, consistent with *Nippon Steel*, we find no basis for the petitioners' claim that Tokyo Steel did not act to the best of its ability or impeded this proceeding.

We also disagree with the petitioners' contention that Tokyo Steel's submission of its revised cost database violates Commerce's factual information regulations.[64]  Commerce's SDQ instructed Tokyo Steel that if any of the company's responses to the specific questions outlined in the SDQ resulted in a change to the company's cost database, the company should provide a revised electronic cost database in SAS and Excel formats.[65]  The revised cost database was submitted by Tokyo Steel when the company, in responding to Commerce's specific questions regarding the physical characteristics of quality and strength and request that Tokyo Steel revise its reconciliation, discovered that certain errors were made in the original submissions.[66]  We find no merit in the petitioners' argument that the number of changes in Tokyo Steel's revised cost database concludes that Tokyo Steel revised its reporting methodology for the supplemental section D response.  Tokyo Steel stated specifically that the changes in the cost databases resulted from the correction of the alloy cost allocation programming error and revisions related to certain semi-finished products.[67]  Furthermore, Tokyo Steel's detailed explanation of its reporting methodology in its SDQR supports the reporting methodology discussed in the DQR.[68]  As such, we find that the changes in Tokyo Steel's revised cost database resulted from the correction of errors rather than from using a revised reporting methodology as claimed by the petitioners.

**Comment 2:  Correction of Error in Tokyo Steel's Margin Calculation**

*Tokyo Steel's Case Brief:*
- Commerce incorrectly utilized a different universe of total home market sales in its SAS calculations in the *Preliminary Results*, resulting in incorrect monthly comparisons between U.S. sales and home market sales.
- Commerce should correct this error by changing the home market program begin date or by changing the margin program begin window date.

*The petitioners did not comment.*

**Commerce's Position***:*  We agree with Tokyo Steel and, upon further review of the dates, we have revised the SAS programs to correctly reflect the sales and window periods.[69]

---

[63] *See* section 782(e)(4) of the Act.
[64] *See* 19 CFR 351.302.
[65] *See* SDQ at 10.
[66] *See* Tokyo Steel's July 5, 2018 SDQR at 3 and 45.
[67] *Id*.
[68] *Id*. at 2.
[69] *See* Tokyo Steel Final Analysis Memorandum.

**Nippon Steel-Specific Issues**

**Comment 3:  Whether Commerce Should Continue to Apply Partial AFA to Certain
Nippon Steel's Affiliated Downstream Resales in the Home Market**

*Nippon Steel's Case Brief:*
- Nippon Steel cooperated by acting to the best of its ability to comply with Commerce's requests for information.
- Commerce failed to support its finding that Nippon Steel can induce its affiliated resellers to report their downstream sales.
- Commerce ignored record evidence that certain affiliated resellers were incapable of providing the requested information.
- Commerce failed to demonstrate that Nippon Steel could have induced the affiliated resellers that may have been capable of providing the requested information to provide such information.

*Petitioners' Rebuttal Brief:*
- In the original investigation, Commerce applied partial AFA to Nippon Steel for its failure to report affiliated downstream sales, for the same reason, Commerce should continue to apply partial AFA to Nippon Steel on these unreported affiliated downstream sales in this administrative review.
- The record indicates that Nippon Steel did not put forth the maximum effort to obtain the necessary information, nor does the record support Nippon Steel's excuse that certain of its affiliated resellers were incapable of providing the data.
- Nippon Steel was clearly able to have worked with its affiliated resellers to provide the necessary data in a timely manner.  Commerce's application of partial AFA to these unreported downstream sales was reasonable and in accordance with the record facts and agency practice.
- As the AFA rate chosen for the *Preliminary Results* had no impact on Nippon Steel's margin, Commerce should apply a sufficiently adverse alternative AFA for the final results, to induce Nippon Steel to cooperate on this issue in the future.
- In the original investigation, Commerce applied AFA to this identical issue for Nippon Steel, but rather than apply the highest CONNUM-specific prices as sold to unaffiliated customers, Commerce assigned to the unreported affiliated resellers' resales the single highest price overall - regardless of CONNUM - as reported to unaffiliated customers.
- In the event the highest price for any CONNUM sold to unaffiliated customers is aberrational, Commerce can select the highest non-aberrational price, or another alternative AFA sufficiently adverse to induce Nippon Steel's cooperation on this matter.
- Commerce could mix its POI and current AFA methodologies and apply to the affiliated resellers resales the single highest net price for sales to unaffiliated home market (HM) customers of only those CONNUMs commonly sold to both unaffiliated customers and those affiliated customers that failed the arm's length.

**Commerce's Position:**  We continue to find that partial AFA is warranted with respect to Nippon Steel's unreported affiliated parties' resales in the home market for the final results.  As Nippon Steel's sales to these affiliated customers accounted for more than five percent of its total

sales of foreign-like product in the home market, in its initial and supplemental questionnaires, Commerce requested Nippon Steel to report downstream sales that were not made at arm's length from Nippon Steel's affiliated resellers. Nippon Steel's arguments that it made attempts to collect but could not obtain these downstream sales data, do not change the fact that the necessary home market price data are missing from the record. The home market sales information is fundamental data, without which Commerce cannot perform the dumping calculation required by the statute. Therefore, we continue to find that the necessary information is not on the record. Accordingly, consistent with our *Preliminary Results*,[70] we continue to find that the use of facts available is warranted in determining the AD margin for Nippon Steel, pursuant to sections 776(a)(1) and (2)(A), (B), and (C) of the Act.

Moreover, the record shows that Nippon Steel has ownership leverage as well as an absolute veto power over whether to sell to, or continue to do business with, an affiliate.[71] In fact, it is Nippon Steel that establishes the prices of sales to its affiliates, thus, Nippon Steel is in a position to make these sales at arm's-length prices or not. Based on this information, we continue to find that Nippon Steel is in a position to induce these companies to report their downstream sales.[72] As such, we continue to find that Nippon Steel has failed to cooperate to the best of its ability in obtaining these companies' downstream sales. Consistent with our finding in the *Preliminary Results*,[73] we continue to find that Nippon Steel has failed to cooperate to the best of its ability in obtaining these companies' downstream sales. Pursuant to 776(b) of the Act, we are using an adverse inference in applying the facts otherwise available, because Nippon Steel has failed to cooperate to the best of its ability to comply with our request for information.

In the *Preliminary Results*, we applied the highest Nippon Steel home market product matching CONNUM-specific price for unaffiliated customers to these unreported affiliated companies' resales.[74] In *Hot Rolled from Japan*, we applied the highest Nippon Steel home market unaffiliated sales price to all unreported affiliated companies' resales.[75] The matching CONNUM-specific home market provides a more limited pool from which to select an appropriate AFA rate. To ensure that the selected AFA rate will induce cooperation, we find it appropriate to evaluate a broader pool, *i.e.*, the respondent's home market sales, in selecting an AFA rate for these unreported sales. Consistent with the methodology from *Hot Rolled Steel from Japan* final determination, for the final results, we have determined to assign the highest unaffiliated home market price of the commonly sold CONNUMs to the unreported downstream sales at issue.[76]

---

[70] *See Preliminary Results* PDM at 11.

[71] *See* Nippon Steel's August 10, 2018 Supplemental Questionnaire Response (Nippon Steel's August 10, 2018 SQR) at Revised Exhibit B-23.

[72] *Id.*

[73] *See Preliminary Results* PDM at 12.

[74] *See* Memorandum, "Antidumping Duty Administrative Review of Certain Hot-Rolled Steel Flat Products from Japan: Preliminary Determination Margin Calculation for Nippon Steel & Sumitomo Metal Corporation," dated November 1, 2018 (Nippon Steel's Preliminary Analysis Memorandum).

[75] *See Certain Hot-Rolled Steel Flat Products from Japan: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 53409 (August 12, 2016) (*Hot Rolled from Japan*) and accompanying Issues and Decision Memorandum (IDM).

[76] *See* Nippon Steel Final Analysis Memorandum.

**Comment 4:  Whether Commerce Should Grant a Constructed Export Price Offset to Nippon Steel**

*Nippon Steel's Case Brief:*
- Nippon Steel's questionnaire responses demonstrate that Nippon Steel's affiliated U.S. manufacturer, Steelscape LLC, which made all the constructed export price (CEP) sales reported in the Section C sales file, performs many of the selling functions in the United States that are performed by Nippon Steel in its domestic market.
- Given that there are no sales in the domestic market at the U.S. level of trade (LOT) to measure a LOT adjustment, the CEP offset is the only means to ensure that the CEP is compared to a normal value in the domestic market at the same place in the chain of distribution.

*Petitioners' Rebuttal Brief:*
- Nippon Steel failed to provide any requested documentation to support its claimed differences in the level of intensity at which it performed activities at each LOT and failed to demonstrate significant and substantial differences between the HM LOT and U.S. LOT.
- The record indicates few differences between the HM LOT and the U.S. LOT. Commerce's *Preliminary Results* found that the few differences between the LOTs were minor and insufficient to merit a CEP offset.
- Like the respondent in *Heavy-Walled Pipe from Korea*,[77] Nippon Steel has not demonstrated why its claimed differences between the HM LOT and the CEP LOT constitute significant and substantial differences that are enough to grant Nippon Steel a favorable finding that the HM LOT is at a more advanced stage of distribution. Accordingly, Commerce should deny Nippon Steel a CEP offset in its final margin calculations.

**Commerce's Position:**  We continue to find that a CEP offset is not warranted for the final margin calculations.  As explained in the *Preliminary Results*, we compared the HM LOT to the U.S. LOT and found that the selling functions Nippon Steel performed for its home market customers are virtually the same as those performed for its U.S. customers at a similar level of intensity.  The only difference is that Nippon Steel coordinates freight and delivery at a relatively lower level of intensity for U.S. sales.  This difference is not sufficient to determine that Nippon Steel's LOT for U.S. sales is different from the LOT for its home market sales.  Therefore, we determine that home market sales and the U.S. sales were made at the same LOT, and that no LOT adjustment was warranted.  Because Nippon Steel's HM LOT is not at a more advanced stage of distribution than its U.S. LOT, a CEP offset is not warranted.[78]

---

[77] *See* Petitioners' Rebuttal Brief at 17 (citing *Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value*, 81 FR 47347 (July 21, 2016), and accompanying IDM at Comment 7).
[78] *Id.*

**Comment 5: Processing Expenses Incurred by Nippon Steel's Affiliated Trading Company in Japan**

*Nippon Steel's Case Brief:*
- Nippon Steel's affiliated trading company in Japan slits and cuts Nippon Steel's coil. Commerce should treat this processing as a direct selling expense and deduct it from normal value in accordance with 773(a)(b) of the Act.

*Petitioners' Rebuttal Brief:*
- The additional processing and finishing operations are an essential part of the production process and impart physical characteristics to hot-rolled coil such as width, form, and pickling are part of Commerce's model-match hierarchy. Therefore, these expenses are production costs, not selling expenses.
- Commerce should continue to deny this downward adjustment to HM prices and instead increase Nippon Steel's reported costs to account for this processing.

**Commerce's Position:** We continue to find that the processing costs (PROCESSH) performed by Nippon Steel's affiliate are not a direct selling expense that should be deducted from normal value. As defined by 19 CFR 351.410(c), direct selling expenses are "commissions, credit expenses, guarantees, and warranties, that result from, and bear a direct relationship to, the particular sale in question." The processing costs at issue are not sales related expenses as defined in 19 CFR 351.410(c). Therefore, for the final results, we are not deducting these processing costs from Nippon Steel's normal value.

**Comment 6: Nippon Steel's Failure to Submit Full Translations of Requested Financial Statement**

*Petitioners' Case Brief:*
- Nippon Steel did not provide fully translated financials of multiple entities involved in sale and/or production of the merchandise under consideration, including the most pertinent financial statements – Nippon Steel's official consolidated and unconsolidated financial statements.
- Without these fully translated financials, Nippon Steel's responses are unreliable and Nippon Steel's failure to provide this information warrants the application of total AFA in the final results.

*Nippon Steel's Rebuttal Brief:*
- The record contains the translated financial statements of Nippon Steel, as well as the translated financial statements of all of the other entities requested by Commerce. Therefore, there is no basis for Commerce to apply AFA in the final results.

**Commerce's Position:** We have not applied total AFA to Nippon Steel in these final results. The record of this review shows that Nippon Steel submitted usable, translated financial

statements for all the companies, as requested.[79]  There is no basis on the record to find that the financial statements submitted by Nippon Steel are unreliable.

**Comment 7:  Nippon Steel's Failure to Provide a Separate Section A Response for Nisshin Steel Co., Ltd**.

*Petitioners' Case Brief:*
- The failure of Nippon Steel to submit a separate section A response for Nisshin Steel Co., Ltd. (Nisshin) demonstrates that Nippon Steel did not act to the best of its ability to provide requested information that is critical to accurate margin calculations.
- Commerce should apply total AFA to Nippon Steel as Nippon Steel failed to act to its best ability to provide requested information that is critical to accurate margin calculations.

*Nippon Steel's Rebuttal Brief:*
- Nippon Steel has provided a section A response for Nisshin, the information provided for Nippon Steel throughout the Section A questionnaire response provides complete information for both Nippon Steel and Nisshin, unless otherwise specified.  As such, these is no basis for Commerce to apply to AFA to Nippon Steel on this issue.

**Commerce's Position:**  We have not applied total AFA to Nippon Steel in these final results.  The record of this review shows that Nippon Steel's Section A questionnaire response provided information for Nisshin and Nippon Steel.[80]  Therefore, there is no basis to resort to facts available, much less AFA, with respect to this issue.

**Comment 8:  Nippon Steel Refused to Report All the HM Sales in the Window Period that Are Necessary for the Margin Calculations**

*Petitioners' Case Brief:*
- Nippon Steel has not reported HM sales for the entire window period required for price comparisons with its U.S. sales.  As such, Commerce should apply total AFA to Nippon Steel given Nippon Steel's refusal to provide this requested data.

*Nippon Steel's Rebuttal Brief:*
- The U.S. sales at issue matched to an identical home-market CONNUM sold in the same month as the U.S. sales.  Therefore, the absence of home market sales for October and November 2015 has no effect on the matches for the U.S. sales at issue.  As such, these is no basis for Commerce to apply AFA on this issue.

**Commerce's Position:**  We have not applied total AFA to Nippon Steel in these final results.  The record of this review shows that Nippon Steel's December 2015 sales were compared to

---

[79] *See* Nippon Steel's February 20, 2018 Section A Questionnaire Response (Nippon Steel's February 4, 2018 AQR), at Exhibit A-26, A-37, A-38; *see also* Nippon Steel's August 10, 2018 SQR at Exhibit SD-4, Revised Exhibits A-27 to A-36, and Exhibit SA-1.

[80] *See* Nippon Steel's February 4, 2018 AQR at Exhibits A-1 through A-9, and Exhibits A-11, A-12, A-16, A-41, and A-42; *see also* Nippon Steel's August 10, 2018 SQR at Revised Exhibit A-1..

identical HM CONNUMs sold in the same month.  Therefore, the missing window period HM sales data would not be used for U.S. sales comparison.

**Comment 9:  Nippon Steel Did Not Report Nisshin's Sales and Costs for the Entire POR**

*Petitioners' Case Brief:*
- Nippon Steel only submitted Nisshin's sales and cost information for the period April 1, 2017 to September 30, 2017, not the entire POR.
- As Nippon Steel and Nisshin are currently undeniably affiliated and were during a large portion of the POR, Nippon Steel has complete control over Nisshin's information, which it could easily submit to Commerce.
- Commerce does not require 51 percent ownership to find affiliation.  Nippon Steel clearly had the potential to control Nisshin as of February 2016, when it held a minority stake in Nisshin.  Moreover, Nippon Steel had access to the information throughout the course of this administrative review.
- As such, Commerce should apply total AFA to Nippon Steel for its failure to submit the requested information.

*Nippon Steel's Rebuttal Brief:*
- Nippon Steel acquired additional shares in Nisshin on March 13, 2017, increasing its stock ownership to 51 percent of the company's outstanding shares.  Prior to March 13, 2017, Nippon Steel owned only an 8.31 percent share of Nisshin.  Thus, Nippon Steel did not control Nisshin prior to March 2017.
- In the 2015-2016 investigation, as well as the original 1992 hot-rolled steel investigation and administrative review, Nippon Steel was not required to report information regarding Nisshin's sales and cost.
- As such, these is no basis for Commerce to apply AFA on this issue.

**Commerce's Position:**  We have not applied total AFA to Nippon Steel in these final results. The record of this review shows that Nippon Steel appropriately reported Nisshin's sales and cost information for the period April 1, 2017 through September 30, 2017.  The first full month of the POR in which Nippon Steel was in a position to control Nisshin's operations was April 2017.

In the *Preliminary Results*, we made the determination that Nippon Steel and Nisshin should be treated as a single entity for AD purposes, effective March 13, 2017, when Nippon Steel increased its ownership of Nisshin to 51 percent of Nisshin's total outstanding shares.  We further explained that in accordance with 19 CFR 351.401(f), it was appropriate to collapse Nippon Steel and Nisshin, effective March 13, 2017, because:  (1) these two entities are affiliated pursuant to section 771(33)(F) of the Act as the level of the common ownership is significant; (2) Nippon Steel and Nisshin have the facilities to produce identical or similar products, such that substantial retooling would not be required to restructure manufacturing priorities; and (3) we find that there exists a significant potential for manipulation of price or production if Nippon Steel and Nisshin do not receive the same AD rate.

Since the *Preliminary Results*, Commerce has not been made aware of any additional information on the record that would necessitate that it change its position on this issue. Therefore, we continue to find that it is appropriate to treat Nippon Steel and Nisshin as a single entity for the purposes of the final results. We have assigned these companies the same cash deposit rate, effective March 13, 2017.

## Comment 10: Whether Nippon Steel Failed to Report All of its U.S. Sales

*Petitioners' Case Brief:*
- Nippon Steel's request that Commerce exempt it from reporting certain U.S. sales under the "special rule"[81] was premised on value-added calculations that incorporated several unusual steps that cast doubt on the accuracy of the company's 65 percent value-added analysis.[82]
- Nippon Steel inexplicably combined Steelscape's two affiliated customers, ASC Profiles, Inc. (ASC) and BlueScope Buildings North America, Inc. (BBNA), in its analysis without justification. There is no conceivable reason why the value added analysis for these two companies should be combined.
- Nippon Steel did not explain how the project's total value is negotiated with the customer and whether it differs from what was reported to Commerce.
- Nippon Steel did not explain how the percentage of its steel for each project is determined in its calculations. U.S. sales further manufactured by Steelscape's affiliates were requested in the investigation and Nippon Steel has provided no legitimate basis not to report them in this review.
- Therefore, Commerce should apply total AFA to Nippon Steel on this issue.

*Nippon Steel's Rebuttal Brief:*
- Both the statute and Commerce's regulations allow Commerce the discretion to exempt a respondent from reporting certain sales to affiliates in the United States where the value added by those affiliates surpasses a 65 percent threshold before the merchandise is sold to unaffiliated customers.
- In this review, as in the investigation, Nippon Steel demonstrated that certain sales made by Steelscape to ASC and BBNA, satisfied the 65 percent value-added threshold, and thus Nippon Steel properly excluded these sales from its U.S. sales database.
- Therefore, Commerce has no basis to apply AFA on this issue.

---

[81] Section 772(e) of the Act states that when the respondent sells the subject merchandise through an affiliated importer, and the value added by that affiliate substantially exceeds the value of the subject merchandise, Commerce will use an alternative calculation method for determining CEP. The alternative calculation method is to base CEP for the sales to affiliates on the respondent's sales to unaffiliated purchasers, or, if there are insufficient sales to unaffiliated purchasers, to use some other reasonable basis.

[82] Pursuant to 19 CFR 351.402(c), Commerce normally will determine that the value added in the United States by the affiliated person is likely to exceed substantially the value of the subject merchandise if the Secretary estimates the value added to be at least 65 percent of the price charged to the first unaffiliated purchaser for the merchandise as sold in the United States. Commerce normally will estimate the value added based on the difference between the price charged to the first unaffiliated purchaser for the merchandise as sold in the United States and the price paid for the subject merchandise by the affiliated person. Commerce normally will base this determination on averages of the prices and the value added to the subject merchandise.

**Commerce's Position:** Similar to our findings in the original investigation and consistent with the *Preliminary Results*,[83] Commerce has continued to exclude certain sales made by Nippon Steel's U.S. affiliate pursuant to the "special rule" for the final results. Moreover, consistent with section 772(e) of the Act, we have continued to assign the calculated weighted-average margin established in this review to those excluded U.S. affiliates' sales.[84]

Similar to our finding in *Hot Rolled from Japan*, there is no basis on the record to find that Nippon Steel attempted to manipulate the value-added calculations to its own benefit. Commerce has discretion to base its value-added calculations on averages from disaggregated groups of products.[85] In *CORE from Korea*, Commerce exempted Hyundai from reporting the completed automobile sales based on aggregated data. However, Commerce also instructed Hyundai to provide separate value-added calculations for tailor welded blanks and auto parts.[86] These latter product groups did not meet the 65 percent value added threshold. Moreover, in *Wire Rod from Brazil*, Commerce specifically instructed the respondent to "provide a further breakdown of value-added merchandise into subgroups."[87]
In its questionnaire response, Nippon Group demonstrated that the value added by Steelscape for certain sales to affiliates satisfied the threshold of 65 percent as provided by 19 CFR 351.402(c). Therefore, we did not require that Nippon Steel include these CEP sales by these further manufacturers in its U.S. sales database.[88] Commerce reviewed and accepted Nippon Steel's value-added calculations in Nippon Steel's questionnaire response.[89]

Therefore, we continue to find that Nippon Steel's value-added calculation for Steelscape's sales to its affiliates are consistent with 19 CFR 351.402(c)(2).

## Comment 11:  Nisshin's G&A Expenses Ratio Calculation

*Petitioners' Case Brief:*
- Nippon Steel failed to report Nisshin's general and administrative (G&A) expenses, it only reported G&A expenses from April 1, 2017 to September 30, 2017, rather than on an annual basis as required by Commerce.

---

[83] *See Hot Rolled from Japan*; and *Preliminary Results* PDM.
[84] *See* Nippon Steel Final Analysis Memorandum.
[85] *See Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 81 FR 35303 (June 2, 2016) (*CORE from Korea*) and the accompanying IDM at Comment 2; *see also Final Results of the First Administrative Review of Carbon and Certain Ally Steel Wire Rod from Brazil*, 70 FR 28271 (May 17, 2005) (*Wire Rod from Brazil*) and the accompanying IDM at Comment 5.
[86] Commerce advised that if Hyundai believed that the sales of subject merchandise further manufactured into other types of merchandise sold by any of Hyundai's U.S. affiliates to unaffiliated parties in the United States might qualify for the special exemption under section 772(e) of the Act, Hyundai would need to demonstrate this claim for each product type at the appropriate stage in the sales chain (*i.e.*, by affiliated reseller) and provide complete supporting documentation.  *See CORE from Korea* IDM at 9.
[87] *See Wire Rod from Brazil* IDM at Comment 5.
[88] *See* Nippon Steel's March 15, 2018 Section C Questionnaire Response (Nippon Steel's March 15, 2018 CQR) at Exhibit C-1.
[89] *See Preliminary Results* PDM; *see also* Nippon Steel Preliminary Analysis Memorandum.

- This is another example of Nippon Steel's failure to report information in the manner requested, and Commerce should apply total AFA to Nippon Steel in this administrative review.

*Nippon Steel's Rebuttal Brief:*
- The record of this review shows that Nippon Steel was not able to assert control over Nisshin until March 13, 2017. Prior to this date, Nippon Steel and Nisshin remained separate steel manufacturers. Therefore, Commerce was correct not to require Nisshin to include this pre-acquisition period in Nisshin's G&A calculations.

**Commerce's Position:** We have not applied AFA to Nippon Steel on this issue in these final results. Instead, we have continued to rely on Nippon Steel's full-year G&A expense rate for the final results because it is a full-year G&A expense rate.

Commerce's standard practice is to rely on a respondent's full-year G&A expenses and cost of goods sold.[90] Nippon Steel acquired a majority of Nisshin's shares on March 13, 2017.[91] In its original questionnaire response, Nippon Steel relied on Nippon Steel's full-year G&A expense rate as a surrogate to calculate Nisshin's G&A expenses.[92] In response to Commerce's request to calculate Nisshin's G&A expenses using Nisshin's full-year G&A expense rate,[93] Nippon Steel reported a separate G&A expense rate for Nisshin based on the portion of the POR when Nisshin was a subsidiary of Nippon Steel (*i.e.*, April 1, 2017 through September 30, 2017).[94] For the *Preliminary Results*, we relied on Nippon Steel's full-year G&A expense rate to calculate Nisshin's G&A expenses.[95]

Nisshin's 6-month G&A expense rate does not conform with our practice of relying on a respondent's full-year G&A expenses and cost of goods sold. Because Nisshin's full-year G&A expense rate is not available, we have instead relied on facts available. As facts available, we used Nippon Steel's full-year G&A expense rate.[96]

**Comment 12: Whether Nippon Steel Failed to Provide a Usable Section E Response**

*Petitioners' Case Brief:*
- Nippon Steel's section E response is completely unusable because it continues to report further manufacturing costs on a consolidated basis instead of providing the individual costs of the two Steelscape companies – Steelscape LLC (SS), and its subsidiary, Steelscape Washington LLC (SSW).
- In the original investigation, Commerce applied partial AFA with respect to this issue. In this review, Nippon Steel continued to report its further manufacturing costs, including

---

[90] *See, e.g.*, *Certain Pasta from Italy: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 91120 (December 16, 2016) (*Certain Pasta from Italy*).

[91] *See* Nippon Steel's February 4, 2018 AQR.

[92] *See* Nippon Steel's March 15, 2018 Section D Questionnaire Response (Nippon Steel's March 15, 2018 DQR), at Exhibits at D-22 and D-19, respectively.

[93] *See* Nippon Steel's August 10, 2018 SQR at 1.

[94] *See* Nippon Steel's March 15, 2018 DQR at 1-2; *see also* Nippon Steel's August 10, 2018 SQR at Exhibit SD-2.

[95] *See* Nippon Steel's Preliminary Analysis Memorandum.

[96] *See, e.g.*, *Certain Pasta from Italy*.

the G&A expense ratio, in the same manner that was rejected in the original investigation, *i.e.*, on a consolidated basis.

- Nippon Steel's submitted trial balances do not represent unconsolidated company-specific figures and are not suitable for company specific calculations.
- Commerce should take even stronger action in this review given Nippon Steel's continued refusal to provide repeatedly requested information that is necessary for accurate margin calculations. Specifically, Commerce should apply total AFA to Nippon Steel.

*Nippon Steel's Rebuttal Brief:*
- The petitioners' claims are erroneous and should be rejected because Nippon Steel has provided the unconsolidated further manufacturing costs and G&A expenses as requested by Commerce.
- SS's reported further processing costs are fully reconciled to SS's financial statements. There are no unexplained discrepancies and therefore no reasons to question SS's reported further processing costs.
- Nippon Steel provided both SS's consolidated and unconsolidated trial balances. Nippon Steel also provided information on the costs and mark-up SS pays SSW for raw material processing and administrative services.
- Nippon Steel provided both SS's and SSW's trial balances for the requested time periods at Exhibits SQE-3 and SQE-4, respectively, of its Section E supplemental questionnaire response.
- Therefore, Commerce has no basis to apply AFA on this issue.

**Commerce's Position:** We have continued to rely on Nippon Steel's reported further-manufacturing costs for SS and SSW for the final results.[97] The record does not support the petitioners' allegation that the trial balances submitted by Nippon Steel reflect consolidated amounts. SS and SSW separately recorded their individual costs as incurred and those costs are reflected in the individual general ledger (GL) accounts shown in the unconsolidated trial balances.[98] At the end of the month, the expenses incurred by SSW on behalf of SS plus additional mark-up amounts are transferred to SS.[99] The transfer is recorded by a single journal entry to one GL account that is separate from the GL accounts used to record expenses.[100] This journal entry offsets SSW's expenses and increases SS's expenses. As such, the amounts shown in SS's and SSW's unconsolidated trial balances for all expense GL accounts other than the transfer account reflect unconsolidated values. Therefore, because Nippon Steel relied on the GL accounts other than the transfer account in determining the reported further manufacturing

---

[97] *See* Nippon Steel's August 10, 2018 SQR at Exhibit SD-1; *see also* and Nippon Steel's July 30, 2018 Supplemental Questionnaire Response (Nippon Steel's July 30, 2018 SQR) at Revised Exhibit E-7, part 1, tab "E-8 FURMANU Allocation." The per-unit cost from the cost data file can be tied to revised exhibit E-7, part 1 by linking variable.
[98] *See* Nippon Steel's Rebuttal Brief at 12; *see also* Nippon Steel's March 15, 2018 Section E Questionnaire Response (Nippon Steel's March 15, 2018 EQR), at Exhibits SQE-3 and SQE-4.
[99] *See* Nippon Steel's Rebuttal Brief at 12-13; *see also* Nippon Steel's March 15, 2018 EQR at Exhibit E-6; and Nippon Steel's July 30, 2018 SQR at Exhibit SQE-2.
[100] *See* Nippon Steel's Rebuttal Brief at 12; *see also* Nippon Steel's July 30, 2018 EQR at Exhibits E-3 and E-4.

Filed By: Jun Jack Zhao, Filed Date: 6/24/19 12:37 PM, Submission Status: Approved

Barcode:3852503-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

costs and those costs reflect unconsolidated values, Commerce has continued to rely on Nippon Steel's reported further-manufacturing costs for the final results.[101]

## Comment 13:  Whether Nippon Steel Reported Incorrect "Mark-up" Rates

*Petitioners' Case Brief:*
- Nippon Steel's section E worksheet calculation of the mark-ups for SS's processing costs and G&A related expenses was incorrect.
- As Nippon Steel failed to submit SSW's unconsolidated trial balance, it is impossible to ensure the accuracy and completeness of the markups between the affiliated parties, which have been eliminated from the consolidated financial data.

*Nippon Steel's Case Brief:*
- Commerce should collapse SS and SSW and treat them as a single entity in an AD proceeding in accordance with section 351.401(f).
- In *Aluminum from China*,[102] Commerce collapsed the respondent and its upstream producer, as both entities were involved in productive activities.
- Commerce should disregard the intercompany mark-up charged by SSW to SS as payment for manufacturing and administrative services.

*Petitioners' Rebuttal Brief:*
- Commerce correctly used the major input rule to value services between SS and SSW because these companies should not be collapsed.

*Nippon Steel's Rebuttal Brief:*
- Nippon Steel correctly reported the mark-up rate that SSW charges SS for its processing and SG&A activities.
- Nippon Steel did provide the unconsolidated trial balances, and the unconsolidated trial balances tie to the mark-up worksheet.

**Commerce's Position:**  In the *Preliminary Results*, Commerce determined that the services performed by SSW constitute a major input into SS's total further manufacturing cost in accordance with section 773(f)(3) of the Act.[103]  As such, we compared the transfer price of the further processing (*i.e.*, SSW's cost of further processing plus the mark-up charged between entities) to SSW's cost of production for the processing services.[104]  Because the transfer price was higher, Commerce adjusted SS's total further manufacturing cost (which they used for reporting) to reflect the difference (*i.e.*, higher amount).[105]  Commerce stated in the original investigation that the record evidence showed that the regulatory criteria of 19 CFR

---

[102] *See* Nippon Steel's Case Brief at 19 (citing *Certain Aluminum Foil from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 83, FR 9282 (March 5, 2018) (*Aluminum from China*), and accompanying IDM).
[103] *See* Nippon Steel's Preliminary Analysis Memorandum at 3-4.
[104] *Id.*
[105] *Id.*

351.401(f)(1), treatment of affiliated producers in AD proceedings, had not been met, as neither SS nor SSW produced hot-rolled coil and neither was involved in the export or sale of subject merchandise.[106]  As such, Commerce determined that there was no basis to conclude that a significant potential for the manipulation of price or production exists.[107]  As discussed further below, the record shows that SSW provides services to SS while SS retains ownership of the product imported and further processed.[108]  Accordingly, because the criteria for collapsing had not been met, Commerce treated SS and SSW as affiliated entities.[109]  The facts in the instant case have not changed from the original investigation.  Neither SS nor SSW produces hot-rolled coil, and neither was involved in the export or sale of subject merchandise.[110]

Commerce obtained affiliation information regarding SS and SSW in its supplemental section E questionnaire (e.g., list of shareholders and transactions between the entities).[111]  In addition, Commerce requested that Nippon Steel report how transfer prices are set for processing and administrative services between the companies.[112]  Commerce also requested that Nippon Steel provide separate G&A expense ratios for both SS and SSW.[113]  Nippon Steel responded that SSW is wholly-owned by SS.[114]  SS engages SSW to further process the raw materials for a processing fee.[115]  SS pays SSW a manufacturing fee equal to SS's actual costs incurred to further process the products plus a mark-up.[116]  SS also compensates SSW for administrative services.[117]  SS pays SSW a percentage of the actual administrative cost incurred by SSW in performance of the administrative services.[118]  The mark-up rates were developed from a 2012 transfer price study commissioned by SS.[119]  Nippon Steel further stated that it incorrectly reported the mark-up on the administrative service in the initial section E questionnaire response, and, accordingly, revised the further manufacturing G&A expense rate to include the proper amount.[120]  The revised mark-up ties to the single journal entry that transfers expenses from SSW to SS for consolidation purposes.[121]  The revised mark-up is included in the calculation of the revised further manufacturing cost G&A expense rate.[122]

Nippon Steel provided a worksheet that shows the calculation of the intercompany mark-up for processing and G&A expenses between SSW and SS for the period of July 2016 through June

---

[106] *See Hot Rolled from Japan* IDM at Comment 6.
[107] *Id.*
[108] *See* Nippon Steel's March 15, 2018 EQR at 2.
[109] *Id.*
[110] *See, e.g.*, Nippon Steel's March 15, 2018 EQR at 1 and 2.
[111] *See* Nippon Steel's March 15, 2018 EQR at 1.
[112] *Id.*
[113] *Id.* at 2.
[114] *Id.*
[115] *Id.* at 3.
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] *Id.* at 3 and 4.
[120] *Id.* at E-4 and Nippon Steel's July 30, 2018 SQR at Exhibit SQE-2.
[121] *See* Nippon Steel's July 30, 2018 SQR at Exhibits SQE-2 and SQE-7.
[122] *Id.* at Exhibit SQE-7.

2017.[123]  Contrary to petitioners' allegation, the worksheet clearly shows the processing and G&A mark-up percentages and the resulting mark-up amounts for this period.[124]  The total processing costs incurred by SSW for SS, SSW's mark-up on those processing costs, and the total amount of G&A expenses incurred by SSW that are charged to SS tie to the single journal entry that transfers these expenses from SSW to SS for consolidation purposes.[125]  The calculated mark-up for G&A expenses shown in Exhibit E-6 was not included in the transfer from SSW to SS reflected in the unconsolidated trial balances.[126]  Nippon Steel relied on the combined expenses of SSW and SS, exclusive of the mark-up, for purposes of calculating the further manufacturing cost.[127]  Nippon Steel increased the further manufacturing cost G&A expense rate for the mark-up on G&A expenses.[128]

Contrary to Nippon Steel's allegation, *Aluminum from China* doesn't apply here.  In *Aluminum from China*, Commerce collapsed a producer of merchandise similar to the scope merchandise with the respondent.[129]  In this case, neither SS or SSW produce or sell scope merchandise.  In addition, we note that the "upstream producer" referred to by Nippon Steel, was found to be affiliated in *Aluminum from China* but was not collapsed with the respondent.[130]

Therefore, consistent with the *Preliminary Results*, we find that the services performed by SSW constitute a major input into SS's total further manufacturing cost in accordance with section 773(f)(3) of the Act.  As such, we continue to adjust the further manufacturing cost to reflect the higher transfer prices of the processing services.  Because Nippon Steel reported the higher transfer price of the administrative services provided by SSWA to SS, we find it unnecessary to adjust SS's reported further manufacturing G&A expenses.  In addition, because neither SS or SSWA produce subject merchandise, the collapsing rule does not apply here.  Therefore, we continue to treat SSW as an affiliated party of SS.

**Comment 14:  Whether Nippon Steel Failed to Provide the Required Information on the Affiliated Suppliers of Major Inputs**
*Petitioners' Case Brief:*
- Nippon Steel failed to provide basic information requested in the original section A and D questionnaires, including financial statements from certain affiliated companies, the category and nature of the affiliated companies, and the cost of production information for affiliated producers of inputs.
- Commerce should resort to AFA due to the fact that Commerce still does not have the above requested information.

---

[123] *See* Nippon Steel's March 15, 2018 EQR at 36 and Exhibit E-6.
[124] *Id.*  While the worksheet in Exhibit E-6 does show certain tax rates as noted by the petitioner, the tax rates were not used in calculating the mark-up rates.
[125] *See* Nippon Steel's March 15, 2018 EQR at Exhibit E-6.
[126] *Id.*  This mark-up rate was revised in Nippon Steel's July 30, 2018 SQR at 4 and Exhibit SQE-2.
[127] *See* Nippon Steel's March 15, 2018 EQR at Exhibit E-6.
[128] *Id.* at Exhibit E-6 and Exhibit E-7.
[129] *See Aluminum from China* IDM at Comment 7.
[130] *Id.*

*Nippon Steel's Rebuttal Brief:*
- Nippon Steel responded completely to Commerce's requests for information regarding the suppliers. Specifically, Exhibit A-14 of Nippon Steel's Section A questionnaire response includes detailed descriptions of each of Nippon Steel's affiliated suppliers of major inputs. Additionally, Exhibit SD-6 of Nippon Steel's Section D supplemental questionnaire response provides the major inputs chart in the format requested by Commerce. Therefore, Commerce has no basis to apply AFA with respect to this issue.

**Commerce's Position:** We continue to find that there is no basis on the record to apply AFA with respect to this issue. Nippon Steel provided a list of affiliated suppliers in its section A response that included the affiliated parties named in the petitioners' case brief.[131] Nippon Steel identified these suppliers as resellers.[132] Because the affiliated companies in question are resellers rather than producers, section 773(f)(2) of the Act (the transactions disregarded rule) applies here rather than section 773(f)(3) of the Act (the major input rule). As such, Commerce did not request that Nippon Steel provide the cost of production information for these inputs. In addition, Commerce did not request that Nippon Steel provide these affiliates' financial statements. Because Nippon Steel provided the necessary information for Commerce's transactions disregarded analysis of these affiliated suppliers,[133] we continue to find Nippon Steel acted to the best of its ability and, as such, that AFA is not warranted.

**Comment 15: Whether Nippon Steel Failed to Provide Requested Information on Affiliate's Assets**

*Petitioners' Case Brief:*
- Commerce requested information on the depreciation and rental expenses related to the equipment used by Wakayama Works (Wakayama), but Nippon Steel refused to provide the information.
- Record evidence seems to indicate Wakayama is directly involved in the production of merchandise under consideration.
- Nippon Steel intentionally withheld information requested by Commerce, which merits the application of AFA.

*Nippon Steel's Rebuttal Brief:*
- In its section D questionnaire response Nippon Steel explained that it transported certain hot-rolled coils that had been produced at other works to Wakayama that were not for the purpose of producing subject merchandise.
- Nippon Steel further explained that all the equipment employed in Wakayama's processing of subject HR steel is owned by Nippon Steel, and none of the equipment employed was owned by an affiliated or unaffiliated company.
- It was not possible to provide additional information regarding the production assets at the Wakayama held by affiliated parties.

---

[131] *See* Nippon Steel's February 20, 2018 AQR at Exhibit A-14; *see also* Petitioners' Case Brief at 33.
[132] *See* Nippon Steel's February 20, 2018 AQR at Exhibit A-14.
[133] *See* Nippon Steel's March 15, 2018 DQR at Exhibit D-7.

- The record of this review does not support the application of AFA on this issue.

**Commerce's Position:**  We continue to find that the application of AFA is not warranted. Nippon Steel explained that the specific assets, referred to by the petitioners, are located at Wakayama but are held by an affiliated party.[134]  Nippon Steel stated that the assets held by the affiliated party were not used in the additional processes performed on the subject merchandise.[135]  Because the record evidence does not support the petitioners' claims that Nippon Steel failed to report information on certain assets related to production of the merchandise under consideration, we find that AFA is not warranted.

**Comment 16:  Whether Commerce Should Revise Its Major Input Rule Adjustment to Steelscape LLC's Costs Based on Steelscape Washington LLC's Full Cost of Production**

*Petitioners' Case Brief:*
- Under the major input rule, Commerce is required to compare the transfer price, which is the value of the input as booked by the affiliated purchaser (*i.e.*, SS), and adjust it to the higher of the input's market value, if available, or the affiliated supplier's full cost of production.  Commerce should resort to AFA due to the fact that Commerce does not have the above requested information.
- In the *Preliminary Results*, Commerce erred in that it used an incorrect amount for the affiliated producer's full cost of production.  While it correctly calculated the transfer price, it did not calculate the full cost of production for the processing services.
- As Nippon Steel has not provided any market value of these services, the transfer price must be compared to the affiliated producer's full cost of production.  The full cost of production in the context of the major input rule consists of the affiliated producer's cost of manufacturing, cost of processing, SG&A, and interest expenses.

*Nippon Steel's Rebuttal Brief:*
- The major input rule directs Commerce to compare the transfer price, and adjust it to the higher of the input's market value or the affiliated supplier's cost of production.
- In the *Preliminary Results*, Commerce made correct adjustments that accurately represents the mark-up and market value of the processing costs. Petitioners fails to demonstrate why the mark-up plus SSW's actual processing and SG&A costs and expenses do not represent the market value for these services.
- The petitioners' proposed application of the major input rule adjustment double-counts SG&A expenses incurred by SSW.

**Commerce's Position**:  We continue to find that AFA is not warranted and have not changed our major input adjustment for the final results.[136]  We also have not changed how we calculated Nippon Steel's affiliated producer's full cost of production for the final results.

---

[134] *Id*. at 6, n. 7.
[135] *Id* at 5.
[136] *See* Nippon Steel Final Analysis Memorandum.

During the POR, SS purchased processing services from SSW.[137]  Because these services constitute a major input into SS's total cost of further manufacturing, for the *Preliminary Results*, as noted above in Comment 13, we evaluated the total purchases in accordance with section 773(f)(3) of the Act.[138]  We compared SSW's total reported cost of further processing to a calculated transfer price.[139]  The transfer price was calculated as SSW's total cost of further processing plus the markup charged between entities.[140]  The mark-up rates were developed from a 2012 transfer price study commissioned by SS.[141]  In the *Preliminary Results*, we did not include SSW's G&A expenses in the total cost of further processing used in Commerce's calculation of transfer price.[142]

As noted by the petitioners, the COP used for purposes of the major input analysis normally includes the cost of manufacturing plus amounts for G&A and interest expenses.  The situation here, however, is unique in that SSW's G&A expenses related to the processing performed for SS are already included in SS's reported G&A expenses.[143]  Therefore, if we were to add SSW's G&A expenses to the transfer price and apply the resulting major input adjustment rate to SS's reported further manufacturing cost, SSW's G&A expenses would be included in both SS's adjusted cost of manufacture and SS's reported G&A expenses.  As noted by Nippon Steel, this results in the double-counting of SSW's G&A expenses.

While we agree with the petitioners that the COP used for the major input analysis should generally be adjusted to include interest expenses, in this case, SS is included in BlueScope's consolidated financial statements.  Commerce's practice is to exclude interest expenses for the purposes of the major input analysis, in order to avoid double-counting, in situations where the affiliated parties (*i.e.*, SS and BlueScope) are consolidated in the same consolidated financial statements.[144]  Therefore, for the final results, we relied on the same major input adjustment as we did for the *Preliminary Results*.[145]

**Comment 17:  Whether Commerce Should Revise the Reported G&A Expense Ratio for Steelscape LLC**

*Petitioners' Case Brief:*
- SS's "separate" G&A expenses omit the amounts paid to SSW for the administrative services.
- The reported markup on the administrative services obtained from SSW was grossly understated.

---

[137] *See* Nippon Steel's July 30, 2018 SQR at 3.
[138] *See* Nippon Steel's Preliminary Analysis Memorandum at 3-4 and Attachment 3.
[139] *Id*.  A market price for the services provided by SSWA is not available on the record of this proceeding.
[140] *Id*.
[141] *See* Nippon Steel's March 15, 2018 EQR at 3 and 4.
[142] *See* Nippon Steel's Preliminary Analysis Memorandum at 3-4 and Attachment 3
[143] *See* Nippon Steel's July 30, 2018 SQR at Revised Exhibit E-7 pt. 1, line 404.
[144] *See, e.g.*, *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) and accompanying IDM at Comment 29.
[145] *Id*.

- Nippon Steel omitted from SS's certain "separate" G&A expenses account, this expense should be included in the reported costs.
- Nippon Steel included an unsupported offset to SS's G&A expenses.
- The reported denominator of SS's "separate" G&A expense ratio should not include coil cost.

*Nippon Steel's Rebuttal Brief:*
- Nippon Steel's section E supplemental questionnaire response demonstrates clearly that the administrative expenses between SS and SSW have been included.
- The record fully supports SS's reported mark-up rate.
- The omitted expenses from the account at issue relate to downgraded product, consistent with U.S. GAAP, Commerce should continue to exclude SS's product downgrade expenses from its reported processing costs in its final results.
- The record supports the inclusion of the offset to SS's G&A expenses.
- The denominator used to calculate the G&A expense ratio is derived from SS's trial balance that Nippon Steel had removed the coil costs.

**Commerce's Position**: We agree that the formula used by Nippon Steel to calculate the denominator of SS's G&A expense rate did not include certain items that the narrative in the same exhibit identified as reductions to the denominator.[146] Therefore, for the final results, we have decreased the denominator of SS's G&A expense rate for these items, recalculated the rate, and used the revised G&A expense rate to determine SS's further manufacturing expenses.[147]

Additionally, we find that the record does not support the petitioners' contention. Nippon Steel's reported G&A expense ratio was calculated using consolidated values. As noted in Comment 13, above, the GL accounts, other than the transfer account, reflected on SS's trial balance are unconsolidated values. Because Nippon Steel relied on the GL accounts other than the transfer account to determine SS's G&A expense rate, SS's G&A expense rate reflects unconsolidated values.[148]

We disagree that Nippon Steel failed to remove the coil costs from the denominator of SS's G&A expense rate. The calculation of the denominator of SS's reported G&A expense rate specifically shows that Nippon Steel reduced SS's cost of sales by the coil cost in the amount noted by the petitioners.[149] We also disagree with the petitioners regarding Nippon Steel's application of the markup rates (*see* Comment 13, above).

We disagree with the petitioners regarding the expense resulting from the valuation downgrade of inventory. Commerce's practice is to exclude inventory-valuation losses which are

---

[146] *See* Nippon Steel Final Analysis Memorandum.
[147] *Id.*
[148] *See* Nippon Steel's July 30, 2018 SQR at Exhibit SQE-3 and Revised Exhibit E-7 pt. 1, tab "COGS & GNA (FY)."
[149] *Id.* at Revised Exhibit E-7 pt. 1, tab "COGS & GNA (FY)" at line 434.

Filed By: Jun Jack Zhao, Filed Date: 6/24/19 12:37 PM, Submission Status: Approved

attributable to finished goods from a respondent's cost of production.[150]  The valuation expenses in this case are for valuation losses related to products rather than raw materials or semi-finished goods.[151]  As such, we have not revised SS's G&A expenses to include these expenses as suggested by the petitioners.

We disagree with the petitioners that the offset to SS's G&A expense is unsupported and should be disallowed.  SS's fiscal year (FY) 2017 trial balance and ASC Profiles LLC (ASC) FY 2017 trial balance clearly show that the offset in question is recorded as a negative expense by SS and as a positive expense by ASC.[152]  While Nippon Steel did not specifically provide the narrative detail of the transactions, and Commerce did not request those details, we find that the evidence on the record supports the offset to SS's G&A expenses as the charge is incurred by ASC.[153]

## VIII.   RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the positions set forth above.  If this recommendation is accepted, we will publish the final results of this review and the final weighted-average dumping margins in the *Federal Register*.

☒                                   ☐
_____            _____
Agree                           Disagree

6/21/2019

X   *{signature}*
_____

Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
  for Enforcement and Compliance

---

[150] *See, e.g., Polyethylene Retail Carrier Bags from Thailand:  Final Results of Antidumping Duty Administrative Review*, 76 FR 12700 (March 8, 2011) and accompanying IDM at Comment 6.
[151] *See* Nippon Steel's July 30, 2018 SQR at Revised Exhibit E-7 pt. 1, tab "COGS & GNA (FY)" at line 232.
[152] *Id*. at Exhibit SQE-7, Pt. 2, tabs "SS TB 2017" at line 359 and "ASC TB 2017" at line 264.
[153] *Id*.

# ATTACHMENT 10



**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

A-588-874
Administrative Review
POR: 03/22/2016 – 09/30/2017
~~Proprietary Document~~ Public Version
AD/CVD, Office VII:  ML

**DATE:**               June 21, 2019

**MEMORANDUM TO**:      The File

**THROUGH**:            Thomas Gilgunn
                        Program Manager
                        AD/CVD Operations, Office VII
                        Enforcement and Compliance

**FROM**:               Myrna Lobo
                        International Trade Compliance Analyst
                        AD/CVD Operations, Office VII
                        Enforcement and Compliance

**RE:**                 Antidumping Duty Administrative Review of Certain Hot-Rolled
                        Steel Flat Products from Japan

**SUBJECT**:            Final Results Margin Calculation for Tokyo Steel Manufacturing
                        Co., Ltd.

_____

This memorandum describes the changes to the calculations for the final results of the
antidumping duty margin for Tokyo Steel Manufacturing Co., Ltd. (Tokyo Steel), in the above
referenced administrative review.

## I.   FINAL RESULTS

A.   **Weighted-Average Margin:**        **2.06 percent**

B.   **SAS Margin Calculation Results**

Quantity Sold:                [      ] metric tons
Total Value:                  [        ] U.S. Dollars
Total Dumping:                [       ] U.S. Dollars

Barcode:3855046-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

## II.    DATABASES USED FOR THE FINAL RESULTS

We used the following databases in the margin calculation submitted by Tokyo Steel:

        U.S. sales:            tsussales02
        Home market sales:     tshmsales02
        Cost database:         tscost04

In addition, we used Commerce's Japan exchange rate database.

## III.    CHANGES SINCE PRELIMINARY RESULTS

As stated in the Issues and Decision Memorandum, we have reviewed Tokyo Steel's dates of sale during the POR and made changes to the SAS programs.  Because Tokyo Steel's first sale date for sales reported in U.S. database is [          ], the correct begin date for the beginning window BEGINDAY in the home market SAS program is 90 days prior, *i.e.*, [            ].  The end date ENDDAY should include a window of 60 days beyond the POR.  Thus, the ENDDAY is November 30, 2017.

For the Margin SAS program, we corrected ENDDAY based on the end date of the POR, to September 30, 2017.  The beginning window BEGINWINDOW in the program was corrected to [            ] consistent with the Home Market program.

The changes to the Home Market Program are as below:

[


                                              ]


The changes to the Margin SAS Program are as below:

[



                                            ]


## IV.    DIFFERENTIAL PRICING ANALYSIS

In order to determine whether the Tokyo Steel's sales of subject merchandise to the U.S. were made at less than normal value, we first conducted a differential pricing (DP) analysis of the

Filed By: Myrna Lobo, Filed Date: 6/27/19 4:15 PM, Submission Status: Approved

Tokyo Steel's U.S. sales for the final results of this review.  The results of the DP analysis are as follows:

| Value of Passing Sales | Value of All Sales | U.S. Sales Passing the Cohen's *d* test |
|---|---|---|
| [          ] | [          ] | 93.09% |

The weight-averaged dumping margin calculated using the three methodologies are shown below:

| A-to-A Method for All U.S. Sales | A-to-T Method for U.S. Sales Which Pass the Cohen's *d* Test; A-to-A Method for Sales Which Do Not Pass | A-to-T Method for All U.S. Sales |
|---|---|---|
| 0.00% | 2.01% | 2.06% |

Based on the results of the differential pricing analysis, we find that 93.09 percent of the value of U.S. sales pass the Cohen's *d* test, and confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  Further, we find that the average-to-average method cannot account for such differences because there is a meaningful difference in the weighted-average dumping margin calculated using the average-to-average method and the alternative comparison method.  Thus, we continue to apply the average-to-transaction method to all U.S. sales.

## V.  LIST OF ATTACHMENTS

Attachment 1:          SAS Program, Log, and Output – Comparison Market
Attachment 2:          SAS Program, Log and Output – Margin Program

Filed By: Myrna Lobo, Filed Date: 6/27/19 4:15 PM, Submission Status: Approved

Attachment I

Comparison Market SAS Program, Log, and Output

(Proprietary in its Entirety,
Not Subject to Public Summarization)

4

Barcode:3855046-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

Attachment II

U.S. Margin SAS Program, Log, and Output

(Proprietary in its Entirety,
Not Subject to Public Summarization)

Filed By: Myrna Lobo, Filed Date: 6/27/19 4:15 PM, Submission Status: Approved

# ATTACHMENT 11

**NOT CAPABLE OF SUMMARY**

# ATTACHMENT 12

**NOT CAPABLE OF SUMMARY**

# EXHIBIT 6

| MESSAGE NO: | 9190303 | MESSAGE DATE: | 07/09/2019 |
|---|---|---|---|

| MESSAGE STATUS: | Active | CATEGORY: | Antidumping |
|---|---|---|---|
| TYPE: | ARF-Admin Review Final | PUBLIC  ☑ | NON-PUBLIC  ☐ |
| SUB-TYPE: | | | |

| FR CITE: | 84 FR 31027 | FR CITE DATE: | 06/28/2019 |
|---|---|---|---|

REFERENCE
MESSAGE #
(s):

| CASE #(s): | A-588-874 |
|---|---|

| EFFECTIVE DATE: | 06/28/2019 | COURT CASE #: | |
|---|---|---|---|

| PERIOD OF REVIEW: | 03/22/2016 | TO | 09/30/2017 |
|---|---|---|---|

| PERIOD COVERED: | | TO | |
|---|---|---|---|

Notice of Lifting of Suspension Date:

TO:  { Directors Of Field Operations, Port Directors }

FROM:  { Director AD/CVD & Revenue Policy & Programs }

RE:  Cash Deposit instructions for certain hot-rolled steel flat products from Japan (A-588-874)

1.  Commerce has published in the Federal Register (84 FR 31025) on 06/28/2019 the final results of its administrative review of certain producers and/or exporters subject to the antidumping duty order on certain hot-rolled steel flat products from Japan for the period 03/22/2016 through 09/30/2017.

2.  As a result of Commerce's review, the cash deposit rates have been revised for certain companies.  Therefore, for shipments of certain hot-rolled steel flat products from Japan produced and/or exported by the firms listed below, entered, or withdrawn from warehouse, for consumption on or after 06/28/2019, the required cash deposit has been revised:

Producer and/or Exporter:  JFE Steel Corporation/JFE Shoji Trade Corporation
Case number:  A-588-874-002
Cash deposit rate: 6.92%

Producer and/or Exporter:  Hanwa Co., Ltd.
Case number:  A-588-874-003
Cash deposit rate: 6.92%

Producer and/or Exporter:  JFE Shoji Trade America
Case number:  A-588-874-004
Cash deposit rate: 6.92%

Producer and/or Exporter:  Kanematsu Corporation
Case number:  A-588-874-005
Cash deposit rate: 6.92%

Producer and/or Exporter:  Kobe Steel, Ltd.
Case number:  A-588-874-006
Cash deposit rate: 6.92%

Barcode:3863640-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

Producer and/or Exporter:  Mitsui & Co., Ltd.

Case number:  A-588-874-007

Cash deposit rate: 6.92%


Producer and/or Exporter:  Miyama Industry Co., Ltd.

Case number:  A-588-874-008

Cash deposit rate: 6.92%


Producer and/or Exporter:  Nippon Steel & Sumikin Logistics Co., Ltd.

Case number:  A-588-874-009

Cash deposit rate: 6.92%


Producer and/or Exporter:  Okaya & Co. Ltd.

Case number:  A-588-874-010

Cash deposit rate: 6.92%


Producer and/or Exporter:  Saint-Gobain KK

Case number:  A-588-874-011

Cash deposit rate: 6.92%


Producer and/or Exporter:  Shinsho Corporation

Case number:  A-588-874-012

Cash deposit rate: 6.92%


Producer and/or Exporter:  Sumitomo Corporation

Case number:  A-588-874-013

Cash deposit rate: 6.92%


Producer and/or Exporter:  Suzukaku Corporation

Case number:  A-588-874-014

Cash deposit rate: 6.92%


Producer and/or Exporter:  Tokyo Steel Manufacturing Co., Ltd.

Case number:  A-588-874-015

Cash deposit rate: 2.06%


Producer and/or Exporter:  Toyota Tsusho Corporation Nagoya

Case number:  A-588-874-016

Barcode:3863640-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

Cash deposit rate: 6.92%

Producer and/or Exporter:  Nippon Steel & Sumitomo Metal Corporation/Nippon Steel & Sumikin Bussan Corporation /Nisshin Steel Co., Ltd.

Case number:  A-588-874-018

Cash deposit rate: 7.64%

Note:  Nisshin Steel Co., Ltd. merged with Nippon Steel & Sumitomo Metal Corporation as of 03/13/2017.

3.  If any entries of merchandise are exported by a firm other than the producer, then the following instructions apply:

A.  If the exporter of the subject merchandise has its own rate, use the exporter's rate to determine the cash deposit rate.

B.  If the exporter of the subject merchandise does not have its own rate but the producer has its own rate, the cash deposit rate will be the producer's rate.

C.  Where neither the exporter nor the producer currently has its own rate, or the producer is unknown, use the all-others rate for establishing the cash deposit rate.

4.  For all producers/exporters of certain hot-rolled steel flat products from Japan without their own rate, the cash deposit rate is 5.58 percent.

5.  These cash deposit requirements shall remain in effect until further notice.  Do not liquidate any entries of merchandise covered by the administrative review until specific liquidation instructions are issued.

6.  If there are any questions by the importing public regarding this message, please contact the Call Center for the Office of AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, at (202) 482-0984.  CBP ports should submit their inquiries through authorized CBP channels only.  (This message was generated by OVII: ML.)

7.  There are no restrictions on the release of this information.

Alexander Amdur

Company Details

Barcode:3863640-01 A-588-874 REV - Admin Review 3/22/16 - 9/30/17

*Party Indicator Value:

I = Importer, M = Manufacturer, E = Exporter, S = Sold To Party

# EXHIBIT 7

**NOT CAPABLE OF SUMMARY**

# EXHIBIT 8

**NOT CAPABLE OF SUMMARY**

# EXHIBIT 9

**NOT CAPABLE OF SUMMARY**

# EXHIBIT 10

**NOT CAPABLE OF SUMMARY**

**EXHIBIT 11**

**NOT CAPABLE OF SUMMARY**

**EXHIBIT 12**

**NOT CAPABLE OF SUMMARY**

# EXHIBIT 13

**NOT CAPABLE OF SUMMARY**

# EXHIBIT 14

**NOT CAPABLE OF SUMMARY**

**EXHIBIT 2**

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

_____
OPTIMA STEEL INTERNATIONAL LLC,    :
             :
          Plaintiff,    :    Court No.  21-00062
             :
          v.    :    Public Version
             :
UNITED STATES,    :
             :
          Defendant.    :
_____:

## ANSWER

Pursuant to Rule 7(a) of the Rules of the United States Court of International Trade, the

United States, defendant, responds to the allegations of plaintiff's, Optima Steel International

LLC (Optima), First Amended Complaint as follows:

## INTRODUCTION

1.    Admits.

2.    Admits that Optima's hot-rolled steel imports in the subject entries consisted of hot-rolled steel produced by Tokyo Steel Manufacturing Co., Ltd. (Tokyo Steel).  Admits that Optima purchased the imported steel from ███████████, to the extent supported by the commercial invoices reflecting the import transactions, otherwise denies.  Denies the remaining allegations in this paragraph for lack of information or knowledge sufficient to form a belief as to their truthfulness.

3.    Admits with respect to the entries at issue in this case; otherwise denies.

4.    Denies with respect to entries filed before August 12, 2016; otherwise admits.

5.    Admits the first three sentences.  Admits the fourth sentence to the extent supported by the final results of the administrative review, 84 Fed. Reg. 31,025 (June 28, 2019); otherwise denies.

6.    Admits to the extent supported by Message No. 9200303 (July 19, 2019); otherwise denies.

7.    The allegation in this paragraph consists of legal argument and/or conclusions of law to which no response is required.  To the extent a response is necessary, denies the

allegation for lack of information or knowledge sufficient to form a belief as to its truthfulness.

8. The allegation in this paragraph consists of legal arguments and/or conclusions of law to which no response is required. To the extent a response is necessary, denies.

9. The allegation in this paragraph consists of legal arguments and/or conclusions of law to which no response is required. To the extent a response is necessary, denies.

10. Admits the allegation but denies that the protest was a valid protest to the extent it fails to challenge a U.S. Customs and Border Protection (CBP) decision involving the application of the liquidation instructions to the entries at issue.

11. The allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required.

12. The allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required.

13. Admits.

14. Admits.

15. Admits.

16. The allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required.

17. Admits.

## **STATEMENT OF FACTS**

18. Admits that nine Optima entries are the subject of this litigation and Exhibit 1 sets forth copies of these nine import entry summaries. Denies the remaining allegations in this paragraph for lack of information or knowledge sufficient to form a belief as to their truthfulness.

19. Admits that for the nine subject entries, the merchandise was exported by ███████ ████████ and imported by Optima. Otherwise denies the allegations in this paragraph for lack of information or knowledge sufficient to form a belief as to their truthfulness.

20. Admits that the merchandise in the nine subject entries was produced by Tokyo Steel, to the extent supported by the Customs Form 7501 (Exhibit 1) and Exhibit 2, which are the best evidence of their contents; otherwise denies.

2

21.     Admits that the merchandise in the nine subject entries was shipped on the vessels, sailing in the months indicated, and in the quantities listed, to the extent supported by the documents cited, which are the best evidence of their contents; otherwise denies.

22.     Denies as to Line 1 of Entry No. 300-4000499-5; otherwise admits that the entries were comprised of merchandise produced by Tokyo Steel, and admits that the documents in Exhibit 2 support that the merchandise was produced by Tokyo Steel, to the extent supported by those documents, which are the best evidence of their contents; otherwise denies.

23.     The allegation in this paragraph consists of legal arguments and/or conclusions of law to which no response is required.  To the extent a response is necessary, admits that the cash deposit rate applicable to Tokyo Steel was 10.24% until it was changed to 5.58%.  Otherwise denies.

24.     Admits.

25.     Admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with the U.S. Department of Commerce's (Commerce) findings; otherwise denies.

26.     Admits to the extent supported by the AD questionnaire provided as Attachment 3 to Exhibit 5, which is the best evidence of its contents, and to the extent consistent with Commerce's findings; otherwise denies.

27.     Admits to the extent supported by the document cited, which is the best evidence of its contents, and to the extent consistent with Commerce's findings; otherwise denies.

28.     Admits to the extent supported by the document cited, which is the best evidence of its contents, and to the extent consistent with Commerce's findings; otherwise denies.

29.     Admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with Commerce's findings; otherwise denies.

30.     The allegation in this paragraph consists of legal argument and/or conclusions of law to which no response is required.  If a response is necessary, denies the allegation for lack of information or knowledge sufficient to form a belief as to their truthfulness.

31.     Denies the first sentence for lack of information or knowledge sufficient to form a belief as to its truthfulness.  The remainder of the paragraph consists of legal argument and/or conclusions of law to which no response is required.  If a response is necessary, denies the allegations for lack of information or knowledge sufficient to form a belief as to their truthfulness.

32. The allegations in this paragraph consist of legal arguments and/or conclusions of law to which no response is required. If a response is necessary, denies the allegations for lack of information or knowledge sufficient to form a belief as to their truthfulness.

33. Denies the allegations in this paragraph for lack of information or knowledge sufficient to form a belief as to their truthfulness.

34. The allegations in this paragraph consist of legal arguments and/or conclusions of law, to which no response is required. If a response is necessary, admits to the extent supported by the document cited, which is the best evidence of its contents, and to the extent consistent with Commerce's findings; otherwise denies.

35. Admits that Attachment 6 to Exhibit 5 contains pages from Tokyo Steel's Section C response, including Exhibit C-5. The remaining allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required. If a response is necessary, admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with Commerce's findings; otherwise denies.

36. Admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with Commerce's findings; otherwise denies.

37. Denies the allegations in this paragraph for lack of information or knowledge sufficient to form a belief as to their truthfulness.

38. The allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required. If a response is necessary, admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with Commerce's findings; otherwise denies.

39. Admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with Commerce's findings; otherwise denies.

40. The allegations in this paragraph consist of legal argument and/or conclusions of law, to which no response is required. If a response is necessary, denies the allegations for lack of information or knowledge sufficient to form a belief as to their truthfulness.

41. Denies the allegation in this paragraph for lack of information or knowledge sufficient to form a belief as to the truthfulness of the allegations of this paragraph.

42. Admits.

43.     Admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with Commerce's findings; otherwise denies.

44.     The allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required. If a response is necessary, admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with Commerce's findings; otherwise denies.

45.     Admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with Commerce's findings; otherwise denies.

46.     Admits to the extent supported by the documents cited, which are the best evidence of their contents, and to the extent consistent with Commerce's findings; otherwise denies.

47.     Denies the allegations in this paragraph for lack of information or knowledge sufficient to form a belief as to their truthfulness.

48.     The allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required. If a response is necessary, denies the allegations for lack of information or knowledge sufficient to form a belief as to their truthfulness.

49.     The allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required. If a response is necessary, denies the allegations for lack of information or knowledge sufficient to form a belief as to their truthfulness.

50.     Admits that Attachment 11 to Exhibit 5 states an amount of ████████ for "TOTAL QUANTITY." The remaining allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required. If a response is necessary, denies the remaining allegations in this paragraph for lack of information or knowledge sufficient to form a belief as to their truthfulness.

51.     The allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required. To the extent a response is necessary, denies the allegations for lack of information or knowledge sufficient to form a belief as to their truthfulness.

52.     Denies that "{o}n June 19, 2019, the USDOC issued both public and non-public liquidation instructions directing CBP to liquidate subject entries in accord with final results." Admits that on July 19, 2019, USDOC issued non-public liquidation instructions that are provided at Exhibit 7. Admits that on July 9, 2019, USDOC issued public cash deposit instructions that are provided at Exhibit 6.

53. Denies that paragraph 1 of the non-public instructions provided at Exhibit 7 directed CBP to liquidate entries "from ███████████████████████████████"" Admits that paragraph 1 of the non-public instructions provided at Exhibit 7 state a rate of ██████████████████████████ and that █████████████████████████████████ █████████

54. Admits.

55. Admits that on February 18, 2020, plaintiff caused the protest at issue in this case to be filed on its behalf. Denies the remaining allegations in the paragraph.

56. Admits that the protest was denied on April 2, 2020 and that this paragraph accurately quotes part of CBP's denial of plaintiff's protest, which is the best evidence of its contents.

57. Admits to the extent supported by the email from Ms. Jacobson to CBP Supervisory Import Specialist Craig Callies dated April 29, 2020 and provided in Exhibit 10, which is the best evidence of its contents; otherwise denies.

58. Denies the allegations in this paragraph for lack of information or knowledge sufficient to form a belief as to their truthfulness.

59. Admits that on May 4, 2020, Ms. Jacobson filed a Void Protest Denial Request on behalf of Optima in ACE and a copy of the memorandum in support of the request is attached as Exhibit 11, which is the best evidence of its contents; otherwise denies.

60. Admits that on May 5, 2020, CBP's ACE system indicated that Optima's Void Denial request had been denied. For the second sentence, admits to the extent supported by Exhibit 12, which is the best evidence of its contents; otherwise denies.

61. Admits.

62. Admits to the extent supported by Exhibit 11, which is the best evidence of its contents; otherwise denies.

## STATEMENT OF CLAIMS

63. The allegations in this paragraph consist of legal arguments and/or conclusions of law to which no response is required. To the extent a response is necessary, denies.

64. Defendant reasserts and incorporates by reference its answers to paragraphs 1-63 as if stated herein.

65. The allegations in this paragraph consist of legal arguments and/or conclusions of law to which no response is required. To the extent a response is necessary, denies.

66.     The allegations in this paragraph consist of legal arguments and/or conclusions of law to which no response is required.  To the extent a response is necessary, denies.

67.     Defendant reasserts and incorporates by reference its answers to paragraphs 1-66 as if stated herein.

68.     The allegations in this paragraph consist of legal arguments and/or conclusions of law to which no response is required.  To the extent a response is necessary, denies.

69.     The allegations in this paragraph consist of legal argument and/or conclusions of law to which no response is required.  To the extent a response is necessary, denies.

    WHEREFORE, defendant respectfully requests that judgment be entered dismissing this action, overruling plaintiff's claim, sustaining the decision of the appropriate U.S. Customs and Border Protection official and the assessment thereunder, and granting defendant such other and further relief as may be just and appropriate.

                                Respectfully submitted,

                                BRIAN M. BOYNTON
                                Acting Assistant Attorney General

                                JEANNE E. DAVIDSON
                                Director

                        By:     /s/ Justin R. Miller
                                JUSTIN R. MILLER
                                Attorney-In-Charge
                                International Trade Field Office

7

/s/ Hardeep K. Josan
HARDEEP K. JOSAN
Trial Attorney
International Trade Field Office
Department of Justice, Civil Division
Commercial Litigation Branch
26 Federal Plaza, Room 346
New York, New York 10278
(212) 264-9245 or 9230

July 2, 2021                                    Attorneys for Defendant